Howard M. Wood III
James H. Howard
Fiorentino, Howard & Petrone, P.C.
773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136

Kristen K. Waggoner
Roger G. Brooks
Jeffery A. Shafer
Christiana M. Holcomb
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother, | Case No.: 3:20-cv-00201-RNC |
| *Plaintiffs,* | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION, | Dated: February 12, 2020 |
| *Defendants.* | |

<u>TABLE OF CONTENTS</u>

Table of Authorities ...................................................................................................iii

Introduction .................................................................................................................. 1

Factual Background ...................................................................................................... 4

    A. The Plaintiffs ....................................................................................................... 4

    B. The CIAC Policy .................................................................................................. 4

    C. Sex-Specific Physiology and Athletic Performance........................................ 5

    D. The Impact of Male Competition on Female Athletes in Connecticut........... 8

    E. The Defendants' Responsibility for the Policy and Failure to Correct the
        Denial of Equal Opportunities to Girls ......................................................... 9

Argument .................................................................................................................... 11

   I. The CIAC Policy Violates Title IX ...................................................................... 11

    A. The goals and achievements of Title IX ....................................................... 11

    B. Title IX, the 1975 Regulations, and Sex-Segregated Athletics ................... 12

       1.  The Text of Title IX.................................................................................. 12

       2.  The 1975 HEW Regulations ................................................................... 13

    C. As a result of the Policy, CIAC and the Defendant Schools do not provide
        equal athletic opportunities for girls. ........................................................... 16

       1.  The CIAC Policy denies girls equal treatment in athletic opportunities
          and experience................................................................................... 17

       2.  The CIAC Policy does not effectively accommodate the athletic abilities
          of girls. .............................................................................................. 24

   II. The Court should grant a preliminary injunction prohibiting males from
    competing in girls' interscholastic track and field competitions in Connecticut.
    26

    D. Legal standard for preliminary injunctive relief ......................................... 26

       1. Likelihood of irreparable harm.............................................................. 27

       2.  Balance of hardships.............................................................................. 28

       3.  The public interest ................................................................................. 29

Conclusion.................................................................................................................. 31

Certificate of Service................................................................................................. 33

## Table of Authorities

*Cases:*

*American Civil Liberties Union v. Clapper,*
804 F.3d 617 92d Cir. 2015)............................................................................. 27

*Bangerter v. Oren City Corp.,*
46 F.3d 1491 (10th Cir. 1995) ......................................................................... 15

*Barrett v. West Chester University,*
2003 WL 22803477, No. Civ. A. 03–CV–4978, at *14 (E.D. Pa. 2003)............ 28

*Beasley v. Alabama State University,*
966 F. Supp. 1117 (M.D. Ala.1997) ................................................................ 28

*Biediger v. Quinnipiac University,*
691 F.3d 85 (2d Cir. 2012) ................................................................. 13, 15, 18

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
531 U.S. 288 (2001) ........................................................................................ 10

*Brentwood Academy. v. Tennessee Secondary School Athletic Association,*
190 F.3d 705 (6th Cir. 1999) ...................................................................... 22-23

*Cannon v. University of Chicago,*
441 U.S. 677 (1979) .......................................................................................... 4

*Cape v. Tennessee Secondary School Athletic Association,*
563 F.2d 793 (6th Cir. 1977) .......................................................................... 23

*Clark v. Arizona Interscholastic Association,*
695 F.2d 1126 (9th Cir. 1982) ................................................................... 10, 23

*Cohen v. Brown University,*
991 F.2d 888 (1st Cir. 1993) ............................................................... 16, 27, 29

*Communities for Equity v. Michigan High School Athletic Association,*
459 F.3d 676 (6th Cir. 2006) .......................................................................... 15

*Favia v. Indiana University of Pennsylvania,*
812 F. Supp. 578 (W.D. Pa. 1993)................................................................... 28

*Haffer v. Temple University,*
678 F. Supp 517 (E.D. Pa.1987)...................................................................... 15

*McCormick v. School Distrist of Mamaroneck,*
370 F.3d 275 (2d Cir. 2004) ........................................... 9, 13, 15, 17-19, 21, 27

iii

*Neal v. Board of Trustee. of California State University,*
198 F.3d 763 (9th Cir. 1999) ............................................................... 11, 12, 15

*New York Progress and Protection PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013) ........................................................................ 29

*North Haven Board of Education v. Bell,*
456 U.S. 512 (1982) .................................................................................... 11

*Roberts v. Colorado State Board of Agriculture,*
998 F.2d 824 (10th Cir. 1993) .................................................................... 24

*Singas Famous Pizza Brands Corp. v. New York Advertising LLC,*
468 Fed. Appx. 43 (2d Cir. 2012). ............................................................. 27

*Williams v School District of Bethlehem,*
998 F.2d 168 (3d Cir. 1993) ............................................... 11, 14, 23, 25

*United States v. Virginia,*
518 U.S. 515 (1996) ...................................................................................... 7

**Statutes:**

20 U.S.C. § 1681(a). ........................................................................................ 12

**Rules and Regulations:**

34 Code of Federal Regulations § 106.2 (i) ................................................. 10

34 Code of Federal Regulations § 106.41 ...................... 11, 13, 14, 16, 19, 20

40 Federal Regulation 52,656 ............................................................. 22, 26

44 Federal Regulation 71,413 ........................................ 9, 16, 21, 22, 24, 25

**Other Authorities:**

Tumblur, Genderfluid Support,
https://genderfluidsupport.tumblr.com/gender (last visited Feb. 10,
2020) ......................................................................................................... 30

Statement of Dr. Bernice Sandler, Hearings Before The Subcommittee on
Postsecondary Education of the Committee on Education and Labor
House of Representatives at 343 (June 1975),

https://bit.ly/39rvo2 (last visited Feb. 10, 2020) ................................................. 8

1975 Elimination of Sex Discrimination Memorandum,
    http://cdn.loc.gov/service/ll/fedreg/fr040/fr040218/fr040218.pdf ................ 9, 22

Protecting Civil Rights, Advancing Equity 33 (U.S. Dept. of Educ. Office of
    Civil Rights, 2015),
    https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-
    secretary-of-education-2013-14.pdf (last visited Feb. 10, 2020). .................... 11

1996 Clarification of Intervollegiate Athletics Policy Guidance: The Three-
    Part Test,
    https://www.2.ed.gov/about/offices/list/ocr/docs/t9interp.html (last
    visited Feb. 10, 2020) ........................................................................ 13, 18, 24

## Introduction

For decades, Connecticut schools, coordinating through the Connecticut Interscholastic Athletic Conference (CIAC), have provided separate track and field meets, selective post-season competitions, and championship recognitions for girls and boys. Sometime before 2017, however, the schools acting through the CIAC enacted a new policy that permits males to enter, win, and be awarded victories and championships in the "girls'" competitions if that male claims a transgender female gender identity (the "Policy"). In 2017, a male student, Andraya Yearwood, began to compete in the girls' division of CIAC-sponsored track events; in 2018 a second male competitor—Terry Miller—followed.[1]

Whatever the intentions behind the Policy, on the track and on the victory podium it is having a devastating effect on girls—those born with XX chromosomes. It is rendering their athletic opportunities and experiences far inferior to those enjoyed by boys. As a result, the Policy violates the requirements of Title IX, a law specifically enacted to ensure that girls and women receive athletic opportunities and experiences in the educational setting *equal* to those available to boys and men.

Between them, these two male competitors have taken 15 girls' state championship titles formerly held by nine different Connecticut female athletes—often setting records far faster than the best times ever achieved in Connecticut by

---

[1] Because Title IX focuses on equal opportunities between the sexes, because this litigation is precisely concerned with physical and legal effects of biological differences between males and females, because the terms "boys" and "men" are commonly understood to refer to males, and to avoid otherwise inevitable confusion, we refer in this complaint to athletes who are biologically male variously as "boys," "men," or "males," and to athletes who are biologically female as "girls," "women," or "females." We use the names preferred by each student rather than legal names.

1

a girl. They have displaced girls from at least 40 separate opportunities to advance to participate in higher level competitions in the 2017, 2018, and 2019 seasons. Verified Complaint ("V.C.") ¶¶ 64–79. Repeatedly, the top two positions on the victory podium in girls' statewide competitions have been occupied by these two male athletes, leaving room for just one girl in the "third place" slot. V.C. ¶¶ 73, 74. In the seven major state-level competitive events across these three years in which males ran in girls' races, and looking at both the boys' competitions and the girls' competitions for these events, <u>males captured first place in 13 out of 14 events</u>, and <u>23 out of 28 first and second place awards</u>, leaving nothing but crumbs for students who had the misfortune to be born female. V.C. ¶¶ 67–76. It is literally true, as one of the Plaintiffs said, that when girls step up to the starting line to compete against a comparably gifted and trained male, "I can't win." Female athletes in Connecticut are being deprived not just of victories, but of hope and aspiration.

It could hardly be otherwise. Athletics is about physical bodies and physical capabilities, not about subjective identities. The length of leaps is measured, the speed of sprints is clocked, wrestling and tackling is gauged and rewarded. Indisputable science documents that, after puberty, male bodies have radical physiological advantages over comparably gifted and trained females, including larger muscle mass, greater oxygen transport capabilities, and longer and stronger bones, all together providing consistent performance advantages totaling 10%–20% or more in most athletic events—an insurmountable margin in elite competition. V.C. ¶¶ 48. In athletic competition, males have—as even the CIAC Policy itself

recognizes—an "unfair advantage." V.C. ¶ 73. As a result, as Professor Coleman of Duke University has testified before Congress, the world's best women's Olympic athletes "would lose to literally thousands of boys and men." V.C. ¶ 45. Needless to say, the math is even worse for female high school athletes. And as is now actually being seen in Connecticut, "because it takes only three male-bodied athletes to preclude the best females from the medal stand, . . . it doesn't matter if only a handful turn out to be gender nonconforming." V.C. ¶ 45.

Each of the Plaintiffs has been personally impacted by this unfair competition, being denied championships, pushed off the victory podium, pushed down the rankings, and/or eliminated from eligibility for an elite meet. V.C. ¶¶ 70–78. Each of the Plaintiffs will almost certainly suffer further injury as a result of the Policy during 2020 winter season state-level competition and/or during the 2020 spring track and field season.

All of this is directly contrary to the goals of Title IX, and irreconcilable with its requirements. The Defendants' desire to affirm the gender identity asserted by a student grants no exemption to the requirements of Title IX, no license to deprive girls in Connecticut of equal opportunities for fair competition, victory, and recognition.

A track season lasts just a few weeks. Victories that girls have worked towards for years are either won or lost, with no chance for a "do-over." Accordingly, Plaintiffs bring this motion for a preliminary injunction to protect their right to

equal athletic opportunities in the remaining months of this academic year, as well as opportunities for Plaintiff Alanna Smith in the coming academic year.

## Factual Background

A.   The Plaintiffs

Plaintiffs Selina Soule, Chelsea Mitchell, and Alanna Smith are female high school students and varsity track and field athletes in Connecticut who compete in interscholastic girls' track and field competitions. Each of the Plaintiffs has trained hard for much of her life, striving for excellence in performance in her sport, and competes at an elite level in Connecticut. Each has been or hopes to be recruited to run as a varsity women's athlete in college, and likewise hopes to be awarded scholarship grants that will assist in making college affordable for her family. Each Plaintiff has lost titles and/or competitive opportunities as a result of the CIAC policy at the center of this lawsuit, V.C. ¶¶ 86-99, and each will almost certainly lose further titles and/or competitive opportunities in the coming Spring track season unless this Court grants the relief requested. Accordingly, the Plaintiffs have standing to bring this claim pursuant to Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979).

B.   The CIAC Policy

In 2017, pursuant to the Policy adopted by the CIAC, CIAC and member-schools including Defendant Schools began allowing males who claim a transgender identity to compete in girls' athletic events. V.C. ¶ 76. In brief, the CIAC Policy determines—and requires member-schools to determine—eligibility to compete in

sex-specific athletic competitions solely based on "the gender identification of that student in current school records and daily life activities in the school." V.C. at ¶ 71.

The Policy on its face recognizes that a male competing in female events enjoys "an unfair advantage in competitive athletics" (an advantage that self-evidently does not exist where a girl seeks to compete in a boys' team or event), yet it is oddly indifferent to this "unfair advantage" over girls so long as the claim of a cross-gender identity is made in good faith. V.C. ¶ 73.

C.     <u>Sex-Specific Physiology and Athletic Performance</u>

Of course, the "unfair advantage" that males enjoy over females flows from physiology, and depends not at all on "bona fide" intent or subjective gender identity. Dr. Gregory Brown, an expert in exercise physiology and the impact of testosterone on athletic performance, details with scientific precision what everyone knows from common experience: After puberty, boys and men enjoy measurable and large advantages in athletic capability over comparably gifted and fit girls and women. These advantages flow from identifiable and well-understood physiological differences produced by male puberty and circulating testosterone levels fifteen times higher than the upper range of circulating testosterone in healthy females. Declaration of Dr. Gregory Brown ¶¶ 68-72 (attached as Exhibit A). These measurable advantages detailed by Professor Brown include:

a.     Larger lungs and denser alveoli in the lungs, enabling faster oxygen uptake;

b.     Larger hearts and per-stroke pumping volume, and more hemoglobin per unit of blood, all enabling higher short-term and sustained levels of oxygen transport to the muscles;

c.    An increased number of muscle fibers and increased muscle mass (for example, men have 75%-100% greater cross-sectional area of upper arm muscle than do comparably fit women, while women have 60-70% less trunk and lower body strength than comparably fit men);

d.    Higher myoglobin concentration within muscle fibers, enabling faster transfer and "cellular respiration" of oxygen within the muscle to unleash power;

e.    Larger bones, enabling the attachment of greater volumes of muscle fiber;

f.    Longer bones, enabling greater mechanical leverage thus enabling males to unleash more power, for instance, in vertical jumps;

g.    Increased mineral density in bones resulting in stronger bones, providing superior protection against both stress fractures and fractures from collisions;

h.    U.S. adult males are on average 5 inches taller than U.S. adult women.

Indeed, the athletic performance-enhancing effects of testosterone are well known, and the anabolic steroids too often used by athletes to gain an unfair and prohibited advantage are often synthetic modifications of testosterone. V.C. ¶ 44. Basically, from puberty on, boys and men have a large and natural "doping" advantage over girls and women.

Meanwhile, female puberty brings distinctive changes to girls and women that identifiably *impede* athletic performance, including increased body fat levels which—while healthy and essential to female fertility—create increased weight to be carried without providing strength, as well as wider hips and different hip joint orientation that result in decreased joint rotation and running efficiency. Brown Decl. ¶¶ 67, 89-90.

As a result of these many inherent physiological differences between men and women after puberty, male athletes consistently achieve performance records 10%–20% better than comparably fit and trained women across almost all athletic events, with even wider consistent disparities in long-term endurance events and in contests of sheer strength such as weight-lifting. Brown Decl. ¶¶ 25-28, 30, 36-46, 48-50, 63-64. These are inescapable biological facts of the human species, not stereotypes, "social constructs," or relicts of past discrimination. As Justice Ginsberg has written, "Physical differences between men and women . . . are enduring: '[T]he two sexes are not fungible'." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The athletic significance of these "enduring physical differences" is written in bold type in the record books, as Dr. Brown also details. For example, in 2017 alone, thousands of men and boys achieved times in the 400 meter faster than the best lifetime performances of three women Olympic champions in that event. Each year, thousands of men—and dozens or hundreds of high school boys under the age of 18—achieve times (or heights or distances) in track events better than the world's single best elite woman competitor that year. Brown Decl. ¶ 14. In 2018, 275 high school boys ran the 400 meter faster than the lifetime best of Olympic Team USA member and world-record holding sprinter Allyson Felix, while in 2017 thousands of men ran the 400 meter faster than any of the world's three fastest women. V.C. ¶¶ 52; Brown Decl. ¶¶ 14.

The same pattern holds true here in Connecticut. As documented in the Complaint, in event after event, the fastest boys in Connecticut outpace the fastest girls by 10–15%, and *numerous* boys would beat the very fastest girl in each event if track and field were a co-ed sport. V.C. ¶ 46.

But again, it did not require modern science to know this. Testifying in 1975 in support of the Department of Health, Education and Welfare ("HEW") regulations implementing Title IX, Dr. Bernice Sandler—who has been called the "Godmother of Title IX" and credited as the driving force behind its passage— cautioned that ignoring differences in male and female physiology would for many sports "effectively eliminate opportunities for women to participate in organized competitive athletics. For these reasons, such an arrangement would not appear to be in line with the principle of equal opportunity.". V.C. ¶ 35. (citing Statement of Dr. Bernice Sandler, HEARINGS BEFORE THE SUBCOMMITTEE ON POSTSECONDARY EDUCATION OF THE COMMITTEE ON EDUCATION AND LABOR, HOUSE OF REPRESENTATIVES at 343 (June 1975), https://bit.ly/39rvo2H (last visited Feb. 10, 2020).

    D.    <u>The Impact of Male Competition on Female Athletes in Connecticut</u>

Dr. Sandler was correct, and the real-world impact of just two male athletes on the opportunities and experience of girls in track and field competition is evident in Connecticut today. As summarized above and detailed in the Complaint, these two male athletes are taking slots in elite girls' championship meets away from girls, sweeping first and second place "girls'" titles in almost every event in which they enter, and by their very presence denying to all girls even the *hope* of a

8

championship victory. *Supra* pp. 1-2; V.C. ¶¶ 77-99; Declaration of Chelsea

Mitchell ¶¶ 11-37 (attached as Exhibit C). Quite simply, in Connecticut today, those

born female have radically fewer opportunities for success, victory, and recognition

in high school track and field competition than do those born male. If just one more

reasonably competitive male in Connecticut were competing in girls' track events, it

is very likely that in some events, all three victory positions in both the "boys" and

"girls" categories will be taken by males. Girls will simply vanish from the victory

podium and national rankings, erased from their own sports.

And given the recent rapid increases in the numbers of young people

identifying as transgender, there is every reason to expect that—if the CIAC Policy

is permitted to stand—this is what the future holds. This is a present, and a future,

that strikes at the heart of Title IX.

E.  The Defendants' Responsibility for the Policy and Failure to Correct the
Denial of Equal Opportunities to Girls

Defendant Schools are "recipients" of federal funds subject to Title IX. V.C.

¶¶ 19-20.[2] Member schools including all Defendant Schools control CIAC through

the CIAC Board of Control, and adopt CIAC Policies through the CIAC Legislative

Body which is made up of the Principals of all member schools. V.C. ¶ 22. CIAC in

---

[2] While much case law and guidance relevant to Title IX is articulated in the context of collegiate
athletics, Title IX applies with equal force to secondary schools. *See* 34 C.F.R. § 106.41(c) ("[a]
recipient which operates or sponsors interscholastic… athletics shall provide equal athletic
opportunity for members of both sexes"); *Elimination of Sex Discrimination in Athletic Programs*, 40
Fed. Reg. 52,655 (Nov. 11, 1975) (the "1975 Elimination of Sex Discrimination Memorandum".
(Available at http://cdn.loc.gov/service/ll/fedreg/fr040/fr040218/fr040218.pdf); OCR Policy
Interpretation, 44 Fed.Reg. at 71,413 (describing the scope of application of its general principles,
which "often apply to … interscholastic athletic programs, which are also covered by regulation."); M*cCormick v. School District of Mamaroneck*, 370 F.3d 275, 290 (2d Cir. 2004) (applying Policy
Interpretation standards to high school sports).

turn coordinates and governs essentially all High School interscholastic athletic competition in Connecticut, including the track competitions that are the subject of this Complaint. V.C. ¶ 23. In short, there is no doubt that the CIAC is so thoroughly entangled with the recipient schools that it is subject to Title IX. *See* V.C. ¶¶ 21-27; 34 C.F.R. § 106.2(i); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303–305 (2001); *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1128 (9th Cir. 1982).

CIAC and its member schools have chosen to provide track and field competition through separate teams and separate competitions for the two sexes. CIAC and its member schools including Defendant Schools are responsible for the adoption of the Policy. Despite repeatedly being made aware of the fact that the Policy is severely unfair to female athletes and violates Title IX, the CIAC has failed to take any steps whatsoever to change the Policy or in any other way cure the violation, and the Defendant Schools have refused to use their influence to press CIAC to change the Policy and cure the violation. The Defendant Schools have chosen to provide opportunities for track and field competition to their students through events governed by the CIAC policies including the Policy, despite being repeatedly warned that the CIAC Policy is unfair to girls and violates Title IX.

## Argument

### I.    The CIAC Policy Violates Title IX

####    A.    The goals and achievements of Title IX

Title IX is concerned with the status and treatment of the sexes. It was

designed to eliminate significant "discrimination against women in education." *Neal*

*v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999) (citing *North*

*Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523–24 & n.13 (1982)). Before the

enactment of Title IX in 1972, schools often emphasized boys' athletic programs "to

the exclusion of girls' athletic programs," *Williams v. School District of Bethlehem*,

998 F.2d 168, 175 (3rd Cir. 1993), and vastly fewer girls participated in competitive

interscholastic athletics than did boys. Many have argued that the competitive

drive and spirit taught by athletics is one important educational lesson that carries

over and contributes to lifetime success in the workplace, and Title IX applies as

rigorously to athletic programs of schools as to academic programs. 34 C.F.R. §

106.41(a).

Title IX has been strikingly successful towards its intended goals in the

realm of athletics. "For example, between 1972 and 2011, girls' participation in high

school athletics increased from approximately 250,000 to 3.25 million students."

PROTECTING CIVIL RIGHTS, ADVANCING EQUITY 33 (U.S. Dept. of Educ. Office of Civil

Rights, 2015), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-

and-secretary-of-education-2013-14.pdf (last visited Feb. 10, 2020). In college,

women's numbers have grown almost as steeply, from 30,000 to more than 288,000

in 2017–18. V.C. ¶ 39. Title IX is regularly given substantial credit for this change.

Following the United States' famed 1999 Women's World Cup win, the Ninth

Circuit wrote that:

> "The victory sparked a national celebration and a realization
> by many that women's sports could be just as exciting,
> competitive, and lucrative as men's sports. And the victorious
> athletes understood as well as anyone the connection between
> a 27–year–old statute [Title IX] and tangible progress in
> women's athletics."

*Neal*, 198 F.3d at 773.

B.   Title IX, the 1975 Regulations, and Sex-Segregated Athletics

What Title IX requires in the realm of athletics is complicated . . . yet at the

end of the day it is simple fairness.

1.   The Text of Title IX.

Title IX itself is brief, and does not mention athletics specifically:

> "No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or
> activity receiving Federal financial assistance . . . ."

20 U.S.C. § 1681(a).

Plaintiffs believe that the facts reviewed above unambiguously establish that

they are being denied the enjoyment of equal benefits in interscholastic athletic

competition "on the basis of [their] sex," but this is all the more clear in light of

subsequent implementing regulations as well as regulatory and judicial

interpretations of Title IX, as Plaintiffs discuss in detail in Subsection I.B below.

From the start, it has been recognized that Title IX does not require that all

athletic teams and competitions be co-ed. On the contrary, as discussed later below,

multiple voices have recognized that in many sports, Title IX's goal of non-discrimination could *not* be achieved with sex-blind programs. In this, Title IX is quite different from the civil rights statutes that are concerned with race. Indeed, The DOE Office of Civil Rights in a 1996 "Dear Colleague" letter accompanying a formal "Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test" (the "1996 Clarification"), noted that Title IX is "unique" in this respect and in "contrast" to Title VI, which would prohibit without exception "separate athletic programs on the basis of race or national origin."[3]

2.     The 1975 HEW Regulations

In 1975, at Congress' explicit behest, the Department of Health, Education and Welfare promulgated implementing regulations (the "Regulations") that have been recognized as authoritative by all Circuit courts that have considered the question, including the Second Circuit. *McCormick,* 370 F.3d at 288–90. The Regulations made explicit Title IX's application to school athletic programs. Section (a) of the Regulations declares that:

> "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis."

---

[3] Available at https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html (last visited Feb. 10, 2020). The Second Circuit identifies the OCR 1996 Clarification Letter as "entitled to substantial deference under *Auer v. Robbins,* [519 U.S. 452, 461 (1997)]", as it "reflect[s] reasonable agency interpretations of ambiguities in its own regulation, and there is no reason to think that the agency's interpretations do not reflect its 'fair and considered judgment on the matter in question.'" *Biediger v. Quinnipiac University*, 691 F.3d 85, 97 (2d Cir. 2012) (citation omitted).

34 C.F.R. § 106.41(a). Like the text of Title IX itself, the Regulation is sex-neutral on its face, but "it would require blinders to ignore that the motivation for the promulgation of the regulation was to increase opportunities for girls." *Williams*, 998 F.2d at 175.

Section (b) of the Regulations authorizes "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." The reason for this "athletic exception" to the general civil rights and Title IX principle of non-discrimination is, of course, the physiological difference between male and female bodies—the fact that women are on the whole not as fast, strong, tall, or heavy as comparably gifted and trained men. *Supra* pp. 5-8; V.C. ¶¶ 43-55; Brown Decl. ¶¶ 11-113.

Section (c) of § 106.41, for its part, requires that all subject entities "shall provide equal athletic opportunity for members of both sexes," and goes on to provide a non-exhaustive list of 10 factors to be considered in evaluating whether opportunities for both sexes are indeed equal. These include whether the program provides "levels of competition" that "effectively accommodate the . . . abilities of [girls]," and whether the program provides equal opportunities for public recognition or "publicity" to both sexes. 34 C.F.R. § 106.41(c)(1), (10) (emphasis added).

Importantly, multiple courts have held that if a school chooses to provide sex-separated athletic opportunities, then that intentional segregation satisfies the "intent" element of a Title IX violation, leaving only the objective question of

14

whether the opportunities provided are equal. This is because the relevant legal "intent" is the intent to treat persons differently according to sex; proof of animus or *malicious* intent is not required. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *Communities for Equity v. Mich. High Sch. Athletic Ass'n.*, *Haffer v. Temple Univ.*, 678 F. Supp. 517, 527 (E.D. Pa. 1987) (university's "explicit classification of intercollegiate athletic teams on the basis of gender" demonstrated discriminatory intent).

Because the necessary intent to differentiate by sex is established by the simple fact of separate teams, "[a] school's decision to provide students with athletic participation opportunities through separate sports programs for each sex thus necessarily raises a disparate treatment rather than disparate impact claim in that the school decides which athletic opportunities are available to particular students 'on the basis of sex';" once a school has decided to segregate athletics by sex, the question is not whether a particular policy is facially neutral or has a "disparate impact," but whether opportunities accorded one sex "constituted unlawful discrimination under Title IX." *Biediger*, 691 F.3d at 97–98; *see also Neal*, 198 F.3d at 772 & n.8 (9th Cir. 1999) ("Because men are not 'qualified' for women's teams (and vice versa), athletics require a gender conscious allocation of opportunities in the first instance."). Thus, for example, when Brown University applied a gender-neutral across-the-board percentage reduction to the funding and programs for both men and women, the First Circuit analyzed (and rejected) this measure under a

disparate treatment analysis. *Cohen v. Brown Univ.*, 991 F.2d 888, 895–900 (1st Cir. 1993).

C.     <u>As a result of the Policy, CIAC and the Defendant Schools do not provide equal athletic opportunities for girls.</u>

Subsequent regulatory guidance and case law have broken out the "equal athletic opportunity" requirement of 34 CFR § 106.41(c) into two separate evaluations. This division is embodied in the "Policy Interpretation" issued by the Department of Education Office of Civil Rights ("OCR") (successor to HEW) in 1979, 44 Fed. Reg. at 71,413 (the "Policy Interpretation").[4] The Second Circuit has found the Policy Interpretation to be "both persuasive and not unreasonable," and so has accorded it deference in construing Title IX and the Regulations. *McCormick*, 370 F.3d at 289–91.

Starting from the overarching requirement of "equal athletic opportunities" for both sexes, the Policy Interpretation gathers and categorizes non-exhaustive factors 2 through 10 listed in 34 CFR § 106.41(c) as concerned with ensuring that girls receive "equivalent treatment, benefits, and opportunities" in athletics; claims asserting that this is not being achieved are commonly referred to as "equal treatment" claims.

The Policy Interpretation presents a separate analysis for claims based on the requirement of the first factor (34 CFR § 106.41(c)(1)) that separate programs "effectively accommodate the . . . abilities of both sexes;" these are commonly

---

[4] The Federal Register version of the Policy Interpretation is difficult to access, so is provided as Exhibit B hereto. The document is also available on the Department of Education website at https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html (last visited Feb. 10, 2020).

referred to as "effective accommodation" claims. *McCormick*, 370 F.3d at 291 (citing Policy Interpretation and 34 C.F.R. §106.41(c)(1)).

The CIAC Policy violates both of these prongs.

      1.    <u>The CIAC Policy denies girls equal treatment in athletic opportunities and experience.</u>

The Regulation, authoritative regulatory interpretations, and courts have provided a variety of articulations of what makes up the "equal treatment" required by Title IX. None of these articulations are exhaustive; none are inconsistent with basic intuition about fairness and equality. The CIAC Policy runs afoul of one after another.

The Policy Interpretation does not lose track of the big picture, summarizing in an "Overall Determination of Compliance" that the Department will "base its compliance determination . . .upon an examination  of . . . whether the policies of an institution are discriminatory in language or effect." *McCormick*, 370 F.3d at 292 (citing Policy Interpretation, 44 Fed.Reg. at 71,417). Elsewhere in that document the OCR similarly framed the question as whether "program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability" between the sexes. *Id*. (citing Policy Interpretation, 44 Fed.Reg. at 71,415).

Given the physiological facts and real-world impacts on girls in Connecticut reviewed above and at more length in the declaration of Dr. Brown and in the Verified Complaint, it is inescapable that the Policy is at the very least "discriminatory in . . . effect" and that the competitive opportunities provided to

girls in track and field in Connecticut are not remotely equivalent in "kind, quality or availability."

Descending to more specificity, the Policy Interpretation states that "equal treatment" requires equal "opportunities to engage in . . . post-season competition," *McCormick*, 370 F.3d at 289 (quoting 44 Fed.Reg. at 71,416), and the Second Circuit has agreed that "opportunities" must be "real, not illusory." *Biediger v. Quinnipac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012). When girls are excluded from post-season and State-level competition because a male has occupied one of their limited qualifying slots, V.C. ¶¶ 104-05—while of course males also occupy all such slots in the boys' division—then female athletes are not receiving equal opportunities to participate in post-season competition.

More, where girls do get an "opportunity" to compete, in its 1996 Clarification the OCR emphasized that this is not just a game of numbers: the program must provide girls an equal "*quality* of competition." 1996 Clarification (emphasis added). When even the fastest girls in the state must step to the starting line knowing that "I can't win," this is a frankly degraded, illusory, and unequal *quality* of competition. *See* Mitchell Decl. ¶¶ 12, 15, 23-25, 47. And for *all* girls—confronted with male competitors whose participation imposes a "ceiling . . . [girls] cannot break through no matter how hard they strive," *McCormick*, 370 F.3d at 295—their training, striving, and competing without even a *hope* of recognition as a champion is a decidedly second-class "quality of competition."

The Second Circuit has elaborated on this very point at some length: "The greater the potential victory, the greater the motivation to the athletes. . . . A primary purpose of competitive athletics is to strive to be the best." *McCormick,* 370 F.3d at 294–95. In *McCormick*, the Second Circuit rejected as inconsistent with Title IX a scheduling policy that had the effect of foreclosing girls from achieving state-level championships and recognition, observing that this:

> "places a ceiling on the possible achievement of the female soccer players that they cannot break through no matter how hard they strive. The boys are subject to no such ceiling. Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes."

*Id*. at 295.

As the court declaimed elsewhere, "[w]e are unpersuaded by the School Districts' attempt to downplay the significance of the opportunity that they are denying their female athletes but affording their male athletes—*the chance to be State champions*." *McCormick*, 370 F.3d at 279 (emphasis added). Instead, the court found that denying the high school girls "treatment equal to boys *in a matter so fundamental to the experience of sports* denies equality of athletic opportunity to the female students." *Id*. (emphasis added).

The harms ripple outward far beyond the girls on the track. The little sister on the sidelines sees that those born female—like her—can't win, don't win, are not recognized as champions. Athletics is not a direction in which she can hope to strive,

achieve, and win recognition. That "collateral damage" is antithetical to the goals and spirit of Title IX.

Closely related to an equal opportunity for victory—or an equal ability to legitimately *aspire* to victory—is the equal opportunity for "publicity" required by 34 C.F.R. §106.41(c)(10). In part, this provision speaks to equal investments by athletic programs in publicity for girls' or women's athletics. But in track events, the starting place for public recognition is the finish line of the race; those who win are the ones who are photographed, written up in the local newspaper, praised in school assemblies and publications . . . and recognized in long-lived public records.

As a result of the CIAC Policy, girls are denied equal treatment in publicity. For example, Plaintiff Alanna Smith lost out on the recognition as a precocious star that would have come had she been awarded the statewide silver medal in the women's outdoor 200-meter race that she legitimately earned in her freshman year. V.C. ¶ 98.  Likewise, instead of recording Plaintiff Chelsea Mitchell's earned first place performance in the 55 meter race at the 2019 State Open Championship, the CIAC written records give that honor to male runner Terry Miller, and announce Chelsea's accomplishment as a third-place finish (without mentioning that the gold and silver were taken by males). Chelsea was likewise deprived of public recognition as "State Open Champion" and "All State Athlete," which her training and performance on the track had legitimately earned. V.C. ¶¶ 90-94; Mitchell Decl. ¶ 26, 29. The fastest boy in the boys' category, of course, was recognized as the

champion in that division, while male athlete Terry Miller was named "All-Courant girls indoor track and field athlete of the year."  (V.C. ¶ 97.)

Likewise, when male competitors seized the top two slots in the qualifying heat for the state final for the indoor 55 meter event in 2019 (by insurmountable margins), Plaintiff Selina Soule was not just denied the opportunity to participate in the finals, she was also denied the public recognition that surrounds being one of those elite finalists, and was excluded from posted lists of the finalists. V.C. ¶¶ 90-91. No footnote explains that she was indeed one of the seven fastest girls in the state. Here as in every disadvantage reviewed above, "[m]ale athletes do not suffer from any comparable disadvantage." *McCormick*, 370 F.3d at 294. Under the CIAC Policy, female athletes simply do not receive equal opportunities for publicity.

Unequal opportunities for publicity, in turn, lead to unequal opportunities for recruiting and scholarships. Not surprisingly, the Policy Interpretation identifies equality in access to scholarships as one aspect of compliance with Title IX. 44 Fed. Reg. at 71,415. The Second Circuit has rightly observed that if girls are excluded from championship competitions, this is likely to reduce their visibility to college coaches who "do their recruiting at the high level club tournaments. . . ." *McCormick*, 370 F.3d at 282. That case concerned scheduling that prevented participation in post-season competitions, but the same is equally true when girls are excluded from championships and even participation in championship meets because males are filling the qualifying top slots in the "girls" competitions.

21

The simple truth is that because of the unalterable facts of human physiology, in track and field, as in many sports, the *only* way to provide "equal treatment" for girls, and competitive opportunities and experiences that are equal in "kind" and in "quality," is the traditional way: competitions and records separated by sex. If males are permitted to compete in the girls' categories, girls will become invisible in athletics. "The Godmother of Title IX" Dr. Sandler said as much near the beginning. *Supra* p. 8. HEW instructed schools on this point in early guidance, in its 1975 "Elimination of Sex Discrimination" memorandum, writing that programs above the elementary school level (i.e., once boys and girls are changed by puberty), should "determine the relative abilities of members of each sex for each . . . sport offered, in order to decide whether to have single sex teams or teams composed of both sexes . . . [A]n institution would not be effectively accommodating the interests and abilities of women if it abolished all of its women's teams and opened up its men's teams to women, but only a few women were able to qualify for the men's team." 40 Fed.Reg. 52656.[5]

HEW successor OCR made the same point in its binding 1979 Policy Interpretation, stating that schools "must" provide separate competitive opportunities where "[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected." 44 Fed.Reg. at 71,418. In the case of track, of course, the relevant "skill" is

---

[5] Available at http://cdn.loc.gov/service/ll/fedreg/fr040/fr040218/fr040218.pdf (last visited Feb. 10, 2020).

speed, and when the competition is mixed, comparably talented and trained female athletes cannot compete successfully.

Numerous courts have agreed. The Sixth Circuit offered frankly: "It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n.*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds*, as recog'd by *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705 (6th Cir. 1999). The Ninth Circuit, ruling against a boy's challenge to a high school policy excluding males from participating on the girls' volleyball team, affirmed that the exclusion of boys was necessary to secure equal opportunity and treatment for female athletes. *Clark v. Ariz. Interscholastic Ass'n.*, 695 F.2d 1126 (9th Cir. 1982). It found it a "physiological fact" to reveal that "males would have an undue advantage competing against women," and that the record evidence in that case was clear that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions" on the women's team. *Id.* at 1131. The result would be that "athletic opportunities for women would be diminished." *Id.*; *see also Williams,* 998 F.2d at 178 (highlighting expert testimony that "if positions on the field hockey team were open to girls and boys, 'eventually boys would dominate, eliminating the opportunities of females.'").

This is exactly, and predictably, what is happening now in Connecticut to these Plaintiffs, and to many girls.

2.   The CIAC Policy does not effectively accommodate the athletic abilities of girls.

The "effective accommodation" standard of the Regulation articulates different tests than the "equal treatment" standard, but in this context it is simply another window into the same basic unfairness, flowing from the same unalterable physiological differences between the sexes, and the Defendants' refusal to recognize and accommodate those differences.

Speaking to the "effective accommodation" requirement, the Policy Interpretation elaborates that schools must provide "equal opportunity in . . . *levels of competition*," and competitive opportunities "which *equally reflect [girls'] abilities*." 44 Fed. Reg. at 71,417–418 (emphasis added).

Courts interpret this to require that "the *quality of competition* provided to male and female athletes equally reflects their abilities," *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 829 (10th Cir.1993) (emphasis added), and the OCR has agreed that this is a component of "effective accommodation." *See* 1996 Clarification ("OCR also considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students.").

To evaluate whether the competitive opportunities offered are equivalent, the Policy Interpretation offers a two-part test. This test is directed principally at issues of scheduling, but the *goal* it highlights is that men and women athletes enjoy "equivalently advanced competitive opportunities." 44 Fed.Reg at 71,418. In

24

evaluating "effective accommodation," "'[a]thletic opportunities' means real opportunities, not illusory ones." *Williams*, 998 F.2d at 175.

Finally, lest we mistake the various means of measurement for the goal itself the Policy Interpretation reminds us that the "overall" question of compliance with the "effective accommodation" requirement will be based on a determination of "whether the policies . . . are discriminatory in . . . effect," or whether there are "disparities" in the program with respect to benefits, treatment, or opportunities that deny equal opportunity. 44 Fed. Reg at 71,417-418.

Again, the CIAC Policy fails under every one of these tests. On its face, the Policy makes no attempt whatsoever to "accommodate" the distinctive abilities of female athletes. In practice, given that boys have consistent and large physiological advantages in athletic performance, the competitive reality that the Policy presents to girls when competent males run in the girls' division is "Sorry, you lose." When girls face insurmountable competition from males, then they do *not* enjoy "equal opportunity in levels of competition," nor equal "quality of competition." Their opportunity to win—or in many cases even to participate in championship-level competition—is rendered "illusory." Boys, of course, face no such impossible odds when they step to the starting line.

And empirically, as detailed in the Complaint, because the Policy does not accommodate the athletic abilities of girls, girls are not only being denied "equal quality of competition," they are being displaced from large numbers of competitive opportunities and competitive victories. V.C. ¶¶ 77-99; Mitchell Decl. ¶¶ 11-37. The

Policy is decidedly "discriminatory in effect." Again, in the case of track and field, at least, where speed is everything, the *only* mechanism that can "effectively accommodate" the athletic abilities of girls is separate, sex-specific recognition of victories, records, and qualification for advancement to elite competition. As HEW specified 45 years ago, "If by opening a team to both sexes . . . an educational institution does not effectively accommodate the abilities of members of both sexes, . . . separate teams in that sport will be required. . . ." 1975 Elimination of Sex Discrimination Memorandum, supra n. 1, 40 Fed. Reg. at 52,656. Speaking in the context of athletic scholarships, HEW elaborated that "effective accommodation" requires: "criteria which do not inherently disadvantage members of either sex . . . ." *Id.* "For example, when 'ability' is used as a basis for scholarship award and the range of ability . . . differs widely between the sexes, separate norms must be developed for each sex." *Id.* 52656–57. In track events, victory, advancement, post-season opportunities, and recognition all depend entirely on athletic "ability." For all the same reasons, "effective accommodation" of the different capabilities of the sexes requires that sex-separated competition.

**II.   The Court should grant a preliminary injunction prohibiting males from competing in girls' interscholastic track and field competitions in Connecticut.**

    A.    <u>Legal standard for preliminary injunctive relief</u>

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in his favor; and (4) an injunction is in the public interest.

*Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *Cohen.*,

991F.2d at 902) (applying same standard in Title IX context).

The facts and law reviewed above establish a strong likelihood of success on

the merits. The other factors also weigh in favor of granting preliminary injunctive

relief.

        1.   <u>Likelihood of irreparable harm</u>

"A showing of irreparable harm is the single most important prerequisite for

the issuance of a preliminary injunction." *Singas Famous Pizza Brands Corp. v.*

*New York Advertising LLC*, 468 Fed. Appx. 43 (2d Cir. 2012). It hardly needs

elaboration to say that lost chances to run in State finals and other elite meets

(V.C. ¶¶ 104-05); lost chances to win new levels of recognition for one's high school

(V.C. ¶ 94); lost recognition as a remarkable freshman state-wide silver-medalist

(*supra* p. 20); lost gold medals and recognition as a State Open Champion and All

State Athlete (*supra* p. 20)—these are indeed irreplaceable, and cannot be "made

right" by a later monetary award or adjustment to records. These are once-in-a-

lifetime experiences, and lifetime memories. Further, the experience in recent

seasons, in which males have again and again taken the top medals in almost every

girls' event in which they enter, leaves no room to doubt that similar harms to

Plaintiff Alanna Smith—and to other girls in Connecticut—will be repeated in the

Spring 2020 track season if no injunctive relief is granted.

The loss to these Plaintiffs of the experience of *fair* competition; being forced

to labor under a "ceiling on … achievement" and without that sense of *potential* for

victory which the Second Circuit has described as central to athletics, *McCormick,*

370 F.3d at 295—these are less tangible, but no less grave and irreparable. And flowing from this insurmountable unfairness, Plaintiffs suffer emotional distress, anxiety, and even depression and nausea on an ongoing basis, race after race. Cmpl. ¶ 113; Mitchell Decl. ¶ 46-47.

This factor thus weighs strongly in favor of injunctive relief. *See Barrett v. West Chester Univ.*, 2003 WL 22803477, No. Civ. A. 03–CV–4978, at *14 (E.D. Pa. 2003) (issuing a preliminary injunction reinstating a sports team, finding irreparable harm in "the fact that Plaintiffs have a finite period of time in which to compete. . . . Several of the players are in their final year of school and would be denied their last opportunity to compete."); *Favia v. Indiana Univ. of Pennsylvania*, 812 F. Supp. 578, 583 (W.D. Pa. 1993) ("The opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not. We believe that the harm emanating from lost opportunities for the plaintiffs are likely to be irreparable."); *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1127 (M.D. Ala. 1997) ("The mere protractedness of [a] lawsuit should not vitiate the named plaintiff's capacity to vindicate the broad remedial purpose of Title IX.").

2.   Balance of hardships

The "balance of hardships" tips decidedly in Plaintiffs' favor. When males take first place in 13 out of 14 CIAC state-level events across both "boys" and "girls" categories in events in which males were permitted to compete in girls' events; when males are awarded 51 opportunities to participate in state-level competition in those events, while girls are awarded only 31, V.C. ¶ 101; when girls must step to the starting line in the "girls' race" knowing that it is almost certain that a male

will win, V.C.¶¶ 84, 108-113—the harm to girls is dramatic, and stabs at the heart of all that Title IX was crafted to achieve. If Title IX is important, then the very type of hardship that these Plaintiffs are suffering must be rated as severe.

Meanwhile, the requested injunction will restore what has been the status quo within Connecticut athletics since Title IX was enacted and until 2017—providing separate competition categories in track and field based on sex because of the physiological differences and abilities between the sexes—and will ensure fair and equal competitive opportunities and experiences for female athletes while this case is litigated. There will be no financial cost to Defendants from complying with the requested preliminary injunction, and Defendants have no cognizable state interest in maintaining the discriminatory treatment of female athletes at issue in this case.

### 3.   The public interest

Finally, if Title IX is in the public interest, then the requested injunction is in the public interest. Courts have recognized that just as "[t]he Government does not have an interest in the enforcement of an unconstitutional law," *New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal citations omitted), so also "the overriding public interest [lies] in the firm enforcement of Title IX." *Cohen.*, 991 F.2d at 906.

No doubt, it will be urged that there is a public interest in accommodating male athletes who claim a transgender identity. But that goal grants no license to nullify or ignore the requirements of Title IX by according a lower priority to its statutory goal of ensuring fair and equal opportunities to females.

> "Title IX requires that schools provide equal athletic
> opportunity to boys and girls. To base our measurement of the
> significance of a denial of opportunity on the lesser value that
> may be placed on the success of girls in athletic competition
> would be contrary to the mandate of the statute."

*McCormick*, 370 F.3d at 296.

In the same way, even if some would assign a "lesser value" to equal opportunities for girls than they do to the participation choices of male students who assert a transgender identity, that preference "must not play a role in our assessment of the significance of the denial of opportunity to the female athletes in this case." *Id.*

Finally, because it attempts to substitute a purely subjective and self-declared state of mind for the objective reality of the biological sexes which is the concern of Title IX and the express basis for sex-separation of athletic competitions, the CIAC Policy is also incoherent. Advocates assert that "gender" is a "spectrum;" a Tumblr blog currently lists 112 different genders that users may claim. TUMBLR, GENDERFLUID SUPPORT, https://genderfluidsupport.tumblr.com/gender (last visited Feb. 10, 2020). It is not possible to map this subjective concept to the two biological sexes which are not only the concern, but the essential backbone of Title IX, both in logic and in enforcement. There can be no public interest in reducing Title IX to incoherence and thus negating its very purpose.

## CONCLUSION

For the reasons set forth above and in the accompanying Declarations and Verified Complaint, Plaintiffs respectfully request that the Court enter a preliminary injunction in the form submitted herewith.

Respectfully submitted this 12th day of February, 2020.

By:  s/   *Howard M. Wood III*

Howard M. Wood III
CT Bar No. 68780, CT Fed. Bar No. 08758
James H. Howard
CT Bar No 309198, CT Fed. Bar No 07418
Fiorentino, Howard & Petrone, P.C.
773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136
Fax: (860) 643-5773
Email: howard.wood@pfwlaw.com
Email: james.howard@pfwlaw.com

Roger G. Brooks*
NC Bar No. 16317
Jeffrey A. Shafer*
OH Bar No. 0067802
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona  85260
Telephone:  (480) 444-0020
Fax: (480) 444-0028
Email: rbrooks@ADFlegal.org
Email: jshafer@ADFlegal.org

Kristen K. Waggoner*
D.C. Bar No. 242069
Christiana M. Holcomb*
D.C. Bar No. 176922
Alliance Defending Freedom
440 First St. NW, Suite 600

Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: kwaggoner@ADFlegal.org
Email: cholcomb@ADFlegal.org

Attorneys for Plaintiffs

*Motions to Appear Pro Hac Vice pending*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Support of Motion for Preliminary Injunction, which was electronically filed in this case on February 12, 2020, will be served on all Defendants by service of process with the Verified Complaint and its accompanying documents.

/s/ Howard M. Wood III