IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SELINA SOULE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00201-RNC |
| | ) | |
| CONNECTICUT ASSOCIATION OF | ) | |
| SCHOOLS, INC. *et al*, | ) | February 21, 2020 |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANDRAYA YEARWOOD and THANIA | ) | |
| EDWARDS on behalf of her daughter, T.M., | ) | |
| | ) | |
| *Proposed Intervenors*. | ) | |
| | ) | |

**MOTION OF ANDRAYA YEARWOOD AND THANIA EDWARDS,
ON BEHALF OF HER DAUGHTER, T.M.,
TO INTERVENE AS DEFENDANTS**

Andraya Yearwood ("Andraya") and Thania Edwards on behalf of her daughter T.M. ("Terry") move to intervene as defendants as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, alternatively, for permissive intervention under Rule 24(b)(1). The basis for the Proposed Intervenor-Defendants' motion to intervene is set forth below as well as in the accompanying declarations.

The central goal of Plaintiffs' lawsuit is to prevent Andraya, Terry, and others girls who are transgender from participating in Connecticut athletics. Throughout their Complaint and Motion for Preliminary Injunction, Plaintiffs repeatedly refer to Andraya and Terry by name and single out Andraya and Terry as the source of Plaintiffs' alleged irreparable injury. *See, e.g.*, Compl. ¶¶ 14-15, 76-77, 80-104, 130-37, 142, 145-46. Their Complaint is replete with factual

1

inaccuracies about Andraya and Terry personally, as well as about issues and policies that directly impact their lives. Andraya and Terry should not be forced to watch on the sidelines while Plaintiffs attempt to bar them from participating in the 2020 spring track and field season and expunge all record of their past accomplishments. The Court should therefore grant their motion to intervene either as of right, or, in the alternative, permissively.

## BACKGROUND

### Andraya and Terry

Andraya and Terry are track athletes in Connecticut who have spent the past four years participating in Track and Field in accordance with Connecticut law and state policy. Yearwood Decl. [Exhibit 1] ¶ 6; T.M. Decl. [Exhibit 2] ¶¶ 6, 10. Both Terry and Andraya are girls who are transgender, which means that they were assigned a male sex at birth but are young women. Yearwood Decl. ¶ 2; T.M. Decl. ¶ 3. Like non-transgender girls, Terry and Andraya have a female gender identity and live their lives as girls. Yearwood Decl. ¶¶ 2-3; T.M. Decl. ¶¶ 3-5. Andraya is an eighteen-year old student in her senior year at Cromwell High School. Yearwood Decl. ¶ 1. Terry is a seventeen-year old student in her senior year at Bloomfield High School. T.M. Decl. ¶ 1.

From the time she was a child, Andraya has known that she is a girl. Yearwood Decl. ¶ 2. In the summer before eighth grade, Andraya told her parents that she is transgender and started to receive social and medical support for her transition. *Id.* ¶ 2. By the time Andraya started high school, she was known to her family and peers as a girl and participated in all aspects of school consistent with her female gender. *Id.* She has legally changed her name to "Andraya" and has been undergoing hormone therapy for several years. *Id.* ¶ 3. As a result of her medical transition, Andraya's circulating hormones are comparable to the hormone levels of non-transgender girls.

*Id.* In her everyday life and on her track team, Andraya is accepted as a girl by her family, her friends, her teammates, and her coaches. *Id.* ¶¶ 2, 6.

Terry also knew from a young age that she is a girl. T.M. Decl. ¶ 3. She recalls as far back as fifth grade being aware of her female gender but not yet having the language or support to understand what she needed in order to live authentically. *Id.* After years of repressing her identity, Terry came out as transgender in tenth grade and began to live all aspects of her life as a girl. *Id.* ¶ 4. She has since updated her Connecticut birth certificate to accurately reflect her sex as female and is undergoing hormone therapy. *Id.* ¶¶ 4-5. As a result of her hormone treatment, Terry has circulating hormones at levels typical of non-transgender girls and, like Andraya, is accepted as a girl by her family, her friends, her teammates, and her coaches. *Id.* ¶¶ 4, 11-12.

Andraya and Terry love to run, and they both participate in Indoor and Outdoor Track and Field on their respective girls' teams. Yearwood Decl. ¶¶ 4-7; T.M. Decl. ¶¶ 6-8. They participate in track for the same reasons as their non-transgender peers: being a part of a team creates lasting social and emotional relationships; through the training and competition they are able to invest physical and emotional energy and release stress and anxiety; and the experience gives them a place to be free to be themselves and thrive. Yearwood Decl. ¶¶ 4-7; T.M. Decl. ¶¶ 6-8. Like their teammates and other athletes in Connecticut and beyond, they value participation and not an expectation of winning. Yearwood Decl. ¶¶ 4, 11; T.M. Decl. ¶¶ 6, 14. During the season they each train multiple hours per day, five days per week, and push themselves and their teammates to improve. Yearwood Decl. ¶ 7; T.M. Decl. ¶ 7. "I am lucky to live in a state that protects my rights and to have a family that supports me," Andraya explained last year. "This is

3

what keeps me going. Every day I train hard—I work hard to succeed on the track, to support my teammates, and to make my community proud."[1]

Andraya and Terry have both excelled in track and field but, contrary to the allegations by Plaintiffs, their successes have been a result of hard work and are well within the range of high school track times for non-transgender girls. Indeed, some of the Plaintiffs in this case have placed ahead of one or both Andraya and Terry in the 55 meter, the 100 meter and the 300 meter events. Yearwood Decl. ¶ 11; T.M. Decl. ¶ 14. After the Complaint was filed, Plaintiff Chelsea Mitchell placed *first* in the 55 meter race at the Class S State Open in front of both Terry and Andraya. Yearwood Decl. ¶ 11; T.M. Decl. ¶ 14. *But see* Compl. ¶ 67 (asserting that the message sent to non-transgender girls under CIAC's policy is "Give up. You can't win.").

**CIAC's policy**

Under rules established by the Connecticut Interscholastic Athletic Conference ("CIAC"), which serves as the "sole governing body for inter-scholastic athletic activities in Connecticut," Andraya, Terry, and other girls who are transgender participate on girls' sports teams, and boys who are transgender participate on boys' sports teams.[2] The current CIAC policy, which has been in effect since 2013, does not, as Plaintiffs allege, allow students to play on girls' teams based on whether "they claim" to have a female gender identity. Compl. ¶ 2. The governing by-laws of the CIAC dictate student participation based on "the gender identification of that student in current school records and daily life activities in the school and community."

---

[1] Dan Brechlin, *Connecticut high school transgender athletes 'no longer want to remain silent' following Title IX complaint*, Hartford Courant (June 20, 2019), https://www.courant.com/sports/high-schools/hc-sp-transgender-policy-runners-respond-20190619-20190620-5x2c7s2f5jb6dnw2dwpftiw6ru-story.html.

[2] Connecticut Interscholastic Athletic Conference, "About CIAC", http://ciacsports.com/site/?page_id=13.

CIAC, 2019-2020 Handbook: CIAC By-Law, Article IX, Section B at 55 (2019-20). The student's school must verify that the "expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id*. The policy restricts participation to the athletic classification of the student's lived and consistently expressed gender identity and bars participation in athletics of both genders. *Id*.

The CIAC's policy is not unusual. Across the country, the overwhelming majority of high school athletic associations have policies allowing boys and girls who are transgender to play on the same teams as other boys and girls. Athletic associations in eighteen states have policies that—like the CIAC's—allow transgender students to participate without requiring students to establish any proof of medical transition. In an additional eighteen states, the athletic associations allow transgender students to participate without hormone therapy or other medical transition on a case-by-case basis. Other states allow transgender students to participate after beginning hormone therapy. *See* CIAC, Reference Guide for Transgender Policy, https://www.casciac.org/pdfs/Principal_Transgender_Discussion_Quick_Reference_Guide.pdf. Based on the athletic policies that exist in almost every state, Terry and Andraya would be eligible to participate in the girls' category either based on their female gender identity, their updated birth certificate, and/or their hormone levels.

Transgender men and women also continue to participate in competitive athletics at every stage of their careers, and no post-secondary or elite athletic body regulates competition based on chromosomes, the relief requested by Plaintiffs. Compl. Prayer for Relief (C). The National College Athletic Association (NCAA) and the International Olympic Committee allow women

5

who are transgender to compete on women's teams after a period of undergoing hormone therapy.[3]

**Plaintiffs' allegations**

In their Complaint and Motion for Preliminary Injunction, Plaintiffs make a series of misleading and inaccurate assertions about Terry and Andraya, the CIAC policy, and Plaintiffs' alleged injuries, which Terry and Andraya strongly dispute.

Plaintiffs misleadingly allege that allege that CIAC changed its policy "at some time before 2017." Compl. ¶ 70. In fact, CIAC adopted its policy four years earlier, in 2013. *See* CIAC, *CIAC Statement on Transgender Policy Change* (Feb. 20, 2020), http://ciacsports.com/site/?p=14124. For seven years, transgender athletes in Connecticut have been participating in interscholastic athletics consistent with their gender identity. During those seven years—in which tens of thousands of student athletes have competed on single sex teams—Plaintiffs have not identified any support for their claims that "the problem of [girls and women who are transgender] taking opportunities from [non-transgender girls and women] has grown very rapidly," Compl. ¶ 61, that "increasing numbers of [girls who are transgender] are in fact competing in girls' and women's events each year," *id.* ¶ 62, or that non-transgender girls "will simply vanish from the victory podium and national rankings," *id.* ¶ 63.

---

[3] *See* NCAA Office of Inclusion, *NCAA Inclusion of Transgender Student-Athletes* (August 2011) at 13 https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf (permitting men who are transgender to participate on men's teams with no medical intervention and women who are transgender to participate on women's teams after one year of hormone therapy); International Olympic Committee, *IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism* (November 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles /Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf (permitting men who are transgender to compete in the men's category with no medical intervention and women who are transgender to compete in the women's category upon proof of suppressed testosterone for a period of 12 months).

Plaintiffs also allege that Terry and Andraya "abruptly appeared" in girls' track competition. Compl. ¶¶ 76, 87. Neither Andraya nor Terry "abruptly" began competing in girls' track. Rather, both girls spent long periods of their lives coming to terms with their gender, coming out to their friends and family, and then transitioning at school. Yearwood Decl. ¶ 2; T.M. Decl. ¶¶ 3-4. Only then did they begin to compete on girls' teams consistent with the recommendation of medical providers and CIAC policy. Yearwood Decl. ¶ 6; T.M. Decl ¶ 10.

Throughout their Complaint, Plaintiffs also refer to Andraya and Terry as "biological males" but offer no consistent definition of "biological male." There are many biological components of sex, including chromosomal, anatomical, hormonal, and reproductive elements. These elements do not always align within an individual as typically male or typically female, either because that individual has intersex traits or because that individual has undergone medical care for gender dysphoria. For these reasons, the Endocrine Society has said "the terms 'biological sex' and 'biological male or female' are imprecise and should be avoided." *See Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018). Plaintiffs appear to equate "biological sex" with chromosomes, Compl. ¶¶ 4, 67, 101, but all of their alleged "inescapable biological facts," *id.* ¶ 47, are the result of hormones—not chromosomes.

For example, Plaintiffs focus on alleged athletic advantages resulting from "male puberty," but as a result of puberty blockers and hormone therapy, many transgender girls go through a typically female puberty, and many transgender boys go through a typically male puberty. A girl who is transgender and who has XY chromosomes undergoing puberty blocking treatment, therefore, would have none of alleged advantages of "male puberty" that Plaintiffs attribute to "biological males." Even if a girl who is transgender begins puberty based on her sex assigned at birth, there is no evidence to support the assumption that girls who are transgender

7

and who receive hormone therapy retain any of the alleged advantages identified by Plaintiffs as being outside the range of performance for non-transgender girls. *See* NCAA Inclusion of Transgender Student-Athletes at 7.

Referring to Andraya and Terry as "males," Plaintiffs claim that "if males compete in girls' events after puberty, equally gifted and dedicated female athletes simply can't win." Compl. ¶ 60. But neither Terry nor Andraya is undefeated and neither have dominant race times among high school girls nationally. Plaintiffs list the best 2019 Outdoor times for the 100m for girls, *see id.* ¶ 54, and the best times listed for Terry and Andraya do not come close to the best times registered for the presumably non-transgender girls on that list, *see id.* ¶¶ 80, 86, 89. Thus, based on the allegations in the Complaint alone, it is demonstrably untrue that a non-transgender female athlete "can't win" in a race with a transgender athlete. Indeed, two days after filing the complaint, Plaintiff Chelsea Mitchell beat *both* Terry and Andraya in the 55 meter race and beat Terry in the 300 meter race at the Connecticut State Championship for Class S for the 2020 Indoor Track & Field season. T.M. Decl. ¶14; Yearwood Decl. ¶ 11.

In their Complaint, Plaintiffs also claim that their alleged deprivation of participation at championship meets cost them "the visibility necessary to attract the attention of college recruiters and resulting scholarships." Compl. ¶ 103. But Plaintiffs make no allegations that college recruitment and the resulting scholarships are linked to participation in certain meets or tied to a threshold of media coverage, as opposed to result times alone. All track and field race times are publicly available and college recruiters can assess a runner's skill, consistency, and improvement through high school based solely on result times. T.M. Decl. ¶ 16.

## ARGUMENT

### I. Andraya and Terry Are Entitled To Intervene As of Right

"To intervene as of right, a movant must: (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001) (internal quotation marks omitted). *See* Fed. R. Civ. P. 24(a)(2). Andraya and Terry satisfy every element of this test.

#### A. Andraya and Terry's Motion Is Timely.

Andraya and Terry's motion to intervene is timely because it has been filed only nine days after Plaintiffs' complaint, and before any responsive pleadings have been filed by Defendants. *See Tyson v. Alvarez*, No. 17-cv-731, 2018 WL 5961425, at *1 (D. Conn. Nov. 14, 2018) (holding that motion to intervene was timely where "one defendant has not yet been served" and "discovery has only recently commenced"); *Privacy Matters v. United States Dep't of Educ.*, No. 16-CV-3015 (WMW/LIB), 2016 WL 6436658, at *3 (D. Minn. Oct. 27, 2016) (same where "Defendants have not yet answered Plaintiffs' complaint, no scheduling order has been issued, and discovery has not begun"); Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2002) (explaining that "an application made before the existing parties have joined issue in the pleadings has been regarded as clearly timely").

#### B. Andraya and Terry Have a Protectable Legal Interest that Could Be Impaired By Disposition of This Action.

Andraya and Terry have a protectable legal interest in being able to compete in the spring track and field season and in protecting records of their past accomplishments. "For an interest to be cognizable by Rule 24(a)(2), it must be direct, substantial, and legally protectable." *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) (internal quotation

marks omitted). In this case, Plaintiffs' lawsuit poses a direct and substantial threat to Andraya and Terry's interests, which are protected under Connecticut law, Title IX, and the Equal Protection Clause. The relief that Plaintiffs seek is an injunction prohibiting Andraya and Terry from competing in the spring season of track and field and expunging Andraya and Terry from the records of any previous track-and-field season in which they competed.

In similar situations, district courts have routinely held that transgender students have a legally protectable interest when non-transgender students challenge policies at their school protecting them from discrimination. *See Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-CV-753, 2019 WL 2052110, at *9 (S.D. Ohio May 9, 2019) (granting intervention to transgender student who "established a specific and direct interest in the subject matter of this litigation, which involves [her school's] Non-discrimination Policy and its application and enforcement for the protection of transgender students"); *Privacy Matters*, 2016 WL 6436658, at *3 (holding that Jane Doe, a transgender student, had standing to intervene because "Plaintiffs seek preliminary and permanent injunctive relief that would require Doe's school to prohibit Doe from using the school restrooms and locker rooms that align with her gender identity" and explaining that "if Plaintiffs prevail on the merits, she will suffer an injury because her school will immediately stop providing her with equal treatment as required under Title IX, 20 U.S.C. §§ 1681, *et seq*., and the Equal Protection Clause of the United States Constitution"); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, No. 2:16-CV-524, 2016 WL 4269080, at *4 (S.D. Ohio Aug. 15, 2016) (holding that Jane Doe, a transgender student, had substantial interest allowing her to intervene in lawsuit seeking to exclude her from using the girls' restrooms).

The Second Circuit's decisions in *Bridgeport Guardians,* 602 F.3d at 473, and *Brennan*, 260 F.3d at 129, are instructive. In both cases, white male employees were allowed to intervene as defendants in employment discrimination cases brought against their employers. The intervening white male employees argued that granting relief to the original plaintiffs, who alleged discrimination against women and racial minorities, would adversely affect intervenors' own employment status and seniority rights. The Second Circuit held that the white male employees could intervene because their legal interests were "the mirror image" of the claims asserted by the original plaintiffs. *Brennan*, 260 F.3d at 130. The white male employees had a right to intervene because the central issue in the case was "whether the remedy [requested by the original plaintiffs] restores circumstances that would have existed but for discrimination or is itself discrimination [against the intervenors]." *Id.* at 130-31; *see Bridgeport Guardians*, 602 F.3d at 474.

The same is true here. Plaintiffs have alleged that allowing Andraya and Terry to play on the same track and field team as other girls violates Plaintiffs' rights under Title IX. Andraya and Terry's defenses are "the mirror image" of those claims. Granting Plaintiffs' requested injunctive relief and banning Andraya and Terry would not remedy any legally cognizable discrimination against Plaintiffs, but would instead constitute unlawful discrimination against Andraya and Terry. *See*, *e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (treating boy who is transgender differently than other boys in the context of single-sex restroom access violates Title IX); *Grimm v. Gloucester Cty Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019) (same); *Adams v. Sch. Bd. of St. Johns Cty*, 318 F. Supp. 3d 1293 (M.D. Fla. 2018) (same); *M.A.B. v. Bd. of Educ. of Talbot Cty*, 286 F. Supp. 3d 704, 719-22 (D. Md. 2018) (same); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (same).

### C. Movants' Interests Are Not Adequately Represented By an Existing Party.

Andraya and Terry's interests are not adequately protected by the current defendants. The burden to demonstrate inadequacy of representation is "minimal," *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972), but the Second Circuit has "demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective," *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001). Specifically, "[w]here there is an identity of interest . . . the movant to intervene must rebut the presumption of adequate representation by the party already in the action." *Id.* at 179-80. "[R]epresentation by an existing party is determined to be adequate only if the party's 'interests are so similar to those of the intervenor that adequacy of representation is *assured*.'" *Willis v. Firestone Bldg. Prod. Co.*, 231 F.R.D. 447, 449 (D. Conn. 2005) (quoting *Brennan*, 260 F.3d at 133) (brackets omitted) (emphasis added by *Willis*).

In this case, Andraya and Terry seek to defend the lawfulness of Defendants' policy, but their interests and Defendants' interest are not "so similar . . . that adequacy of representation [is] assured." *Brennan*, 260 F.3d at 133. As the Second Circuit explained in *Brennan*, a defendant faced with competing discrimination claims "may . . . behave like a stakeholder rather than an advocate" because the defendant may have "an equally strong or stronger interest in bringing such litigation to an end by settlements." 260 F.3d at 133; *see also Briscoe v. City of New Haven*, 654 F.3d 200, 203 (2d Cir. 2011) (holding in context of non-party preclusion that city defending racial discrimination claim by white applicants did not adequately represent the interests of non-white applicants with contrary discrimination claims "because their interests are widely divergent").

Once again, the same is true here. Faced with the prospect of expensive litigation, Defendants' have an interest in defending their policy, but they also have an interest in bringing the litigation to a speedy and inexpensive conclusion. Andraya and Terry are the only potential parties with an undivided interest in protecting their rights to equal treatment. *See* Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 ("Since the rule is satisfied if there is a serious possibility that the representation may be inadequate, all reasonable doubts should be resolved in favor of allowing the absentee, who has an interest different from that of any existing party, to intervene so that the absentee may be heard in his own behalf.").

Moreover, although Defendants may be willing to defend the lawfulness of their current athletic policy, they may not have a similar incentive to argue that the policy is legally required by Title IX and the Equal Protection Clause. *See N.Y. Pub. Interest Research Grp. v. Regents of Univ. of State of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (granting intervention because intervenors would "make a more vigorous presentation of the economic side of the argument than would the [defendants]"); *Meriwether*, 2019 WL 2052110, at *12 (holding that transgender student's interests were not adequately represented by university defending nondiscrimination policy because university did not affirmatively argue that the policy was required by the Constitution and Title IX).

Finally, Defendants have neither the same incentive nor the same ability as Andraya and Terry to rebut the numerous factual inaccuracies in Plaintiff's complaint and to ensure that their personal information and history is correctly presented. Terry and Andraya are best positioned to contest the allegations that are directed at them personally, to provide their responses to the Plaintiffs' alleged injuries, and to accurately and fully identify the harms that would result from Plaintiffs' requested relief. They deserve the opportunity to answer these inaccuracies directly,

rather than relying on the Defendants to do so with only partial information. *See*, *e.g.*, *Day v. Sebelius*, 227 F.R.D. 668, 674 (D. Kan. 2005) (granting intervention where "none of the[] existing defendants are or ever will be personally impacted by [the challenged law]. The proposed intervenors may have access to evidence that the government of the state of Kansas and the officials of Kansas colleges may not have.")

## II. In the Alternative, Andraya and Terry Should Be Granted Permissive Intervention.

Andraya and Terry also satisfy the requirements for permissive intervention under Rule 24(b)(1). On a timely motion, the Court may permit anyone to intervene who has a claim or defense that shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b)(1). In exercising its discretion, the Court "considers substantially the same factors" as for an intervention as of right. *"R" Best Produce v. Shulman-Rabin Marketing*, 467 F.3d 238, 240 (2d Cir. 2006). "A district court may grant a motion for permissive intervention if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (quoting Fed. R. Civ. P. 24(b)(2)).

Permissive intervention is particularly appropriate here because the Defendants may face multiple lawsuits with conflicting results if Andraya and Terry are not joined as parties. Indeed, Federal Rule of Civil Procedure 19(a)(1)(B) specifically instructs that a person is considered an "indispensable party" if they "claim[] an interest relating to the subject of the action and [are] so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." *See Briscoe*, 654 F.3d at 203 (advising that when faced with potential

14

competing discrimination suits, an employer should join all interested parties so they can be bound by the same litigation).

The same considerations support granting permissive intervention here. If Andraya and Terry are not permitted to intervene, a settlement or other resolution of the case would likely lead to subsequent litigation by Andraya, Terry, and other transgender student-athletes whose rights are affected under the resolution but not represented in the litigation. *See Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16 C 4945, 2016 WL 3269001, at *3 (N.D. Ill. June 15, 2016) (allowing transgender student to intervene because granting the motion to intervene could obviate subsequent lawsuits).

## CONCLUSION

For all the foregoing reasons, the Motion of Andraya and Thania Edwards on behalf of her daughter T.M. to Intervene should be granted.

Respectfully submitted,

\_\_/s/ Dan Barrett_____
Dan Barrett (# ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

Chase Strangio*
Joshua A. Block*
Lindsey Kaley*
James D. Esseks*
Galen Sherwin*
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
cstrangio@aclu.org

jblock@aclu.org
lkaley@aclu.org
jesseks@aclu.org
gsherwin@aclu.org

*Pro hac vice admissions pending