UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother,<br><br>*Plaintiffs*,<br><br>v.<br><br>CONNECTICUT ASSOCIATION OF SCHOOLS d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION,<br><br>*Defendants.* | Case No.: 3:20-cv-00201(RNC)<br><br><br>**MEMORANDUM IN OPPOSITION TO MOTION OF ANDRAYA YEARWOOD AND THANIA EDWARDS ON BEHALF OF TERRY MILLER[1] TO INTERVENE AS DEFENDANTS**<br><br><br>February 26, 2020 |

Movants Andraya Yearwood and Terry Miller reveal a mistaken understanding of the standards governing intervention under Fed. R. Civ. P. 24. In seeking intervention under that rule, proposed intervenors "bear[ ] the burden of demonstrating that [they] meet[ ] all requirements for intervention." *Mehedi v. Memry Corp.*, No. 3:17-CV-809 (CSH), 2017 WL 2873224 at *4 (D. Conn. 2017). Among other considerations, "the movant to intervene must rebut the presumption of adequate representation by the party already in the action." *Butler,*

---

[1] In their public filing (ECF 36 at 4 n.1), Proposed Intervenors provide a link to a June 2019 newspaper article (attached as Exhibit A hereto) entitled "Connecticut high school transgender athletes 'no longer want to remain silent' following Title IX complaint," which identifies Terry Miller by name, and includes a photograph of Terry and quotations from an interview given by Terry to a reporter.

1

*Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179-80 (2d Cir. 2001). Proposed Intervenors make no effort to offer any facts that could meet that burden. Instead, they devote a lengthy "Background" section to rhetoric, to pre-arguing the merits, and to beginning a process of so thoroughly draining all meaning out of language used to denote the sexes that a coherent discussion of Title IX would become impossible.

      A.      <u>The "Background" assertions of Proposed Intervenors are mistaken or misleading.</u>

This is not the place to prove up the facts; Plaintiffs will offer only a few remarks on assertions made in Proposed Intervenors' "Background."

*First*, Plaintiffs will not cede the linguistic field to confusion and false statements. Sex is not "assigned" at birth (Mem. 2); it is not "assigned" by any human, ever. Instead, it is an objective fact that exists from the moment of conception, and from that instant every nucleated cell in the child's body is either XX or XY. The sex of a child can be accurately identified at birth in over 99.98% of cases,[2] simply with a glance.

The new human with XY chromosomes will develop male reproductive organs and—barring developmental defect—will mature to produce sperm and be able to father children. The new human with XX chromosomes will develop female reproductive organs, and—again barring developmental defect—will mature to produce ova and be able to carry and give birth to new human life. What we were taught in sixth grade biology is true. The English language words for

---

[2] Invocation of the rare genetic or developmental defects that result in "intersex conditions" is a red herring. Evolutionary biologist Dr. Colin Wright explains that "[b]iological sex in humans … is clear-cut over 99.98 percent of the time. [I]ntersex conditions correspond to less than 0.02 percent of all births, and intersex people are *not a third sex*." https://quillette.com/2018/11/30/the-new-evolution-deniers/. Dr. Wright goes on to observe that "any method exhibiting a predictive accuracy of over 99.98 percent would place it among the most precise methods in all the life sciences. We revise medical care practices and change world economic plans on far lower confidence than that." *Id*.

those with XX chromosomes and female reproductive organs are "female," "woman," "girl," and "she," and Plaintiffs use those words in that sense.

Proposed Intervenors (and many other voices) would lead the Court down a rabbit hole into a reversed land where the measurable, objective, biological facts of sex are disparaged as "imprecise" and to be "avoided" (Mem. 7), while the purely subjective, immeasurable, and indeed fluid[3] and "expressed gender identity" (Mem. 5) is to be treated as the supreme fact. But whatever philosophers might make of that inversion, this lawsuit concerns Title IX, and Title IX is concerned with and will not permit us to "avoid" the objective and binary categories of the male and female sexes.

*Second*, while Proposed Intervenors assert that a male who undergoes "puberty blocking . . . would have none of the alleged advantages of 'male puberty' that Plaintiffs attribute to 'biological males'" (Mem. 7), the Court will note that neither of them claim that this describes themselves. Miller makes no claim to have used puberty blockers at all to prevent the process of male puberty, and Yearwood is quite vague on the topic, stating nothing of duration of puberty blocker use, and claiming only to have avoided "full" male puberty.

Related to this, it is never true that "many transgender girls go through a typically female puberty." (Mem. 7.) "Typical female puberty" involves the maturation of ovaries, the commencement of ovulation and menses, and achievement of fertility. Indeed, that's the point. None of these ever occur in a male placed on cross-sex hormones, at whatever age.

---

[3] "The ACLU defines gender identity as a person's internal sense of being a man or a woman (or both or either)." https://www.aclunv.org/sites/default/files/kyr-gender_idenity_and_expression_2016_0.pdf. Similarly, the Human Rights Campaign defines gender identity as "[o]ne's innermost concept of self as male, female, a blend of both or neither – how individuals perceive themselves and what they call themselves." https://www.hrc.org/resources/glossary-of-terms. A person can have "a fluid or unfixed gender identity." *Id.*

*Third*, the fact that the NCAA and high school leagues in several states have policies similar to that of the CIAC is irrelevant. When Title IX was passed, many—perhaps most—schools had athletic programs and budgets that disadvantaged girls and women. Title IX aims to remedy and prevent that state of affairs. (Verified Complaint ("V.C.") ¶¶ 33-39.) If the CIAC Policy is disadvantaging girls and young women, then Title IX is violated, and there is no strength in numbers.

*Fourth* and finally, Chelsea Mitchell's victory over Miller in the 55 Meter Dash after the filing of Plaintiffs' complaint, at the recent Connecticut Indoor State Open Track and Field Championships (Mem. 4),[4] in no way contradicts Plaintiffs' case or allegations. Of course, the fastest girls and women can beat some boys and men (although in fact Miller's personal best in the 55 meter is much faster than Chelsea's).[5]  What Plaintiffs alleged—and what is true—is that due to physiological differences, female athletes cannot beat "comparably talented and trained" males. (*See, e.g.,* V.C. ¶ 42.) And if Chelsea beat Miller by a hair in a particular race, Miller nevertheless deprived one girl of the second-place title in that race, and pushed the third-fastest girl off the victory podium entirely. The decisive fact relevant to the requirements of Title IX is not Chelsea herself or a single race, but the widely disparate opportunities for success currently available in Connecticut high school track competition, with those born male taking "first place in 13 out of 14 [identified] state championship events," taking "23 out of 28 first and second

---

[4] Proposed Intervenors mistakenly assert that in the 55-meter race Chelsea also finished "in front of" Andraya Yearwood (Mem. 4). Andraya false-started and thus was excluded from the 55-meter competition. *See* https://www.athletic.net/TrackAndField/meet/388186/results/f/1/55m (recording Andraya Yearwood's "FS" (false start) and no time recorded due to disqualification).
[5] Terry's personal best in the indoor 55 meters is 6.91 seconds (https://www.athletic.net/result/JdiXO4MuK4Sy0ZzACA/); Chelsea's personal best is 7.14 seconds (https://www.athletic.net/result/W3iYKVAClQSxeQ8vhZ/).

place awards" in those same events, and occupying almost 2/3 of the opportunities to participate in higher-level state competition. (V.C. ¶¶ 99-101.)

      **B.**    <u>Proposed Intervenors are not entitled to intervene as of right.</u>

Evidence concerning Yearwood and Miller can be introduced through declarations and discovery. The question at present is only whether they should be parties in Plaintiffs' lawsuit in which Plaintiffs are asserting their rights under Title IX against educational entities subject to the requirements of that law. They should not be.

It is "a fairly common situation" for non-parties to seek intervention to "defend an action of the government which the government itself is defending." *Schaghticoke Tribal Nation v. Norton*, 65 Fed.R.Serv.3d 157, 2006 WL 1752384 at *5 (D. Conn. 2006). But as noted above, in order to intervene as of right, the Proposed Intervenors bear a burden to "rebut the presumption of adequate representation," *Butler*, 250 F.3d at 179-80, and "in the absence of evidence to the contrary," courts presume the government will adequately represent the aligned interests of non-parties, *Schaghticokem*, 2006 WL 1752384 at *5. Indeed, where governmental defendants and the proposed intervenors "have the same ultimate objective," the Second Circuit "demand[s] a more rigorous showing of inadequacy" of representation of movants than is otherwise required. *Butler*, 250 F.3d at 179-80 (*quoting Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). That showing cannot be made, nor that presumption rebutted, by means of "conclusory allegations and hypothetical disagreements." *In re Ambac Financial Group, Inc. Derivative Litigation*, 257 F.R.D. 390, 393 (S.D.N.Y. 2009). Yet Proposed Intervenors offer nothing else.

The CIAC and its member schools adopted the challenged cross-sex participation policy some years ago, and have emphatically refused to consider any changes to it despite its visible impact on girls and vocal objections from parents. (V.C. ¶¶ 116-124.) Defendants have maintained the policy in the face of a formal Office of Civil Rights investigation of its violation

of Title IX. (V.C. ¶¶ 116-124.) In the Hartford Courant article cited by Proposed Intervenors, CIAC Executive Director Glenn Lungarini is quoted vigorously defending the Policy. (See Exhibit A.) In sum, the named defendants have shown every indication of an intent to vigorously defend the challenged policy.

Yearwood and Miller nevertheless speculate that the school boards and the CIAC "have an interest in bringing the litigation to a speedy and inexpensive conclusion" rather than vigorously defending their Policy. (Mem. 13). But that is indeed mere speculation, of a type that the Fifth Circuit has instructively discussed and rejected:

> The mere possibility that a party may at some future time enter into a settlement cannot alone show inadequate representation. If this were so, the requirement that the would-be intervenor show inadequacy of representation would be effectively written out of the rule, for it is always a possibility that the present parties will settle a lawsuit.

*Bush v. Viterna*, 740 F.2d 350, 358 (5th Cir.1984), quoted by *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton*, 178 F.R.D. 39, 44 (E.D.N.Y. 1998); *see also Weller v. Actors' Equity Ass'n*, 93 F.R.D. 329, 330 (S.D.N.Y.1981) (a proposed intervenor's conclusory assertion that a named party might decide to settle does not suffice to show inadequate representation).

Next, Yearwood and Miller propose that the named defendants "may not have a similar incentive to argue that the policy is legally required by Title IX and the Equal Protection Clause." (Mem. 13.) But this, too, is inadequate. *See Washington Elec. Co-op, Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92 (2d Cir. 1990) ("a putative intervenor's interest is not inadequately represented merely because its motive to litigate is different from that of a party to the action."). The vital consideration is the shared goal, not the individual reasons for wanting to achieve that goal. *Natural Res. Def. Council, Inc. v. New York State Dep't of Envtl. Conservation*, 834 F.2d 60, 62 (2d Cir. 1987) (whatever putative intervenors' unique

economic interests may be, "there has been no showing that the nature of those economic interests is related to colorable legal defenses that the public defendants would be less able to assert.").

Yearwood and Miller also speculate that the named defendants will not have the reason or ability to rebut the alleged "factual inaccuracies" presented in Plaintiffs' complaint. (Mem. 13.) They do not identify which alleged "inaccuracies" they refer to, why the named defendants would not address them through the discovery and evidentiary process, or how these contested allegations relate to the resolution of the case. Such mere speculation and say-so do not meet Proposed Intervenors' burden. *Cf. Great Atlantic & Pacific Tea Co.*, 178 F.R.D. at 43 (rejecting as "speculative" the notion that the movant "might be more persuasive" due to its particular perspective and expertise).

Movants additionally contend that only they can "accurately and fully identify the harms that would result from Plaintiffs' requested relief." (Mem. 13.) But even if true, this does not call for intervention. To the extent relevant, their voices can be fully heard through the discovery and trial process. Given the adequacy of the representation, there is no reason to doubt that they will be. And the relevance of their individual harms is far from clear. Title IX enforcement and compliance by federal funds recipients regularly and notoriously results in harm to the interests of male athletes, both as individuals and teams. This is a legislative policy choice, and the fact that some are disadvantaged by that choice neither militates against enforcement of Title IX, nor justifies intervention. In a previous filing, Plaintiffs noted that:

> Yearwood and Miller cite not a single [Title IX athletics] case in which students whose interests or wishes would be adversely impacted by the requested relief were joined as parties, necessary or otherwise. And yet such collateral impact is often in view. In *McCormick v. School District of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004), for example, options for remediation suggested by the Second Circuit included "moving boys'

7

> soccer to the spring" or relegating boys to spring soccer in "alternating years"—both "solutions" which would deprive boys of the very opportunities for championship competition which the Court found to be so important for girls. *Id.* at 297, 302. . . . Yet the Second Circuit suggested no need for either the boys or the girls who would be negatively impacted to be represented in that litigation . . . .

Pl. Mem. in Reply to Filing of Non-Parties Yearwood and Miller, ECF 24, at 2-3. Proposed Intervenors still cite no such case.

In contrast to these speculations and inadequate arguments, the types of evidence that typically rebut the presumption of adequate representation by a named party include "evidence of collusion, adversity of interest, nonfeasance, or incompetence." *Butler, Fitzgerald & Potter*, 250 F.3d at 180. Yearwood and Miller present no evidence of any such defect. And their citations to the fact-specific conclusions of other courts concerning other litigants defending different laws or policies (Mem. 12-13) is not evidence that can satisfy Proposed Intervenors' burden to rebut a presumption of adequate representation. *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016) ("courts applying Rule 24 'must be mindful that each intervention case is highly fact specific and tends to resist comparison to prior cases'") (citation omitted). In sum, Yearwood and Miller are not entitled to intervene as of right under Rule 24.

    **C.**    <u>Permissive intervention should not be granted.</u>

No doubt courts have considerable discretion to permit or decline permissive intervention. *Brennan*, 579 F.2d at 191. But that does not leave it appropriate or desirable absent a showing of good cause.

One of the considerations relevant to a request for permissive intervention is the adequacy of representation by the named parties of the movant's interests. *United States v. New York City Housing Auth.*, 326 F.R.D. 411, 418 (S.D.N.Y. 2018). As detailed above, movants have made no showing of inadequate representation.

A court's "principal consideration" when addressing permissive intervention, however, is "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978); Fed.R.Civ.P. 24(b)(3). Here, there is concrete reason to fear that complication and delay is a motive and will be a result of the requested intervention. In their first filing with this Court as non-parties, Yearwood and Miller announced that their first step, if they are joined as parties, will be "to move for an extension of time to respond to the Motion for Preliminary Injunction," ECF 20 at 5, asserting that they were "blindsided," and are having to "scramble" to "respond to the Plaintiff's legal assertions, secure declarations," etc. *Id.* But these protests shade the truth. The very news article cited by movants in their intervention memorandum (Mem. 4, n.1) (attached at Exhibit A), reveals that Yearwood and Miller told the reporter that they "have been working with the American Civil Liberties Union as the [OCR administrative] complaint begins to unfold." *Id.* And indeed, that complaint was filed on June 17, 2019, and within *two days* the ACLU had already published a "Statement from Andraya Yearwood," and lead counsel for the movants' ACLU attorney Chase Strangio had already published a legal statement about the merits of Plaintiffs' administrative complaint under Title IX. *See* https://www.acluct.org/en/press-releases/aclu-and-student-athlete-statement-complaint-against-transgender-student-athlete (June 19, 2019). No one has been "blindsided;" no one is "scrambling." If the movants are prepared to engage in this sort of revisionist history to delay this case at the very outset, then their involvement will indeed "unduly delay . . . the adjudication" of Plaintiffs' rights, and permissive intervention should be denied. *U.S. Postal Serv.*, 579 F.2d at 191.

Respectfully submitted this 26th day of February, 2020.

By: s/ *Howard M. Wood II*

Howard M. Wood III
CT Bar No. 68780, CT Fed. Bar No. 08758
James H. Howard
CT Bar No 309198, CT Fed. Bar No 07418
FIORENTINO, HOWARD & PETRONE, P.C.
773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136
Fax: (860) 643-5773
Email: howard.wood@pfwlaw.com
Email: james.howard@pfwlaw.com

Roger G. Brooks
CT Fed. Bar No. PHV10498
Jeffrey A. Shafer
CT Fed. Bar No. PHV10495
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: rbrooks@ADFlegal.org
Email: jshafer@ADFlegal.org

Kristen K. Waggoner
CT Fed. Bar No. PHV10500
Christiana M. Holcomb
CT Fed. Bar No. PHV10493
Alliance Defending Freedom
440 First St. NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: kwaggoner@ADFlegal.org
Email: cholcomb@ADFlegal.org

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

      I hereby certify that on February 26, 2020, a copy of the foregoing Memorandum in Opposition to Motion of Andraya Yearwood and Thania Edwards on behalf of Terry Miller to Intervene as Defendants and attached Exhibit A was filed electronically with the Clerk of Court. Service on all parties will be accomplished by operation of the court's electronic filing system or by mail service if not registered with the court's CM/ECF system.

                                                *s/ Howard M. Wood II*
                                                Attorney for Plaintiffs