# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, by Cheryl Radachowsky, her mother<br><br>Plaintiffs,<br><br>v.<br><br>CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION<br><br>Defendants. | No. 3:20-cv-00201 (RNC) |

## STATEMENT OF INTEREST

The United States files this Statement of Interest under 28 U.S.C. § 517, which authorizes the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States." *Id.* The United States enforces Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and has a significant interest in the proper interpretation of Title IX. The United States also enforces several other federal anti-discrimination statutes that, like Title IX, prohibit sex discrimination, *e.g.* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the United States has a significant interest in the proper interpretation of these laws. The United States also has a significant interest in ensuring that

1

federal funds are not used to discriminate on the basis of sex and other protected classes.  *See* 20 U.S.C. § 1682.

## INTRODUCTION

Title IX requires that "[n]o person in the United States shall, on the basis of sex, . . . be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a); *accord* 34 C.F.R. § 106.41(a).  Title IX's prohibition against sex discrimination extends to athletics operated or sponsored by recipients of federal money.  34 C.F.R. § 106.41.  As a result, covered institutions must "provide equal athletic opportunity for members of both sexes."  *Id.* § 106.41(c).

The Connecticut Interscholastic Athletic Conference (CIAC), however, has adopted a policy that requires biological males to compete against biological females—despite the real physiological differences between the sexes—if the male is a transgender individual who publicly identifies with the female gender.  CIAC claims that "federal law" requires this state of affairs.  CIAC 2019-2020 Handbook (CIAC Handbook), at 55, http://www.casciac.org/pdfs/ ciachandbook_1920.pdf; *see also* Defs.' Initial Summ. Issues at 7, ECF No. 63.  So do the proposed student-intervenors.  *See* Mot. to Intervene at 11, ECF No. 36.

They are incorrect.  Title IX and its implementing regulations prohibit discrimination solely "on the basis of sex," not on the basis of transgender status, and therefore neither require nor authorize CIAC's transgender policy.  To the contrary, CIAC's construction of Title IX as requiring the participation of students on athletic teams that reflect their gender identity would turn the statute on its head.  One of Title IX's core purposes is to ensure that women have an "equal athletic opportunity" to participate in school athletic programs.  34 C.F.R. § 106.41(c); *see also Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("Equal opportunity to

participate lies at the core of Title IX's purpose.").  Schools realize that purpose primarily by establishing separate athletic teams for men and women and by ensuring that those teams are on equal footing.  *See* 34 C.F.R. § 106.41(b)-(c).  Because of the physiological differences between men and women, the existence of women's sports teams permits women to participate more fully in athletics than they otherwise could.

Under CIAC's interpretation of Title IX, however, schools may not account for the real physiological differences between men and women.  Instead, schools must have certain biological males—namely, those who publicly identify as female—compete against biological females.  In so doing, CIAC deprives those women of the single-sex athletic competitions that are one of the marquee accomplishments of Title IX.  The United States therefore submits this Statement of Interest to aid the Court in the proper application of Title IX in this case.

## TITLE IX DOES NOT MANDATE CIAC'S TRANSGENDER POLICY

Title IX does not require that recipients assign students to participate in sex-specific athletic teams that reflect their gender identity.  CIAC's policy and its briefing to this Court construing Title IX conflict with the statute's text, history, purpose, and implementing regulations.

### A.    Text and History

**1.a.**    Title IX prohibits "discrimination" in educational programs and activities "on the basis of sex."  20 U.S.C. § 1681(a).  Although Title IX includes statute-specific definitions of various terms, "sex" is not one of them.  *See id.* § 1681(c) (defining "educational institution"); *id.* § 1687 (defining "program or activity" and "program").  Without such a definition, the term "sex" should "be interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted).

When Congress enacted Title IX in 1972, the "ordinary, contemporary, common meaning" of "sex" was biological sex.  In that same year, 1972, the United States explained to the Supreme Court that "sex, like race and national origin, is a visible and immutable biological characteristic," U.S. Br. at *15, *Frontiero v. Laird*, No. 71-1694, 1972 WL 137566 (U.S. Dec. 27, 1972), and the Court agreed that "sex" is "an immutable characteristic determined solely by the accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

Also during the time period surrounding Title IX's enactment, dictionaries defined "sex" as referring to the physiological distinctions between males and females, and more particularly their reproductive functions.  For example, *Webster's Third* defined "sex" as "one of the two divisions of organic esp. human beings respectively designated male or female," or "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction."  Webster's New International Dictionary 2081 (3d ed. 1968).  Other contemporaneous dictionaries defined "sex" similarly.  *See, e.g.*, American Heritage Dictionary of the English Language 1187 (1st ed. 1969) ("1. a. The property or quality by which organisms are classified according to their reproductive functions. b. Either of two divisions, designated male and female, of this classification."); The American College Dictionary 1109-10 (1970) ("1. The character of being either male or female . . . 2. The sum of the anatomical and physiological differences with reference to which the male and female are distinguished or the phenomena depending on these differences."); The Random House College Dictionary 1206 (1973) ("1. either the male or female division of a species esp. as differentiated with reference to the reproductive functions.  2. The sum of the structural and functional differences by which male and females are distinguished.").

4

Other provisions of Title IX employ "sex" as a binary term, and thus provide further confirmation that the prohibition on "sex" discrimination does not extend to discrimination on the basis of transgender status or gender identity.  If the term "sex" in Title IX included "gender identity"—which, according to the American Psychiatric Association, may include "an individual's identification as . . . some category *other than* male or female," *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* 451 (2013) (emphasis added)—then multiple Title IX provisions would make little sense.

Title IX consistently uses "sex" as a binary concept capturing only two categories:  male and female.  For example, the statute creates an exception for "father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*."  20 U.S.C. § 1681(a)(8) (emphases added).  Likewise, Title IX includes a transitional period for an "educational institution which has begun the process of changing from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*," provided certain criteria are met.  *Id.* § 1681(a)(2) (emphases added).  Moreover, Title IX expressly provides that nothing in the statute "shall be construed to prohibit any educational institution . . . from maintaining separate living facilities *for the different sexes*."  *Id.* § 1686 (emphasis added).[1]  These provisions could not sensibly function if the term "sex" includes "gender identity," which, unlike "sex," may not be limited to two categories.

---

[1] *See also* 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of *one sex*, when compared to that provided to students of the *other sex*, shall be" proportionate and comparable. (emphasis added)); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of *one sex* shall be comparable to such facilities provided to the *other sex*." (emphasis added)).

**b.**      Historical context further confirms that Congress used the word "sex" in its ordinary biological sense.  "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education."  *McCormick ex rel. McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982).  Against that backdrop, members of Congress voting on Title IX and any politically engaged citizen would have understood the law as directed at eliminating discrimination in education based on biological sex—*i.e.*, unequal treatment of men and women—consistent with the term's ordinary meaning.

Congress's actions in the 48 years following Title IX's enactment confirm that "sex" in this statute does not encompass transgender status.  In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate from sex discrimination.  For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of the victim poses a serious national problem."  34 U.S.C. § 30501(1) (emphasis added).

Congress accordingly used the Hate Crimes Prevention Act to amend or create several statutory provisions that prohibited or otherwise specifically addressed discrimination based on "gender identity," in addition to discrimination based on "sex" or "gender."  *See* 18 U.S.C. § 249(a)(2)(A) & (c)(4) (prohibiting acts or attempts to cause bodily injury to any person "because of the actual or perceived religion, national origin, *gender, sexual orientation, gender identity,* or disability of any person," and defining "gender identity" as "actual or perceived

gender-related characteristics" (emphasis added)); 34 U.S.C. § 30503(a)(1)(C) (regarding federal assistance to state, local, or tribal investigations of crimes "motivated by prejudice based on the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity,* or disability of the victim" (emphasis added)); *id.* § 30506(2) (construing violent acts motivated by actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of a victim (emphasis added)); *id.* § 41305(b)(1) (regarding compiling statistics "about crimes that manifest evidence of prejudice based on race, *gender and gender identity*, religion, disability, *sexual orientation*, or ethnicity) (emphasis added)).

Similarly, in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), *as amended by* Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), *sexual orientation,* or disability" (emphases added)).

These post-Title IX enactments illustrate that Congress "kn[ows] how" to prohibit discrimination based on gender identity when it wishes to do so. *Dep't of Homeland Sec. v. MacLean,* 135 S. Ct. 913, 921 (2015). "If Congress had meant to prohibit . . . transgender discrimination" in Title IX, "surely the most straightforward way to do so would have been to say so—to add . . . 'transgender status' or 'gender identity' to the list of classifications protected under" Title IX. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 338 (5th Cir. 2019) (Ho, J., concurring) (addressing Title VII). Congress did not do so when originally enacting Title IX or subsequently. Instead, Congress has failed to enact proposed bills to amend Title IX to add

protections for "gender identity."  *See*, *e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

To be sure, "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).  Subjective expectations of Members of Congress as to which particular practices Title IX would prohibit therefore do not control.  But the historical context makes clear that, in using the term "sex," Congress was referring to discrimination based on biological sex— *i.e.*, unequal treatment of men and women—consistent with the term's ordinary meaning. Conversely, the United States knows of no evidence showing that when Congress employed the term "sex" in Title IX it did so to reach anything about transgender status, and CIAC has identified none.

2.      In addition, Title IX prohibits only "*discrimination*" "on the basis of sex," 20 U.S.C. § 1681(a) (emphasis added), and requiring all students to participate on the athletic team associated with their biological sex cannot be described as sex "discrimination."  The "normal definition of discrimination, is differential treatment" or, more specifically, "less favorable treatment."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (citation and internal quotation marks omitted) (construing "discrimination" in Title IX).  Thus, for a prohibition on *discrimination* because of sex, "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions . . . to which members of the other sex are not exposed."  *Oncale*, 523 U.S. at 80 (citation omitted) (addressing Title VII).  Requiring students to participate on the athletic team associated with their biological sex accounts for the real physiological differences between the sexes in a manner that burdens each sex equally, which is the main reason why Defendants may continue to maintain single-sex teams.  *See infra* Part B.

The situation is no different for transgender students specifically:  biological males with a female gender identity are exposed to the same conditions as similarly situated biological females with a male gender identity.

Indeed, because such a policy would facially turn solely on biological differences rather than on gender identity, the policy would not even consider, much less discriminate on the basis of, transgender status.  School officials would not even have to "know an individual's transgender status in order to enforce the policy—knowledge of characteristics unrelated to gender preference is both necessary and sufficient."  *Doe 2 v. Shanahan*, 917 F.3d 694, 733 (D.C. Cir. 2019) (Williams, J., concurring in result) (addressing military policy requiring all "service members [to] serve 'in their biological sex'"); *cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) (noting that if an employer "were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on respondent's disability").

If the law were otherwise, countless sex-specific policies would be per se unlawful.  A policy mandating that male students not frequent the women's bathrooms or locker rooms, for example, would be susceptible to challenge.  And so would a policy setting different physical-fitness standards for male and female athletic events.  Indeed, many of Title IX's implementing regulations—which permit sex-specific athletic teams, bathrooms, locker rooms, or shower facilities—would be in jeopardy if CIAC's view of sex discrimination were to carry the day.  *See* 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."); *id.* § 106.41(b) (permitting "separate teams for members of each sex"); *see also infra* Part B.

Nothing in Title IX or Supreme Court precedent requires such radical upheaval.  To the contrary, the Supreme Court has recognized that sex-based classifications sometimes are permissible because certain "differences between men and women" are "enduring."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  That holds true in the area of physical-fitness standards, as "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs."  *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (finding FBI did not violate Title VII when using different physical fitness standards for special agent candidates based on sex); *see also Virginia*, 518 U.S. at 550 n.19 (admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs").

### B.      Purpose and Regulations

Far from being required by Title IX, CIAC's transgender policy is in tension with "the core of Title IX's purpose"—namely, ensuring that women have an "[e]qual opportunity to participate" in educational programs and activities at covered institutions.  *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993); *accord McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286-95 (2d Cir. 2004).  Notably, Congress reaffirmed that Title IX's core purpose was to provide women equal opportunities—and particularly athletic opportunities—with the Civil Rights Restoration Act of 1987, which superseded a Supreme Court decision that limited the scope of Title IX.  As the Second Circuit observed, "[t]he congressional debate leading to the passage of [the Civil Rights Restoration Act] demonstrates concern by members of Congress about ensuring equal opportunities for female athletes."  *McCormick*, 370 F.3d at 287-88; *see also Cohen*, 991 F.2d at 894 ("Although the Restoration Act does not specifically

mention sports, the record of the floor debate leaves little doubt that the enactment was aimed, in part, at creating a more level playing field for female athletes.").

Title IX's athletic regulations further the statute's purpose by expressly contemplating the existence of single-sex teams.  As Title IX's sponsor promised, the statute and its implementing regulations would "permit differential treatment by sex . . . in sport facilities," 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh), and would not mandate, for instance, the "desegregation of football fields," 117 Cong. Rec. 30407 (1971) (statement of Sen. Bayh); *see North Haven Bd. of Ed.*, 456 U.S. at 526-27 ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.").  Accordingly, those regulations provide that a recipient of federal funds does not violate Title IX when it "operate[s] or sponsor[s] separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."  34 C.F.R. § 106.41(b).  And the regulations expressly require "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics [to] provide equal opportunity for members of both sexes."  *Id.* § 106.41(c).

CIAC nevertheless has decided to force biological girls to compete against biological boys who publicly identify with the female gender and want to compete on sex-specific athletic teams.  Specifically, CIAC's policy determines eligibility for sex-specific sports teams according to a student's gender identification "in current school records and daily life activities in the school and community," and does not require students to attempt to undergo any physiological changes to reflect their gender identity.  CIAC Handbook at 55.  Accordingly, CIAC's transgender athletic policy is in tension with the core purpose of Title IX and its implementing regulations.

The policy also illustrates why this Court should not read Title IX to compel schools to require students to participate on sex-specific teams solely on the basis of their gender identity. Even if the term "sex" is somehow ambiguous, if "only one of the permissible meanings" of an allegedly ambiguous term "produces a substantive effect that is compatible with the rest of the law," this Court should adopt it because the Judiciary "cannot interpret federal statutes to negate their own stated purposes." *King v. Burwell*, 135 S. Ct. 2480, 2492-93 (2015) (citations omitted). Reading Title IX to compel schools to require biological males to compete against biological females in athletic competitions is precisely the type of interpretation that this Court should reject on this ground.

## CONCLUSION

For the foregoing reasons, this Court should reject the assertion that Title IX requires CIAC's transgender policy.

Respectfully submitted,

WILLIAM P. BARR
Attorney General

| | |
|---|---|
| JOHN H. DURHAM<br>United States Attorney<br>District of Connecticut | ERIC S. DREIBAND<br>Assistant Attorney General<br>Civil Rights Division |
| | *s/ Matthew J. Donnelly* |
| JOHN B. HUGHES<br>Civil Chief<br>United States Attorney's Office<br>District of Connecticut<br>157 Church Street, 25th Floor<br>New Haven, Connecticut 06510 | MATTHEW J. DONNELLY (PHV10507)<br>Attorney<br>United States Department of Justice<br>Civil Rights Division<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br>202-616-2788<br>matthew.donnelly@usdoj.gov |

DATED: March 24, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2020, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to all counsel of record.

*s/ Matthew J. Donnelly*
MATTHEW J. DONNELLY (PHV10507)
Attorney for the United States