# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SELINA SOULE, a minor, by Bianca
Stanescu, her mother, et al.,

*Plaintiffs,*

v.

CONNECTICUT ASSOCIATION OF
SCHOOLS d/b/a CONNECTICUT
INTERSCHOLASTIC ATHLETIC
CONFERENCE, et al.,

*Defendants.*

Case No.: 3:20-cv-00201-RNC

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION TO
DISQUALIFY**

May 8, 2020

## CONTENTS

INTRODUCTION ........................................................................................................... 1

I.      The Court's Order of April 16 and surrounding statements .................................. 3

II.     The legal standard governing disqualification ..................................................... 4

III.    Plaintiffs' claim and the role of words in presenting and adjudicating that claim .............. 5

IV.     The Court's Order and surrounding statements raise doubts about the court's impartiality. ................................................................................................................ 8

    A.      The Court's comments about Plaintiffs' use of the word "male" destroyed an appearance of impartiality. ............................................................................... 8

        1.      The Court's statement that Plaintiffs' use of the word "male" is "bullying" and contrary to "common decency" was unjustified and inconsistent with an appearance of impartiality. ................................................................................................................ 8

        2.      The Court's assertion that the ordered wording is "more accurate" and "consistent with science" was unjustified and inconsistent with an appearance of impartiality. ............. 11

    B.      The Court's comments about Plaintiffs' legal theories could reasonably be interpreted as disclosing a prejudgment and rejection of those theories inconsistent with an impartial adjudication. ................................................................................................................ 12

        1.      The Court's assertion that the individuals must be referred to as "transgender females" because "[t]hat is what this case is about" creates an appearance of partiality. .... 12

        2.      The Court's assertion that prohibiting Plaintiffs from referring to the individual intervenors as "males" does not impair "any legitimate interest or position" conflicts with an appearance of impartiality. ................................................................................ 13

    C.      The unprecedented Order deprived Plaintiffs of Due Process and First Amendment rights in a manner that raises strong questions about the appearance of impartiality. ............. 14

    CONCLUSION ........................................................................................................... 17

# TABLE OF AUTHORITIES

*Cases:*

*Apple v. Jewish Hospital & Medical Center,*
    829 F.2d 326 (2d Cir. 1987).................................................................................5

*Diamondstone v. Macaluso,*
    148 F.3d 113 (2d Cir. 1998).................................................................................4

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ...............................................................................2

*Frontiero v. Richardson,*
    411 U.S. 677 (1973).......................................................................................6, 10

*Greenlaw v. United States,*
    554 U.S. 237 (2008).............................................................................................7

*Holt v. Virginia,*
    381 U.S. 131 (1965)...........................................................................................15

*In re Boston's Children First,*
    244 F.3d 164 (1st Cir. 2001)............................................................................4, 5

*In re IBM Corp.,*
    45 F.3d 641 (2d Cir. 1995)..................................................................................5

*Legal Services Corporation v. Velazquez,*
    531 U.S. 533 (2001)...........................................................................................16

*Nichols v. Alley,*
    71 F.3d 347 (10th Cir. 1995) ..............................................................................5

*Offutt v. United States,*
    348 U.S. 11 (1954).............................................................................................15

*Potashnick v. Port City Construction Co.,*
    609 F.2d 1101 (5th Cir. 1980) ..........................................................................15

*Powell v. Alabama,*
    287 U.S. 45 (1932).............................................................................................15

*Republic of Panama v. American Tobacco Co.,*
    217 F.3d 343 (5th Cir. 2000) ..............................................................................5

iii

*Smith v. Berg*,
    247 F.3d 532 (3d Cir. 2001)............................................................................4

*Students and Parents for Privacy v. School Directors of Township High School District 211*,
    377 F. Supp. 3d 891 (N.D. Ill. 2019) ............................................................10

*United States v. Antar*,
    53 F.3d 568 (3d Cir. 1995)..............................................................................4

*United States v. Bayless*,
    201 F.3d 116 (2d Cir. 2000)........................................................................4, 11

*United States v. Cooley*,
    1 F.3d 985 (10th Cir. 1993) ...........................................................................5

*United States v. Cronic*,
    466 U.S. 648 (1984).....................................................................................15

*United States v. Dandy*,
    998 F.2d 1344 (6th Cir. 1993) ........................................................................5

*United States v. Kelly*,
    888 F.2d 732 (11th Cir. 1989) .......................................................................5

*United States v. Samuels*,
    808 F.2d 1298 (8th Cir. 1987) ......................................................................14

*United States v. Sineneng-Smith*,
    140 S.Ct.__, slip op., 2020 WL 2200834 (May 7, 2020)...........................7, 14

*United States v. Varner*,
    948 F.3d 250 (5th Cir. 2020) ...............................................1, 2, 6, 10, 13, 14

*United States v. Virginia*,
    518 U.S. 515 (1996).....................................................................................10

**Statutes:**

28 U.S.C. § 455(a) ...............................................................................................4

**Other Authorities:**

BiologyOnline.com Dictionary, https://www.biologyonline.com/dictionary..................................9

American Heritage Dictionary, https://ahdictionary.com ................................................9

Diagnostic and Statistical Manual of Mental Disorders, (5th ed. 2013) ....................................6, 9

Merriam-Webster.com Medical Dictionary, https://www.merriam-webster.com/medical .........8, 9

Oxford Univ. Press, Oxford Dictionary of Biology (7th ed. 2015) .................................................9

Webster's Encyclopedic Unabridged Dictionary of the English Language (1996)........................9

Webster's New World Dictionary of the American Language (1984) ...........................................9

WPATH Standards of Care, version 7 ........................................................................................10

ABA Model Code of Professional Responsibility, EC 3-5 (1980)..........................................15, 16

# INTRODUCTION

It is undisputed that the purpose of Title IX at the time of its enactment was to ensure equal opportunities for women by prohibiting discrimination or the denial of educational opportunities—including athletic opportunities—based on biological sex. Here, Plaintiffs allege that they lost track-and-field victories, advancement opportunities, and an equal experience of fair competition because the challenged league and school policy allowed two males to compete in the women's division. Yet the Court has now reprimanded Plaintiffs' counsel and prohibited Plaintiffs from referring to those individuals as "male athletes" because—in the Court's view—alluding to an individual of the male sex as male is contrary to science, "bullying," and violates "human decency" if that individual claims a female gender identity.

The Court's Order is legally unprecedented. "[N]o authority supports the proposition that [courts] may require litigants, judges, court personnel, or anyone else to refer to gender-dysphoric litigants with pronouns [or adjectives] matching their subjective gender identity." *United States v. Varner*, 948 F.3d 250, 254–55 (5th Cir. 2020). And yet the Court did all this before hearing any expert evidence about the science; indeed, before even giving counsel an opportunity to speak. A disinterested observer would reasonably believe that the Court's order and comments have destroyed the appearance of impartiality in this proceeding. That requires recusal.

To be sure, the public debate over gender identity and sports is a heated and emotional one. This only increases the urgency that courts preserve their role as the singular place in society where all can be heard and present facts before an impartial tribunal. That is why federal law promises not just a factually fair and impartial hearing, but a hearing before a tribunal which

1

preserves the *appearance* of impartiality. The Court "may have the most benign motives in honoring a party's request to be addressed" in accord with that individual's "'deeply felt, inherent sense of gender.'" *Id.* at 256 (quoting *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2019) (cleaned up). "Yet in doing so, the court ... unintentionally convey[ed] its tacit approval of the litigant's underlying legal position," *id.* (cleaned up), i.e., that the law views a person's "sex" based on identity rather than biology. "Even this appearance of bias, whether real or not, should be avoided." *Id.*

Regrettably, this Court's oral order entered on April 16, 2020 (the "Order"), and surrounding statements,[1] created rather than avoided that appearance of bias on matters at this lawsuit's heart: whether by allowing males to take victories and opportunities away from females in separate athletic competitions designated for girls, the challenged policy deprives the Plaintiffs of rights guaranteed to them by Title IX.

In short, the Court's Order and comments during the hearing would leave an impartial observer gravely concerned that the Court has prejudged the matter, rejected core aspects of Plaintiffs' case before hearing the evidence and legal arguments, and assumed the role of advocate for the defendants, all to the detriment of Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti. Regardless of the Court's true thoughts and intentions—which Plaintiffs presume were honorable—the damage to the appearance of impartiality cannot be undone, and 28 U.S.C. §455(a) requires that the Court recuse itself.

---

[1] Excerpts from the transcript of the April 16, 2020 hearing are submitted as Exhibit A to this memorandum.

## I.    The Court's Order of April 16 and surrounding statements

During a telephonic hearing on April 16, absent any motion and without first permitting and hearing argument from counsel, the Court ordered that "going forward, [counsel for Plaintiffs] will not refer to the proposed intervenors as 'males,'" stating, "you must refer to them as 'transgender females.'" (Tr. 26, 29.)

The Court stated that Plaintiffs' counsel would not "surrender any legitimate interest or position if you refer to them as transgender females," asserting that those individuals' status as "transgender females" is "what the case is about." (Tr. 26.) The Court then declared that its Order was "consistent with science, common practice and perhaps human decency" (Tr. 29), and the Court voiced its view that to call "male" the individual intervenors—who were born and inevitably remain biologically male—would be "bullying" and "very provocative" (Tr. 26).

The Court entered its Order—which the Court rightly anticipated would "cause some consternation for [Plaintiffs]"—without first giving Plaintiffs' counsel an opportunity to be heard on a fraught question implicating both zealous representation and the merits of the case. Indeed, the Court twice refused counsel's express request to be heard until *after* counsel acknowledged that he understood that an order had been entered, and that he understood that order. (Tr. 26-27.) The Court did not invite briefing; it only implied contempt, and pointed to appeal as the only remaining recourse. (Tr. 29.)

In subsequent colloquy, the Court acknowledged that counsel was not prohibited from mentioning the fact that the individual intervenors have male bodies but did not relax its prohibition on referring to them as "male."  (Tr. 31.)

This Order and these statements have left an ineradicable impression that the Court took the bench guided by a firm personal commitment on a much-disputed matter rather than a

3

commitment to an impartial evaluation of the facts and the law that the parties might present. It is difficult to imagine any impartial observer who, after watching this proceeding, would reasonably believe that Plaintiffs will get a fair shake when they ask the Court to rule that when schools chose to provide separate athletic opportunities for boys and girls, women and men, they violate Title IX if they then permit males to take opportunities and victories in the divisions designated for girls or women.

## II.     The legal standard governing disqualification

28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Second Circuit has elaborated:

> [A] court of appeals must ask the following question: Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?

 *United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000), quoting *Diamondstone v. Macaluso*, 148 F.3d 113, 120–21 (2d Cir. 1998). Critically, the operative question concerns *potential* interpretations or perceptions of bias, *not* the judge's actual impartiality. *In re Boston's Children First*, 244 F.3d 164, 171 (1st Cir. 2001).

Recusal is regularly based on a single statement or conversation; no repetition or pattern is necessary to create this sort of doubt. *United States v. Antar*, 53 F.3d 568, 576 (3d Cir. 1995), overruled on other grounds by *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) (court mandated recusal though "aware that we are focusing on one sentence out of volumes of transcripts"); *In re Boston's Children First*, 244 F.3d 164  (mandating recusal where judge made short comments to the press defending her order). Further, an aggrieved party may not "wait and see how it goes"

4

after an incident occurs that casts doubt on impartiality. "It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987); *accord In re IBM Corp.*, 45 F.3d 641, 643 (2d Cir. 1995).

"If the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal." *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995). *See also In Re Boston's Children First*, 244 F.3d at 167 (same); *Republic of Pan. v. Am. Tobacco Co.*, 217 F.3d 343, 347 (5th Cir. 2000) (same); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993) (same); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) (same). When the judge's action is unusual, this increases the risk that it could be interpreted as reflecting bias. *In re Boston's Children First*, 244 F.3d at 170 ("[T]he very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias."); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (requiring recusal where judge's statement to the media "was an unusual thing for a judge to do").

### III.    Plaintiffs' claim and the role of words in presenting and adjudicating that claim

Plaintiffs' core contention is that, once an educational institution subject to Title IX elects to provide separate, sex-specific athletic teams and competitions, if it then allows biological males to compete in the women's division—and take victory and advancement opportunities away from women or girls—that institution denies equal athletic opportunities and experiences to the female half of the population and fails to accommodate the different physiology and athletic capabilities of women and girls, all in violation of Title IX.

Factually and scientifically, Plaintiffs' claim is exclusively about athletics and thus about the objective reality of bodies and the large difference in physical capabilities that the bodies of male humans enjoy after passing through even early stages of male puberty. Gender identity is objectively irrelevant to the deprivation of equal opportunity inflicted on women and girls by competition against males—an impact amply detailed in the Complaint—because it is irrelevant to the physiological advantage in athletic capability enjoyed by male bodies over comparably gifted and trained female bodies.

Legally, Plaintiffs contend that gender identity is *irrelevant* to the Title IX claim that Plaintiffs have chosen to bring. This is because—as the United States Department of Justice has explained in detail in a brief signed by the Attorney General, the head of the Civil Rights Division, and the United States Attorney for the District of Connecticut (Statement of Interest of the United States, ECF No. 75)— Title IX and its implementing regulations concern themselves with and protect the rights of what the Supreme Court has recognized as the "immutable" categories of male and female, *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality), defined by sexual biology, not by felt gender identity, sexual attractions, or social roles. Indeed, if we try to substitute the mutable and non-binary categories of gender identity—which does not stop at "transgender female" but includes "gender fluid" and innumerable other shades and variations[2]—for the immutable and binary categories of male and female, man and woman, then

---

[2] The American Psychiatric Association's widely quoted *Diagnostic and Statistical Manual of Mental Disorders*, 5th Edition ("DSM-5") states that, "Experienced gender may include alternative gender identities beyond binary stereotypes," DSM-5 453 (5th ed. 2013), and the Fifth Circuit recently cited authorities positing that a "galaxy" of gender identities exist. *Varner*, 948 F.3d at 256-57.

Title IX quickly dissolves into incoherence. The very terms of Title IX rely on and speak to the reproductive categories of male and female.

As a result, references to individuals as "transgender females" obscures and rejects the binary of reproductive biology and declares that there is a third (at least) category relevant to Plaintiffs' claims. More, it is a declaration that, as between subjective gender identity (female) and objective reproductive biology (male), the subjective is the more important and essential "truth."

Plaintiffs dispute these propositions as a matter of science, law, and indeed philosophy. Plaintiffs have a right to, and must be able to, talk clearly and accurately about their case and their arguments. "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 140 S.Ct.__, slip op. at 3, 2020 WL 2200834, at *1 (May 7, 2020), quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). The Order prohibiting Plaintiffs from referring to a biologically male human being as "male" exhibited an appearance of prejudgment by the Court on matters at the very center of Plaintiffs' case, before hearing that case. And the Order prohibits Plaintiffs from presenting their case accurately and clearly.

Indeed, this is not just an appearance problem; the Order has already prejudiced Plaintiffs. Plaintiffs were in the final stages of preparing their Amended Complaint when the Court issued its April 16 Order. Following the telephonic hearing, counsel had to revise that Amended Complaint to remove all references to the individual intervenors as "males." The Order prevented Plaintiffs from articulating the source of Plaintiffs' injuries and the nature of Plaintiffs' legal claims in the manner that Plaintiffs believe is most accurate.

**IV.     The Court's Order and surrounding statements raise doubts about the court's impartiality.**

     **A.     The Court's comments about Plaintiffs' use of the word "male" destroyed an appearance of impartiality.**

         **1.     The Court's statement that Plaintiffs' use of the word "male" is "bullying" and contrary to "common decency" was unjustified and inconsistent with an appearance of impartiality.**

The Court stated that counsel's use of the word "male" to refer to individuals who undisputedly were born genetically male and possess male bodies was "very provocative," possibly inconsistent with "human decency," and amounted to "bullying." This demonstrated an *ex ante* endorsement and indeed enforcement of the individual intervenors' claim of a right to be considered and spoken of as females in this litigation. As reviewed above, this fundamentally contradicts the facts and the law as Plaintiffs believe them to be and wish to present them, and strikes at the very heart of Plaintiffs' case. As a result, a disinterested observer would reasonably question this Court's impartiality.

The Court is also wrong. Plaintiffs and counsel are not "bullying," and they are not violating principles of "human decency." The use of the word "male" to describe individuals who have been genetically male since conception and possess male bodies is accurate, consistent with timeless use as well as formal definitions of "male," and follows widespread usage in legal contexts in which accuracy is required.

Numerous formal definitions of "male" and "female" look to reproductive biology, not to felt identity or social roles. Looking to technical sources, the *Merriam-Webster Medical Dictionary* defines "male" as "an individual of the sex that is typically capable of producing small, usually motile gametes (such as sperm or spermatozoa) which fertilize the eggs of a female." *Male*, Merriam-Webster.com Medical Dictionary, https://www.merriam-

webster.com/medical (last visited, April 27, 2020). The *Oxford Dictionary of Biology* identifies a "male" as "an individual whose reproductive organs produce only male gametes," *Male*, Oxford Univ. Press, Oxford Dictionary of Biology (7th ed. 2015), while the online dictionary of the "Biology Online" resource defines a male as an individual who belongs to "the sex that begets or procreates young, or (in a wider sense) to the sex that produces spermatozoa, by which the ova are fertilized." *Male*, BiologyOnline.com Dictionary, https://www.biologyonline.com/ dictionary (last visited Apr. 27, 2020). The widely cited DSM-5 psychiatric diagnostic manual identifies "biological indicators of male and female (understood in the context of reproductive capacity), such as sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia." DSM-5 451.

Dictionaries directed at more general usage are in accord. *Webster's New World Dictionary of the American Language* defines a "male" as someone "of the sex that fertilizes the ovum," *Male*, Webster's New World Dictionary of the American Language (1984); *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996) says, "an organism of the sex or sexual phase that normally produces a sperm cell or male gamete," *Male*, Webster's Encyclopedic Unabridged Dictionary of the English Language (1996); the *American Heritage Dictionary* continues the same focus on reproductive biology: "the sex that has organs to produce spermatozoa for fertilizing ova." *Male*, American Heritage Dictionary, https://ahdictionary.com (last visited Apr. 27, 2020). No definition suggests that the word "male" is itself vulgar, obscene, or in any way negative or abusive, akin to a racial epithet that is intended to demean someone because of who they are. The individual intervenors have not even contended—nor has the Court heard evidence—that they are not "male" under every single one of these dictionary definitions.

The United States, in its Statement of Interest filed on March 24, cites both Supreme

Court precedent and dictionary definitions to observe that (at least as relevant to Title IX), an

individual's sex is "an immutable characteristic determined solely by . . . birth," and that

physical "differences between men and women" are "enduring." (ECF No. 75 at 4, 10, quoting

*Frontiero*, 411 U.S. at 686, and *United States v. Virginia*, 518 U.S. 515, 533 (1996).)

Accordingly, in this pleading signed by the Attorney General of the United States, the head of

the Department of Justice Civil Rights Division, and the United States Attorney for the District

of Connecticut, the Government consistently refers to those born male as "biological males"

rather than "transgender females," regardless of their subjective gender identity. (ECF No. 75 at

2, 3, 9, 12.)

Likewise, the Fifth Circuit, in a recent, published opinion, declined a request to refer to a

male litigant who claims a female gender identity as "she" despite that individual's assertion that

being referred to "simply as a male and with male pronouns based solely on my biological body

makes me feel very uneasy and disrespected." *Varner*, 948 F.3d at 254. A district court in

another circuit, while upholding a school policy that admitted students into restrooms based on

gender identity rather than sex, did not hesitate to differentiate clearly between sex and gender

identity by referring to the relevant students as "male students with female genders," rather than

as "transgender females." *Students and Parents for Privacy v. Sch. Dirs. of Twp. High Sch. Dist.*

*211*, 377 F. Supp. 3d 891, 906 (N.D. Ill. 2019).

Even transgender advocacy organizations like WPATH recognize that the definition of

gender dysphoria involves "a *discrepancy* between a person's gender identity and that person's

sex assigned at birth." WPATH Standards of Care, version 7, at 2 (emphasis added). If so, then

one must be able to name and speak of those two different things by different names. Here, the

"discrepancy" is between the individual intervenors' sex as defined by reproductive biology, which is "male," and their subjective gender identity, which they identify as "transgender female." Plaintiffs need to refer to—and indeed emphasize—the objective *sex* of these individuals. The only proper and accurate word is "male." To refer to them as "transgender females" is purposefully to avoid mention of their sex.

In sum, it is insupportable to denounce Plaintiffs' use of the word "male"—in a manner consistent with technical and general dictionary definitions, with recent usage by circuit and district courts, and with usage by senior officers of the Department of Justice—as "bullying" and inconsistent with "common practice" and "human decency." But those words have been said by this Court and cannot be unsaid, and after hearing them, any reasonable observer would "entertain significant doubt[s]," *Bayless*, 201 F.3d at 126, that Plaintiffs can obtain an impartial hearing of their claims and theories from this Court.

> **2.      The Court's assertion that the ordered wording is "more accurate" and "consistent with science" was unjustified and inconsistent with an appearance of impartiality.**

The Court's assertion—before hearing any evidence—that referring to individuals who fit every definition of "male" quoted above but claim a female "gender identity" as "transgender females" is somehow "more accurate" and more "consistent with science" (Tr. 29) is equally insupportable and irreconcilable with an appearance of impartiality.

Science is concerned with objective, measurable facts. It requires accurate terminology. As noted above, in technical as well as lay sources, "male" and "female" are defined by the immutable facts of bodily reproductive function. Using words according to this long and widely accepted definition, the individual intervenors, like others who describe themselves as "transgender females," are "male." Such usage is both accurate and consistent with science.

11

To that point, Plaintiffs have submitted expert evidence that details at length the sex-specific physiological basis of athletic advantages enjoyed by males once male puberty begins, in the Declaration of Dr. Gregory Brown submitted with Plaintiffs' Motion for a Preliminary Injunction. These are not "gender-identity-specific" advantages—they are sex-specific advantages. The gender identity of a male athlete is irrelevant to discussion of those advantages, or to a discussion of the loss of equal opportunities that those advantages inflict on girls and women if males may enter girls' or women's competitions. In a discussion centered on bodies and physical capabilities, to refer to individuals who possess male bodies as "females" or "transgender females" muddies and confuses a clear and accurate discussion of the science.

Thus, Plaintiffs contend that the Court's assertions concerning "accuracy" and "science" were factually wrong and not based on science or the record. But for the present motion, the decisive point is that to make those statements before hearing the evidence evinced a potential prejudgment that irrevocably corroded this Court's appearance of impartiality on these issues.

**B.**   **The Court's comments about Plaintiffs' legal theories could reasonably be interpreted as disclosing a prejudgment and rejection of those theories inconsistent with an impartial adjudication.**

**1.**   **The Court's assertion that the individuals must be referred to as "transgender females" because "[t]hat is what this case is about" creates an appearance of partiality.**

The Court justified its Order directing Plaintiffs to refer to the individual intervenors as "transgender females" by asserting that "[t]hat is what the case is about." (Tr. 26.) As reviewed in Section III, Plaintiffs emphatically do not believe that "that is what the case is about." On the contrary, Plaintiffs contend that gender identity is *irrelevant* to the Title IX claim that Plaintiffs have chosen to bring—a position that finds strong support from the Department of Justice.

12

The individual intervenors have male bodies. They are not "female" in any sense relevant to Plaintiffs' theory of the case. To refer to them as "female," no matter the preceding adjective, obfuscates Plaintiffs' claim and prohibits their clear presentation at the threshold.

Plaintiffs understand that Defendants wish to frame the case differently and to use words differently. That is not unusual in litigation. But for the Court to prohibit Plaintiffs from presenting the case within the legal, biological, and semantic framework they believe to be correct, and to order Plaintiffs instead to articulate their case within *Defendants'* preferred logical framework and semantics is, so far as Plaintiffs can find, absolutely unprecedented. *See, e.g., Varner*, 948 F.3d at 255. Once this Court makes statements that appear to reject Plaintiffs' theory of the law and the case before Plaintiffs have even presented and briefed it, and pairs those statements with a ban on Plaintiffs using words in the way they believe to be most accurate, no reasonable observer would say the proceeding retains the appearance of impartiality.

   **2.    The Court's assertion that prohibiting Plaintiffs from referring to the individual intervenors as "males" does not impair "any legitimate interest or position" conflicts with an appearance of impartiality.**

Plaintiffs contend that Title IX demands equal educational and athletic opportunities for those of the female sex and does not speak to subjective gender identities at all. Plaintiffs contend that whatever their gender identity, the individual intervenors are male in the sense relevant to Title IX, to Plaintiffs' injuries, and to Plaintiffs' claim. The Court's assertion that an order requiring Plaintiffs to refer to those individuals as "female" does not impair any "legitimate interest or position" (Tr. 26) strongly suggests to a reasonable observer that the Court has rejected as "*il*legitimate" the heart of Plaintiffs' legal contentions before hearing them. To dismiss as "illegitimate" Plaintiffs position at the threshold, and to prohibit Plaintiffs from using

words in the manner that best represent that position—inescapably raises a reasonable question about the impartiality of this Court towards Plaintiffs' claims.

**C. The unprecedented Order deprived Plaintiffs of Due Process and First Amendment rights in a manner that raises strong questions about the appearance of impartiality.**

The Court's comments were enough to raise reasonable doubts about its impartiality. But the Court did not stop at commenting—it entered the Order prohibiting Plaintiffs' counsel from referring to the individual intervenors as "male."

It entered this Order absent any request from the individual intervenors, much less any motion. This itself undermined the appearance of impartiality. "[C]ourts . . . do not, or should not, sally forth each day looking for wrongs to right." *Sineneng-Smith*, 140 S.Ct.__, slip op. at 4, 2020 WL 2200834, at *3, *quoting United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987). And the Court did so without inviting briefing and argument first. Instead, the Court twice rebuffed counsel's request to address the issue, until counsel first acknowledged understanding what had by then already been ordered. (Tr. 26-27.) Then, the Court implicitly threatened contempt—stating that it would be "unfortunate" if Plaintiffs felt unable to comply—and pointed to "an application to the Court of Appeals" as the only recourse. (Tr. 29.)

While there has been much litigation in recent years involving controversial topics relating to gender identity, the Order's restrictions on counsel's speech and presentation of Plaintiffs' case and theories is unprecedented. *See, e.g., Varner*, 948 F.3d at 255-56. And for good reason. The Order deprives the Plaintiffs of Due Process rights to present their case fully and fairly through zealous representation, as well as First Amendment rights.

The *Varner* court noted that any such order would be enforceable through the contempt power. *Varner*, 948 F.3d at 257. Yet the Supreme Court has repeatedly rebuffed use of the

contempt power in any manner that interferes with the vigorous presentation of a party's claim or defense. "The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues." *Holt v. Virginia*, 381 U.S. 131, 136 (1965) (reversing contempt conviction). More, a party is entitled to "fearless, vigorous and effective advocacy, no matter how unpopular the cause in which it is employed." *Offutt v. United States*, 348 U.S. 11, 13 (1954) (reversing contempt conviction). Here, as in *Holt*, "the words used in [Plaintiffs' briefs and arguments] were plain English, in no way offensive in themselves, and wholly appropriate" to the proposition being advanced. *Holt*, 381 U.S. at 137. Here, the "word being used"— "male"—is in no way a vulgarity or term of abuse, and it is not only "wholly appropriate" but *essential* to the proposition that Plaintiffs wish to advance: that competition from male athletes has deprived the Plaintiff girls of equal athletic opportunities. What the Court cannot properly punish through the contempt power it cannot properly prohibit by preemptive order. The Order conflicts with *Holt*.

In another context, the Supreme Court has held that if a court should "refuse to hear a party by counsel," it could "not be doubted" that this would be a deprivation of due process. *Powell v. Alabama*, 287 U.S. 45, 69 (1932). And that right to be heard by counsel must be "freely exercised without impingement." *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980). The foundation of our litigation system is that truth "is best discovered by powerful statements on both sides of the question," delivered through "partisan advocacy on both sides of a case" that subjects the positions of both sides to "the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 655-56 (1984) (cleaned up). In this "crucible," it is the unique responsibility of the lawyer "to relate the general body and philosophy of law to a specific legal problem of a client." ABA Model Code of Professional Responsibility,

EC 3-5 (1980). Here, the preemptive Order amounts to an effective refusal to allow Plaintiffs'
counsel to present Plaintiffs' claims and legal theories in a clear and consistent manner that they
believe rightly relates the "philosophy of law"—including hotly contested philosophical issues
concerning sex and gender—to the facts and to Plaintiffs' claims. The Order muzzles "powerful
statements" from just one side concerning hotly contested questions surrounding sex and gender
identity, while protecting the contentions of the other side from the full heat of the "crucible of
meaningful adversarial testing." In short, the Order infringes Plaintiffs' due process rights both
to be meaningfully and impartially heard, and to zealous advocacy by counsel.

Finally, the Order impinges the principle taught in *Legal Services Corporation v.
Velazquez*, 531 U.S. 533 (2001). There, the Supreme Court held that—even when Congress is
providing the funding for the lawyers involved—the First Amendment prohibits Congress from
imposing limitations that prevent those attorneys from presenting "certain vital theories and
ideas" on behalf of their clients. *Id.* at 548. "The Constitution does not permit the Government to
confine litigants and their attorneys in this manner." *Id.* A "theory and idea" "vital" to Plaintiffs'
claim is that the individual intervenors are male within the meaning relevant to Title IX and are
not female within any meaning relevant to Title IX. Yet the Order now prevents Plaintiffs from
using the very words that assert and advance that theory.

Hypothetically, the Court on reflection may agree that its Order was improvident and
should be dissolved. But by leaping so hastily and emphatically to an order that deprived
Plaintiffs of Due Process and First Amendment rights importantly involved in the litigation
process, the Court created objective questions about its impartiality that cannot be dissolved. For
this reason, as well, the standard of 28 U.S.C. § 455(a) requires that this Court disqualify itself
from further proceedings in this matter.

16

## CONCLUSION

For all these reasons, regardless of this Court's intentions in entering the Order and in making the remarks that accompanied that Order, that Order and those remarks have created reasonable questions as to whether it can adjudicate the issues presented by Plaintiffs' claims impartially.  As a result, 28 U.S.C. § 455(a) requires that the Court recuse itself and permit this case to be heard by a different tribunal.

Respectfully submitted this 8th day of May, 2020.

By: *s/ Roger G. Brooks*

Roger G. Brooks
CT Fed. Bar No. PHV10498
Jeffrey A. Shafer
CT Fed. Bar No. PHV10495
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: rbrooks@ADFlegal.org
Email: jshafer@ADFlegal.org

Kristen K. Waggoner
CT Fed. Bar No. PHV10500
Christiana M. Holcomb
CT Fed. Bar No. PHV10493
Alliance Defending Freedom
440 First St. NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: kwaggoner@ADFlegal.org
Email: cholcomb@ADFlegal.org

Howard M. Wood III
CT Bar No. 68780, CT Fed. Bar No. 08758
James H. Howard
CT Bar No 309198, CT Fed. Bar No 07418
Fiorentino, Howard & Petrone, P.C.

773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136
Fax: (860) 643-5773
Email: howard.wood@pfwlaw.com
Email: james.howard@pfwlaw.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2020, a copy of the foregoing Memorandum in Support of

Plaintiffs' Motion to Disqualify was filed electronically with the Clerk of Court. Service on all

parties will be accomplished by operation of the court's electronic filing system.


*s/ Roger G. Brooks*
Attorney for Plaintiffs