IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SELINA SOULE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 3:20-cv-00201-RNC |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' OPPOSITION TO** |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. *et al*, | ) | **PLAINTIFFS' MOTION TO DISQUALIFY** |
| | ) | |
| *Defendants.* | ) | May 29, 2020 |
| | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO DISQUALIFY**

Defendants Connecticut Association of Schools, Inc., Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education, Glastonbury Public Schools Board of Education, Canton Public Schools Board of Education, and Danbury Public Schools Board of Education; Intervenor Defendants Andraya Yearwood and Thania Edwards, on behalf of her daughter, T.M.; and Intervenor Defendant Commission on Human Rights and Opportunities, respectfully submit the following opposition to Plaintiffs' Motion to Disqualify, ECF 103.

**INTRODUCTION**

"All persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other participants." *In re Snyder*, 472 U.S. 634, 647 (1985). Federal judges must, therefore, not only "be patient, dignified, respectful, and courteous to litigants," but must also "require similar conduct by those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process." Code of Conduct for U.S. Judges, Canon 3(A)(3) (2019). In carrying out these responsibilities, the Court acted well within its discretion in admonishing counsel to stop gratuitously referring to the

1

Individual Intervenor Defendants—two teenage girls who are transgender—as "males." There was nothing "unprecedented" about the Court's request, Pls.' Mem., ECF No. 103-1 at 1; many courts have made similar admonishments. Respecting a person's gender identity—or, at a minimum, refraining from gratuitously misgendering them—is common courtesy and does not forecast any view on the underlying legal merits or the definition of "sex" in a particular statute.

Plaintiffs now seek recusal by mischaracterizing the Court's statements and the context in which those statements were made. The Court did not require Plaintiffs to refer to Andraya and Terry as "females" or "transgender females" and, after discussion, made clear to Plaintiffs that the Court's Order did not prevent Plaintiffs from referring to Andraya and Terry with phrases such as "male bodies," "biological male," and "physiologically male."[1] The Court simply directed Plaintiffs to stop referring to Andraya and Terry as "'males,' period." Tr. of Tel. Conf. 29:10. Plaintiffs can continue to argue that sex-separated teams under Title IX must be defined based on physiological and biological characteristics, and they can continue to argue that girls who are transgender have an athletic advantage based on physiological characteristics resulting from testosterone levels that result from typical male puberty. Plaintiffs assert that their "claim is exclusively about athletics and thus about the objective reality of bodies and the large difference in physical capabilities that the bodies of male humans enjoy after passing through even early stages of male puberty." Pls.' Mem., ECF No. 103-1 at 6. Because Plaintiffs contend that

---

[1] In noting the limited scope of the Court's Order, Defendants do not concede that any of the foregoing terminology would be medically accurate or appropriate to describe the Individual Intervenor Defendants or other girls who are transgender. There are many biological components of sex, including gender identity, as well as chromosomal, anatomical, hormonal, and reproductive elements, which do not always align within an individual as typically male or typically female, either because that individual has intersex traits or because that individual is transgender. For these reasons, the Endocrine Society has explained that terms like "biological sex," "biological male," and "biological female" are imprecise and "should be avoided." *See Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018).

"gender identity" is irrelevant to their legal claims and do not contest that Terry and Andraya are transgender, Plaintiffs are not prejudiced by extending to Andraya and Terry the common courtesy of referring to them as "transgender athletes," which is precisely what this Court permitted them to do. Pls.' Mem., ECF No. 103-1 at 6.

The Court acted well within its discretion in seeking to maintain "respectful, humane, intelligent, civil discourse." Tr. of Tel. Conf. 30:2. Plaintiffs' Motion to Disqualify is baseless and should be denied.

## BACKGROUND

The Connecticut Interscholastic Athletic Conference ("CIAC") follows a policy of allowing transgender students to play on sex-separated sports teams that are consistent with their gender identity if they meet certain criteria. Compl., ECF No. 1 at ¶¶ 70-71[2] (citing CIAC, 2019-2020 Handbook: CIAC By-Law, Article IX, Section B at 55 (2019-20)).[3] The CIAC policy entitled "Transgender Participation," governs eligibility "for students who have a gender identity that is different from the gender listed on their official birth certificates." *Id*. For purposes of the "Transgender Participation" policy, a student's school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." *Id*.

The Plaintiffs allege that CIAC's "Transgender Participation" rule violates Title IX's prohibition on sex discrimination by depriving cisgender girls of equal athletic opportunities. Plaintiffs contend that, for purposes of assigning students to sex-separated teams under Title IX,

---

[2] Given that parties have not resolved which Complaint is the operative Complaint, all Complaint citations herein refer to the Complaint and not the Amended Complaint.

[3] The CIAC By-Laws are available online at http://www.casciac.org/ciachandbook/.

a student's sex must be defined based on "biological differences"—specifically, whether an individual has XX or XY chromosomes. Compl., ECF No. 1 at ¶¶ 4-5 ("Compared to boys—those born with XY chromosomes—in the state of Connecticut those who are born female—with XX chromosomes—now have materially *fewer* opportunities to stand on the victory podium"). The Complaint, ECF 1, alleges that there are "biological differences" between girls who are transgender and girls who are cisgender that give girls who are transgender an unfair athletic advantage. Specifically, Plaintiffs allege that girls who are transgender go through "male puberty," which "quickly increases the levels of circulating testosterone" and "drives a wide range of physiological changes that give males a powerful physiological athletic advantage over females." *Id*. at ¶ 43. Plaintiffs therefore argue that gender identity should be irrelevant when determining whether students are eligible to participate in girls' sports. Pls.' Mem., ECF No. 103-1 at 6.

Most of the allegations in the Complaint are directed at two girls who are transgender, Andraya Yearwood and Terry Miller. Throughout the Complaint, Plaintiffs refer to Andraya, Terry, and other girls who are transgender as "males" and "boys." In the few places where the Complaint acknowledges they are transgender, the Complaint describes them as "boys" who "claim a female gender identity" or "males claiming transgender identity as girls." Compl., ECF No. 1 at ¶¶ 2, 64. Andraya and Terry filed a motion to intervene in the case as Defendants and submitted declarations explaining various medical, social, and legal steps they have taken in accordance with their female gender identity. Mot. to Intervene, ECF No. 36. Andraya testified that from the time she was a child, she has known that she is a girl. Andraya Decl., ECF No. 36-1 at ¶ 2. When she was in eighth grade, she told her parents that she is transgender and started to receive social and medical support for her transition. *Id*. at ¶¶ 2-3. By the time Andraya started

high school, she was known to her family and peers as a girl and participated in all aspects of school consistent with her female gender. *Id*. at ¶ 2. She has legally changed her name to "Andraya" and has been undergoing hormone therapy for several years. *Id*. at ¶ 3. As a result of her medical transition, Andraya's circulating hormones are comparable to the hormone levels of non-transgender girls. *Id*. at ¶ 3. She is accepted as a girl by her family, her friends, her teammates, and her coaches. *Id*. at ¶¶ 5-6.

Like Andraya, Terry also testified that she knew from a young age that she is a girl. T.M. Decl., ECF No. 36-2 at ¶ 3. She recalls as far back as fifth grade being aware of her female gender but not yet having the language or support to understand what she needed in order to live authentically. *Id*. After years of repressing her identity, Terry came out as transgender in tenth grade and began to live all aspects of her life as a girl. *Id*. at ¶ 4. She has since updated her Connecticut birth certificate to accurately reflect her sex as female and is undergoing hormone therapy. *Id*. at ¶¶ 4-5. As a result of her hormone treatment, Terry has circulating hormones at levels typical of non-transgender girls. *Id*. at ¶ 4. Terry is accepted as a girl by her family, her friends, her teammates, and her coaches. *Id*. at ¶¶ 5, 11-12.

On April 16, 2020, the Court held a telephonic hearing on the pending motions to intervene. During the hearing, counsel for Plaintiffs referred to Andraya and Terry as "male competitor[s]" and "male athletes." Tr. of Tel. Conf. 22:16-17, 25:7. The Court then stated:

> I don't think we should be referring to the proposed intervenors as "male athletes." I understand that you prefer to use those words, but they're very provocative, and I think needlessly so. I don't think that you surrender any legitimate interest or position if you refer to them as transgender females. That is what the case is about. This isn't a case involving males who have decided that they want to run in girls' events. This is a case about girls who say that transgender girls should not be allowed to run in girls' events.
>
> So going forward, we will not refer to the proposed intervenors as "males"; understood?

5

Tr. of Tel. Conf. 26:12–23. Plaintiffs' counsel responded:

> The entire focus of the case has to do with the fact that male bodies have a physiological advantage over female bodies that gives them an unfair advantage to competition.
>
> The entire focus of the case is the fact that the CIAC policy allows individuals who are physiologically, genetically male to compete in girls' athletics.
>
> But if I use the term "females" to describe those individuals -- and we've said in our opening brief, we're happy to use their preferred names, because names are not the point to the case. Gender identity is not the point of this case. The point of this case is physiology of bodies driven by chromosomes and the documented athletic advantage that comes from a male body, male hormones, and male puberty in particular. . . .
>
> Your Honor, this is a serious thing to say -- I am not sure that I can comply with that direction consistent with vigorous representation of the position that my clients are putting forward here.
>
> If you see Dr. Brown's expert report that we put in in support of the preliminary injunction, you will see that it's all about male and female bodies using the terms as they're understood in science, and we can't get away from that.

Tr. of Tel. Conf. 27:11–28:23. The Court responded:

> I'm not asking you to refer to these individuals as "females." I know that you don't want to do so. What I'm saying is you must refer to them as "transgender females" rather than as "males." Again, that's the more accurate terminology, and I think that it fully protects your client's legitimate interests. Referring to these individuals as "transgender females" is consistent with science, common practice and perhaps human decency.
>
> To refer to them as "males," period, is not accurate, certainly not as accurate, and I think it's needlessly provocative; and, for me, civility is a very important value, especially in litigation.
>
> So if you feel strongly that you and your clients have a right to refer to these individuals as "males" and that you therefore do not want to comply with my order, then that's unfortunate. But I'll give you some time to think about it and you can let me know if it's a problem. If it is, gosh, maybe we'll need to do something. I don't want to bully you, but at the same time, I don't want you to be bullying anybody else.

6

> Maybe you might need to take an application to the Court of Appeals. I don't know. But I certainly don't want to put civility at risk in this case. Quite the opposite. My goals for this case include, very importantly, the goal of maintaining civil discourse, respectful, humane, intelligent, civil discourse in the course of the case. Nothing more, nothing less.

Tr. of Tel. Conf. 29:2–30:3.

In response to a follow-up question from Plaintiffs' counsel, the Court further clarified that it was not ordering Plaintiffs' counsel to use the specific phrase, "transgender female."

> MR. BROOKS: Do you have any objection to our referring to those intervenors simply as transgender athletes?
>
> THE COURT: That's fine. That's fine with me.
>
> MR. BROOKS: Am I correct that you also have no objection to our discussing, as need be to make argument, the fact that they have male bodies and, in at least one case, don't deny that they went through male puberty?
>
> THE COURT: That is your prerogative, certainly. As you say, that's what the case is about.

Tr. of Tel. Conf. 31:1–10.

Plaintiffs did not seek reconsideration of the Court's Order pursuant to Federal Rule of Civil Procedure 59(e). Though the Court explicitly advised that Plaintiffs might need to "take an application to the Court of Appeals," Plaintiffs did not ask the Court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) or file a petition for mandamus.

## ARGUMENT

### I. STANDARD FOR RECUSAL

The judicial recusal statute provides that "[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "[T]he existence of the appearance of impropriety is to be determined 'not by considering what a straw poll of the only partly informed man-in-the-street would show, but by examining the record facts and the law, and then deciding whether a reasonable person

7

knowing and understanding all the relevant facts would recuse the judge.'" *United States v. Bayless*, 201 F.3d 116, 126-27 (2d Cir. 2000) (cleaned up).

Motions to recuse based on a judge's orders and statements during litigation are governed by the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994). Under *Liteky*, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* at 555. "[T]hey will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* (emphasis omitted). "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

Here, as discussed below, the Court's Order violated none of these precepts, but rather, fell squarely within its authority to ensure efficient and respectful courtroom administration.

## II. THE COURT'S REQUEST FOR "RESPECTFUL, HUMANE, INTELLIGENT, CIVIL DISCOURSE" DID NOT DISPLAY A DEEP-SEATED ANTAGONISM THAT WOULD MAKE FAIR JUDGMENT IMPOSSIBLE.

### A. The Court's Order was consistent with its duty to maintain civility in legal proceedings.

As noted above, federal judges must not only "be patient, dignified, respectful, and courteous to litigants," but must also "require similar conduct by those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process." Code of Conduct for U.S. Judges, Canon 3(A)(3) (2019). In carrying out these responsibilities, the Court acted well within its discretion in admonishing Plaintiffs' counsel to stop gratuitously referring to two teenage girls who are transgender as "males."

8

Respecting a person's gender identity—or, at a minimum, refraining from gratuitously misgendering them—is common courtesy.[4] In arguing that the Court's request for common courtesy was an "unprecedented" manifestation of bias, Plaintiffs rely almost entirely on non-binding controversial dicta from *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020). The 2-1 panel majority in *Varner* refused to use female pronouns when referring to a woman who is transgender and, in dicta, opined at length about whether the court would have the power to compel other litigants to do so even though no party had sought such relief from the court. As explained in Judge Dennis's "emphatic[] dissent," the panel's "lengthy opinion is dictum and not binding precedent in [the Fifth Circuit]." *Id.* at 261 (Dennis, J., dissenting). The majority's "inappropriate [and] unnecessary" discussion, *id.* at 260 (Dennis, J., dissenting), and its refusal to extend the courtesy of addressing the plaintiff with female pronouns, prompted 83 legal ethics professors and a wide array of civil rights organizations to file amicus briefs in support of a petition for rehearing en banc.[5]

Plaintiffs' assertion that this Court's admonishment is "unprecedented" is simply wrong. Courts routinely respect the gender identity of litigants, and have admonished opposing counsel to do the same. *See, e.g., Canada v. Hall*, No. 18-CV-2121, 2019 WL 1294660, at *1 n.1 (N.D.

---

[4] Connecticut state law also requires schools to refer to students by names and pronouns consistent with gender identity and Plaintiffs do not challenge any aspect of that law. Conn. Gen. Stat. § 46a-58(a) (2017); Connecticut State Dep't of Educ., *Guidance on Civil Rights Protections and Supports for Transgender Students* (Sept. 2017), https://www.portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance.pdf?la=en (interpreting state protections based on gender identity and expression to require schools to use names and pronouns consistent with gender identity regardless of a student's legal name or sex assigned at birth).

[5] *See* Amicus Brief of 83 Legal Ethics Professors, *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020) (No. 19-40016) (attached as Ex. A); Amicus Brief of Civil Rights Organizations, *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020) (No. 19-40016) (attached as Ex. B); Amicus Brief Lambda Legal, et al., *United States v. Varner*, 948 F.3d 250 (5th Cir. 2020) (No. 19-40016) (attached as Ex. C).

Ill. Mar. 21, 2019) ("Although immaterial to this ruling, the Court would be derelict if it failed to note the defendants' careless disrespect for the plaintiff's transgender identity, as reflected through implications that the plaintiff might not actually be transgender and the consistent use of male pronouns to identify the plaintiff. The Court cautions counsel against maintaining a similar tone in future filings."); *Lynch v. Lewis*, No. 7:14-CV-24 (HL), 2014 WL 1813725 at *2 n.2 (M.D. Ga. May 7, 2014) ("The Court and Defendants will use feminine pronouns to refer to the Plaintiff in filings with the Court. Such use is not to be taken as a factual or legal finding. The Court will grant Plaintiff's request as a matter of courtesy, and because it is the Court's practice to refer to litigants in the manner they prefer to be addressed when possible."); *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 740 n.2 (N.D. Iowa 1999), *aff'd in part, rev'd in part on other grounds*, 249 F.3d 755 (8th Cir. 2001) ("As a matter of courtesy, the masculine pronoun will be used in reference to the plaintiff throughout this opinion, as it was throughout the trial by all parties. The court appreciates such courtesy from all counsel and witnesses, whatever the legal merits on any issue may be."); *United States v. Manning*, No. Army 20130739 Order (A. Ct. Crim. App. March 4, 2015) (Ordering the use of neutral or feminine pronouns in all legal papers and proceedings in case involving transgender defendant) (attached as Exhibit D).

Nor was there anything unprecedented in the Court's recognition that deliberately and repeatedly referring to two girls and women who are transgender as "men" or "males" can be a form of "bullying." *See T.B., Jr., by & through T.B., Sr. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 577 (4th Cir. 2018) (describing student's harassment of transgender female teacher by referring to her as "Mr.," "sir," "he," and "him," as "pure meanness."); *Hampton v. Baldwin*, No. 3:18-cv-550-NJR-RJD, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (referencing expert testimony that "misgendering transgender people can be degrading, humiliating, invalidating,

and mentally devastating"); *State of Ohio v. Cantrill*, No. L-18-1047, 2020 WL 1528013, at ¶ 30 (Ohio Ct. App., 6th Dist., March 31, 2020) (agreeing with *Varner* dissent that "using an individual's preferred pronouns demonstrates respect for that person's dignity, regardless of what the law may require or prohibit" and reaffirming that "[t]here is no place in our judicial system for malice, disparagement, or intentional disrespect toward any party, witness, or victim.").[6]

### B. The Court's narrow Order did not prejudge the merits of Plaintiffs' legal claims or prevent Plaintiffs from referring to girls who are transgender as individuals with "male" physiological attributes.

The Court's instruction for Plaintiffs to stop referring to Andraya and Terry as "'males,' period" does not prejudge the merits of Plaintiffs' claims under Title IX or exhibit a bias against Plaintiffs. It is commonplace for courts to respect transgender litigants' gender identity while ruling against them on the merits, including in cases involving access to sex-separated facilities and programs under Title VII and Title IX. *Cf. Johnston v. Univ. of Pittsburgh of Commw. Sys.*

---

[6] In other contexts, courts have also directed counsel to refer to other parties with courtesy and civility, even if it encroaches on the counsel's preferred language. For example, in *Lee v. ITT Standard*, 268 F. Supp. 2d 315 (W.D.N.Y. 2002), three African-American plaintiffs alleged that they were unlawfully terminated on the basis of their race. *Id.* at 325, *report and recommendation adopted in part sub nom. Estate of Lee v. ITT Standard*, 268 F. Supp. 2d 356 (W.D.N.Y. 2003). In opposing defendants' motion for summary judgment, plaintiffs referred to an employee of defendants as their "'token African–American human resources manager.'" *Id.* at 354. Defendants protested the comment as "personally offensive and a racially motivated scurrilous remark," and requested that the court order plaintiffs' counsel to apologize in writing. *Id.* The word "token" is not itself "vulgar" or "obscene," but the court nonetheless recognized it "to be a gratuitous slur of a racial character upon [the employee's] qualifications and reputation," and concluded that "the statement cannot be overlooked or countenanced by this court." *Lee*, 268 F. Supp. 2d at 355. The court noted that such a comment does not "appear to be within the bounds of counsel's obligation to represent his clients' interests with an expected degree of warm zeal." *Id.*; *see also Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1263 n.9 (N.D. Cal. 1997) (noting counsel "exceeds the bounds of zealous advocacy" by referring to a report as "'more akin to the product of a bordello than a research laboratory'"). Courts may assume that a comment by counsel is not intended to be a slur, but nonetheless recognize that it was perceived as offensive and act accordingly. *Sedie v. U.S. Postal Serv.*, No. C-08-04417 EDL, 2009 WL 4021666, at *2 (N.D. Cal. Nov. 19, 2009) (sanctioning counsel who commented that opposing counsel was "'going to give [him] bug eyes,'" noting statement was "rude and insensitive regardless of any racial connotation," but citing history of the term as a stereotype for African-American people).

*of Higher Educ.*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (acknowledging plaintiff's identity as a man who is transgender and using male pronouns, but holding on the merits that he was not entitled to use the men's restrooms under Title IX); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227-28 (10th Cir. 2007) (acknowledging plaintiff's identity as a woman who is transgender and using female pronouns but holding on the merits that she was not entitled to use women's restrooms under Title VII).

In this case, the Court was clear that in ordering Plaintiffs to desist from referring to Andraya and Terry as "males," it was not rendering judgment on the merits of Plaintiffs' claims about the meaning of "sex" under Title IX. Plaintiffs assert that the term "sex" in Title IX and its implementing regulations must be defined based solely on physiological characteristics like chromosomes and reproductive capacity. But Plaintiffs' counsel did not describe Andraya and Terry as "genetically male," "physiologically male," or "biologically male." Rather, Counsel repeatedly and provocatively "refer[ed] to them as 'males,' period," Tr. of Tel. Conf. 29:10, suggesting that the case involves non-transgender boys wishing to compete in girls' sports, which it does not.[7]

The Court's limited instruction to stop referring to Andraya and Terry as "'males,' period" does not prejudice their ability to argue that the term "sex" in Title IX must be defined by physiology. The Court did not order the Plaintiffs to refer to Terry and Andraya as "females," and after discussion about what references would be acceptable, the Court clarified that Plaintiffs may refer to the Individual Intervenor Defendants as "transgender athletes" and may explicitly

---

[7] Defendants do not concede that using the phrase "biologically male" or "physiologically male" would be the medically accurate terminology to describe girls who are transgender. *See supra*, at n.1.

refer to girls who are transgender as individuals with "male bodies" and individuals who went through "male puberty." Tr. of Tel. Conf. 31:1-10. According to Plaintiffs, "[g]ender identity is objectively irrelevant to the deprivation of equal opportunity" at issue in the case under Title IX, so Plaintiffs do not suffer any prejudice by acknowledging that Andraya and Terry are transgender while still naming those characteristics Plaintiffs think are relevant for purposes of Title IX (bodies, sex assigned at birth, puberty). Pls.' Mem., ECF No. 103 at 6.

Plaintiffs take particular issue with this Court's statement that referring to girls who are transgender as "transgender females" is "consistent with science." Pls.' Mem., ECF No. 103 at 11-12. But the Court was not commenting on the physiological characteristics of males and females, or on Plaintiffs' proffered expert evidence regarding the alleged athletic advantages of people who have a male sex assigned at birth or go through typical male puberty. Rather, the Court was simply responding directly to Plaintiffs' counsel's unsupported assertion that referring to Andraya and Terry as "males" was the *only* way to use terms "as they're understood in science." Tr. of Tel. Conf. 28:22.[8] Because no one disputes that Andraya and Terry are transgender, referring to them as such is simply reiterating an uncontested fact of the case and does not suggest any "potential prejudgment" about the nature of physiological differences between people assigned male and female at birth. Plaintiffs can continue to argue that sex-separated teams under Title IX must be defined based on certain physiological and biological characteristics while still extending the common courtesy of acknowledging that Andraya and Terry are transgender.

---

[8] In responding the Plaintiffs' assertions about "science," this Court could properly rely upon the evidence presented in the Individual Intervenor Defendants' declarations, and the Individual Intervenor Defendants' citations to the recommendations of the Endocrine Society and other sources in their Motion to Intervene.

### III. THE COURT'S REQUEST FOR "RESPECTFUL, HUMANE, INTELLIGENT, CIVIL DISCOURSE" DID NOT DEPRIVE PLAINTIFFS OF DUE PROCESS OR VIOLATE THE FIRST AMENDMENT.

Plaintiffs also contend that the Court's Order deprives them of due process and violates the First Amendment. But challenges to the merits of an order are "grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555. Despite the Court's invitation for Plaintiffs' counsel to "let me know if it's a problem," Plaintiffs did not seek reconsideration of the Court's Order pursuant to Federal Rule of Civil Procedure 59(e). And despite the Court's statement that Plaintiffs might need to "take an application to the Court of Appeals," Plaintiffs did not ask the Court certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) or file a petition for mandamus.

In any event, the Court's request for courtesy did not violate the First Amendment rights of either Plaintiffs or their counsel. "It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071 (1991). In an analogous case, a court in this Circuit held that a Magistrate Judge did not violate plaintiff's First Amendment right to free speech by striking a document from the docket deemed "inflammatory" due to its repeated reference to a party as racist, where plaintiff had leave to refile without such language. *Farmer v. Fzoad.com Enters. Inc.*, No. 17-CV-9300, 2019 WL 3948175, at *4–5 (S.D.N.Y. Aug. 21, 2019). The court held that the Magistrate Judge's "request for Plaintiff to file letters with respectful language was reasonable," and within the well-established "'inherent power and responsibility [of district courts] to manage their dockets so as to achieve the orderly and expeditious disposition of cases.'" *Id.* at *5 (quoting *In re World Trade Cent. Disaster Site Litig.*, 722 F.3d 483, 487 (2d Cir. 2013) (cleaned up)). Accordingly, the court concluded that Plaintiffs' First Amendment rights were not violated because the Magistrate Judge, "never hindered Plaintiff's

14

speech; she merely requested that the parties interact with one another in a civilized fashion to better facilitate the proceedings." *Id.*

Outside the courtroom, Plaintiffs can continue to refer to girls who are transgender as "male." And inside the courtroom, Plaintiffs can continue to argue that sex-separated teams under Title IX must be defined based on physiological and biological characteristics. As noted above, the Court did not require Plaintiffs to refer to Andraya and Terry as "females" or "transgender females" and did not prevent Plaintiffs from using phrases such as "male bodies," "biological male," or "physiologically male."[9] The Court simply asked for Plaintiffs to stop referring to Andraya and Terry as "'males,' period." Tr. of Tel. Conf. 29:10. This limited order, consistent with the prevailing judicial norms over the past several decades, neither "muzzle[d]" Plaintiffs, Pls.' Mem., ECF 103 at 16, nor restricted them from raising and advancing their claims. Accordingly, even if a motion for recusal were an appropriate vehicle to raise these arguments, Plaintiffs' First Amendment argument is without merit and the recusal motion should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Recusal should be denied.

Dated: May 29, 2020

Respectfully submitted,

BY: /s/ Dan Barrett
Dan Barrett (# ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

---

[9] As noted above, Defendants do not concede that any of the foregoing terms are medically accurate. *See supra*, at n.1.

Chase Strangio*
Joshua A. Block*
Lindsey Kaley*
James D. Esseks*
Galen Sherwin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
cstrangio@aclu.org
jblock@aclu.org
lkaley@aclu.org
jesseks@aclu.org
gsherwin@aclu.org
*Admitted Pro Hac Vice
For Andraya Yearwood and Thania Edwards on behalf of her daughter, T.M.


BY: /s/ Peter J. Murphy
PETER J. MURPHY (ct26825)
LINDA L YODER (ct01599)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Telephone: 860-251-5950
Facsimile: 860-251-5316
Email: pjmurphy@goodwin.com
For Connection Association of School and the Danbury Board of Education

BY: /s/ Johanna G. Zelman
Johanna G. Zelman (ct26966)
Elizabeth M. Smith
FordHarrison, LLP
CityPlace II
185 Asylum Street, Suite 610
Hartford, CT 06103
Telephone: 860-740-1355
Facsimile: 860-578-2075
Email: jzelman@fordharrison.com
For the Cromwell Board of Education and the Bloomfield Board of Education

BY: /s/ David S. Monastersky

16

David S. Monastersky (ct13319)
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 061114
Telephone: 860-249-1361
Facsimile: 860-249-7665
Email: dmonastersky@hl-law.com
For the Canton Board of Education and the
Glastonbury Board of Education

BY: /s/ Michael E. Roberts
Michael E. Roberts (ct30824)
Human Rights Attorney
Commission on Human Rights
and Opportunities – Legal Division
450 Columbus Blvd., Suite 2, Hartford, CT 06103
(860) 541-4715 | michael.e.roberts@ct.gov
For Connecticut Commission on Human Rights and
Opportunities