IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SELINA SOULE, *et al.*,                )
                                       )
                    *Plaintiffs*,      )        No. 3:20-cv-00201-RNC
                                       )
        v.                             )
                                       )        **MOTION TO DISMISS**
CONNECTICUT ASSOCIATION OF             )
SCHOOLS, INC. *et al*,                 )
                                       )        August 21, 2020
                    *Defendants,*      )
                                       )
_____        )


**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………..……………………………………………..i

INTRODUCTION……………………………………………………………………………1

FACTUAL BACKGROUND………………………………………………………………....3

   The CIAC Policy………………………..…………………………………………….4

   Andraya and Terry…………………………………………………………………….5

   Plaintiffs…………………………………………………………………………………7

   Plaintiffs' Participation in High School Girls' Track………………………………...7

   Plaintiffs' Claims and Requested Relief……………………………...……………...11

LEGAL STANDARD……………………………………………………………….............12

ARGUMENT…………………………………………………………………………......14

   I.  Plaintiffs Have Failed to Allege Standing for Prospective Relief against
      the CIAC, Bloomfield, Cromwell, Glastonbury, Canton and Danbury…...……....14

      A.  Plaintiffs Smith and Nicoletti's Claims of Future Injury Are Too
         Conjectural to Support Standing to Enjoin CIAC's Policy………………….14

      B.  Plaintiffs Lack Standing to Seek Expungement of Transgender
         Students'Athletic Records Because Doing So Would Not Redress
         Alleged Injury……………………………………………………………17

   II.  Plaintiffs' Requested Relief Would Violate the Rights of the Individual
      Intervenor-Defendants and Other Transgender Students……...……………….18

      A.  Plaintiffs' Requested Injunctions Would Violate the Equal
         Protection Clause……………………………………..…………………..........18

      B.  Plaintiffs' Requested Injunctions Would Violate Title IX………………...…24

   III.  Plaintiffs Have Failed to Allege a Cognizable Claim Under Title IX…...........27

**A. Title IX and Its Implementing Regulations Do Not Define Sex-Separated Teams in a Manner that Bars Girls Who Are Transgender from Participating with Other Girls**……………………………**28**

**B. Plaintiffs Have Not Plausibly Alleged that Competing with Girls Who Are Transgender Deprives Them of "Effective Accommodation" Under Title IX**……………………..…………………**31**

**C. Plaintiffs Have Not Plausibly Alleged the Elements of an Equal Treatment Claim**…………………………………………………...**38**

**D. Plaintiffs' Claims for Retrospective Relief are Barred by *Pennhurst***………..**42**

**IV. Plaintiffs Have Failed to Allege that Title IX Provides a Cause of Action Against the School District Defendants**……………………………..…..**46**

**A. Plaintiffs Have No Cause of Action Against Their Home Schools (Glastonbury, Danbury, and Canton)**…………………………………….....**46**

**1. Plaintiffs Have Not Alleged that Their Home Schools Failed to Provide Effective Accommodation**………………………….**47**

**2. Plaintiffs Have Not Alleged that Their Home Schools Failed to Provide Equal Treatment**……………………….…………...**48**

**3. The Home Schools Are Not Liable for 'Applying' or 'Facilitating' the CIAC policy**………………………...……………**49**

**B. Plaintiffs Have No Cause of Action Against the Individual Intervenor-Defendants' Schools (Bloomfield and Cromwell)**……………...**50**

**CONCLUSION**………………………………………………………………...**56**

# TABLE OF AUTHORITIES

## CASES

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty*, ---F.3d. ---, No. 18-13592, 2020 WL 4561817 (11th Cir. Aug. 7, 2020) ................................................................... passim

*Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) ..................................................... 34

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................. 19

*Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001) ................................. 14

*Arocho v. Ohio Univ.*, No. 2:19-cv-4766, 2020 WL 3469223 (S.D. Ohio June 25, 2020) .......... 51

*Arora v. Daniels*, No. 3:17-cv-134, 2018 WL 1597705 (W.D.N.C. Apr. 2, 2018) ..................... 51

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 13, 47

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985) .............................................. 43

*Austin v. Univ. of Or.*, 925 F.3d 1133 (9th Cir. 2019) .................................................. 40

*Bd. of Educ. of City of New Haven v. City of New Haven*, 237 Conn. 169 (1996) ...................... 43

*Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................................................ 19

*Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016) ................................................................................. 44

*Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014) .............................. 34

*Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922 (8th Cir. 1976) .................................... 34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 13, 47

*Biediger v. Quinnipiac Univ.*, 691 F.3d 85 (2d Cir. 2012) ........................................ 31, 32

*Biediger v. Quinnipiac Univ.*, 928 F. Supp. 2d 414 (D. Conn. 2013) ........................... 39, 47, 48

*Bostock v. Clayton Cty.*, --- U.S. ---, 140 S. Ct. 1731 (2020) ........................................ passim

*Boucher v. Syracuse Univ.*, 164 F.3d 113 (2d. Cir. 1999) ........................................ 31, 39

*Brenden v. Indep. Sch. Dist.* 742, 477 F.2d 1292 (8th Cir. 1973) ...................................... 34

*Burgess v. Harris Beach PLLC*, 346 F. App'x 658 (2d Cir. 2009) .................................... 49

*Cf. Suesz v. Med-1 Sols.*, LLC, 757 F.3d 636 (7th Cir. 2014) ...................................... 29

*Cheshire v. McKenney,* 182 Conn. 253 (1980) ....................................................... 43

*Clark, ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982) .................... 21

i

*Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092 (9th Cir. 2000) ...................................... 16

*Comtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805 (W.D. Mich. 2001) 39

*Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629 (1999) ........... 42

*Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999)...................................... 52, 53

*DiFolco v. MSNBC Cable LLC.*, 622 F.3d 104 (2d Cir. 2010)........................................................ 3

*Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016).................................................. 26, 28

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d at 530 (3d Cir. 2018)........................................ 27, 28

*Doe v. Brown University*, 896 F.3d 127 (5th Cir. 2018).......................................................... 54, 55

*Evancho v. Pine-Richland Sch. Dist*, 237 F. Supp. 3d 267  (W.D. Pa. 2017) ........................ 19, 46

*Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509 (D. Conn. 2016)................................. 25, 26

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52 (1st Cir. 2002) .................................................. 54

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016) .............. 25, 28, 29

*Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730 (E.D. Va. 2018) .................................... 6

*Hecox v. Little*, No. 1:20-cv-00184-DCN, 2020 WL 4760138 (D. Idaho Aug. 17, 2020) .... passim

*Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017) ............................................ 33

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ........................................................ 43

*Jane Doe v. Brown University*, 270 F. Supp. 3d 556 (D.R.I. 2017) ........................... 51, 52, 53, 54

*K. T. v. Culver-Stockton Coll.*, No. 4:16-CV-165 CAS, 2016 WL 4243965 (E.D. Mo. Aug. 11, 2016).............................................................................................................................................. 51

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ..................................................................... 19

*Kelley v. Ithaca Coll.*, 3:18-CV-1082, 2019 U.S. Dist. LEXIS 102636 (N.D.N.Y. June 18, 2019) ...................................................................................................................................................... 26

*Lantz v. Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985)................................................................. 35

*Lawson v. E. Hampton Planning & Zoning Comm'n*, No. 3:07c-v-1270, 2008 WL 4371297 (D. Conn. Sept. 22, 2008)..................................................................................................................... 3

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ............................................................ 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 14, 15

*M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704  (D. Md. 2018) ............................... 19

*Mansourian v. Regents of Univ. of California*, 602 F.3d 957 (9th Cir.  2010)....................... 39, 47

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) passim

*Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) ................................................................ 26

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014) ................................................................................ 3

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ............................................................................ 20

*Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093 (S.D. Cal. 2012) ................. 41

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) .................................................... 1, 28

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ................................ 42, 43, 44, 46

*Perkins v. S. New Eng. Tel. Co.*, No. 3:07-CV-967, 2009 WL 350604 (D. Conn. Feb. 12, 2009) 13

*Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834 (D. Minn. 2019) ........................................ 48

*Preferred Commc'ns, Inc. v. City of Los Angeles*, 13 F.3d 1327 (9th Cir. 1994) ........................ 16

*Robb v. Lock Haven Univ. of Pennsylvania*, 2019 WL 2005636 (M.D. Pa. May 7, 2019) .... 47, 48

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) ................................................................ 20

*Sobel v. Yeshiva Univ.*, 477 F. Supp. 1161 (S.D.N.Y. 1979) ...................................................... 50

*Sossamon v. Texas*, 563 U.S. 277 (2011) .................................................................................... 43

*South Dakota v. Dole*, 483 U.S. 203 (1987) .......................................................................... 42, 43

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................................................ 17

*Thomas v. Regents of Univ. of Calif.*, 2020 WL 1139595 (N.D. Cal. Mar. 9, 2020) ................... 48

*Thomas v. Regents of University of California*, 2020 WL 3892860 (N.D. Cal. July 10, 2020) .. 32, 40, 48

*United States v. Virginia*, 518 U.S. 515 (1996) .......................................................................... 20

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) 20, 26, 28

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) .............................................................. 19

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651 (6th Cir. 1981) ................................................................................................................. 34

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) .................................................... 26

## S<small>TATUTES</small>

20 U.S.C. § 1681(a) ........................................................................................................... 1, 24, 27

## O**THER** A**UTHORITIES**

1979 Policy Interpretation § VI(B)(3)(i) ................................................................................ 41

1979 Policy Interpretation § VII.C.4 .................................................................................... 35

CIAC By-Laws Article IX, Section B ................................................................................ 4, 6

## R**EGULATIONS**

34 C.F.R. § 106.41(a) .......................................................................................................... 34

34 C.F.R. § 106.41(b) .......................................................................................................... 34

34 C.F.R. § 106.41(c)(1) ...................................................................................................... 31

34 C.F.R. § 106.41(c)(2)-(10) ......................................................................................... 31, 39

44 Fed. Reg. 71413 (1979) ................................................................................................. 31

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants

Connecticut Association of Schools, Inc., d/b/a/ Connecticut Interscholastic Athletic Conference;

Bloomfield Public Schools Board of Education, Cromwell Public Schools Board of Education,

Glastonbury Public Schools Board of Education, Canton Public Schools Board of Education, and

Danbury Public Schools Board of Education; Intervenor-Defendants Andraya Yearwood

("Andraya") and Thania Edwards on behalf of her daughter T.M. ("Terry") (collectively, the

"Individual Intervenors"); and Intervenor-Defendant Connecticut Commission on Human Rights

and Opportunities, respectfully file this memorandum of law in support of their move to dismiss

Plaintiffs' Second Amended Complaint, ECF No. 141, for lack of jurisdiction and for failure to

state a claim upon which relief can be granted.

## INTRODUCTION

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* prohibits

educational institutions from discriminating against students "on the basis of sex" in educational

programs, including athletics. *See* 20 U.S.C. § 1681(a). Discriminating against a student because

she is transgender violates Title IX. *See Bostock v. Clayton Cty.*, --- U.S. ---, 140 S. Ct. 1731

(2020); *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty*, ---F.3d. ---, No. 18-13592,

2020 WL 4561817 (11th Cir. Aug. 7, 2020); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227

(9th Cir. 2020). It also violates the Equal Protection Clause of the Fourteenth Amendment. *See*

*Hecox v. Little*, No. 1:20-cv-00184-DCN, 2020 WL 4760138, at *2 (D. Idaho Aug. 17, 2020).

In 2013, the Connecticut Interscholastic Athletic Conference ("CIAC") implemented a

policy ("the CIAC Policy") that allows transgender students to play on sex-separated sports

teams based on their gender identification in current school records and daily life activities in the

school. For seven years, that policy has governed, and transgender students, including the Intervenor Defendants, have participated in sports consistent with their gender identification.

Plaintiffs now attempt to strike down CIAC's policy and mandate discrimination against girls who are transgender by prohibiting them from participating on the same sports teams as other girls. Plaintiffs also seek an order removing all past records of transgender students' participation and successes—even after two of the plaintiffs and both Intervenor-Defendants have already graduated. Plaintiffs' claims are based on an unprecedented legal theory that distorts Title IX and contradicts the U.S. Department of Education's own guidance, Supreme Court precedent, and decisions from federal courts across the country. Based on the same theory spouted by Plaintiffs here, the Idaho legislature enacted a similarly sweeping statute banning girls who are transgender from all girls' sports teams. In its ruling issued just days ago, the U.S. District Court for the District of Idaho concluded that the statute likely violated transgender students' rights under the Equal Protection Clause, and, therefore, issued a preliminary injunction prohibiting Idaho from enforcing it. *Hecox*, 2020 WL 4760138, at *2.

As in *Hecox*, this Court should find that Plaintiffs' attempts to limit the athletic opportunities of students who are transgender cannot stand. Because Plaintiffs' claims find no legal basis in either the text or regulations of Title IX—and worse, per *Hecox*, would mandate an unconstitutional result—the Court should dismiss the Second Amended Complaint in its entirety with prejudice.

## FACTUAL BACKGROUND

As more fully set forth below, for purposes of this motion, the Court must "accept as true all factual allegations and draw from them all reasonable inferences," but is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (internal citation omitted). "When ruling on a motion to dismiss, the court may consider the allegations in the complaint, any documents attached to the complaint or incorporated by reference in the complaint, and other facts of which judicial notice may be taken." *Lawson v. E. Hampton Planning & Zoning Comm'n*, No. 3:07c-v-1270, 2008 WL 4371297, at *2 (D. Conn. Sept. 22, 2008).

The Second Amended Complaint quotes from and relies upon (a) the text of the CIAC policy at issue in this case, CIAC By-Laws Article IX, Section B, and (b) publicly available records of students' track-and-field performance posted on the online repository Athletic.net. The complete text of the CIAC policy and the relevant individuals' athletic records may, therefore, be considered on a motion to dismiss because even when "a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal citation omitted).

**The CIAC Policy**

Since 2013, the CIAC has followed a policy of allowing students who are transgender to play on sex-separated sports teams that are consistent with their gender identity if they meet certain criteria. Sec. Am. Compl. ("SAC") ¶ 74 (*citing* CIAC By-Laws Article IX, Section B).[1] The CIAC Policy specifies that:

> The CIAC is committed to providing transgender student-athletes with equal opportunities to participate in CIAC athletic programs consistent with their gender identity. Hence, this policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates [at the time of birth].[2]

CIAC By-Laws Article IX, Section B. The policy acknowledges that any other rule would be "fundamentally unjust and contrary to applicable state and federal law." *Id.*

For purposes of the CIAC policy, a student's school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." *Id.* By submitting a team roster to the CIAC, each school district "is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*

---

[1] The CIAC By-Laws are available online at http://www.casciac.org/ciachandbook.

[2] Of course, some transgender students may have had their gender markers changed on their birth certificates as part of the process of transitioning. The CIAC policy would cover those students as well.

4

**Andraya and Terry**

Individual Intervenor-Defendants Andraya and Terry attended the Cromwell Public Schools ("Cromwell") and Bloomfield Public Schools ("Bloomfield"), respectively. SAC ¶¶ 15–16. They are teenage girls who are transgender, which means that they are girls with a female gender identity who at birth were designated the sex of male. Gender identity is the medical term for a person's deeply felt, inherent sense of belonging to a particular gender. Most people have a gender identity that matches the sex they were designated at birth. But people who are transgender have a gender identity that differs from their sex designated at birth.[3]

The Second Amended Complaint refers to Andraya and Terry as "biological males" and as people who "were born genetically and physiologically male and have male bodies." SAC ¶¶ 117, 77. But the Second Amended Complaint does not define or otherwise identify any specific physiological characteristics that one must have to be "physiologically male" or "have a male body." There are many biological components of sex, including chromosomal, anatomical, hormonal, and reproductive elements. These elements do not always align within an individual as typically male or typically female, either because that individual has intersex traits, or because that individual has undergone medical care for gender dysphoria. For these reasons, the

---

[3] In describing transgender individuals, Defendants and Intervenor-Defendants use the same terminology used by, *inter alia*, the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society. *See* Br. of American Academy of Pediatrics, et al., *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, ECF No. 32-1 (4th. Cir.), *available at* https://www.aclu.org/sites/default/files/field_document/brief_of_medical_public_health_and_mental_health_organizations.pdf. The Court may take judicial notice of amicus briefs filed by these organizations "as evidence of the views of the organizations that prepared them, and not as substantive evidence of the accuracy of such views." *Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 455 (E.D. Va. 2019), *appeal filed*, No. 19-1952 (4th Cir. Sept. 3, 2019); *see also Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.) ("Some amicus briefs collect background or factual references that merit judicial notice.").

Endocrine Society has said "the terms 'biological male or female' are imprecise and should be avoided." *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018) (quoting Endocrine Society's clinical practice guidelines).

Pursuant to the CIAC policy, Andraya competed on the girls' track-and-field team at Cromwell High School for the 2017, 2018, and 2019 indoor and outdoor seasons. *See* SAC ¶¶ 81, 90, 91, 99.[4] Terry competed on the girls' track-and-field team at Bloomfield High School for the 2018 outdoor season and the 2019 indoor and outdoor seasons. *See* SAC ¶¶ 88–91.[5] Both Andraya and Terry also competed on the girls' track-and-field team for the 2020 indoor season.[6] They have now graduated from high school. *See* SAC ¶ 81 (stating that Andraya's "freshman season" was in 2017, which would position her to graduate in 2020); *see id.* ¶ 88 (stating that Terry began running track in the 2017 season, which would similarly position her to graduate in 2020).

---

[4] The published results of all of Andraya's track-and-field events ("Andraya's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14519891. A copy is attached for the Court's convenience as Exhibit A.

[5] The published results of all of Terry's track-and-field events ("Terry's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14046370. A copy is attached for the Court's convenience as Exhibit B.

[6] The original Complaint in this case was filed on February 12, 2020, ECF No. 1, midway through track-and-field's 2020 indoor season. The Amended Complaint was filed on April 17, 2020, ECF No. 89, and the Second Amended Complaint was filed on August 11, 2020. ECF No. 141. By that point, the 2020 indoor season was complete, and the 2020 outdoor season had been canceled in its entirety as a result of the COVID-19 pandemic. *See, e.g.*, Joe Morelli, *CIAC officially cancels 2020 spring season, following schools' closure*, gametimect.com, https://www.gametimect.com/ciac-expected-to-finally-cancel-spring-season. Nonetheless, the Second Amended Complaint contains multiple outdated factual allegations about the purported injuries that will be suffered by Plaintiffs in the 2020 outdoor season. *See* SAC ¶¶ 131–51. It also does not contain any information about Plaintiffs' many achievements in the 2020 indoor season.

**Plaintiffs**

Plaintiffs are four non-transgender girls: Selina Soule,[7] Chelsea Mitchell,[8] Alanna Smith,[9] and Ashley Nicoletti.[10] Soule and Mitchell have now graduated from high school. *See* SAC ¶ 148 (stating that because Soule and Mitchell "are seniors, the Spring 2020 track season is their final opportunity to compete in high school track and field events"). Thus, the only parties to this case who are current high school students are Smith and Nicoletti. *See id.* SAC ¶ 178(5) (stating that only plaintiffs Smith and Nicoletti are seeking prospective injunctive relief).

**Plaintiffs' Participation in High School Girls' Track**

The high schools attended (or formerly attended) by Plaintiffs and the Individual Intervenor-Defendants all participate in the CIAC for outdoor and indoor track. Schools are grouped by size, or "Class": Class S, M, L, or LL. Schools generally compete against schools their same size. At the end of the season, there is a Class championship meet in both indoor and outdoor track. *See* SAC ¶ 79. The students with the five fastest times in, for example, the girls' outdoor track 100m final at the Class M championship advance to the subsequently held State Open Championship. *See, e.g.*, SAC ¶¶ 79, 81, 87. At the State Open, students from the various

---

[7] The published results of all of Selina Soule's track-and-field events ("Soule's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=10678905. A copy is attached for the Court's convenience as Exhibit C.

[8] The published results of all of Chelsea Mitchell's track-and-field events ("Mitchell's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=12095608. A copy is attached for the Court's convenience as Exhibit D.

[9] The published results of all of Alanna Smith's track-and-field events ("Smith's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14790311&L=4. A copy is attached for the Court's convenience as Exhibit E.

[10] The published results of all of Ashley Nicoletti's track-and-field events ("Nicoletti's Results") are posted online at https://www.athletic.net/TrackAndField/Athlete.aspx?AID=14752303. A copy is attached for the Court's convenience as Exhibit F.

Classes compete against each other in each race. *Id*. After some preliminary heats, the top

finishers race in the final heat of, for example, the girls' outdoor track 100m final, and have the

opportunity to move on to the New England Championship. *Id*.

Under that format, Plaintiffs allege that they have been deprived of equal athletic

opportunity in violation of Title IX. Plaintiffs assert that girls who are transgender have an unfair

"athletic advantage," and that Andraya and Terry's participation in girls' track-and-field events

deprives Plaintiffs of equal athletic opportunity on the basis of sex. SAC ¶¶ 165–66, 175–76. All

four plaintiffs assert in conclusory terms that, as a result of the participation of girls who are

transgender in girls' high school athletic events, Plaintiffs "are losing competitive opportunities,

the experience of fair competition, and the opportunities for victory and the satisfaction, public

recognition, and scholarship opportunities that can come from victory." *Id*. ¶ 70.

Despite these sweeping assertions, the Complaint identifies only a few specific instances

in which Andraya or Terry allegedly had any impact on Plaintiffs' athletic opportunities. For

example, Soule identifies only one instance in which she was allegedly denied an athletic

opportunity as a result of competing against either Andraya or Terry. SAC ¶¶ 91–92. During the

2019 indoor track season, Soule competed against Andraya and Terry in the 55m dash at the

State Open Championship. *Id*. ¶ 91. In the preliminary race, to determine eligibility for the final

heat of the State Open Championship in the 55m dash, Terry had the fastest time and Andraya

had the second-fastest. *Id*. Soule had the eighth-fastest time—behind Terry, Andraya and five

other, non-transgender girls—and therefore failed to qualify for the final 55m championship

race. *Id*. Soule alleges that if Andraya and Terry had not participated in the race, she would have

placed sixth, and would therefore have been eligible to compete in the final heat for a spot at the

New England Championship. *Id*. ¶ 92. Soule does not identify any race for which she allegedly

would have won a championship but for Andraya or Terry's participation, nor does a review of posted publicly available records show the same.

Despite this single instance in which Soule was allegedly denied the opportunity to compete for a spot at the New England Championship in the 55m dash, Soule had numerous *other* opportunities in which she was able to secure a spot in New England Championship events. In 2019 indoor season, Soule competed in the New England Championship in both long jump and the 4x200 relay. *See* Soule's Results (Ex. C) at p. 5 (long jump results); p. 6 (relay). She did so again in the 2019 outdoor season, *see id.* at p. 4 (long jump), and had previously done so in the 2018 outdoor season in the 100m dash and long jump. *Id.* at p. 7 (100m dash); p. 9 (long jump).

Like Plaintiff Soule, Plaintiff Ashley Nicoletti alleges only one instance in which she was allegedly denied an athletic opportunity as a result of competing against either Andraya or Terry. SAC ¶ 100. During the 2019 outdoor season, Nicoletti competed against Andraya and Terry in the 100m at the S Class Women's Outdoor Track Finals. *Id.* In the preliminary race, to determine eligibility for the final heat, Plaintiff Chelsea Mitchell had the fastest time, Terry had the second-fastest time, and Andraya had the third-fastest time. *Id.* Nicoletti had the ninth-fastest time and failed to qualify for the final. *Id.* Like Soule, Nicoletti does not identify any race for which she allegedly would have won a championship but for Andraya or Terry's participation, nor do the publicly available posted records reflect the same.[11]

---

[11] Nicoletti is a sophomore who appears to compete during the outdoor season only. *See* Nicoletti's Results (Ex. F) at p. 1 (listing outdoor results only). Thus, the 2019 outdoor season is the only season in which she has competed in during high school. *Id.* In that season, she placed ninth in in the 100m preliminary race at the S Class Championship. At that same event, Nicoletti finished thirteenth in the 200m. She did not advance to the state open in any event. *Id.*

Plaintiff Alanna Smith also alleges only one occasion when she claims she was negatively affected by Andraya or Terry's participation. SAC ¶ 102. During the 2019 outdoor season, Smith competed against Terry in the 200m State Open Championship. *Id.* Terry placed first, and Smith placed third. *Id.* During the same season, however, Smith outperformed both Terry and Andraya in the 100m State Open Championship, where Smith placed third, Andraya placed fourth, and Terry was disqualified because of a false start. *Compare* Smith's Results (Ex. E) at p. 1 (showing third-place finish), *with* Andraya's Results (Ex. A) at p. 3 (showing fourth-place finish), *with* Terry's Results (Ex. B) at p. 3 (showing "FS"). During the same season, Smith also won the 400m State Open Championship and the 400m in the New England Championship. *See* Smith's Results (Ex. E) at p. 3 (showing first-place finish at State Open and at New England Championship).

Plaintiff Chelsea Mitchell competed against Andraya and Terry on several occasions, including State Open Championships for the 55m dash, and certain 100m, 200m, and 300m races from the 2017 indoor season through the 2020 indoor season. SAC ¶¶ 91, 100–02. On most occasions, Mitchell had slower times than Andraya and Terry, but Mitchell also had faster times on several occasions. For example, in the 2019 outdoor season, Mitchell outperformed Andraya in the S Class championship for both the 55m dash and the 100m state open championship. *Id.* ¶¶ 100–01. And, in the 2020 indoor season, Mitchell outperformed Terry in the 55m dash "S Class," the 55m dash state open championship, and the 300m "S Class" championship. *Compare* Mitchell's Results (Ex. D) at p. 1 (showing first-place finish in 55m dash at "S Class" and State Open, and first-place finish in 300m at "S Class") with Terry's Results (Ex. B) at p. 1 (showing second-place finish in 55m dash at S Class and third-place finish at State Open, along with sixteenth-place finish in 300m at "S Class").

10

As of the 2020 indoor season, Mitchell ranked number one among all girls in Connecticut for the 200m. *See* Mitchell's Results (Ex. D) at p.1 (showing first-place ranking with time of 25.98). Mitchell also competes in the long-jump competition, where she has won multiple state championships. For the 2020 indoor season, Mitchell ranked number one among girls in Connecticut and number two among girls nationally in the long jump. *Id.* [12]

**<u>Plaintiffs' Claims and Requested Relief</u>**

Plaintiffs assert that as a result of Andraya and Terry's participation, Defendants have violated Title IX by failing to effectively accommodate the athletic abilities of girls, *see* SAC ¶¶ 178(A), and failing to provide equal treatment, benefits, and opportunities for girls' athletics. *Id.* 178(B). For these alleged violations, Plaintiffs seek nominal and compensatory damages. *Id.* ¶ 178(F). Plaintiffs also seek prospective relief in the form of a declaratory judgment and three injunctions. *Id.* ¶¶ 178(A) – (E).

- Plaintiffs Smith and Nicoletti request "[a]n injunction prohibiting all Defendants . . . from permitting males [sic] from participating in events that are designated for girls, women, or females." SAC ¶ 178(C), (5).

- All Plaintiffs also seek "[a]n injunction requiring all Defendants to . . . remove male [sic] athletes from any record or recognition purporting to record times, victories, or qualifications for elite competitions designated for girls or women, and conversely to correctly give credit and/or titles to female athletes who would

---

[12] In paragraphs 77-119, the Second Amended Complaint makes numerous allegations regarding student athletes who are not parties to this action. It also makes overarching statements about the CIAC policy's effect on non-transgender female athletes in general. These allegations are irrelevant to this matter. This matter concerns only the CIAC policy as it affects the four named Plaintiffs in the individual events in which they compete.

have received such credit and/or titles but for the participation of athletes born male and with male bodies in such competitions." *Id.* ¶ 178(D).

- Finally, all Plaintiffs seek "[a]n injunction requiring all Defendants to correct any and all records, public or non-public, to remove times achieved by athletes born male and with male bodies from any records purporting to record times achieved by girls or women." *Id.* ¶ 178(E).

All of Plaintiffs' legal claims, and all of their requested injunctions, are based on the premise that by allowing Andraya and Terry to participate on the same teams as other girls, the CIAC policy is allowing "males" to participate in women's sports. The requested relief thus refers to girls who are transgender as "males" and "athletes born male and with male bodies." But despite the Plaintiffs' frequent use of that terminology, the Second Amended Complaint does not define or otherwise identify any specific physiological characteristics that one must have to be "physiologically male" or "have a male body," for purposes of violating Title IX.

## LEGAL STANDARD

Rule 12(b)(1) permits the Defendants to challenge this Court's subject matter jurisdiction over the Plaintiffs' Complaint by motion to dismiss. *See* Fed. R. Civ. P. 12(b)(1). It is Plaintiffs' burden to prove by a preponderance of the evidence that subject matter jurisdiction does exist. *Id.* The Court, in determining if subject matter jurisdiction does exist, may refer to evidence submitted outside the pleadings. *Id*.

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The law and rules governing motions to dismiss brought pursuant to Rule 12(b)(6) are well-established. In adjudicating a motion brought pursuant to Rule 12(b)(6), the Court is generally required to accept all factual allegations made in the

complaint as true and draw all reasonable inferences in favor of the Plaintiff. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Perkins v. S. New Eng. Tel. Co.,* No. 3:07-CV-967, 2009 WL 350604, at *1 (D. Conn. Feb. 12, 2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has clarified:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.
>
> ***
>
> While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id*. at 679 (internal citations omitted); *see also Twombly*, 550 U.S. at 565–66. Thus, the court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. After discounting those allegations not entitled to the assumption of truth, the court can next proceed to consider whether those "factual allegations [entitled to the assumption of truth] . . . plausibly suggest an entitlement to relief." *Id*. at 681.

## ARGUMENT

**II.    Plaintiffs Have Failed to Allege Standing for Prospective Relief against the CIAC, Bloomfield, Cromwell, Glastonbury, Canton and Danbury.**

Litigants do not have standing for declaratory and injunctive relief unless they can meet

three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.
>
> Second, there must be a causal connection between the injury and the conduct complained of . . . [and]
>
> Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The allegations in the

Second Amended Complaint are insufficient to meet any of those three elements, and, therefore,

Plaintiffs lack standing to seek injunctive and declaratory relief.

**A.    Plaintiffs Smith and Nicoletti's Claims of Future Injury Are Too Conjectural to Support Standing to Enjoin CIAC's Policy.**

Plaintiffs Smith and Nicoletti (the only plaintiffs who are still high school students as of

today)[13] seek an injunction to enjoin CIAC's policy and prohibit girls who are transgender from

competing with other girls. SAC ¶ 178(C), (5). To demonstrate standing to bring this claim,

Smith and Nicoletti must first plead and prove that they will suffer an invasion of a legally

protected interest that is (a) concrete and particularized, and (b) actual or imminent, not

---

[13] Soule and Mitchell cannot claim future injury from participation of girls who are transgender since they have graduated, and, therefore any such claims are moot. *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001).

conjectural or hypothetical. Allegations of "some day" injuries, "without any description . . . or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564.

Here, Smith and Nicoletti allege that they will be injured if they have to compete in unidentified future races against unidentified girls who are transgender.  Even assuming, *arguendo*, that any plaintiff could have a legally protected interest in avoiding competition with girls who are transgender—which they cannot, *see infra* at Sec. III—Smith and Nicoletti fail to allege any facts showing an "actual or imminent" risk they will have to do so. The only girls who are transgender mentioned in the Second Amended Complaint are Andraya and Terry, who have now graduated and are no longer eligible to compete in CIAC events. Smith and Nicoletti have not identified any girls who are transgender who will be competing against them in the future. Indeed, they have not identified any girls who are transgender who will be competing in track and field, at all. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Lujan*, 504 U.S. at 564–65 n.2.

The highly conjectural nature of Smith and Nicoletti's claim stands in stark contrast to the future injuries found to support standing in *McCormick* and other Title IX cases. The plaintiffs in *McCormick* had established that the girls' soccer program in their school district was scheduled in the spring, and thus did not allow them to compete for the state championships, which were held in the fall season. *McCormick*, 370 F.3d at 284–85. For this reason, the threat of future harm was both "actual and imminent, not conjectural or hypothetical." As the Second Circuit held, "[s]cheduling soccer in the spring denies the athletes the opportunity to play for a

team that can qualify for the Regional and State Championships," and thus, the plaintiffs "have a concrete and personal stake in the outcome of this case" so as to justify standing. *Id.* at 284.

Yet Smith and Nicoletti's chain of contingencies does not end there. Even if Smith and Nicoletti could allege with any certainty that girls who are transgender will imminently compete in track and field, and that they will personally compete against those transgender girls, Smith and Nicoletti cannot credibly allege that they will finish in particular spots in particular races next year if girls who are transgender are barred from competing. *See*, *e.g.*, *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1100 (9th Cir. 2000) (finding alleged Title IX injury too uncertain to support standing, and likening it to the "very speculative assumption," in the damages context, that, had it "only been given the chance," a company would undoubtedly have won a competitive opportunity and would furthermore have operated it profitably) (citing *Preferred Commc'ns, Inc. v. City of Los Angeles*, 13 F.3d 1327, 1334 (9th Cir. 1994)).

At the 2021 State Open, if one is even held, Smith and Nicoletti could very easily default, slip, or just lose to someone they were "supposed" to beat. Notwithstanding numerous examples of unpredicted outcomes in athletic competition[14], Plaintiffs' entire complaint is built on the belief that there is certainty in track outcomes, and that they *will* finish in particular places

---

[14] In 1980, the U.S. men's hockey team famously beat the Soviet Union's team at Lake Placid, which is considered one of the greatest upsets of all times. *See*, *e.g.*, Nicholas Schwartz, *The 11 Biggest Upsets in Sports History*, Business Insider (June 10, 2012), https://www.businessinsider.com/the-11-biggest-upsets-in-sports-history-2012-6#1980-usa-4-ussr-3-2. Al Michaels's countdown and statement "Do you believe in miracles?" aptly summarized the feelings of those watching the game, and the phrase has been used repeatedly over the years to motivate any perceived underdog in a sporting event. As Buster Douglas, the North Carolina State Wolfpack, and David Tyree and the rest of the New York Giants can attest, there are no sure outcomes in a sporting event—not for Plaintiffs, not for Andraya and Terry, not for anyone.

without transgender runners in the race. This is not the way athletics work. Plaintiffs' speculation as to their "otherwise-guaranteed" victories does not give them standing.

> **B. Plaintiffs Lack Standing to Seek Expungement of Transgender Students' Athletic Records Because Doing So Would Not Redress an Alleged Injury.**

All of the Plaintiffs also ask for an injunction requiring Defendants "to remove times achieved by" girls who are transgender "from any records purporting to record times achieved by girls or women," along with "any record or recognition purporting to record times, victories, or qualifications" for girls who are transgender. SAC ¶ 178(E), (1)-(4). But Plaintiffs have not plausibly alleged how expunging the records of girls who are transgender would redress any of Plaintiffs' alleged past injuries, as required for standing. To the extent the erasure of Terry and Andraya's achievements would make Plaintiffs feel better, it is black-letter law that "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107 (1998). Notably, Plaintiffs ask for the erasure of Terry and Andraya's records and times across the board—as well of those of any other transgender students—not only "record[s] or recognition" for events in which Plaintiffs took part. Eliminating any trace of Andraya and Terry from events in which Plaintiffs did not take part does not redress any purported injury to Plaintiffs. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Id.*

All Plaintiffs also ask to be retroactively awarded "credit and/or titles" they "would have received . . . but for the participation" of girls who are transgender. SAC ¶ 178(D), (1)-(4). Again, Plaintiffs' claims are based on the assumption that, if Terry and Andraya did not race, everyone would have finished in the same order, but just moved up one or two positions (depending on whether one or both of Terry and Andraya ran and finished ahead of Plaintiffs).

This is highly speculative and woefully insufficient to establish standing. If Terry and Andraya had not been allowed to compete, two different girls from their divisions would have advanced to compete in the races against Plaintiffs, and there is no way to know how each competitor would have placed in that hypothetical matchup.  Racers do not run the exact same time every time they compete. As discussed above, Terry and Andraya's absence from the race would have affected who participated in the race, as well as the participants' lanes, positions, and, according to Plaintiffs, even their attitudes. *See* SAC ¶ 117.  Moreover, given the number of variables inherent in any athletic competition, it simply is not possible to state that everyone would have finished higher than they did with Terry and Andraya in the race, and in the exact same order.[15]

**III.    Plaintiffs' Requested Relief Would Violate the Rights of the Individual Intervenor-Defendants and Other Transgender Students.**

   **A.  Plaintiffs' Requested Injunctions Would Violate the Equal Protection Clause.**

Plaintiffs' requested injunctions would violate the Equal Protection Clause. The U.S. District Court for the District of Idaho recently concluded that an Idaho statute with a similarly sweeping ban likely violated transgender students' rights under the Equal Protection Clause, and issued a preliminary injunction prohibiting Idaho from enforcing it. *See generally Hecox v. Little*, No. 1:20-cv-00184-DCN, 2020 WL 4760138, at *27–34 (D. Idaho Aug. 17, 2020).

---

[15] For example, during the 2020 indoor track season, Soule failed to finish in the top five at her Class meet for the 55m dash, and therefore missed out on advancing to the Indoor State Open final.  *See* Soule's Results (Ex. C) at p. 1 (showing tenth-place finish). Neither Terry nor Andraya was in Soule's Class, and therefore they had no role in her failure to advance to the State Open Final.  Her failure to advance in those races could have been based on anything from not being as good as the other students she ran against, to not feeling well on race day, to slipping on water on the floor during the race, or any number of other variables inherent in a competitive race.

Discrimination against transgender people is subject to heightened scrutiny. The Second Circuit has set forth four considerations for determining whether a particular classification is subject to heightened scrutiny under the Equal Protection Clause. *Windsor v. United States,* 699 F.3d 169 (2d Cir. 2012), *aff'd,* 570 U.S. 744 (2013). These include:

> A) whether the class has been historically subjected to discrimination; B) whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society; C) whether the class exhibits obvious, immutable, or distinguishing characteristics that define them as a discrete group; and D) whether the class is a minority or politically powerless.

*Id.* at 181 (internal quotation marks, brackets, and citations omitted). Applying that same test, Judge Rakoff held in *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015), that transgender status meets all of the heightened-scrutiny criteria identified in *Windsor*. *Accord Johnson v. Padin et al*., No. 3:20-CV-637 (CSH), 2020 WL 4818363, at *3 (D. Conn. Aug. 16, 2020) ("Because transgender people are a quasi-suspect class, the Court must apply intermediate scrutiny to defendants' treatment of plaintiff." (citing *Adkins*, 143 F. Supp. 3d at 140)). The Ninth Circuit and district courts across the country have reached the same conclusion. *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *Hecox*, 2020 WL 4760138, at *26; *M.A.B. v. Bd. of Educ. of Talbot Cty*., 286 F. Supp. 3d 704, 719–22 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ*., 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016).

Excluding transgender students from sex-separated teams based on presumptions about their bodily sex characteristics would also independently trigger heightened equal protection scrutiny because it is sex discrimination. *See Adams*, 2020 WL 4561817 , at *5. A policy purporting to define who is a "biological girl" for purposes of participating in sex-separated teams "cannot be stated without referencing sex" and would therefore be "inherently based upon

a sex-classification." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). And "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996).

Plaintiffs have not plausibly alleged that their requested injunctions could withstand heightened scrutiny. To survive heightened scrutiny, Plaintiffs would have to show that their proposed policy serves an important governmental interest and "that the discriminatory means employed" "are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). "Moreover, the classification must substantially serve an important governmental interest today, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Id.* (quoting *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015)) (cleaned up).

Here, even accepting Plaintiffs' allegations as true, Plaintiffs' own pleading demonstrates that their requested injunctions are not substantially related to the important governmental interest of providing equal athletic opportunity. As noted above, Plaintiffs' factual allegations do not plausibly support that they have actually been deprived of equal athletic opportunities. Nor do they support that banning transgender girls from competing and stripping them of their past achievements is a constitutionally appropriate means of serving that interest.

The district court's decision in *Hecox* is particularly instructive, because Idaho tried to justify its categorical ban on girls who are transgender participating in girls' sports by pointing to the Individual Intervenors in *this very case*. "[D]uring the entire legislative debate over the Act, the only transgender women athletes referenced were two high school runners who compete in Connecticut, and who were, notably, also defeated by cisgender girls in recent races." 2020 WL

4760138, at *30. But the *Hecox* court concluded that this information—i.e., the mere fact of Andraya and Terry's participation in girls' track—did not provide "an 'exceedingly persuasive' justification" for Idaho's sweeping exclusion of all girls and women who are transgender. *Id.* at 31.

The *Hecox* court explained that there is a critical difference between providing sex-separated sports teams for boys and girls, and enacting discriminatory rules that bar girls who are transgender from participating on the same teams as other girls. 2020 WL 4760138, at *28. Courts applying heightened scrutiny have held that providing sex-separated teams is substantially related to advancing an important governmental interest in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." *See, e.g.*, *Clark, ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). But as explained by the court in *Hecox*, those important interests are not similarly served by banning girls who are transgender from participating. 2020 WL 4760138, at *28. "First, like women generally," and unlike cisgender men, "women who are transgender have historically been discriminated against, not favored." *Id.* Second, excluding girls and women who are transgender from participating in women's sports effectively prevents them from participating in *any* sex-separated sport. *Id.* at 29.[16] Third, because transgender people represent just a small percentage of the population, "it appears untenable that allowing transgender women to compete on women's teams would substantially displace [non-transgender] female athletes."

---

[16] The court noted that the "argument that . . . transgender women are not excluded from school sports because they can simply play on the men's team is analogous to claiming homosexual individuals are not prevented from marrying under statutes preventing same-sex marriage because lesbians and gays could marry someone of a different sex." *Hecox*, 2020 WL 4760138, at *35.

*Id*. And fourth, girls and women who receive puberty blockers or suppress testosterone through gender-affirming hormone therapy do not have the same athletic advantages as cisgender males. *Id.* at 30. Ultimately, the court concluded that Idaho's claim of an "'absolute advantage' between transgender and cisgender women athletes is based on overbroad generalizations without factual justification." *Id.* at 33.

Just as Terry and Andraya's participation in girls' track did not provide any justification for Idaho's sweeping statutory exclusion of women and girls who are transgender from women's competition, their participation also does not provide any justification for Plaintiffs' sweeping attempt to void the CIAC's policy, bar women and girls' who are transgender from women's events in Connecticut, and erase any past victories transgender athletes have obtained.

The Second Amended Complaint suffers from the same flaws as the Idaho statute at issue in *Hecox*. Even though Plaintiffs seek to categorically ban all girls who are transgender from participation, the Second Amended Complaint fails to allege that a person's sex designation at birth, and undefined references to "being possessed of a male body," actually confer any athletic advantage. Rather, the Amended Complaint admits that "boys and girls have comparable athletic abilities before boys hit puberty," and the alleged physiological advantages for boys do not occur until puberty when "testosterone drives a wide range of physiological changes." SAC ¶ 46. Despite the centrality of testosterone to their factual allegations, Plaintiffs admit they do not know whether Andraya and Terry—or any other girls who are transgender and participate in school athletics—are undergoing gender-affirming hormone therapy to suppress their levels of circulating testosterone, or other medical treatment. SAC ¶ 59. Instead, Plaintiffs make the conclusory assertion that it "does not matter" whether Andraya and Terry are undergoing hormone therapy to reduce the impact of testosterone on their bodies. *Id*. And, despite the

centrality of the effects of male puberty to its allegations, *see* SAC ¶¶ 46–48, the Second

Amended Complaint does not allege whether either Andraya or Terry—or any other girls who

are transgender and participate in school athletics—have received puberty blockers to prevent the

progress of typically male puberty. *See* AAP Amicus, *supra* n.1 (describing types of treatments

for gender dysphoria recommended by the American Academy of Pediatrics and other medical

organizations).[17]

       For all of these reasons, even if Plaintiffs' allegations about "athletic advantages" were

true, the scope of the injunctions would still not correlate with Plaintiffs' allegations. Instead, the

Second Amended Complaint seeks to prohibit all girls who are transgender from participating on

the same teams as other girls, regardless of whether they have actually gone through a typically

male puberty and regardless of whether they possess characteristics that might be understood to

confer any advantage. Such a sweepingly overbroad and discriminatory injunction is not

substantially related to the allegations in the complaint and cannot survive heightened scrutiny.

*See Hecox*, 2020WL4760138, at *35 (explaining that categorical ban served only "an invalid

---

[17] The Second Amended Complaint relies extensively on the work of Duke law professor
Doriane Lambelet Coleman in support of its allegations that girls who are transgender have an
athletic advantage over non-transgender girls. *See* SAC ¶¶ 55, 56, 58. But Coleman has publicly
opposed legislation in Arizona and Idaho that would exclude all transgender students from sex-
separated teams based solely on their chromosomes, without regard to whether the athletes have
received puberty blockers or hormone therapy. *See Hecox,* 2020 WL 4760138, at *32 (noting
that "[p]rofessor Coleman herself urged Governor Little to veto H.B. 500 because her work was
misused); Betsy Russell, *Professor whose work is cited in HB 500a, the transgender athletes bill,
says bill misuses her research and urges veto*, The Idaho Press (Mar. 19, 2020), at
https://www.idahopress.com/eyeonboise/professor-whose-work-is-cited-in-hb-a-the-
transgender/article_0e800202-cac1-5721-a769-3268665316a8.html. The Court may take judicial
notice of Ms. Coleman's published letter, which is posted alongside the *Idaho Press* news article,
as evidence of Ms. Coleman's views. *See, e.g.*, *Fed. Ins. Co. v. Speedboat Racing Ltd.*, 200 F.
Supp. 3d 312, 349 (D. Conn. 2016) (taking judicial notice of media reports, on motion to
dismiss, for fact of their publication).

interest of excluding transgender women and girls from women's sports entirely, regardless of their physiological characteristics"); *Adams*, 2020 WL 4561817, at *8 (holding that policy excluding transgender students from restrooms based on "anatomical differences" failed to account for the anatomical and physiological differences resulting from gender-affirming medical care).[18]

### B.  Plaintiffs' Requested Injunctions Would Violate Title IX.

Plaintiffs' requested injunctions would also violate the rights of the Individual Intervenor-Defendants and other girls who are transgender under Title IX. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a).  Prohibiting girls who are transgender from participating in athletics with other girls would exclude them from participation in athletics altogether and deny them the benefits of athletic opportunities in violation of the plain statutory text.

Discriminating against a person because they are transgender is discrimination on the basis of sex. Plaintiffs would have this Court define "sex" exclusively by particular biological traits typical of males and females. But, the plain meaning of "sex" refers more generally to "*the*

---

[18] By focusing on the overbroad nature of the proposed injunction and claims for relief, the Defendants are in no way conceding that the CIAC policy, which does not require high schools to inquire about a girl's puberty status or the status of any gender-affirming medical care, violates Title IX. To the contrary, the Defendants strongly contend that the CIAC policy is both consistent with and mandated by law and public policy for the many reasons discussed in this memorandum. However, the Defendants would be remiss in failing to address the internal inconsistencies in the Plaintiffs' Second Amended Complaint and, in particular, how such inconsistencies make clear that none of the Plaintiffs has made allegations that are sufficient to support the overbroad claims for injunctive and other relief.

*properties or characteristics* by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016) (collecting definitions) (italics in original). Those characteristics are not limited to chromosomes or another singular biological trait; instead, they also include hormonal, anatomical, reproductive, and social elements. Dictionaries thus frequently define sex as "the sum of the morphological, physiological, and behavioral peculiarities of living beings . . . that is typically manifested as maleness and femaleness." *Id.* (internal citation omitted); *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017) (same).

The Supreme Court recently declined the invitation to limit the meaning of sex under federal law to the physiological distinctions advocated by the Plaintiffs here. In *Bostock*, the Court held that Title VII's prohibition on discrimination because of sex prohibits discrimination against an individual for being transgender because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," since "transgender status [is] inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1741–42. The Court rejected the arguments of the employers and the United States that such a reading of Title VII could not be squared with the intentions of the law's drafters, noting that "Title VII's prohibition of sex discrimination in employment is a major piece of federal civil rights legislation . . . written in starkly broad terms [and] has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them." *Id.* at 1752. "To refuse enforcement just because of that, because the parties before us happened to be unpopular at the time of the law's passage, would not only require [the Court] to abandon [its] role as interpreters

25

of statutes; it would tilt the scales of justice in favor of the strong or popular and neglect the

promise that all persons are entitled to the benefit of the law's terms." *Id.* at 1751.

The holding and reasoning of *Bostock* apply to this Court's analysis of Title IX, since

courts "interpret[] Title IX by looking to the case law interpreting Title VII." *Menaker v. Hofstra*

*Univ.*, 935 F.3d 20, 31 (2d Cir. 2019). Relying on *Bostock*, in *Adams*, the Eleventh Circuit held

that a school's policy barring a boy from the boys' restroom solely because he is transgender

violates Title IX. The Adams Court explained:

> *Bostock* teaches that, even if Congress never contemplated that Title VII could
> forbid discrimination against transgender people, the "starkly broad terms" of the
> statute require nothing less. This reasoning applies with the same force to Title IX's
> equally broad prohibition on sex discrimination. . . . [I]f an employer fires a
> transgender female employee but retains a non-transgender female employee, this
> differential treatment is discrimination because of sex. In the same way, [a
> transgender boy] can show discrimination by comparing the School Board's
> treatment of him, as a transgender boy, to its treatment of non-transgender boys.

*Adams,* 2020 WL 4561817 at *11–12 (internal citations omitted); *see also Whitaker*, 858 F.3d at

1049–50 ("A policy that requires an individual to use a bathroom that does not conform with his

or her gender identity punishes that individual for his or her gender non-conformance, which in

turn violates Title IX. The School District's policy also subjects [the plaintiff], as a transgender

student, to different rules, sanctions, and treatment than non-transgender students, in violation of

Title IX."); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (per curiam)

(upholding preliminary injunction barring school from prohibiting transgender girl from using girls' restroom).[19]

Like the discriminatory restroom exclusions at issue in *Adams*, Plaintiffs' requested injunctions would single out girls who are transgender for different and discriminatory treatment. They would classify any girl who is transgender as male and bar her from athletic activities for women and girls, even when she is already recognized as a girl "in current school records and daily life activities in the school and community." The requested relief would single out and publicly brand girls who are transgender "with a scarlet 'T'" when they step out of the schoolhouse doors and onto the athletic field. *Boyertown*, 897 F.3d at 530. Though Plaintiffs complain that they want more championship trophies to go along with the ones they already have, they seek injunctions that would literally "exclude[] [girls who are transgender] from participation" in sex-separated sports at all. 20 U.S.C. § 1681(a).  Such a wholesale bar on participation in sex-separated sports cannot be squared with Title IX.

## IV.   Plaintiffs Have Failed to Allege a Cognizable Claim Under Title IX.

Even if Title IX and the Equal Protection Clause did not already *prohibit* schools from discriminating against girls who are transgender, nothing in Title IX would *require* schools to do so. Indeed, doing so would distort Title IX beyond recognition.

Plaintiffs have attempted to argue that the inclusion of girls who are transgender violates Title IX's regulations on sex-separated sports teams because Title IX requires schools to use a

---

[19] Although the Second Circuit has not revisited this issue since *Bostock*, prior case law is consistent with both *Bostock* and *Adams*. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018), *aff'd, Bostock, supra*; *Fabian.*, 172 F. Supp. 3d at 526; *Kelley v. Ithaca Coll.*, 3:18-CV-1082, 2019 U.S. Dist. LEXIS 102636, at *17 n.9 (N.D.N.Y. June 18, 2019). Therefore, there can be no doubt that transgender individuals, including Andraya and Terry, are protected by Title IX by its very plain language. This requires this Court to dismiss Plaintiffs' claims.

definition of "sex" that is limited to certain biological traits (or to sex assigned at birth). Plaintiffs further argue that, under Title IX, they have been denied both effective accommodation and equal treatment. Their allegations fail on all three fronts. Nothing in the Title IX regulations authorizing the establishment of separate sports teams based on sex requires the exclusion of girls who are transgender from competing along with other girls. Plaintiffs further fail to allege facts that would support that they have been denied either effective accommodation or equal benefits or opportunities to compete. To the contrary, the operative complaint and their own records show the opposite. Their Title IX claims therefore fail as a matter of law.

### A. Title IX and Its Implementing Regulations Do Not Define Sex-Separated Teams in a Manner that Bars Girls Who Are Transgender from Participating with Other Girls.

Plaintiffs' claims are premised upon the assertion that Title IX and its regulations establish a definition of "sex" that precludes girls who are transgender—and who are recognized as girls "in current school records and daily life activities in the school and community"—from being recognized by their schools as girls for purposes of sex-separated athletic activities.  But Plaintiffs fail to identify any text within Title IX, its implementing regulations, or Department of Education policy statements purporting to define sex in such a manner. Plaintiffs fundamentally fail to state a claim under Title IX.

Even before *Bostock,* every court of appeals to address the issue has rejected the notion that Title IX establishes a definition of "sex" that precludes girls who are transgender from using the same sex-separated facilities as other girls (or that precludes boys who are transgender from using the same sex-separated facilities as other boys). "[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on [']biological sex['] and cannot accommodate gender identity." *Parents for*

*Privacy*, 949 F.3d at 1227; *accord Boyertown*, 897 F.3d at 533; *Whitaker,* 858 F.3d at 1049; *G.G.*, 822 F.3d at 722; *Dodds*, 845 F.3d at 219. This reasoning applies equally to sex-segregated restrooms as it does to sex-segregated athletic teams, and demands the dismissal of Plaintiffs' case here.

Far from requiring a definition of sex that is limited to some definition of "biological sex," Title IX's implementing regulations do not define the term "sex" or delineate how this provision should be applied with respect to those whose gender identity and physiological characteristics do not align with the sex assigned to them at birth. *See G.G.*, 822 F.3d at 722 (explaining that Title IX's implementing regulations assume that the student population consists of "what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction. [They] shed[] little light on how exactly to determine the 'character of being either male or female' where those indicators diverge." ). *Cf. Suesz v. Med-1 Sols.*, LLC, 757 F.3d 636, 639 (7th Cir. 2014) (en banc) ("[T]erms that seem plain and easy to apply to some situations can become ambiguous in other situations.").

Nothing in the regulation dictates an interpretation of "sex" that would result in the exclusion of transgender girls from girls' teams. As the Eleventh Circuit explained of the Title IX regulations permitting separate restrooms for boys and girls, "Title IX and its accompanying regulations contain no definition of the term 'sex,'" and "[a]lso absent from the [regulation] is the term 'biological.'" *Adams*, 2020 WL 4561817 at * 14. Thus, while "[i]t seems fair to say that § 106.33 tells us that restrooms may be divided by male and female[,] the plain language of the regulation sheds no light" on whether a transgender student's sex is defined by the student's sex assigned at birth or other characteristics. *Id.* That separate restrooms or athletic teams for boys

29

and girls are permissible under Title IX does not lead to the conclusion, advocated by Plaintiffs here, that the law compels the expulsion of girls and boys who are transgender from spaces that align with their gender identity.

Instead of applying the plain and unambiguous statutory and regulatory text, Plaintiffs are making policy arguments that teams should be separated based on advantages that allegedly accrue during puberty, and then trying to shoehorn those policy arguments into the definition of the word "sex." "But none of these contentions about what [plaintiffs] think the law was meant to do, or should do, allow [courts] to ignore the law as it is." *Bostock*, 140 S. Ct. at 1745. In order to guarantee equal athletic opportunity for all its students, the CIAC adopted a policy providing that, if a girl who is transgender is recognized as a girl "in current school records and daily life activities in the school and community," she should also be recognized as a girl in school athletics.[20] No matter how strongly plaintiffs believe in the importance of sex separation in athletics, and in their particular definition of what constitutes sex separation, nothing in the plain text of Title IX or the athletic regulation prohibits CIAC from making that decision, or requires CIAC to subject girls who are transgender to different and discriminatory treatment. *Cf. Bostock*, 140 S. Ct. at 1750 (defendant's interpretation of Title VII "impermissibly seeks to displace the

---

[20] Plaintiffs' requested remedy would create a situation where girls who are transgender are treated as girls for all purposes during the school day, including student records, how teachers refer to them, what bathroom they use, and how they are reported to the state and federal governments, but then treated differently solely for purposes of athletics. "It is, to be sure, well-established that a statute should be interpreted in a way that avoids absurd results." *S.E.C. v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (alteration omitted).

plain meaning of the law in favor of something lying beyond it"). Thus, Plaintiffs' Title IX claims fail on their face and must be dismissed.

### B. Plaintiffs Have Not Plausibly Alleged that Competing with Girls Who Are Transgender Deprives Them of "Effective Accommodation" Under Title IX.

"Title IX claims of sex discrimination in athletics fall into two categories based on the [regulatory] factors to which the claims are addressed: effective accommodation claims focus on [34 C.F.R.] § 106.41(c)(1), and equal treatment claims focus on § 106.41(c)(2)-(10)." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012).  Under either theory—and even if Plaintiffs could show that Title IX somehow defines girls who are transgender as so-called "males"— Plaintiffs would still fail to state a cognizable claim that their rights have been violated.

In Count One, Plaintiffs pursue an "effective accommodation" claim, alleging that they have been denied equal opportunity to compete. *See* SAC ¶¶ 160–68. An effective accommodation claim looks at "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1); *see also* 44 Fed. Reg. 71413 *et seq.* (1979) (the "1979 Policy Interpretation") at § IV.C (explaining that the "regulation requires institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes"); *Biediger*, 691 F.3d at 92–94. It is assessed at the aggregate level, and focuses on a school's entire athletic program as a whole, rather than on any one particular individual's ability to compete, or win, on a given team. *See Biediger*, 691 F.3d at 92–93 (effective accommodation claim regarding Quinnipiac University's elimination of women's volleyball team as varsity sport); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 (2d. Cir. 1999) (effective accommodation claim that Syracuse discriminated against female athletes in its "decisions regarding which varsity teams to field as

31

well as how many opportunities for participation by female varsity athletes are thereby created as a result of those decisions"); *Thomas v. Regents of Univ. of Cal.*, No. 19-cv-06463-SI, 2020 WL 3892860, at *9 (N.D. Cal. July 10, 2020) (effective accommodation claim regarding "systemwide imbalance in athletic opportunities for women"). A typical effective accommodation claim thus involves situations where "[a plaintiff] was denied effective accommodation because she wishes to play on an unfielded team . . . or [] the university eliminated all opportunities for women to participate in a particular sport." *Id.* at *10 (citation omitted).

In accordance with the 1979 Policy Interpretation, courts address effective accommodation claims through a three-part test that analyzes: (1) whether participation opportunities are provided to males and females in numbers substantially proportionate to their respective enrollments; (2) if one sex is underrepresented in sports, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest[s] and abilities of the members of that sex; or (3) if one sex is underrepresented, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program. *Biediger*, 691 F.3d at 92–93. "The test is applied to assess whether an institution is providing nondiscriminatory *participation opportunities* to individuals of both sexes, and an institution is in compliance if it meets any one of the three prongs of the test." *McCormick*, 370 F.3d at 300 (emphasis in original). Indeed, the focus throughout the effective accommodation analysis is on how an athletics program, taken as a whole, provides participation opportunities for each sex as a whole. *See* Office for Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* 2-3 (1996),

https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html#two (last visited August 17, 2020)

(explicating test); Office for Civil Rights, U.S. Dep't of Educ*., Requirements under Title IX of the Education Amendments of 1972*,

https://www2.ed.gov/about/offices/list/ocr/docs/interath.html (last visited August 17, 2020)

(summarizing effective accommodation analysis).

Here, it is undisputed that Plaintiffs' schools have separate girls' indoor and outdoor track teams, that those teams participated in numerous meets, and that based on those meets, Plaintiffs themselves were able to qualify for their Class championships, for the State Open, and for the New England Championship—often to great success. *See supra* at pp. 9–12 (discussing the other athletic opportunities and achievements reflected in Plaintiffs' track records). But instead of applying the traditional three-part test for effective accommodation claims—perhaps because it has no application to claims like these—Plaintiffs' amorphous theory here is that the only way to provide equal athletic opportunity to girls and women is to exclude transgender girls from participation to protect them from competing against people "gifted with male bodies" (even if it deprives Intervenor Defendants of their own rights). SAC ¶ 104. Rather than attempt an effective accommodation analysis, Plaintiffs simply assume "that any result consistent with their account of the statute's overarching goal must be the law." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (internal citation omitted). This interpretation subverts the purpose of Title IX's "effective accommodation" doctrine, which is both inapposite to and unsupported by the facts presented here.

First, Plaintiffs' assumption that effective accommodation always requires sex-separated teams is wrong. There is no requirement that schools offer sex-separated teams at all, much less define them as Plaintiffs propose. Far from mandating separate teams, Title IX's regulations for

athletics establish a "[g]eneral" rule ***prohibiting*** schools from "provid[ing] . . . athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a). The regulations then carve out an exception to that general prohibition, stating that "a recipient ***may*** operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b) (emphasis added). The regulations thus allow schools to provide sex-separated teams, but they do not require schools to do so: They are "purposely permissive and flexible on this point, rather than mandatory." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking down high school athletic association rule mandating sex-separation for all teams as inconsistent with Title IX).

Plaintiffs' presumption that sex-separated teams are the only way to provide effective accommodation is by no means a foregone conclusion. On the contrary, at the time that Title IX was adopted, and continuing to this day, courts have recognized that allowing girls to play on boys' teams (and vice versa) can sometimes be the only effective way to provide equal athletic opportunity under the Fourteenth Amendment. *See, e.g.*, *Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922, 923 (8th Cir. 1976) (injunction allowing girl to compete on boys' cross-country team); *Brenden v. Indep. Sch. Dist*. 742, 477 F.2d 1292 (8th Cir. 1973) (injunction allowing girl to compete on boys' tennis, cross-country, and cross-country skiing team); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014) (injunction allowing girl to compete on boys' wrestling team); *Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) (same); *Lantz v.*

34

*Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985) (injunction allowing girl to compete on boys' football team).[21]

The Department of Education's 1979 Policy Interpretation—now more than 40 years old—is the only document that addresses when a school is ***required*** to provide separate teams for boys and girls. Under the 1979 Policy Interpretation, effective accommodation means that "where an institution sponsors a team in a particular sport for members of one sex, it may be required ***either*** to permit the excluded sex to try out for the team ***or*** to sponsor a separate team for the previously excluded sex." 1979 Policy Interpretation § VII.C.4 (emphasis added). Sex-separated teams in non-contact sports are required only if, among other things, "[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team or to compete actively on such a team if selected." *Id.* at § VII.C.4.b(3).

Thus, even assuming for purposes of this Motion that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs cannot state a claim for denial of effective accommodation unless they can show that they do not possess sufficient skill "to compete actively" alongside girls who are transgender. *Id.* Plaintiffs' own

---

[21] For example, although Title IX's regulations allow schools to provide separate teams for contact sports, many schools' athletic organizations—including CIAC—allow girls and boys to compete with each other on the same contact-sports team.  According to published statistics from the National Federation of State High School Associations, during the 2018-19 academic year, 42 girls in Connecticut played on boys' football teams, 21 girls in Connecticut played on boys' ice hockey teams, and 131 girls in Connecticut played on boys' wrestling teams. *See* Nat'l Fed. of State High Sch. Ass'ns Participation Data, *available at* https://members.nfhs.org/participation_statistics (last accessed Aug. 17, 2020). Last year in North Carolina, a high school girl competed on the boys' wrestling team and won the state championship. *See* The Associated Press, *Teen makes history as first girl to win wrestling championship in NC* (Feb. 27, 2020), https://wset.com/news/local/teen-makes-history-as-first-girl-to-win-wrestling-championship-in-nc.

Second Amended Complaint, and their considerable personal records of accomplishment, belie any such allegations.

First, while Plaintiffs assert over and over again that they "can't win," SAC ¶¶ 63, 70, 113, nothing in Title IX equates "competing actively" with winning every contest. The effective accommodation analysis is focused on ensuring equal participation opportunities—not on ensuring certain results for individual participants or teams.

Second, as a factual matter, Plaintiffs can, and do, win. As discussed above, Mitchell and Smith have actively competed against Andraya and Terry and have repeatedly *won* those competitions. *See supra* at pp. 10–11. And a comparison of the State Open Championships across the relevant seasons and years makes clear that Terry and Andraya have not dominated the girls' track events, or even the plaintiffs in those events, as Plaintiffs falsely allege. The falsity of these allegations is evident both from the face of the Second Amended Complaint and the public records on which Plaintiffs' allegations rely.[22]

**Outdoor State Open Championship: Total events won out of 18, including 3 relays**

|      | Terry | Andraya | Plaintiffs |
|------|-------|---------|------------|
| 2020 | *No season due to COVID-19* | | |
| 2019 | 2 (1 individually) | 0 | 2 (2 individually) |

---

[22] State Open results listed in these tables are publicly available online at AthleticNET, which has a toggle feature that enables a viewer to see results in each event. *See, e.g.*, https://www.athletic.net/TrackAndField/meet/306453/results (2017 outdoor results); https://www.athletic.net/TrackAndField/meet/288015/results (2017 indoor results); https://www.athletic.net/TrackAndField/meet/334210/results (2018 outdoor results); https://www.athletic.net/TrackAndField/meet/319841/results (2018 indoor results); https://www.athletic.net/TrackAndField/meet/364088/results (2019 outdoor results); https://www.athletic.net/TrackAndField/meet/352707/results (2019 indoor results); https://www.athletic.net/TrackAndField/meet/388188/results (2020 indoor results).

| | | | |
|---|---|---|---|
| 2018 | 2 (2 individually) | 0 | 0 |
| 2017 | 0 | 0 | 0 |

**Indoor State Open Championship: Total events won out of 15, including 3 relays**

| | Terry | Andraya | Plaintiffs |
|---|---|---|---|
| 2020 | 0 | 0 | 2 (1 individually) |
| 2019 | 2 (2 individually) | 0 | 2 (1 individually) |
| 2018 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 |

These results, taken on their face, exemplify that Plaintiffs have been able to effectively compete right alongside both Terry and Andraya.

Additionally, Plaintiffs assert that they are denied "the chance to be champions." SAC ¶ 112. But, again, that conclusory assertion conflicts with the publicly available data. Mitchell and Smith are highly accomplished athletes, and their track and field records show that they have both had the chance to be, and have been, "champions."[23] They have won some championships when competing directly against Andraya and Terry, and they have won some championships in other events, such as the long-jump and 400m race, events in which neither Andraya nor Terry compete. Soule, too, is a champion. In both the 2019 and 2020 indoor seasons, she won the 4x200 relay in the state open. *See* Soule's Results (Ex. C) at pp. 2, 5. Her team, Glastonbury,

---

[23] Soule and Nicoletti do not allege that they would have won a championship for any particular event had Andraya or Terry not participated. Both runners placed behind at least five non-transgender runners, including other Plaintiffs to this lawsuit, in events they claim denied them a chance to be a champion.

won the 2020 indoor championship.[24]  And, despite faulting Terry and Andraya for her eighth

place finish in the 55m dash during the 2019 indoor season, and thus implying that she missed a

"spot at the New England Championship" because of them, SAC ¶¶ 91–92, Soule in fact made it

to that championship in both long jump and the 4x200 relay. *See* Soule's Results (Ex. C)  at p. 5

(long jump results); p. 6 (relay). She did so again in the 2019 outdoor season, *see id.* at p. 4 (long

jump), and had previously done so in the 2018 outdoor season in the 100m dash and long jump.

*Id.* at p. 7 (100m dash); p. 9 (long jump).

Mitchell, Smith, and Soule are "champions." But there is enough room in Connecticut—

and in track-and-field competition more generally—for girls who are transgender to have "the

chance to be champions," too. Defendants can and *must* effectively accommodate the athletic

abilities and interests of *all* girls, including girls who are transgender. Providing effective

accommodation for the interests and abilities of these four Plaintiffs does not require Defendants

to deny effective accommodation to others.

### C.  Plaintiffs Have Not Plausibly Alleged the Elements of an Equal Treatment Claim.

In Count Two of the Second Amended Complaint, Plaintiffs claim that Defendants have

failed to ensure that female athletes such as Plaintiffs receive equivalent treatment, benefits, and

opportunities in athletic competition as compared to boys, due to the presence of transgender

girls, such as Intervenor Defendants, in a small minority of track and field events. SAC ¶¶ 169-

78. As with their effective accommodation claim, in making this argument, Plaintiffs presuppose

that transgender girls are "boys" for purposes of athletic competition. Regardless, Plaintiffs'

---

[24] *See* 2020 Combined Indoor Open State Championship, team scores,
https://www.athletic.net/TrackAndField/meet/388188/teamscores (showing Glastonbury ranked
first overall).

novel equal treatment claim stretches Title IX well beyond its intended application, and has no basis in law or fact.

An equal-treatment claim under Title IX focuses on "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 964–65 (9th Cir. 2010) (internal quotation omitted). As Judge Underhill previously noted, "equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Biediger v. Quinnipiac Univ.*, 928 F. Supp. 2d 414, 436 (D. Conn. 2013) (Underhill, J.), *aff'd*, 691 F.3d 85, 92 (2d Cir. 2012); *see also Boucher*, 164 F.3d at 115 n.1–2 (distinguishing effective-accommodation claims from equal-treatment claims).

When determining whether equal treatment has been denied, courts review the second through tenth factors set forth in the Title IX regulations:

> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c)(2)-(10); *McCormick*, 370 F.3d at 291 (setting out same). Thus, for example, an athletic program may be found to deny equal treatment when it schedules women's sports in a less advantageous manner than men's sports. *See, e.g.*, *McCormick*, 370 F.3d at 299 (sustaining unequal treatment claim by members of women's soccer team given high school's "off-season scheduling that disadvantaged members of only one sex"); *Comtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 855-57 (W.D. Mich. 2001) (high school

athletic association violated Title IX by scheduling athletic seasons and competitions for girls'

sports during nontraditional and less advantageous times compared to boys' sports). "To give

rise to an equal treatment claim, a plaintiff must make 'sufficient, nonconclusory allegations

plausibly linking the [action at issue] to discrimination on the basis of sex.'" *Thomas*, 2020 WL

3892860 at *2 (quoting *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019)). "Just saying

so is not enough. A recitation of facts without plausible connection to gender is not cured by

labels and conclusory statements about sex discrimination." *Id.* (finding that individual's claim

that she had been cut from soccer team did not reflect on system-wide inequality so as to support

equal treatment claim).

Plaintiffs' factual allegations fail to state a valid equal treatment claim under this legal

framework. In this case, Plaintiffs do not even attempt to argue that the CIAC treats boys' track

and field teams and girls' track and field teams differently. The Second Amended Complaint is

devoid of any allegations relating to unequal provision at interscholastic competitions of

equipment, facilities, services, or any of the other factors used in assessing unequal treatment.

Rather, the only allegations even remotely related to the regulatory factors are Plaintiffs' vague

claims that they were somehow, in some unknown way, denied publicity and recognition of their

efforts due to victories by other girls. But, as with an "effective accommodation" claim, the

assessment of unequal publicity on its face focuses on the publicity institutions provide to their

athletes or teams as a group—not the coverage ultimately enjoyed individually by each athlete

from third-party news outlets.[25] If, for example, a school were only publicizing its male athletes, and not its female athletes, on the school's website, that would support a claim for unequal publicity. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1112 (S.D. Cal. 2012) (sustaining unequal treatment claim on the basis of, among other things, a showing that "girls' athletic activities were provided with less coverage and promotion in yearbooks, fewer announcements in the school's Daily Bulletin, less signage on the school's electronic marquee, and inferior signage"), *aff'd*, 768 F.3d 843 (9th Cir. 2014). However, Plaintiffs have not alleged such facts in the Second Amended Complaint. Instead, Plaintiffs speculate that they *would have* received more publicity from unnamed news sources—which are not parties in this suit, and whose coverage is entirely outside of the control of Defendants—*if* they had finished first at the State Open, for example, instead of second. *See, e.g.*, SAC ¶ 97.[26] Such an argument, in addition to being wholly speculative, again has no basis in Title IX, and fails to meet even the basic standard necessary to survive a motion to dismiss.

---

[25] In regard to publicity, the 1979 Policy Interpretation states "[c]ompliance will be assessed by examining, among other factors, the equivalence for men and women of: (1) Availability and quality of sports information personnel; (2) Access to other publicity resources for men's and women's programs; and (3) Quantity and quality of publications and other promotional devices featuring men's and women's programs." 1979 Policy Interpretation § VI(B)(3)(i).

[26] As the Court is aware, Plaintiffs are no strangers to the press. They have given numerous interviews over the course of these proceedings.  For example, Soule was interviewed by Tucker Carlson on his nationally broadcast show. *See* "Biological Boys Taking Part in Women's Sports," Fox News (June 17, 2019), available at https://www.youtube.com/watch?v=whYYZwXwpbA. After Mitchell beat Terry in 2020 at the indoor state open finals, she was interviewed by the Hartford Courant. *See* Shawn McFarland, *For the second week in a row, Canton's Chelsea Mitchell beats Terry Miller in 55-meter dash, this time to win State Open title*, Hartford Courant (Feb. 22, 2020), https://www.courant.com/sports/high-schools/hc-sp-chelsea-mitchell-terry-miller-55-meter-dash-state-open-20200222-zdwb7shfbnfrxajs2hgmdwutbi-story.html. Neither of these press opportunities would have been presented to these high school athletes in the absence of their complaints about Terry and Andraya. If anything, Plaintiffs have actually received *more* publicity of their athletic careers through this case than they would have received otherwise.

### D.  Plaintiffs' Claims for Retrospective Relief are Barred by *Pennhurst*.

At a minimum, even if Plaintiffs could state a claim for prospective relief (despite their lack of standing to do so), their claims for retrospective relief are barred by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981).

According to *Pennhurst*, the Spending Clause to the U.S. Constitution precludes the federal government from imposing any obligation on states, as a condition of receipt of federal funds, that Congress did not make clear in the statutory language.  *Id*. at 17, 24–25.  Congress is required to "speak with a clear voice," and "unambiguously" put state funding recipients on notice of the conditions of federal funds.  *Id.* at 17.  "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'"  *Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 640 (1999) (*citing Pennhurst*, 451 U.S. at 17).  "In interpreting language in spending legislation, we thus 'insis[t] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.'"  *Id.* (*citing Pennhurst*, 451 U.S. at 24–25).

Congress may employ the spending power to "further broad policy objectives by conditioning receipt of federal mon[ies]" on the recipient's compliance with federal directives.  *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987).  The Supreme Court in *Dole* identified four limitations on the exercise of the spending power to condition federal grants: (1) Congress must use its spending power to further "the general welfare;" (2) Congress must state all conditions on the receipt of federal funds "unambiguously" so as to "enabl[e] the States to exercise their choice

knowingly, cognizant of the consequences of their participation;" (3) conditions attached to federal grants must be related "to the federal interest in particular national projects or programs;" and (4) conditions on federal funding must not violate any other constitutional provision. *Id.*

This requirement of congressional clarity is heightened where, as under Title IX, Congress asks the states to relinquish their historic immunity from suit as one condition of receiving federal funds. In the Eleventh Amendment context, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). While Congress may choose either to abrogate sovereign immunity directly or (as in Title IX) make waiver of sovereign immunity a condition to receipt of federal funds, the test in either case is the same: Congress's intent must be "expressly and unequivocally stated in the text of the relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 290–91 (2011).[27]

Because Title IX was passed pursuant to the Spending Clause, "private damage actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005).

> When Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.' As we have recognized, '[t]here can . . . be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds].')

*Id.* at 182–83 (*quoting Pennhurst*, 451 U.S. at 17).

---

[27] Local boards of education act as agents of the state when fulfilling the statutory duties imposed upon them by the legislature in light of the state constitutional mandate to furnish public education. *Cheshire v. McKenney,* 182 Conn. 253, 257–58 (1980). "A local board of education acts as an agent of the state when it performs those duties delegated to it by the state. . . . In other words, if a school board is engaged in the provision of primary and secondary education, it is acting under the authority of the state and as the state's agent." *Bd. of Educ. of City of New Haven v. City of New Haven*, 237 Conn. 169, 181 (1996).

Title IX is an exercise of Congress' spending power. However, as discussed *supra*, Title IX does not expressly and unequivocally provide for a definition of sex that would preclude transgender girls from participating in sex-separated girls' teams. As has been repeated throughout this memorandum, "[l]ooking at both the specific and broader context of the use of the term 'sex,' neither Title IX nor the implementing regulations define the term 'sex' or mandate how to determine who is male and who is female. . . ." *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 867 (S.D. Ohio 2016). "Title IX and its accompanying regulations contain no definition of the term 'sex.' Also absent from the [regulation] is the term 'biological.'" *Adams*, 2020 WL 4561817, at *14. "[T]he plain language of the regulation sheds no light on whether" a student's sex is defined based on their sex assigned at birth. *Id.*

As discussed above, Plaintiffs' interpretation of Title IX is unprecedented. Plaintiffs fail to identify any text within Title IX, its implementing regulations, or Department of Education policy statements that would alert schools receiving federal funds that Title IX bars girls who are transgender from participating in athletics with other girls. Under *Pennhurst*, schools cannot be held liable for damages under such an unprecedented and unsupported legal theory.

This conclusion is buttressed by an examination of guidance from the Department of Education's own Office for Civil Rights. In an opinion letter dated January 7, 2015, (the "2015 Letter"), OCR explained that "[t]he Department's Title IX regulations permit schools to provide sex-segregated . . . athletic teams . . . [and] [w]hen a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity." Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7,

2015), *available at*

http://www.bricker.com/documents/misc/transgender_student_restroom_access_1-2015.pdf.

On May 13, 2016, the Department of Justice and the Department of Education issued a

joint "Dear Colleague" letter (the "2016 Letter") summarizing public schools' obligations

regarding transgender students under Title IX, and explaining how those departments evaluate a

school's compliance with those obligations. Letter from Catherine E. Lhamon, Ass't Sec. for

Civil Rights, U.S. Dep't of Educ. and Vanita Gupta, Principal Dep. Ass't Attorney for Civil

Rights, U.S. Dep't of Justice (May 13, 2016),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf. The

2016 Letter included notice that Title IX protects students from discrimination in school on the

basis of gender identity, including in regard to names and pronouns, restrooms, and athletics.

The guidance made clear that Title IX allows students to participate in sex-segregated activities

and access sex-segregated facilities consistent with their gender identity.

On February 22, 2017, however, the DOE and DOJ issued another "Dear Colleague"

letter (the "2017 Letter"). Letter from Sandra Battle, Acting Ass't Sec. for Civil Rights, U.S.

Dep't of Educ. and T.E. Wheeler, II, Acting Ass't Attorney General for Civil Rights, U.S. Dep't

of Justice (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-

title-ix.pdf. The 2017 Letter withdrew the 2015 Letter and the 2016 Letter, but did not replace

their guidance with any contrary guidance.  As one court aptly stated: "[T]he 2017 [Letter] did

not propound any 'new' or different interpretation of Title IX or the Regulation, nor did the 2017

[Letter] affirmatively contradict the 2015 and 2016 Guidance documents. It instead appears to

have generated an interpretive vacuum pending further consideration by those federal agencies of

the legal issues involved in such matters." *Evancho v. Pine-Richland Sch. Dist*., 237 F. Supp. 3d

267, 298 (W.D. Pa. 2017); *see also Adams*, 2020 WL 4561817 at *57 (noting that the 2017

Letter simply constituted a withdrawal of previous guidance based on disavowal of guidance

letters generally, and "contained no substantive interpretation of the meaning of 'sex

discrimination' in Title IX"). Although it created an "interpretive vacuum" in regard to federal

law, the 2017 Letter was unequivocal in stating that "the Departments believe that, in this

context, there must be due regard for the primary role of the States and local school districts in

establishing educational policy."

Until recently, then, the federal agencies responsible for enforcing Title IX were

instructing schools that Title IX required them to treat students who are transgender in

accordance with their gender identity, including when it comes to athletics. Against this

backdrop, it is absurd to suggest that Defendants were "on notice" that they would be liable if

they did not, instead, bar girls who are transgender from their sex-separated athletic teams.

Therefore, under *Pennhurst*, Plaintiffs' claims for nominal and compensatory damages must be

dismissed.

## V. Plaintiffs Have Failed to Allege that Title IX Provides a Cause of Action Against the School District Defendants.

### A. Plaintiffs Have No Cause of Action Against Their Home Schools (Glastonbury, Danbury, and Canton).

In addition to their claims against CIAC, Plaintiffs Soule, Smith, and Miller have also

brought claims against their "home" schools, which are Glastonbury, Danbury, and Canton,

respectively. *See* SAC ¶¶ 10–13. These three Boards of Education are defendants in this action

only because three of the plaintiffs happen to live within their towns. Plaintiffs cannot identify

any actions their home schools took in regard to transgender athletes within their schools, or any

actions taken by their home schools that limited Plaintiffs' athletic participation. Instead,

46

Plaintiffs allege that actions of other parties harmed them. Consequently, the factual allegations in the Second Amended Complaint fall well short of pleading "enough facts to state a claim to relief that is plausible on its face" under either theory against Glastonbury, Danbury, and Canton. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678

### 1. Plaintiffs Have Not Alleged that Their Home Schools Failed to Provide Effective Accommodation.

As discussed above, effective accommodation claims "derive from the Title IX regulation at 34 C.F.R. § 106.41(c)(1), which bases Title IX compliance in part on whether 'the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.'" *Mansourian*, 602 F.3d at 964. When conducting the assessment of whether a school effectively accommodates students from the underrepresented group, the proper focus is on the programs offered at the school the plaintiff attends. *Biedeger*, 928 F. Supp. 2d at 436 (analyzing claims raised by students who attended Quinnipiac); *Robb v. Lock Haven Univ. of Pennsylvania*, 2019 WL 2005636, at *7 (M.D. Pa. May 7, 2019) (analyzing participation numbers at Lock Haven University to address students' challenge to elimination of its women's varsity swim team and demotion of its women's varsity field hockey team from Division I to Division II).

In this case, Soule, Smith, and Miller have not and cannot allege that their schools eliminated girls' track, or failed to field a girls' track team, or that they were denied any opportunity to participate on it. To the contrary, they specifically allege that their home schools had girls' track teams, and that they were able to participate (and succeed) on such teams. Rather than focus on the opportunities presented at their home schools, Soule, Smith, and Miller base their effective accommodation claim solely on the fact that transgender females were allowed to

participate on the girls' track teams at Cromwell and Bloomfield High Schools—schools that they did not attend and that are not operated by their home school districts. There is no legal authority for Plaintiffs to base effective accommodation claims against their home schools on opportunities provided at other schools, or decisions made by other schools as to which athletes are qualified to compete. Plaintiffs accordingly fail to state an effective accommodation claim against their home schools: Glastonbury, Danbury, and Canton. *Cf. Thomas*, 2020 WL 3892860, at *10 (dismissing plaintiff's effective accommodation claim "because plaintiff has not tied her release from the team to any alleged system-wide participation gaps at UC Berkeley").

### 2. Plaintiffs Have Not Alleged that Their Home Schools Failed to Provide Equal Treatment.

Like an effective accommodation claim, an equal treatment claim reviews the plaintiff's treatment with the treatment received by members of the opposite sex *at the same school*. *Thomas v. Regents of Univ. of Cal.*, 2020 WL 1139595 *4 (N.D. Cal. Mar. 9, 2020) (comparing women's soccer program at Berkeley with men's soccer program at Berkeley); *Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 863–67 (D. Minn. 2019) (comparing university's athletics program for men with its athletics program for women and finding that, among other things, "men's teams are overall favored in receiving superior quality practice and competitive facilities"); *Lock Haven*, 2019 WL 2005636, at *6 (explaining that "to succeed on their equal treatment claim, Plaintiffs must show that there is a substantial disparity between the treatment of male and female athletes in an individual segment of Lock Haven's athletics program or in the athletics program as a whole").

In this case, Plaintiffs Soule, Smith, and Miller again fail to allege that the boys' track teams at their own schools receive preferential treatment in regard to things such as "schedules, equipment, coaching, and other factors affecting participants in athletics." *Biediger*, 928 F. Supp.

2d at 436. Instead, their allegations focus exclusively on the treatment of female athletes at Cromwell and Bloomfield High Schools—schools that they do not attend. Title IX simply has no mechanism for students to base equal treatment claims against their home school on actions taken at schools that they do not attend. *Cf. Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 661 (2d Cir. 2009) (rejecting Title IX claim brought by an attorney against several schools: "Without a direct relationship between herself and any of the defendants, there was no materially adverse action that any of the defendants could have taken against Burgess and therefore no way for them to have retaliated against her.").

### 3. The Home Schools Are Not Liable for 'Applying' or 'Facilitating' the CIAC policy.

Plaintiffs attempt to avoid the clear deficiencies in their effective accommodation and equal treatment claims against Canton, Glastonbury, and Danbury by alleging that their home schools harmed them by "applying and facilitating" the CIAC policy. This argument must fail, however, as there are no factual allegations to support it. As noted previously, Canton, Glastonbury, and Danbury are not alleged to have any transgender athletes participating in girls' track, and are not alleged to have "applied" the CIAC's policy to any athletes that attend their high schools.

In regard to "facilitating" the CIAC's policy, the Second Amended Complaint alleges that Canton, Glastonbury, and Danbury are dues-paying members of the CIAC, along with "[v]irtually all public and parochial high schools in Connecticut." SAC ¶¶ 23–24. The Second Amended Complaint further alleges:

> Each Defendant School actively works with and assists CIAC to schedule and organize interscholastic athletic competitions, including track and field meets, that are conducted subject to CIAC rules including the CIAC policy at issue in this litigation. Each defendant board of education causes the schools and athletic programs under its authority to abide by the rules, regulations, and qualifications of

49

CIAC concerning eligibility, competition rules, and tournament policies and procedures.

*Id.* ¶ 32. Facilitating is generally defined as "to make easier; help bring about."[28] Scheduling meetings and abiding by the CIAC's rules for athletic competitions falls well short of "facilitating" the CIAC's policy as to transgender students' eligibility. Indeed, as conceded by the Plaintiffs in their Second Amended Complaint, schools such as Canton, Danbury, and Glastonbury have no way of knowing whether runners on other schools' teams are transgender, as the CIAC's policy allows athletes to participate based on the gender they identify with in their home school. This information is not available to other member schools. Scheduling meets and allowing their students to participate in such meets falls well short of any definition of "facilitating" actions that allegedly violate Title IX. Moreover, Plaintiffs have not and cannot set forth a legal basis for holding the home schools liable for such "facilitation" under Title IX. For all of these reasons, Canton, Glastonbury, and Danbury simply are not necessary or appropriate parties in this matter, and they should be dismissed as defendants as a matter of law.

**B. Plaintiffs Have No Cause of Action Against the Individual Intervenor-Defendants' Schools (Bloomfield and Cromwell).**

Title IX's private right of action is limited only to the "intended beneficiaries" of a "federally funded program." *See Sobel v. Yeshiva Univ.*, 477 F. Supp. 1161, 1167 (S.D.N.Y. 1979) (explaining that "[a private] right of action existed for the benefit of beneficiaries, *such as students*, of any educational program receiving federal financial assistance" (emphasis added)). Federal funds are received by a school district for the direct benefit of its *own* students, not the students in other districts. Thus, the "intended beneficiaries" of federal funds received by Bloomfield and Crowell are the students attending schools in those districts, such as Terry and

---

[28] *See* https://www.merriam-webster.com/dictionary/facilitate.

Andraya, respectively, not Plaintiffs. Since they are not the intended beneficiary of the federal

funds received by either Bloomfield or Cromwell, Plaintiffs lack standing to pursue such Title IX

claims against either school district.[29]

Persuasive authority can be found in *K. T. v. Culver-Stockton College*, No. 4:16-CV-165

CAS, 2016 WL 4243965, at *1 (E.D. Mo. Aug. 11, 2016), *aff'd on other grounds*, 865 F.3d 1054

(8th Cir. 2017), and *Jane Doe v. Brown University*, 270 F. Supp. 3d 556 (D.R.I. 2017), *aff'd*, 896

F.3d 127 (1st Cir. 2018). Both dismissed Title IX claims brought by non-students, holding they

lacked standing because the plaintiff in a Title IX suit must be a student of the educational

institution being sued in order for his or her claims to proceed. *See also*, *e.g.*, *Arocho v. Ohio

Univ.*, No. 2:19-cv-4766, 2020 WL 3469223, at *4 (S.D. Ohio June 25, 2020) ("Plaintiff has not

alleged that she was a student at an educational institution receiving federal funds—specifically,

that she was a student at Ohio University—and thus was entitled to the protection of Title IX for

the allegations she makes here."); *Arora v. Daniels*, No. 3:17-cv-134, 2018 WL 1597705, at *8

(W.D.N.C. Apr. 2, 2018) ("Because there is no authority in this Circuit or elsewhere supporting

Mrs. Arora's statutory standing to bring suit against an institution which, at the time of the

allegations, she did not attend, was not an applicant for, and did not receive federal educational

benefits from, her claims under Title IX must be dismissed.").

In *K.T. v. Culver-Stockton College*, a soccer recruit was sexually assaulted by a Culver-

Stockton student while visiting that school's campus. *See K.T.*, 2016 WL 4243965, at *1. In her

---

[29] In the Second Circuit, there is some authority under Title VI of the Civil Rights Act of 1964, which prohibits, *inter alia*, race discrimination in federally funded programs, including educational institutions. Although some of these cases discuss the intended beneficiary as being students attending the schools receiving the federal funds, most relate to parents seeking standing under Title VI on their own behalf. Thus, these cases offer little in the current context.

lawsuit against the college, she alleged that the school failed to act on her report of the assault and, therefore, was liable to her pursuant to Title IX under the theory of deliberate indifference as established by *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).[30] *See id.* at *3. The court dismissed the claim, holding that K.T. did not have standing to pursue the complaint because as a non-student, she was not the intended beneficiary of the college's federal funds. *Id.* at *6. In so holding, the court looked directly to the statutory language of Title IX. Finding nothing in the plain language of the statute itself, the court relied on the Supreme Court's decision in *Davis* to arrive at its "conclu[sion] that Title IX's protections in the context of student-on-student harassment are limited to students." *Id.* The court specifically rejected the plaintiff's argument because it "would impermissibly expand the law's scope beyond the limited right of action recognized by the Supreme Court that requires a 'systemic effect on educational programs or activities.'" *Id.* Thus, the court concluded that the protections afforded by Title IX "do[] not extend" to "a non-student." *Id.* at *5.

Even more persuasive is the decision in *Jane Doe v. Brown University*. In that case, the plaintiff was a student at Providence College. While on campus at Brown University, where she was not enrolled, she was sexually assaulted. In her lawsuit against Brown for deliberate indifference, she alleged, similar to Plaintiffs here, that Brown University's conduct deprived her of equal access to educational opportunities and benefits at Providence College, and ultimately caused her to withdraw from school. *See Doe*, 270 F. Supp. 3d at 558. In evaluating the

---

[30] In *Davis*, the U.S. Supreme Court held that an educational instruction receiving federal financial assistance can be held liable for its deliberate indifference to student-on-student sexual harassment pursuant to Title IX. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

plaintiff's claims, the court described the issue, similar to the one presented by Plaintiff's

complaint against Bloomfield and Cromwell, as follows:

> The question that this case presents . . . is can a Providence College student who
> was sexually assaulted by a Brown student on Brown's campus bring a Title IX
> damages suit against Brown alleging deprivation of an educational opportunity at
> Providence College? In order to answer this question—one that appears to be a
> matter of first impression—the  Court turns back to the purpose of the statute and
> its language—who did Congress intend to protect from discrimination in
> educational programs based on gender; and who did it intend to punish; and to
> whom did the United States Supreme Court intend to give a private right of action?

*Id.* at 561.  In answering these questions, the court looked to the plain language of the statute,

supported by legislative history.

First, the court found that the statutory language indicates that enforcement was meant to

be "program-specific—that is, the financial penalties are to be applied to the specific program

where the violation occurred, not the school in general." *Id.*

Second, the court found the statements of Senator Birch E. Bayh made during the Senate

debate over Title IX persuasive. Senator Bayh stated: "We are dealing with discrimination in

admission to an institution, *discrimination of available services or studies **within** an institution*

***once students are admitted*** and discrimination in employment within an institution, as a member

of a faculty or whatever."  *Id.* (additional emphasis added).  "[T]his statement implies that

Congress intended Title IX to protect against discrimination of students <u>admitted</u> to the

offending school," *id.*, which was neither the case there, nor here before this Court with respect

to Bloomfield or Cromwell.

Third, the *Doe* court looked to *Davis* and other relevant case law holding that the

protection of Title IX is generally limited to students actually attending the offending school. It

found *Davis's* reference to the defendant school's own students highlighted that Title IX's right

of action extends *only* to students attending the federally funded defendant school. *Id.* (quoting

*Davis,* 526 U.S. at 644 ("If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' *its students* to harassment.")); *see also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002) (a plaintiff must allege, among other things, that she was a student in the defendant institution's schools). The court held that because Doe was not actually enrolled at Brown, Brown exercised no "control or influence" over Doe's educational programs at Providence College, and, therefore, had no authority to take corrective action to end any discrimination she alleged prevented her from continuing her classes at Providence College. *Id.* at 562. Thus, the court dismissed Doe's complaint.

On appeal, the First Circuit affirmed. The Court explained that a Providence College student could not maintain a Title IX claim against Brown University, the funding recipient whose program was at issue, because Doe did not "suffer unjust or prejudicial treatment on the basis of sex *while participating . . . in the funding recipient's education program or activity*." *Doe*, 896 F.3d at 131 (emphasis added). The court explained:

> That a potential Title IX plaintiff seeking relief for being "subjected to discrimination under" an education program must be a participant . . . in the defendant's educational program or activity seems logical since the "discrimination" that Title IX prohibits is not the acts of sexual assault or sexual harassment in and of themselves, but rather the differential treatment by a funding recipient of persons of a particular sex who are taking part . . . in its educational program or activity but are suffering acts of sexual harassment or assault that undermine their educational experience. And here is where Doe's complaint is lacking.
>
> ***
>
> [T]he scope of Title IX's "subject to discrimination under" clause is circumscribed to persons who experience discriminatory treatment while participating, or at least attempting to participate, in education programs or activities <u>provided by the defendant institution</u>[.] *Davis* also supports this proposition. In *Davis*, while discussing the circumstances under which schools may be liable for their deliberate indifference to student-on-student sexual harassment, the Court stated that "funding

> recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge,  that is so severe, pervasive, and objectively offensive <u>that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school</u>.

*Id.* at 131–32 (emphases in original; internal citations omitted). Therefore, because Doe "did not allege that she participated or even would have participated in any of Brown's educational programs or activities," she could not maintain a claim under Title IX against Brown because she was not "subjected to discrimination under Brown's education program or activity." *Id*. at 133.

These cases require dismissal of claims by Plaintiffs against Bloomfield and Cromwell. A Title IX action can only be maintained by a student against a school district in which she is enrolled. The Second Amended Complaint makes clear that Soule was enrolled in school in Glastonbury, Michell in Canton, Smith in Danbury, and Nicoletti at Immaculate High School. Neither Soule, Mitchell, Smith, nor Nicoletti was enrolled in either Bloomfield or Cromwell. That Terry and Andraya were students in Bloomfield and Cromwell, respectively, is of no matter. Neither Bloomfield nor Cromwell was obligated by Title IX to ensure Soule's, Mitchell's, Smith's, or Nicoletti's equal access to athletic opportunities that accommodate their abilities. Nor could they violate the CIAC policy, which they were following in permitting Terry and Andraya to rightly participate in girls' athletics under Title IX. Bloomfield and Cromwell only had that obligation with respect to Terry and Andraya, respectively. Neither Bloomfield nor Cromwell had or has any intent to violate the Title IX and equal protection rights of its own students to satisfy students attending school in other districts.

Simply put, Plaintiffs lack statutory standing to proceed under Title IX against Bloomfield and/or Cromwell. Since Plaintiffs' sole claims are made under Title IX, the Second Amended Complaint as brought against Bloomfield and Cromwell must be dismissed.

**CONCLUSION**

For the foregoing reasons, the Second Amended Complaint should be dismissed in its entirety, with prejudice.

Respectfully submitted,


/s/ Joshua Block

Joshua Block*
Chase Strangio*
Galen Sherwin*
Lindsey Kaley*
American Civil Liberties Union Foundation
125 Broad Street,18th Floor
New York, NY 10004
(212) 549-2500
jblock@aclu.org

Elana Bildner (ct30379)
Dan Barrett (ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

*Counsel for Andraya Yearwood and Thania*
*Edwards on behalf of T.M.*


Michael E. Roberts (ct30824)
CHRO
450 Columbus Boulevard, Suite 2
Hartford, CT 06103
(860) 541-4715
michael.e.roberts@ct.gov
*Counsel for CHRO*


*Admitted Pro Hac Vice*

Johanna G. Zelman (ct26966)
Mohammed B. Shihabi*
FordHarrison, LLP
CityPlace II
185 Asylum Street, Suite 610
Hartford, CT 06103
(860) 740-1355
jzelman@fordharrison.com
*Counsel for Bloomfield and Cromwell*
*Boards of Education*


Peter J. Murphy (ct26825)
Linda L. Yoder (ct01599)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
(860) 251-5950
pjmurphy@goodwin.com
*Counsel for CIAC and*
*Danbury Board of Education*


David S. Monastersky (ct13319)
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
dmonastersky@hl-law.com
*Counsel for Glastonbury and Canton*
*Boards of Education*