## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, a minor, by Bianca Stanescu, her mother; CHELSEA MITCHELL, a minor, by Christina Mitchell, her mother; ALANNA SMITH, a minor, by Cheryl Radachowsky, her mother; ASHLEY NICOLETTI, a minor, by Jennifer Nicoletti, her mother, | Case No.:  3:20-CV-00201-RNC |
| *Plaintiffs*, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. d/b/a CONNECTICUT INTERSCHOLASTIC ATHLETIC CONFERENCE; BLOOMFIELD PUBLIC SCHOOLS BOARD OF EDUCATION; CROMWELL PUBLIC SCHOOLS BOARD OF EDUCATION; GLASTONBURY PUBLIC SCHOOLS BOARD OF EDUCATION; CANTON PUBLIC SCHOOLS BOARD OF EDUCATION; DANBURY PUBLIC SCHOOLS BOARD OF EDUCATION, | Dated: September 11, 2020 |
| *Defendants.* | |

ORAL ARGUMENT REQUESTED

Table of Contents

Table of Authorities ........................................................................................................ iv

Introduction ...................................................................................................................... 1

I.      Plaintiffs' Allegations, and the Findings of the Office for Civil Rights ......................... 2

   A.   The Allegations of the Complaint .................................................................... 2

   B.   The May 15, 2020, and August 31, 2020, Findings of the Office for Civil Rights ......... 5

II.     Governing Legal Standards ................................................................................ 7

   A.   Standards Governing a Motion to Dismiss .................................................... 7

   B.   Title IX's Requirements Governing Sex-separated Athletics. ......................... 9

   C.   The OCR's Interpretation of Title IX and the Regulation ............................. 13

   D.   The OCR's interpretations of Title IX and the Regulation are entitled to
        deference under *Chevron* and *Auer*. ............................................................. 14

III.    Plaintiffs have adequately alleged claims under Title IX. ............................... 16

   A.   Plaintiffs have alleged that as a result of the Policy, Defendants have denied girls—
        including Plaintiffs—"equal treatment . . . and opportunities" in athletics. ................. 16

   B.   Plaintiffs have alleged that as a result of the Policy, Defendants have failed
        to provide athletic programs that "effectively accommodate the . . . abilities"
        of girls, including Plaintiffs. ......................................................................... 20

   C.   Plaintiffs have pled Title IX claims against their home schools. .................. 25

   D.   Plaintiffs have alleged a cause of action against the school districts of the
        Intervenor Defendants (Bloomfield and Cromwell). ................................... 28

IV.     Defendants' collateral attacks on Plaintiffs' claims are without merit. ......... 31

   A.   Plaintiffs have standing to assert the claims of the Complaint. .................... 31

      1.   Plaintiffs' allegations adequately establish standing to seek prospective
           injunctive relief. ................................................................................. 33

      2.   Plaintiffs' allegations adequately establish standing to seek retrospective relief
           including declaratory relief. ................................................................. 34

   B.   Plaintiffs' claims are not moot. ..................................................................... 36

C.      Defendants' criticisms of the requested relief are irrelevant to their
        motion to dismiss. ........................................................................................... 39
D.      Defendants' Equal Protection arguments are irrelevant and meritless for additional
        reasons........................................................................................................... 40
E.      The doctrine of *Pennhurst* does not bar Plaintiffs' claim for damages......................... 44
Conclusion ........................................................................................................................ 47

Table of Authorities

**Cases**

*Anderson News, L.L.C. v. American Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012) .................................................................. 8, 33, 36

*Auer v. Robbins,*
    519 U.S. 452 (1997) ................................................................................ 14, 15

*Babcock v. Frank,*
    729 F. Supp. 279 (S.D.N.Y. 1990) .......................................................... 39, 40

*Bangerter v. Orem City Corp.,*
    46 F.3d 1491 (10th Cir. 1995) ........................................................................ 11

*Barfield v. Semple,*
    No. 3:18-cv-1198 (MPS), 2019 WL 3680331 (D. Conn. Aug. 6, 2019) .......... 31, 32

*Bauer v. Lynch,*
    812 F.3d 340 (4th Cir. 2016) .................................................................. 2, 40, 41

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 7, 8

*Biediger v. Quinnipiac University,*
    691 F.3d 85 (2d Cir. 2012) .............................................................. 9, 11, 16, 23

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) .............................................................................. 12, 13

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 410 (1945) ........................................................................................ 15

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
    190 F.3d 705 (6th Cir. 1999) ........................................................................... 2

*Cannon v. University of Chicago,*
    441 U.S. 677 (1979) .......................................................................... 25, 26, 45

*Cape v. Tennessee Secondary School Athletic Association.,*
    563 F.2d 793 (6th Cir. 1977) ............................................................................ 2

*Chase Group Alliance LLC v. City of New York Department of Finance,*
    620 F.3d 146 (2d Cir. 2010) ............................................................................. 7

*Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.,*
    467 U.S. 837 (1984) ........................................................................................ 14

iv

*Citizens for Responsibility and Ethics in Washington v. Trump,*
2020 WL 4745067 (2d Cir. August 17, 2020) ............................................. 32, 33

*City of New York v. A-1 Jewelry & Pawn, Inc.,*
247 F.R.D. 296 (E.D.N.Y. 2007) ........................................................ 40

*Clark v. Arizona Interscholastic Association,*
695 F.2d 1126 (9th Cir. 1982) ............................................. 2, 40, 44

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council,*
557 U.S. 261, 129 S. Ct. 2458 (2009) ............................................. 15

*Cohen v. Brown University,*
991 F.2d 888 (1st Cir. 1993) ........................................................... 15

*Cole v. Oroville Union High School District,*
228 F.3d 1092 (9th Cir. 2000) ........................................................ 37

*Craig v. Boren,*
429 U.S. 190 (1976) ........................................................................ 44

*Davis Next Friend LaShonda D. v. Monroe County Board of Education,*
526 U.S. 629 (1999) ................................................................. 30, 45

*Deshawn E. ex rel. Charlotte E. v. Safir,*
156 F.3d 340 (2d Cir. 1998) ........................................................... 32

*Doe v. Brown University,*
896 F.3d 127 (1st Cir. 2018) ............................................... 28, 29, 30

*Engquist v. Oregon Department of Agriculture,*
553 U.S. 591 (2008) ....................................................................... 40

*Flint v. Dennison,*
488 F.3d 816 (9th Cir. 2007) .......................................................... 36

*Ford Motor Credit Co. v. Milhollin,*
444 U.S. 555 (1980) ....................................................................... 14

*Fox v. Pittsburg State University,*
257 F.Supp.3d 1112 (D. Kan. 2017) ............................................... 29

*Franklin v. Gwinnett County Public Schools,*
503 U.S. 60 (1992) ................................................................... 39, 45

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,*
528 U.S. 167 (2000) ........................................................... 37, 38, 39

*Frontiero v. Richardson,*
    411 U.S. 677 (1972) ...................................................................... 18

*Goldman v. Reddington,*
    417 F. Supp.3d 163 (E.D.N.Y. 2019) ............................................. 40

*Haffer v. Temple University of Commonwealth System of Higher Education,*
    678 F. Supp. 517 (E.D. Pa. 1987)................................................... 11

*Hatter v. L.A.  City High School District,*
    452 F.2d 673 (9th Cir. 1971) ................................................... 35, 36

*Hecox v. Little,*
    No. 1:20-cv-00184-DCN, 2020 WL 4760138 (D. Idaho Aug. 17, 2020)............. 8

*Holt Civic Club v. City of Tuscaloosa,*
    439 U.S. 60 (1978) ........................................................................ 39

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) .................................................................. 45, 46

*Lalli v. Lalli,*
    439 U.S. 259 (1978) ...................................................................... 44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 32, 33

*Lynch v. City of New York,*
    952 F.3d 67 (2d Cir. 2020) ............................................................. 7

*Martin v. Occupational Safety & Health Review Commission,*
    499 U.S. 144 (1991) ...................................................................... 14

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) ..................................................*passim*

*Mennone v. Gordon,*
    889 F. Supp. 53 (D. Conn. 1995).................................................... 27

*Mississippi University for Women v. Hogan,*
    458 U.S. 718 (1982) ...................................................................... 44

*Nguyen v. INS,*
    533 U.S. 53 (2001) .................................................................. 41, 44

*North Haven Board of Education v. Bell,*
    456 U.S. 512 (1982) ...................................................................... 28

*Norwalk CORE v. Norwalk Redevelopment Agency,*
    395 F.2d 920 (2d Cir. 1968) ............................................................. 39

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ........................................................................ 44, 45

*Roberts v. Colorado State Board of Agriculture,*
    998 F.2d 824 (10th Cir.1993) ......................................................... 21

*Rosa R. v. Connelly,*
    889 F.2d 435 (2d Cir. 1989) ............................................................. 46

*Schuette v. Coalition to Defend Affirmative Action,*
    572 U.S. 291 (2014) ......................................................................... 42

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ........................................................................... 35

*Thomas Jefferson University v. Shalala,*
    512 U.S. 504 (1994) ......................................................................... 15

*Thomas v. Regents of University of California,*
    No. 19-cv-06463-SI, 2020 WL 3892860 (N.D. Cal. 2020) ................. 23

*United States v. Concentrated Phosphate Export Association,*
    393 U.S. 199 (1968) ......................................................................... 37

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................ 2, 18, 19, 41

*United States. v. Quattrone,*
    402 F.3d 304 (2d Cir. 2005) ............................................................. 38

*Vega v. Hempstead Union Free School District,*
    801 F.3d 72 (2d Cir. 2015) ............................................................ 7, 8

*Williams v. School District of Bethlehem,*
    998 F.2d 168 (3d Cir. 1993) ....................................................... 2, 9, 21

*Woods v. Rondout Valley Central School District Board of Education,*
    466 F.3d 232 (2d Cir. 2006) ............................................................. 46

*Yusuf v. Vassar College,*
    35 F.3d 709 (2d Cir. 1994) ............................................................... 45

## <u>Statutes, Codes, and Ordinances</u>

20 U.S.C. § 1681 ................................................................................. 28

## Regulations

34 C.F.R § 106.41(a) ................................................................................ 9

34 C.F.R § 106.41(b) ................................................................................ 9

34 C.F.R § 106.41(c) ......................................................................*passim*

44 Fed. Reg. 71,413 (Dec. 11, 1979) ........................................ 10, 11, 16, 19

40 Fed. Reg. 52,656 (Nov. 11, 1975) ...................................................... 24

## Other Authorities

Office for Civil Rights, U.S. Department of Education, *Clarification of
    Intercollegiate Athletics Policy Guidance: The Three–Part Test*
    (Jan. 16, 1996),
    https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html .............. 12, 16, 21

<u>Introduction</u>

Plaintiffs are four high school female student-athletes who allege—with extensive and detailed supporting factual allegations—that as a result of a policy of the Connecticut Interscholastic Athletics Conference ("CIAC") and its member schools, they have actually and identifiably been denied athletic opportunities and experiences equal to those enjoyed by boys, in violation of Title IX. The United States Department of Education Office for Civil Rights has, after an independent investigation, formally found that the Defendants in this action have indeed violated Title IX as alleged in the Complaint, and have indeed deprived each of the Plaintiffs of rights protected by Title IX. Yet Defendants refuse to change the challenged policy.

Instead, Defendants have filed a blunderbuss motion to dismiss, arguing variously that Plaintiffs have no standing to seek redress, that the claims are moot, that Title IX's requirement of "equality" is satisfied by something materially less than equality, and that Title IX's requirement for "effective accommodation" of the abilities of female athletes does not mean what it says. Defendants raise objections to the relief requested by Plaintiffs, and dispute facts alleged in the Complaint.

Much if this is irrelevant as a matter of law, and none of it could support dismissal. Plaintiffs have alleged valid claims under Title IX. If Plaintiffs prove what they have alleged, they are entitled to relief. Defendants motion must be denied.

I.       Plaintiffs' Allegations, and the Findings of the Office for Civil Rights

  A.       The Allegations of the Complaint

  In their Second Amended Complaint ("SAC"), Plaintiffs challenge a policy and practice of the CIAC that permits athletes with male bodies to compete in girls' high school interscholastic athletics in Connecticut if they claim a female transgender identity (the "Policy"). The Policy imposes no requirements of testosterone suppression, nor other safeguards of any kind. SAC ¶¶ 71-76. Any assertions concerning the effects of testosterone suppression have no relevance to the Policy challenged in this lawsuit.

  Plaintiffs have alleged in detail the systematically superior athletic capabilities of male bodies over comparably fit and trained female bodies. SAC ¶¶ 43-63. This "enduring" fact of the sexually dimorphic human species, *see United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*") (Ginsburg, J.), is universally known through common experience, and has been repeatedly recognized as a legally significant fact by courts.[1]

_____

[1] "It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n.*, 563 F.2d 793, 795 (6th Cir. 1977), abrogated on other grounds, as recog'd by *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 190 F.3d 705 (6th Cir. 1999); *Clark v. Ariz. Interscholastic Ass'n.*, 695 F.2d 1126, 1131 (9th Cir. 1982) (observing that "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions" on the girls' volleyball team); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 178 (3d Cir. 1993) (noting expert testimony that "if positions on the field hockey team were open to girls and boys, 'eventually boys would dominate, eliminating the opportunities of females'"). *See also Bauer v. Lynch*, 812 F.3d 340, 343, 351 (4th Cir. 2016) (approving more rigorous physical fitness benchmarks for male FBI applicants against Title VII challenge, "in order to account for [the sexes'] innate physiological differences," which "impact their relative [physical] abilities").

Plaintiffs have alleged in detail the severely adverse effect that this Policy has had on competitive opportunities and victories for girls in Connecticut since first one and then another male-bodied athlete began to compete in girls' track events beginning in 2017. While many specifics are alleged, this impact is dramatically reflected by a few statistics:

- In seven state-level competitive events in which these two male-bodied athletes competed in 2017-2019, and considering both boys' and girls' divisions of those events, individuals born male swept 13 out of 14 state championships, leaving just one championship to a girl. In those same competitive events, individuals born male took 22 out of 28 first and second place awards, while students born with female bodies took only six. SAC ¶¶ 103-08.

- Across 2017-2019, two male-bodied athletes took 15 girls' statewide championship titles—championship titles previously held by nine different girls. SAC ¶ 77.

- Across 2017-2019, just two male-bodied competitors in girls' track events deprived students born female of more than 50 separate opportunities to be recognized as a state-level first-place champion, or to advance to and participate in high-level competitions, in CIAC-sponsored events. SAC ¶ 103.

These results are fundamentally inconsistent with Title IX's goal and requirement to provide equal opportunities in athletics to that half of the population who are born with female bodies. In previous years, of course, all of these victories,

3

championship titles, and opportunities to participate in higher-level competition went to Connecticut students born female.

Plaintiffs have additionally alleged how each one of them has *individually* been deprived of victories, advancement opportunities, and/or ranking positions in girls' athletics in Connecticut as a result of the CIAC Policy and competition from male-bodied athletes. SAC ¶¶ 87-103. Defendants respond that Plaintiffs have not been denied *all* victory and advancement opportunities. This is true, but it is no answer at all to Title IX, which insists on *equal* athletic opportunities and experiences for girls.

Plaintiffs have alleged that CIAC, by adopting the Policy that has enabled this unfair competition, has violated rights of Plaintiffs protected by Title IX. Plaintiffs have alleged that their own schools, by participating as CIAC members in the adoption and perpetuation of the unlawful Policy, and by providing athletic opportunities for their female students through meets governed by the unlawful policy, have violated their rights protected by Title IX. Plaintiffs have alleged that the schools which the individual intervenor defendants attended, by participating as CIAC members in the adoption and perpetuation of the unlawful Policy, and by sponsoring male-bodied athletes to compete in the girls' division of interscholastic track competitions, have violated Plaintiffs' rights protected by Title IX.

The facts alleged by Plaintiffs, if true, establish valid claims under Title IX. Defendants attempt to muddy the water with additional (and not actually inconsistent) facts, but these are not relevant to a motion to dismiss. Defendants attack Plaintiffs' standing, despite the personal harm they have suffered, but these

attacks are without merit. And Defendants take issue with the relief requested—but this is not a basis which can support dismissal of a claim.

Undeniably, this case raises legal issues and questions of fairness which are novel. But that is because the Policy that permits male-bodies athletes to compete in girls' athletics is novel—a sharp departure from historic practice and expectations. On the facts alleged, however, these issues must be addressed. Plaintiffs have pled valid claims, which cannot be disposed of on a motion to dismiss.

B.    The May 15, 2020, and August 31, 2020, Findings of the Office for Civil Rights

At the pleadings stage, the requirement is "plausibility." That Plaintiffs' factual allegations are at the very minimum "plausible" should now be beyond dispute, given that the U.S. Department of Education Office for Civil Rights ("OCR"), after conducting its own in-depth investigation, has found them to be accurate.

On May 15, 2020, after conducting an investigation that included interviews of administrators and staff of CIAC and all Defendant Schools, review of the CIAC Policy described in the Complaint, and analysis of the impact of that Policy on female athletes in Connecticut, the OCR issued a "Letter of Impending Enforcement" directed to the CIAC and each of the Defendant Schools. "5/15/20 OCR Letter" (Attached as Exhibit A.) This letter "sets forth OCR's determination in these individual OCR cases." 5/15/20 OCR Letter p. 45. OCR concluded that "the actions of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and

5

Danbury resulted in the loss of athletic benefits and opportunities for female student athletes." 5/15/20 OCR Letter p. 3.

As to the CIAC, OCR determined:

that the CIAC, by permitting the participation of certain male student-athletes in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied female student-athletes athletic benefits and opportunities, including advancing to the finals in events, higher level competitions, awards, medals, recognition, and the possibility of greater visibility to colleges and other benefits. Accordingly, OCR determined that the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX of the Education Amendments of 1972 (Title IX), at 34 C.F.R. § 106.41(a).

5/15/20 OCR Letter pp. 3-4.

As to Gastonbury, Canton, and Danbury (the schools attended by Selina Soule, Chelsea Mitchell, and Alanna Smith respectively), OCR found:

that the participation of Glastonbury, Canton, and Danbury in athletic events sponsored by the CIAC . . . which resulted in Students 1, 2, and 3, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Glastonbury, Canton, and Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. . . . Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. . . . 34 C.F.R § 106.6(c).

5/15/20 OCR Letter p. 4.

The OCR found that in numerous specifically identified instances (instances also detailed in Plaintiffs' Complaint), CIAC and the Defendant Schools had "denied female student-athletes benefits and opportunities including to advance to finals in

events; to advance to higher level competitions, . . .; to win individual and team state championships, along with the benefit of receiving medals for these events; to place higher in any of the above events; [and] to receive awards and other recognitions." 5/15/20 OCR Letter p. 33; *see* specific instances documented at *id*. pp. 18-27.

On August 31, 2020, the OCR issued a "Revised Letter of Impending Enforcement Action" in this same matter. "8/31/2020 OCR Letter" (Attached as Exhibit B). This revised letter repeated the factual findings quoted above without change. It added further elaboration concerning the OCR's official interpretation of Title IX and implementing regulations as they pertain to transgender participation in girls' or women's athletics, as described in Section II below.

II.   Governing Legal Standards

   A.   Standards Governing a Motion to Dismiss

In evaluating the adequacy of a complaint, the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (citation omitted). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "On a motion to dismiss, the question is not whether a plaintiff is *likely* to prevail, but

whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.,* whether plaintiffs allege enough to 'nudge[ ] their claims across the line from conceivable to plausible.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 570). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

Importantly, this is a radically different standard than that applied by the court in an opinion recently issued in *Hecox v. Little*, which is cited extensively in Defendants' brief. Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 145-1 ("Def. Mem."). There, the court did not dispose of *any* claim, instead denying defendants' motion to dismiss and granting a motion for preliminary injunction. And while that court had evidentiary and expert submissions before it in addition to the allegations of the complaint, it nevertheless emphasized that its preliminary findings were precisely preliminary, based only on the "current record," *Hecox v. Little*, No. 1:20-cv-00184-DCN, 2020 WL 4760138, at *2, *34 (D. Idaho Aug. 17, 2020), that "further development of the record" was necessary, *id*. at *30, that the court "must hear testimony from the experts at trial," *id*. at *33, and in short that "actual success—or failure—on the merits will be determined at a later stage." *Id*. at *35. If anything, the *Hecox* opinion stands for the proposition that the novel questions presented by the intersection of Title IX, women's athletics, and transgender identities must be decided in the context of a well-developed factual record.

B.   Title IX's Requirements Governing Sex-separated Athletics.

The text of Title IX does not mention athletics, but it has been understood from the start that school athletic programs comprise an important part of education. In 1975, the Department of Health, Education and Welfare ("HEW") promulgated implementing regulations (the "Regulation").[2] The Regulation made explicit Title IX's application to school athletic programs. Section (a) of the Regulation declares that:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R § 106.41(a).

Like the text of Title IX itself, the Regulation is sex-neutral on its face, but "it would require blinders to ignore that the motivation for promulgation of the regulation on athletics" was to increase opportunities for girls. *Williams*, 998 F.2d at 175.

Section (b) of the Regulation authorizes "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R § 106.41(b).

Section (c) of the Regulation requires that all subject entities "shall provide equal athletic opportunity for members of both sexes," and goes on to provide a non-

---

[2] The Second Circuit has recognized each of the regulations or regulatory sources discussed in this section as entitled to either *Chevron* or *Auer* deference. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288-91 (2d Cir. 2004); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96-97 (2d Cir. 2012).

exhaustive list of 10 factors to be considered in evaluating whether opportunities for both sexes are indeed equal. 34 C.F.R § 106.41(c). These include whether the program provides "levels of competition" that "effectively accommodate the . . . abilities of [girls]," and whether the program provides equal opportunities for public recognition or "publicity" to both sexes. 34 C.F.R. § 106.41(c)(1), (10).

Subsequent regulatory guidance and case law have broken out the "equal athletic opportunity" requirement of 34 CFR § 106.41(c) into two separate evaluations. This division is embodied in the "Policy Interpretation" issued by the Department of Education Office of Civil Rights ("OCR") (successor to HEW) in 1979, Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413, 71,413 (Dec. 11, 1979) (the "Policy Interpretation").

Starting from the overarching requirement of "equal athletic opportunities" for both sexes, the Policy Interpretation categorizes non-exhaustive factors 2 through 10 listed in 34 CFR § 106.41(c) as concerned with ensuring that girls receive **"equivalent treatment, benefits, and opportunities"** in athletics, 44 Fed. Reg. at 71,414; claims asserting that this is not being achieved are commonly referred to as "equal treatment" claims.

The Policy Interpretation presents a separate analysis for claims based on the requirement of the first factor (34 CFR § 106.41(c)(1)) that separate programs "**effectively accommodate the . . . abilities of members of both sexes**;" these are commonly referred to as "effective accommodation" claims. *McCormick ex rel.*

*McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 291 (2d Cir. 2004) (citing Policy Interpretation and 34 C.F.R. §106.41(c)(1)).

Plaintiffs have amply alleged violations of both of these prongs.

To avoid confusion, Plaintiffs note at the outset that while both common sense and regulatory comment teach that separation of athletic competitions by sex may be necessary to satisfy the requirements of Title IX in some settings, *infra* p. 24 n. 8, a decision of this question is not necessary to Plaintiffs' claims. It is well established that *if* a school chooses to provide athletic opportunities through sex-segregated teams and competitions, then that intentional segregation by itself satisfies the "intent" element of a Title IX violation, leaving only the objective question of whether the opportunities provided are *equal. See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97-98 (2d Cir. 2012); *Haffer v. Temple Univ. of Commw. Sys. of Higher Educ.*, 678 F. Supp. 517, 527 (E.D. Pa. 1987). This is because the relevant legal "intent" required to establish a violation of Title IX is simply the intent to treat persons differently according to sex; proof of animus or malicious intent is not required. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995).

As Plaintiffs have alleged, CIAC and Defendant schools do separate athletic competition by sex in many sports including track, SAC ¶¶ 30-31, and so have an affirmative duty to ensure that the opportunities provided to each sex are equal. Plaintiffs adequately allege that as a result of the Policy, Defendants have not complied with that duty.

Because Defendants cite the Supreme Court's decision on *Bostock* "*passim*," it is also useful to pause on that decision at the threshold. Defendants cite *Bostock* as though that decision somehow undercut Plaintiffs' claim of denial of equal opportunities and accommodation based on sex in violation of Title IX. *Bostock* does nothing of the kind. In *Bostock*, the Court faced the question of whether—in the employment setting in which sex discrimination is undisputedly illegal under Title VII—termination of employment based on sexual orientation or gender identity necessarily *involved* prohibited sex discrimination. The Court held that it did. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). Here, by contrast, Defendants acknowledge that sex "discrimination" (separation of athletics by sex) is legal in the setting of athletics, Def. Mem. 28-29, provided equal opportunities and accommodation of abilities are provided for both sexes. Plaintiffs' claim is that as a result of the Policy, the opportunities and accommodations provided by CIAC and the Defendant Schools are *not* equal. The question addressed by the *Bostock* decision is thus entirely irrelevant to the Title IX claims that Plaintiff has alleged. Indeed, while Title VII and Title IX differ in important respects (in a 1996 "Dear Colleague" letter, the OCR recognized that Title IX is "unique," in contrast to other civil rights legislation, in permitting athletic programs separated by sex[3]), it is essential to note that *Bostock* did not conflate "sex" with either sexual orientation or

---

[3] Office for Civil Rights, U.S. Dep't of Educ., Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test, at 2–3 (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html.

gender identity. Instead, every Justice signed an opinion that clearly recognizes sex and gender identity to be two different things.[4]

C.     The OCR's Interpretation of Title IX and the Regulation

Regarding its 8/31/2020 letter, the OCR stated, "This letter constitutes a formal statement of OCR's interpretation of Title IX and its implementing regulations and should be relied upon, cited, and construed as such. Congress explicitly delegated to the OCR the task of prescribing standards for athletic programs under Title IX. As a result, the degree of deference to the Department is particularly high in Title IX cases." 8/31/2020 OCR Letter p. 49. In the Letter, the OCR made a number of statements interpreting the requirements of Title IX and the Regulation, including the following:

- "Title IX was passed, and implemented by regulations, to . . . protect equal athletic opportunity for students who are biologically females . . ." *Id.* p. 34.

- Where selection for a team is "based upon competitive skill or the activity involved is a contact sport . . . men and women are not similarly situated because of their physiological differences, and separating them based on sex is accordingly not prohibited by Title IX . . . Those regulations authorize single-sex teams because physiological differences are relevant." *Id.* p. 35.

- It is "the Department's position that its regulations authorize single-sex teams based only on biological sex at birth—male or female—as opposed to a person's gender identity." *Id.*

- "When separation based on sex is permissible—for example, with respect to sex-specific sports teams—such separation must be based on biological sex." *Id.* pp. 35-36.

---

[4] *See Bostock*, 140 S. Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex.") (majority opinion); at 1756 (citing multiple definitions of "sex" as tied to reproductive function) (Alito, J., dissenting); at 1828 ("[F]ew in 1964 (or today) would describe a firing because of sexual orientation as a firing because of sex.") (Kavanaugh, J., dissenting).

- "the Department continues to interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams 'for members of each sex' (emphasis added), to mean operation of teams for biological males, and for biological females, and does not interpret Title IX to authorize separate teams based on each person's transgender status, or for members of each gender identity. When a recipient provides 'separate teams for members of each sex' under 34 C.F.R. § 106.41(b), the recipient must separate those teams on the basis of biological sex, and not on the basis of homosexual or transgender status." *Id.*

D.   The OCR's interpretations of Title IX and the Regulation are entitled to deference under *Chevron* and *Auer*.

When an agency interprets its own regulations, such an interpretation is controlling so long as it is a "based on a permissible construction of the statute." *Auer v. Robbins*, 519 U.S. 452, 457 (1997) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

In *Chevron*, the Supreme Court held that if "Congress has not directly addressed the precise question at issue" but an administrative agency has, a court should "not simply impose its own construction on the statute." 467 U.S. at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Similarly, in *Auer*, the Supreme Court held that an agency's construction of a regulation it administers must be given deference unless Congress has "directly spoken to the precise question at issue." 519 U.S. at 457 (quoting *Chevron*, 467 U.S. at 837). An agency's ability to interpret its own regulations is "a component of the agency's delegated lawmaking powers." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991). *See also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566–68 (1980). When an agency provides an interpretation

14

of its regulations, a court should not perform a *de novo* review of competing interpretations of the regulations; instead, courts should defer to the agency's fair and considered judgment unless it is plainly erroneous or inconsistent with the regulation. *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 286, (2009); *Auer*, 519 U.S. at 461–62; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 417 (1945).

Here, while Plaintiffs contend that the meaning of "sex" in Title IX and the Regulation is amply clear, and therefore that the violations alleged in the Complaint are equally clear, if there is any ambiguity then the OCR's interpretations contained in the 8/31/2020 OCR Letter authoritatively resolve that ambiguity. As quoted above, this letter sets forth "a formal statement of OCR's interpretation of Title IX and its implementing regulations," and concludes that Title IX its implementing regulations refer to and guarantee equal opportunities based on "biological sex at birth," and that the Policy has operated to violate Title IX. *See supra* § II.C. This interpretation is consistent with the plain meaning of the word "sex" and Congressional intent at the time of enactment. *See infra* p. 17-19. Thus, as the Second Circuit held in in a similar case, the Court should "defer to the interpretation" of the OCR. *McCormick*, 370 F.3d at 288. Indeed, "[t]he degree of deference is particularly high in Title IX cases . . . ." *Id.* (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993)).

III.   <u>Plaintiffs have adequately alleged claims under Title IX.</u>

    A.   <u>Plaintiffs have alleged that as a result of the Policy, Defendants have denied girls—including Plaintiffs—"equal treatment . . . and opportunities" in athletics.</u>

"Equal" is a big word. The Regulation, regulatory interpretations, and courts have articulated a variety of components included within the comprehensive "equal treatment" required by Title IX.

Defendants carve one phrase out of the Second Circuit's opinion in *McCormick* to suggest that all that is required is equal "participation opportunities." Def. Mem. 32. Certainly the threshold level of "participation" represented by membership on a team roster is necessary, but it is very far from sufficient. Instead, the HEW Policy Interpretation states that "equal treatment" requires equal "opportunities to engage in . . . post-season competition," *McCormick*, 370 F.3d at 289 (quoting 44 Fed. Reg. at 71,416), and the Second Circuit has more recently emphasized that "opportunities" must be "real, not illusory." *Biediger*, 691 F.3d at 93. Plaintiffs have alleged that as a result of the Policy, girls in Connecticut—and the Plaintiffs themselves—have not received equal opportunities to engage in post-season competition. SAC ¶¶ 105-109.

At every level, girls are entitled to an equal "*quality* of competition." Office for Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test*, at 2–3 (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html ("1996 Clarification") (emphasis added). In fact, the required equality of opportunity extends to the very pinnacle of sport: the opportunity to win. The Second Circuit rejected a school

district's attempt to "downplay the significance of the opportunity that they are denying their female athletes but affording their male athletes—the chance to be . . . champions," holding that denying girls "treatment equal to boys in a matter so fundamental to the experience of sports denies equality of athletic opportunity to the female students." *McCormick*, 370 F.3d at 279, 294–95. Plaintiffs have alleged that as a result of the Policy, girls in Connecticut—and the Plaintiffs themselves— are not enjoying equal "quality" of competition, both as a result of measurably inferior "chances to be champions," and as a result of the less tangible impact of being subjected to fundamentally unfair competition when they step to the starting line matched against a male-bodied athlete. SAC ¶¶ 77-119. Indeed, Defendants' efforts to minimize the very concept of "equality" become frankly embarrassing when confronted with harsh realities reviewed above, such as the fact that in seven track events in which male-bodied athletes competed in state-level competitions from 2017 through 2019, students born female captured just one out of 14 state championships, and only six out of 28 first and second place awards. *Supra* p. 3; SAC ¶¶ 103-08. It is impossible to reconcile Title IX's demand for equality of opportunities and experiences for that half of the human species born female ("women") with such figures.

Unable to redefine "equality," Defendants try to dissolve Title IX into incoherence by arguing that "sex" is undefined in Title IX and its implementing regulations, and that any effort to link the word to the objective reality of the male/female biological reproductive dimorphism that characterizes humans (as it does all mammalian species) is "shoehorn[ing] . . . policy arguments into the

17

definition of the word 'sex.'" Def. Mem. 30. The inescapable implication of this argument is that Title IX is (or should be) utterly indifferent if that half of the student body who were born female and have female bodies are widely or even categorically squeezed off of girls' varsity teams, out of playing and competitive opportunities, and out of all victories and championships . . . so long as the male-bodied athletes who take their place consider themselves "girls."

The position is untenable. Its premise is false—"sex" had a crystal clear and unambiguous meaning at the time Title IX was adopted in 1972, uniformly denoting the male/female reproductive dimorphology. As the Supreme Court articulated it in *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), "sex" is "an immutable characteristic determined solely by the accident of birth." *See also* United States' Statement of Interest 4-8, ECF No. 75 ("Statement of Interest"). Title IX itself consistently uses "sex" to refer to the binary biological division of the species. *See* Statement of Interest at 5. As Plaintiffs have alleged, and as the "Godmother of Title IX" testified before the House Subcommittee on Postsecondary Education in 1975 while testifying in support of the implementing regulations of Title IX in the context of athletics in particular, it is not states of mind, but bodies and physiology that are relevant. SAC ¶¶ 44-63. As the OCR stated in its 8/31/2020 Letter, the only *reason* that sex-separated athletics are permissible under Title IX is precisely "because physiological differences are relevant," *id.* at 35, and numerous courts have recognized and accepted this understanding of Title IX.[5] And as noted above, the Supreme Court—which earlier described the physical differences between the

---

[5] *See* cases cited *supra* n. 1.

sexes as "enduring," *VMI*, 518 U.S. at 533—has continued to adhere to the common sense and biology-based definition of the word "sex" up to the present. *Supra* p. 12-14 and note 4.

Finally, the Policy Interpretation does not lose track of the big picture, summarizing in an "Overall Determination of Compliance" that compliance of athletic programs with Title IX turns in the end on "[w]hether the policies of an institution are discriminatory in . . . effect." *McCormick*, 370 F.3d at 292 (citing Policy Interpretation, 44 Fed. Reg. at 71,417). Elsewhere in that document the OCR similarly framed the question as whether "opportunities are not equivalent in kind, quality or availability" between the sexes. *Id.* (citing Policy Interpretation, 44 Fed. Reg. at 71,415). Plaintiffs have alleged the objective evidence of state championships lost and opportunities to advance to elite meets denied to girls, demonstrating that the Policy is "discriminatory in . . . *effect*," however virtuous its intent. SAC ¶¶ 77-119.

Defendants' repeated observations that the Plaintiffs (and other girls) have won *some* championships, and have enjoyed *some* advancement opportunities, and in a few races have even beat male-bodied athletes, are flatly irrelevant as a matter of law. Title IX is a rigorous law that demands equality, not "good enough for girls." Yes, good sportsmanship in defeat is an important lesson of sport, but Title IX is not satisfied if girls get extra lessons in losing.

Plaintiffs also allege that as a result of the operation of the Policy, CIAC and the Defendant Schools have denied to girls "equal opportunities" to enjoy "publicity," one of nine non-exhaustive factors relevant to evaluation of "equivalent

treatment . . . and opportunities." 34 CFR § 106.41(c)(10). Contrary to Defendants'
assertion that Plaintiffs' complain that "they were somehow, in some unknown way,
denied publicity and recognition of their efforts," Def. Mem. 40, the "how" is clearly
alleged. For a runner, there can be no greater "publicity" than the photograph of
crossing the finish line first, and the recognition as a first-place winner—what the
Second Circuit called "the chance to be . . . champions." *McCormick*, 370 F.3d at
279. The Complaint expressly alleges over 50 times in which Plaintiffs and other
girls "have been denied the recognition of being named state-level first-place
champions," SAC ¶ 103, as well as other specific instances of opportunities for
publicity that were denied to Plaintiffs as a result of the Policy. SAC ¶ 94-97. It is
true that the brief discussion of "publicity" in the 1979 Policy Interpretation focuses
on the allocation of publicity resources "among other factors," 44 Fed. Reg. at
71,417, but no authority has held or even suggested that denial of fair opportunities
for "publicity" itself does not also evince denial of "equal opportunity" in athletics.
Defendants are improperly seeking to import a limitation into the language of the
Regulation.

> B.   Plaintiffs have alleged that as a result of the Policy, Defendants have
> failed to provide athletic programs that "effectively accommodate the . . .
> abilities" of girls, including Plaintiffs.

Defendants observe that a "typical effective accommodation claim" involves a
university's failure to field a desired team, resulting in denial of "participation
opportunities." Def. Mem. 32. This is true as far as it goes, but the "effective
accommodation" requirement goes farther.

Speaking to the "effective accommodation" requirement, the Policy Interpretation elaborates that schools must provide "equal opportunity in . . . *levels of competition*," and competitive opportunities "which *equally reflect [girls'] abilities*." 44 Fed. Reg. at 71,417–418 (emphasis added).

Courts interpret this to require that not merely participation opportunities, but also "the *quality* of competition provided to male and female athletes equally reflects their abilities," *Roberts v. Colorado State Board of Agriculture*, 998 F.2d 824, 829 (10th Cir. 1993) (emphasis added), and the OCR has agreed that this is a component of "effective accommodation." *See* 1996 Clarification ("OCR also considers the quality of competition offered to members of both sexes in order to determine whether an institution effectively accommodates the interests and abilities of its students.").

To evaluate whether the competitive opportunities offered are equivalent, the Policy Interpretation offers a two-part test. This test is directed principally at issues of scheduling, but the *goal* it highlights is that men and women athletes enjoy "*equivalently advanced competitive opportunities*." *McCormick*, 370 F.3d at 301 (quoting 44 Fed. Reg at 71,418) (emphasis added). Among other things, the *McCormick* court inquired whether girls enjoyed equivalent opportunities "to compete in championship games." *Id*. In evaluating "effective accommodation," "'[a]thletic opportunities' means real opportunities, not illusory ones." *Williams*, 998 F.2d at 175.

Finally, lest we mistake the various means of measurement for the requirement itself, the Policy Interpretation reminds us that the "overall" question

of compliance with the "effective accommodation" requirement will be based on a determination of "whether the policies . . . are discriminatory in . . . effect," or whether there are "disparities" in the program with respect to benefits, treatment, or opportunities that deny equal opportunity. 44 Fed. Reg at 71,417-418.

Again, the CIAC Policy fails under every one of these tests. As already reviewed, Plaintiffs have alleged that under the Policy, high school female track athletes in Connecticut including Plaintiffs do *not* experience equal "quality of competition;" they experience physiologically unfair and unbalanced competition different in kind from anything their brothers experience. They do *not* enjoy equivalent opportunities "to compete in championship games," *McCormick*, 370 F.3d at 301; they have been displaced from a large number of championship meets by male-bodied athletes—a denial that does not symmetrically affect male athletes. And Plaintiffs have alleged that the Policy demonstrably fails to effectively accommodate the abilities of girls because it has resulted in many girls losing the "benefits" of being recognized as winners and champions in numerous races—the very "benefit" which lies at the heart of competitive athletics. *See* SAC ¶¶ 77-119.

Plaintiffs have alleged that as a result of the Policy, CIAC and the Defendants Schools do not adequately accommodate the abilities of girls. This allegation turns on factual questions and is not amenable to resolution as a matter of law. Decisions that engage in analyses of what is or is not "effective

accommodation" uniformly follow factual development in discovery. *See, e.g.,*

*Biediger*, 691 F.3d 85.[6]

Faced with Plaintiffs' detailed allegations as to how the Policy fails to provide

athletic opportunities "which *equally* reflect [girls'] abilities," 44 Fed. Reg. at 71,418,

Defendants respond by arguing that girls including Plaintiffs have won various

championships, and in a few cases have won even when competing against the

male-bodied Intervenors. Def. Mem. 10, 36-38. This "girls sometimes win" defense is

no basis for a motion to dismiss, for two reasons. First, what Title IX requires—and

what Plaintiffs allege the Policy denies—is "accommodation" for the abilities of girls

that is sufficiently "effective" that it results in *equal* opportunities, competitive

experiences, and benefits for girls. It is not satisfied with merely "some," or even

"quite a few." Second, Defendants' attempts to prove their "case" on this point wade

deep into factual disputes, disputable factual characterizations, and facts outside

the allegations, none of which is proper material for a motion to dismiss. Instead,

Plaintiffs' allegations must be credited, and all reasonable inferences drawn in

Plaintiffs' favor. *Supra* § II.A. Some of the "facts" asserted by Defendants are so

misleadingly presented as to be false.[7] But all of that is matter for another day,

after discovery.

---

[6] *Thomas v. Regents of University of California*, No. 19-cv-06463-SI, 2020 WL
3892860 (N.D. Cal. 2020), dismissed an "effective accommodation" claim because
the plaintiff did not allege that she was causally *harmed* by the alleged denial of
"effective accommodation." Here, Plaintiffs here have alleged individual harm
resulting from the alleged violation.

[7] For example, in a chart headed "Outdoor State Open Championship," Defendants
purport to show that Intervenor Miller won only four "out of 18" events in 2017-
2019. Def. Mem. 36-37. But Miller did not compete in girls' track in 2017, and each
entrant in the State Open is only permitted to compete in three events. Thus, what

23

As a desperate fall-back, Defendants propose a "call it co-ed" defense. After correctly stating that "it is undisputed that Plaintiffs' schools [and indeed, all schools operating under CIAC rules] have separate girls' indoor and outdoor track teams," Def. Mem. 33, Defendants suggest that if the participation of male-bodied athletes in girls' competitions *is* destroying equality of opportunity for girls in athletics, then the Court should simply deem that the track opportunities provided by CIAC and the Defendant Schools are "no longer 'sex separated'," thereby (so the theory apparently goes) dispensing with the annoying equality and effective accommodation mandates that are the basis of Plaintiffs' claims. Def. Mem. 35-36.

But the argument is meritless on its own terms. Contrary to Defendants' extended digression, Def. Mem. 33-35, there is little doubt that CIAC and Connecticut schools could *not* shift to all-co-ed track (and other sport) competition consistent with their obligations under Title IX.[8] In the unlikely event they wish to

---

this chart instead shows is that Miller took first place championships away from girls in four out of the six events in which Miller competed in the 2018 and 2019 State Open Championships. The fuller race results information contained in the Complaint provides the more complete picture of the impact of male-bodied athletes on girls in Connecticut.

[8] HEW instructed schools in its 1975 "Elimination of Sex Discrimination" memorandum that, "[A]n institution would not be effectively accommodating the interests and abilities of women if it abolished all of its women's teams and opened up its men's teams to women, but only a few women were able to qualify for the men's team." Sex Discrimination in Athletic Programs, 40 Fed. Reg. 52,655, 52,656 (Nov. 11, 1975). HEW successor OCR repeated this instruction in its 1979 Policy Interpretation, stating that schools "must" provide separate competitive opportunities where "[m]embers of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected." 44 Fed. Reg. at 71,418. *See also* SAC ¶¶ 44. And courts have repeatedly recognized this reality. *Supra* note 1. Defendants' assertion that "courts have recognized that allowing girls to play on boys' teams (and vice versa) can sometimes be the only effective way to provide equal athletic opportunity[ies]" is simply false. Def. Mem. 34. All the cases they cite involve allowing girls to play on boys' teams.

try, that will present a very different set of facts than those presented here, and a

different lawsuit. But for the present case, it is sufficient to observe that CIAC and

the Defendant Schools have *not* adopted an all-coed track program, and *do* purport

to offer track for girls at the high school level only through "separate girls' indoor

and outdoor track teams." Def. Mem. 33. Certainly this is what is alleged.

SAC ¶¶ 30-31. Nor is it true that moving to a thoroughly coed program would

relieve CIAC and the Defendant Schools of their obligations under Title IX to

provide equal athletic opportunities for girls. Regardless of the characterization,

Defendants must satisfy the equal opportunity and effective accommodation

obligations of Title IX.

Finally, Defendants' renewed effort to redefine (or undefine) "sex" so as to

neuter the "effective accommodation" requirement of Title IX, Def. Mem. 30, is

unsustainable for reasons discussed above. *Supra* p. 17-19.

C. <u>Plaintiffs have pled Title IX claims against their home schools.</u>

School districts cannot evade their responsibilities (or liability) under Title IX

by outsourcing athletic competitions to another entity they direct and control, and

through which they exclusively provide athletic opportunities for their students. To

permit this would destroy the ability of Title IX to achieve its two overriding

objectives: "avoid[ing] the use of federal resources to support discriminatory

---

There is no "vice versa" about it—because of the systematically asymmetrical
physical advantages enjoyed by boys. Likewise, all of the examples of "allow[ing]
girls and boys to compete with each other" listed in Defendants' footnote 21, Def.
Mem. 35, involve girls competing in boys' divisions—never "vice versa."

practices; [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

Defendants do not dispute that Selina, Chelsea, and Alanna's "home" school boards of education—Glastonbury, Canton, and Danbury respectively—are subject to Title IX, have chosen to sponsor separate teams for members of each sex, and must "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); see also SAC ¶¶ 20-21, 161-63, 170-72. Instead, these three "home school Defendants" plead that they are mere by-standers who have done nothing inconsistent with their Title IX obligations. Def. Mem. 46. The facts that Plaintiffs have alleged show otherwise.

Most fundamentally, the home school Defendants chose to provide athletic competitive opportunities overwhelmingly through events sanctioned by and subject to the CIAC Policy which has the effect of discriminating against girls. SAC ¶¶ 17-19, 165-66. The track teams of Glastonbury, Canton, and Danbury are part of the schools' federally funded athletics programs, SAC ¶ 21, and remain so as they compete in CIAC meets. CIAC competitions are integral to the sports programs offered by Defendants. And the CIAC competitions are celebrated as such: student accomplishments at CIAC meets are touted in school record books, and championship wins are celebrated with banners in the school gym. SAC ¶¶ 95-96. If a school chose to provide competitive opportunities for their students only through a league that had racially discriminatory policies, the "It wasn't us!" defense would be instantly rejected. The same must be true with respect to out-sourced discrimination based on sex.

Separately, Title IX responsibility and liability attaches where the defendant exercises some level of control over the program or activity in which the discrimination occurs. *See Mennone v. Gordon*, 889 F. Supp. 53, 56 (D. Conn. 1995) (noting that Title IX does not restrict the class of defendants based on nature or identity, but on their function or role in a federally funded program or activity). Glastonbury, Canton, and Danbury actively fund and participate in control of the CIAC. SAC ¶¶ 23-24, 27, 32. Plaintiffs have alleged that these schools are complicit in and share responsibility for the adoption and continuation of the CIAC's discriminatory Policy. SAC ¶¶ 15-32, 166, 176. They work with the CIAC to schedule meets and determine eligibility under CIAC rules. SAC ¶ 32. They apply and facilitate the CIAC's discriminatory policy by requiring their female athletes to compete under it or not at all. SAC ¶¶ 166, 176. And they are on notice of how the CIAC's policy negatively impacted the Plaintiffs. SAC ¶¶ 124, 129, 131. These schools' utter failure to take any corrective action, and to work to change the CIAC Policy, leave them actively responsible for the discrimination and harm suffered by Plaintiffs.

Glastonbury, Canton, and Danbury have a duty to ensure that the athletic opportunities they provide to their students both effectively accommodate and ensure equal athletic opportunities for their female athletes. The Plaintiffs' allegations plausibly allege that these "home schools" have failed to meet both these duties. SAC ¶¶ 87-102, 175-77.

Leaving no doubt at all that the allegations against the Plaintiffs' home schools are at the very least plausible, the Department of Education Office for Civil

Rights has now found—as part of "a formal statement of OCR's interpretation of

Title IX and its implementing regulations"—that the actions of the home school

defendants alleged in the Complaint constitute violations of Title IX. With respect

to each school, the OCR has formally concluded:

> the participation of [plaintiff's school] in athletic events sponsored
> by the CIAC . . . which resulted in [plaintiff] . . . competing against
> [male-bodied athletes], denied athletic benefits and opportunities
> to [plaintiff] and other female student athletes, in violation of the
> regulation implementing Title IX, at 34 C.F.R. § 106.41(b). . . .
> [School] placed female student-athletes in athletic events against
> male student-athletes, resulting in competitive disadvantages for
> female student-athletes. . . . [School's] obligation to comply with
> the regulation implementing Title IX is not obviated or alleviated
> by any rule or regulation of the CIAC.

August 31, 2020, OCR Enforcement Letter, at 38-39. Plaintiffs have alleged a cause

of action against the Glastonbury, Canton, and Danbury Boards of Education.

### D.   Plaintiffs have alleged a cause of action against the school districts of the Intervenor Defendants (Bloomfield and Cromwell).

Under Title IX, "no person in the United States shall, on the basis of sex, . . .

be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681. As

the Supreme Court has noted, "Congress easily could have substituted 'student' or

'beneficiary' for the word 'person'" had it wished to limit the individuals protected by

Title IX. *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (finding that

university employees can bring claims under Title IX). But it did not. Title IX

broadly protects any person alleging discrimination in a federally funded program

or activity—including those who may not be the most obvious beneficiaries of the

program. *See Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018) ("While the

Court has recognized that this [Title IX] right of action extends to students and employees, it has never expressly restricted it to those two categories of plaintiffs"); *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1123 (D. Kan. 2017) (concluding that a janitor could bring a Title IX sexual harassment claim and need not show a nexus to an educational program).

It is undisputed that Bloomfield and Cromwell are schools subject to the obligations of Title IX. SAC ¶¶ 15-16, 21. Plaintiffs Selina, Chelsea, Alanna, and Ashley are "persons" under Title IX. And they have pled that Bloomfield and Cromwell denied them the benefits of full and fair competition in a federally funded education program. SAC ¶¶ 15-16, 20-21, 87-102. Bloomfield and Cromwell have chosen to provide interscholastic athletics in coordination with and through the CIAC. They coordinate schedules. SAC ¶ 32. They contribute financially to the league. SAC ¶¶ 23-24. They direct and control the CIAC, along with other Connecticut schools. SAC ¶ 27. And they chose to enroll individuals with male bodies into girls' athletic competitions. SAC ¶¶ 15-16. By entering these males into competition, Bloomfield and Cromwell deprived Selina, Chelsea, Alanna, and Ashley of the equal athletic opportunities promised to them under Title IX. *See* SAC ¶¶ 15-16, 20-21, 87-102.

Defendants rely exclusively on cases drawn from the sexual assault context to argue that Selina, Chelsea, Alanna, and Ashley nevertheless cannot state claims against Bloomfield and Cromwell. But Defendants' reliance is misplaced. Instead, the reasoning of their principal case, *Doe*, 896 F.3d 127, supports Plaintiffs' claim. In *Doe*, the First Circuit clearly held that "a victim does not need to be an enrolled

29

student at the offending institution in order for a Title IX private right of action to exist," *id.* at 132 n.6, and instead affirmed dismissal of a young woman's claims based on a sexual assault because the plaintiff did not allege that she suffered discrimination in connection with an educational program or activity of the funding recipient, *id.* at 131-33.

Here, by contrast, Plaintiffs Selina, Chelsea, Alanna, and Ashley have alleged that they were deprived of equal athletic opportunities specifically in the context of meets in which Bloomfield and Cromwell participated. These meets—and indeed, the experience of competing in these meets against students of other schools— constituted integral parts of the athletic programs of Bloomfield and Cromwell. The meets represent an educational activity not only participated in, but in part controlled, funded, and directed by Bloomfield and Cromwell. SAC ¶¶ 15-32, 91, 100-02. In a very real sense, track meets (or other interscholastic athletic competitions) are "educational opportunities or benefits provided by," *Doe*, 896 F.3d at 132 (quoting *Davis Next Friend LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999)), each and all of the participating schools, for all of the participating students. These Defendant schools operated knowingly and in concert with the CIAC to allow male-bodied athletes to compete in the girls' category against Plaintiffs. SAC ¶¶15-32, 91, 100-02, 166, 176. Where a school's athletic program *necessarily and by design* involves participation and involvement by students from multiple schools, no precedent suggests—much less holds—that the school owes Title IX obligations to some but not all of the girls or women who participate in that program.

Again, Plaintiffs' claims against Bloomfield and Cromwell are more than plausible; they comport with the findings of the OCR, which has concluded that by sponsoring male-bodied student-athletes into CIAC girls' track competitions, these two schools "denied athletic benefits and opportunities to [Plaintiffs] . . . in violation of the regulation implementing Title IX, at 3f C.F.R. Section 106.41(a)." 8/31/20 OCR Letter at 40.

IV.   <u>Defendants' collateral attacks on Plaintiffs' claims are without merit.</u>

Defendants argue that even if the Policy had the effect of denying equal opportunities and experiences in athletics to girls, Plaintiffs cannot seek a remedy for lost opportunities they have already suffered, nor protection against such injuries in the future. They argue that Plaintiffs may not seek a remedy against the schools of the Intervenors, which sponsored male-bodied athletes into CIAC competitions, nor against their own schools, which chose to provide competitive athletic opportunities for girls only through meets governed by the unfair CIAC Policy. They argue that even if the Policy violates Title IX, Plaintiffs are entitled to no relief. Defendants are wrong on all points.

A.   <u>Plaintiffs have standing to assert the claims of the Complaint.</u>

While somewhat scrambled in Defendants' brief, the questions of standing, mootness, and available remedies are distinct issues, and are governed by distinct legal principles. Plaintiffs have standing to bring the asserted claims.

Standing is a jurisdictional requirement arising out of the Article III "case and controversy" requirement and is determined "as of the commencement of suit." *Barfield v. Semple*, No. 3:18-cv-1198 (MPS), 2019 WL 3680331, at *7 (D. Conn. Aug.

6, 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.5 (1992)). If plaintiffs are added by means of an amended complaint, the standing analysis for each plaintiff is performed as of the date that that plaintiff was first party to a complaint. *Id*. For Selina Soule, Alanna Smith, and Chelsea Mitchell, the relevant date for the standing analysis is February 12, 2020, when the initial complaint was filed. For Ashley Nicoletti, that date is April 17, 2020, when the First Amended Complaint ("FAC") was filed. Both of these dates were during the 2019-2020 academic year, at a time when CIAC had announced that it intended to "make every effort" to conduct a Spring 2020 track season and championships, and "All four Plaintiffs expect[ed] to compete in the Spring 2020 track and field season." FAC ¶ 133.

A plaintiff must allege facts as of that time sufficient to "demonstrate standing separately for each form of relief sought" (e.g., for damage or for injunctive relief). *Barfield*, 2019 WL 3680331, at *6 (cleaned up). To establish standing, a plaintiff must allege facts that establish that (1) he "suffered an 'injury in fact,'" (2) there is "a causal connection between the injury and the conduct complained of," and (3) "it [is] likely . . . that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (cleaned up). The "injury in fact" need not be actually accomplished, else there could never be jurisdiction to enjoin a violation or threatened harm before it occurs. Instead, it is sufficient if the facts alleged establish "a likelihood that [the plaintiff] will be injured in the future." *McCormick*, 370 F.3d at 284 (quoting *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). "[T]he Supreme Court has often expressed the governing standard

32

without any reference to 'certainty,' but requiring only a 'realistic danger' or a 'substantial risk' of harm." *Citizens for Responsibility & Ethics in Wash. v. Trump*, No. 18-474-cv, 2020 WL 4745067, at *29 (2d Cir. Aug.17, 2020) (collecting cases).

Defendants misstate the law when they assert that Plaintiffs must "plead *and prove*" facts sufficient to establish standing. Def. Mem. 14 (emphasis added). At this stage, nothing is to be "proved." As with other aspects of a motion to dismiss, the facts pled must be accepted as true for purposes of standing, and plausibility—not "proof" or even probability—is the standard. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012).

> 1.  Plaintiffs' allegations adequately establish standing to seek prospective injunctive relief.

All four girls alleged that they intended to—and had a reasonable expectation to—compete in CIAC Spring 2020 championships in various events. FAC ¶¶ 134-150; SAC ¶¶ 133-150. All four alleged that, "If genetically and physiologically male athletes are permitted to compete in girls' track and field competitions governed by the CIAC Policy in the Spring 2020 season, then Plaintiffs will likely lose victory, recognition, and advancement opportunities in the spring season." SAC ¶ 134. All four provided specific details about the events in which such adverse impacts could reasonably be expected, and why they could reasonably be expected. FAC ¶ 134; SAC ¶ 134.

As comparison with the facts in the *McCormick* case reveals, these allegations adequately establish the first component of standing for all four plaintiffs—that is, that the plaintiff suffered an "injury in fact." *Lujan*, 504 U.S. at 560-61. That case involved a complaint that the seasonal scheduling of girls' soccer

33

made it impossible for girls in the Mamaroneck school system to compete in the state finals. The plaintiffs had never played soccer for the Mamaroneck high school (although they asserted that they would like to), *McCormick*, 370 F.3d at 284, and there was good reason to doubt that the Mamaroneck team could qualify for the state finals within a time frame relevant to plaintiffs even if its scheduling permitted, as it had not even qualified for sectional finals in the prior year, *id.* at 294. As the school district pointed out there, and Defendants point out here, Def. Mem. 16, the outcomes of athletic competitions are never entirely predictable; upsets happen. But plausibility, not certainty, is what is required. The Second Circuit found that the *McCormick* plaintiffs had adequately alleged standing despite the same unpredictable outcomes at issue there. *Id.* at 285.

However, since Selina Soule and Chelsea Mitchell have now graduated, in the Second Amended Complaint, only Alanna Smith and Ashley Nicoletti seek prospective injunctive relief against operation of the Policy. *See* SAC Prayer for Relief. As to these two girls, the allegations also amply established (as of the time of suit) (a) a "causal connection" between the Policy they seek to enjoin and the threatened injury, and (b) that it was "likely that the injury will be redressed" by the requested injunction. The allegations establish that Smith and Nicoletti had standing to seek an injunction against application of the Policy.

> 2. Plaintiffs' allegations adequately establish standing to seek retrospective relief including declaratory relief.

All Plaintiffs seek injunctive relief to correct records, nominal and compensatory damages, and a declaration that the Policy violates and violated Title

IX. SAC, Prayer for Relief. All plaintiffs had standing, measured at the relevant time, to pursue these claims and these remedies.

Defendants dispute standing to seek injunctive relief and correction of records on the ungracious argument that correcting publicly available records will do nothing to redress the unfair harm that these girls have suffered. Def. Mem. 17-18.

If the records of athletic achievement maintained by CIAC and the Defendant Schools did not matter, Defendants would not be resisting the requested corrections. But they do matter. Records and recognition are integrally entwined with athletic competition and the "chance to be champions." *McCormick*, 370 F.3d at 295. Correcting records cannot restore the lost moment of thrill and public applause at the finish line, but it will remediate the harm in part. Receiving the specific recognition that these plaintiffs have earned is very far from the entirely general "psychic" satisfaction associated with seeing "the Nation's laws . . . faithfully enforced," which the court found inadequate to confer standing in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998). Each of the plaintiffs has identified specific races in which she has been denied recognition in official CIAC and school records for victories or placements which she would have received but for the Policy. SAC ¶¶ 77-108. Being able to point to official records that accurately reflect these achievements will plausibly be relevant to the college recruitment opportunities of Alanna Smith and Ashley Nicoletti, and employment opportunities for all Plaintiffs. SAC ¶¶ 2-4, 95. *C.f. Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971) (correcting school records is relevant to college recruitment

and employment and a student's graduation does not render claims for declaratory or injunctive relief moot in such a case); *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) (same).

It is plausible that—as is alleged—they would have achieved these victories and advancement opportunities if male-bodied athletes had not been permitted to take top honors in girls' competitions, and plausibility is all that is required. If Defendants wish to dispute the likelihood of those outcomes, that is a factual dispute for a later day. *See Anderson News*, 680 F.3d at 184-85. Similarly, Plaintiffs have alleged that Defendants maintain public, official records of race results and victories that deny accurate recognition to Plaintiffs. SAC ¶¶ 156-57. Precisely what physical and electronic records of these events are kept by the Defendants, and how, is a subject for discovery, not for a motion to dismiss.

Defendants also argue that the scope of the records-correction requested by Plaintiffs is overbroad. Def. Mem. 17. As discussed in Section IV(C) below, the precise *scope* of appropriate injunctive relief that is appropriate is not relevant to the question of whether these Plaintiffs have standing to seek injunctive relief. They do.

B.     Plaintiffs' claims are not moot.

An entirely separate question is whether the graduation, in June 2020, of the two male-bodied athletes responsible for the specific losses to girls of championships and advancement opportunities detailed in the Complaint *moots* the requests of Plaintiffs Alanna Smith and Ashley Nicoletti, who will compete in CIAC track

events this year, for injunctive relief against future enforcement of the Policy.[9] It does not.

If standing exists at the time injunctive relief is requested, then that request will not be deemed moot unless defendants meet "the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, Inc., 528 U.S. 167, 189 (2000) (cleaned up). Subsequent events must make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).

Defendants cannot remotely carry that "heavy burden." They do not even try, preferring merely to speculate that it might not happen again, and attempting to shift to Plaintiffs a burden of proof that rests on Defendants. In fact, the alleged violation of Title IX can "reasonably be expected to recur." First one, then another, male-bodied athlete has participated in girls' track competitions under CIAC auspices for each of the last three years. CIAC and the Defendant Schools insist on continuing the Policy that enables this, *despite a finding by the OCR that the Policy violates Title IX.* They refuse to rescind the Policy precisely because they believe that other students may wish to take advantage of it. Indeed, Defendants' entire discussions arguing that the requested injunction should be denied because it would

---

[9] As noted above, only these Plaintiffs seek prospective injunctive relief. The position of these Plaintiffs distinguishes this case from *Cole v. Oroville Union High School District*, 228 F.3d 1092, 1098-1100 (9th Cir. 2000), cited by Defendants. In that case, the request for injunctive relief was deemed moot once *all* the plaintiffs who had been directly harmed by the policy had graduated.

violate Equal Protection and Title IX, Def. Mem. 18-26, are premised on the assumption that the situation *will* recur.

Further, this case presents the classic situation of a policy that is "capable of repetition, but evading review." Well-established precedent "permits federal courts to decide a case where '(1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'" *United States. v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (citation omitted). Plaintiffs, of course, have no ability to know what male-bodied athletes may register to compete in girls' track events in the next season. But once a season has started, it is impractical as a matter of timing to obtain judicial intervention quickly enough to avoid the harm complained of. Illustrating that reality, the present case—and a motion for preliminary injunction—were filed in February of 2020. Only six months after the Complaint was filed have Defendants been required to "move or answer," and Plaintiffs' motion for preliminary injunction, filed concurrently with the original Complaint, has yet to be heard.

Indeed, even if Defendants had repealed the Policy (which they emphatically refuse to do), this Court's jurisdiction would not be destroyed. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant . . . free to return to his old ways. In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Friends of*

*the Earth*, 528 U.S. at 189 (cleaned up). The graduation of the Intervenors has not

mooted Plaintiffs' requests for prospective injunctive relief.

    C.    <u>Defendants' criticisms of the requested relief are irrelevant to their</u>
<u>motion to dismiss.</u>

    Defendants spend a great deal of space arguing that the relief requested by

Plaintiffs cannot be granted for several reasons: because it would violate Equal

Protection rights of Intervenors, Def. Mem. 18-24; because it would violate Title IX,

Def. Mem. 24-26; because it extends to events in which Plaintiffs themselves did not

participate, Def. Mem. 17-18. Defendants are wrong on the substance in each case,

but the decisive point for immediate purposes is that these arguments are

categorically irrelevant and out of place in a motion to dismiss. They simply cannot

be entertained at this point in the lawsuit.

    If schools violate Title IX, the federal courts are tasked to enjoin the

violation, and to craft a remedy for the harms. *Franklin v. Gwinnett Cty. Pub. Schs.*,

503 U.S. 60, 66 (1992). What the appropriate shape of that relief should be is a

question for a later day. A federal court may not dismiss a meritorious claim

because the requested relief is not the correct one. *Holt Civic Club v. City of*

*Tuscaloosa*, 439 U.S. 60, 65–66 (1978). If a court "dismissed on the basis that the

relief requested was inappropriate, or beyond the Court's power to grant, the Court

moved too quickly. . . . [FRCP's] clear and long-accepted meaning is that a

complaint should not be dismissed for legal insufficiency except where there is a

failure to state a claim on which some relief, not limited by the request in the

complaint, can be granted." *Norwalk CORE v. Norwalk Redevelopment Agency*, 395

F.2d 920, 925–26 (2d Cir. 1968); *see also Babcock v. Frank*, 729 F. Supp. 279, 286

(S.D.N.Y.,1990) ("If a complaint states a case justifying *any* relief within the court's power to grant, the prayer for relief must be disregarded and the action may not be dismissed under Rule 12(b)(6). The question is not whether the relief sought by the plaintiff is available, but whether any relief whatsoever could be granted."). This is true even if the objection to the requested relief is a constitutional one. *See Goldman v. Reddington*, 417 F. Supp. 3d 163, 176 (E.D.N.Y. 2019) (motion to dismiss contending that requested injunction would violate First Amendment was "an inappropriate basis for dismissal"); *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) (Contention that remedy sought by City would be unconstitutional deemed irrelevant to motion to dismiss. That motion "properly addresses the cause of action alleged, not the remedy sought.").

D.      Defendants' Equal Protection arguments are irrelevant and meritless for additional reasons.

Defendants' extended arguments concerning Equal Protection all attack the relief requested by Plaintiffs and are irrelevant for that reason. But these attacks are mistaken and irrelevant for other reasons as well.

The *only* division or classification in athletics that Plaintiffs' requested relief implicates is one based on biological sex. Although "discrimination" based on sex is subject to intermediate scrutiny, it is established beyond dispute that where the physiological differences between the sexes are genuinely relevant, differentiation by biological sex is not "arbitrary," *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 598 (2008), but rather is permissible. *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) (rejecting demand by boy, based on equal protection, to be permitted to compete in girls' volleyball); *Bauer v. Lynch*, 812 F.3d

340, 350 (4th Cir. 2016) (rejecting Title VII sex discrimination challenge to lower physical fitness requirements for female FBI recruits, because "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs"). Indeed, in *VMI*, while rejecting separation in *education* as incompatible with equal protection, Justice Ginsburg, writing for the Court, volunteered that the admission of women to VMI would "undoubtedly require" separate *physical fitness* standards for women because of "physiological differences between male and female individuals." *VMI*, 518 U.S. at 533, 550 n.19.[10]

As all these cases indicate, different treatment of the sexes where physical strength and capability is relevant satisfies intermediate scrutiny not because it is traditional, but for a concrete, objective *reason*: the broadly consistent physiological differences between men and women, including the fact that men have systematically greater athletic capabilities. These differences are recognized in the precedents cited above. Detailed and more-than-plausible facts about those differences in athletic capability are alleged in the Complaint, SAC ¶¶ 43-63, and must be accepted as true for purposes of the present motion. The Department of Education has even said that separation of athletics by biological sex may be *essential* in order to provide equal athletic opportunities to women. *Supra* p. 24 n. 8. In short, what Plaintiffs seek is not new, is justified by physiological facts well recognized in the law, and is legal.

---

[10] *Cf. Nguyen v. INS*, 533 U.S. 53, 73 (2001) (rejecting equal protection challenge to more rigorous requirements of proof of paternity vs. maternity for immigration purposes, and condemning the failure "to acknowledge even [the] most basic biological differences" between the sexes, as if those real differences were but "stereotypes").

What is new is Defendants' attempt to invoke Equal Protection to *mandate* discrimination based on gender identity—even as they argue that gender identity should be recognized as a quasi-suspect class for purposes of Equal Protection (a designation that neither the Supreme Court nor the Second Circuit has ever approved). Under traditional separation of sports by sex, and under the relief Plaintiffs request, no eligibility, no qualification, turns on gender identity, whether expressly or implicitly. The only divisor is the objectively justified and legally permissible criterion of biological sex.

Under the regime that Defendants advocate, by contrast, if two biological males step up to the registration desk to try out for the varsity girls' basketball team, the male who claims a female gender identity must be allowed to try out for the girls' team, while the male who claims a male gender identity must be excluded. This is discrimination based on gender identity pure and simple. And it is discrimination entirely untethered to those facts of physiology that have been recognized as the justification for separation of athletics based on biological sex. More, Defendants are asserting that Equal Protection not only allows but *requires* this discrimination or different treatment based on gender identity. But this is impossible: Equal Protection acts to prohibit discrimination. In no case has the Supreme Court ever held that compliance with Equal Protection can *require* discrimination on any criterion whatsoever.[11]

---

[11] *Cf. Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 300-02 (2014) (reviewing cases that establish that Equal Protection may permit, but cannot require, "affirmative action" based on race in educational admissions).

Finally, Defendants' references to hormone suppression, Def. Mem. 22-23, are utterly irrelevant. The CIAC Policy that Plaintiffs challenge as violating Title IX does not require or even mention hormone suppression. If CIAC repeals the Policy and adopts a different policy that requires male athletes to undergo hormone suppression before competing in female events, that will be time enough for that debate. But CIAC has not done so. Meanwhile, the only "facts" concerning hormone suppression for purposes of the present motion are Plaintiffs' plausible allegation that "Administering testosterone-suppressing drugs to males by no means eliminates their performance advantage," and "suppressing testosterone in men after puberty . . . does not completely reverse their advantages in muscle mass and strength, bone mineral density, lung size, or heart size." SAC ¶¶ 59-60.

In fact, Defendants' invocations of hormone suppression, Def. Mem. 22-23, highlight the incoherence of their position. Are they arguing that Equal Protection requires schools to permit male-bodied athletes who claim a female gender identity to participate in girls' athletics *if and only if they have thoroughly suppressed any physiological advantage that they might otherwise have*? If so, then they are arguing for a regime that rejects separation of athletics by either sex *or* gender identity, but instead separates based on some extremely difficult to define criterion of athletic capability.

Or is their position that Equal Protection requires schools to permit *all* students born male who claim a female gender identity to participate in girls' athletics, *regardless* of whether they have undergone any hormone suppression at

all? If so, then Defendants' discussion of hormone suppression is nothing more than an intentional distraction and smokescreen.

In either case, even if it is true (as it undoubtedly is) that some males do not have superior physical capabilities as compared to athletic females—whether as a result of natural genetics or hormonal intervention—nothing follows. It is both alleged and true that "male athletes consistently achieve records 10-20% superior to comparably fit and trained women across almost all athletic events." SAC ¶ 51. Courts have recognized that sex is "a legitimate accurate proxy" for athletic capabilities, because of "average real differences between the sexes." *Clark*, 695 F.2d at 1129. And this is enough. As the Supreme Court has explained: "None of our gender-based classification equal protection cases have required that the [regulation] under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. "[F]ew statutory classifications are entirely free from the criticism that they sometimes produce inequitable results." *Lalli v. Lalli*, 439 U.S. 259, 273 (1978). With intermediate scrutiny, the policy need only have a "substantial relation" to an important government interest. *See Craig v. Boren*, 429 U.S. 190, 197 (1976); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).

E.    The doctrine of *Pennhurst* does not bar Plaintiffs' claim for damages.

Defendants argue that even if the Policy violates Title IX, the doctrine of *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), means that "Plaintiffs' claims for nominal and compensatory damages must be dismissed." Def. Mem. 46. *Pennhurst* is in fact irrelevant to the present motion, for multiple reasons.

First, as noted above, if Plaintiffs have alleged valid causes of action (and they have), then debates about *proper* relief are for a later day, not a basis for dismissal.

Second, Defendants are attempting to misdirect the Court into misapplying *Pennhurst* to decide *de novo* what are in fact settled questions of law. *Pennhurst* addresses the question of *whether* a private right of action will be implied from a federal mandate that is based on the spending power. *Pennhurst*, 451 U.S. at 16-17. But that question is not open here; it is established that an implied private right of action to seek redress for violations of Title IX exists. *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994) (citing *Cannon*, 441 U.S. 677). It is equally established that damages are available to private plaintiffs asserting such a claim. *Id.* (citing *Franklin*, 503 U.S. 60). Plaintiffs cite no case in which *Pennhurst* has been applied to limit the available remedies once a private right of action is found to exist.

Third, as to Title IX specifically, the Supreme Court has repeatedly held that the text of Title IX and repeated Supreme Court decisions have put educational institutions "on notice that they could be subjected to private suits for intentional sex discrimination," and that this liability "encompass[es] diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182–83 (2005). In sum, the Court has held that "the [*Pennhurst*] notice problem does not arise in a case such as this, in which intentional discrimination is alleged." *Id.* (alterations original) (quoting *Franklin*, 503 U.S. at 74–75); *see also Davis*, 526 U.S. at 642 (same). In *Jackson*, *Franklin*, and *Davis*, the Court each time held that Title IX protected a different form of intentional discrimination than the Court had

previously recognized—and that *Pennhurst* did not bar damages for this newly recognized class of claims. Any contrary argument based on supposed lack of "notice," the Court held, "ignores the import of our repeated holdings construing 'discrimination' under Title IX broadly." *Jackson*, 544 U.S. at 174. These multiple precedents are fatal to Defendants' attempt to muddy the water concerning "notice" by calling Plaintiffs' claims "novel" and citing a promptly rescinded "Dear Colleague" letter issued by the Department of Education in 2016. Def. Mem. 44-46. Here, the complaint plausibly alleges intentional discrimination. SAC ¶¶ 124-132. If Defendants intentionally violated Title IX, then damages are not barred by *Pennhurst.*

Defendants' attempt to invoke the Eleventh Amendment and sovereign immunity to fabricate a heightened "notice" requirement, Def. Mem. 43, is specious. Whatever state courts may have held in different contexts for different purposes, *see* Def. Mem. 43 n. 27, the Second Circuit has unequivocally held that Connecticut school boards are not arms of the state for purposes of Eleventh Amendment immunity. *Rosa R. v. Connelly*, 889 F.2d 435, 437-38 (2d Cir. 1989) ("[L]ocal school boards are municipal bodies for purposes of the Eleventh Amendment and thus subject to suit in federal court."); *see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 239 (2d Cir. 2006) ("[T]he Supreme Court ruled that a local Ohio board of education was not entitled to such immunity because it was 'more like a county or city than it [was] like an arm of the State.' We reached the same conclusion with respect to a local Connecticut board of education . . . .") (cleaned up). No heightened notice requirement applies.

Conclusion

For the reasons set forth above, Defendants motion to dismiss should be denied in its entirety.

Respectfully submitted this 11th day of September, 2020.

By: /s/ *Roger G. Brooks*

Roger G. Brooks
CT Fed. Bar No. PHV10498
Jeffrey A. Shafer
CT Fed. Bar No. PHV10495
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: rbrooks@ADFlegal.org
Email: jshafer@ADFlegal.org

Kristen K. Waggoner
CT Fed. Bar No. PHV10500
Christiana M. Holcomb
CT Fed. Bar No. PHV10493
Parker Douglas
CT Fed. Bar No. PHV10761
Alliance Defending Freedom
440 First St. NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 393-8690
Fax: (202) 347-3622
Email: kwaggoner@ADFlegal.org
Email: cholcomb@ADFlegal.org
Email: pdouglas@ADFlegal.org

Howard M. Wood III
CT Bar No. 68780, CT Fed. Bar No. 08758
James H. Howard
CT Bar No 309198, CT Fed. Bar No 07418
Fiorentino, Howard & Petrone, P.C.
773 Main Street
Manchester, CT 06040
Telephone: (860) 643-1136
Fax: (860) 643-5773
Email: howard.wood@pfwlaw.com
Email: james.howard@pfwlaw.com

Attorneys for Plaintiffs

<u>Certificate of Service</u>

I hereby certify that on September 11, 2020, a copy of the foregoing Response in Opposition to Motion to Dismiss was filed electronically with the Clerk of Court. Service on all parties will be accomplished by operation of the court's electronic filing system.


/s/ *Roger G. Brooks*
Attorney for Plaintiffs

49