IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SELINA SOULE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 3:20-cv-00201-RNC |
| | ) | |
| v. | ) | |
| | ) | **REPLY** |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. *et al*, | ) ) | |
| | ) | September 25, 2020 |
| *Defendants*, | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiffs have brought this lawsuit based on the unprecedented theory that Title IX prohibits schools from allowing girls who are transgender—and who are recognized as girls in current school records and daily life activities in the school and community—from participating on the same sports teams as other girls. Plaintiffs' claims are not supported by the facts, sound legal analysis, or legal precedent, and are otherwise barred as brought against school districts they never attended. Nothing in Plaintiffs' Memorandum in Opposition ("Opp.") rebuts these arguments. Therefore, the Motion to Dismiss should be granted in its entirety.

**I.  Plaintiffs' Claims for Prospective Relief Should Be Dismissed for Lack of Standing.**

    **A.  Plaintiffs' Claims of Future Injury Are Too Speculative to Support Injunctive Relief Against CIAC's Policy.**

On a motion to dismiss pursuant to Rule 12(b)(1), "plaintiffs bear the burden of alleging facts that affirmatively and plausibly suggest that they have standing to sue." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (cleaned up). When they filed this lawsuit in February 2020, Plaintiffs alleged they faced future injury as a consequence of having to compete against Individual Intervenors, Andraya and Terry, during the Spring 2020 track-and-field season.

Compl. ¶¶ 143-46. But after the Complaint was filed, the Spring 2020 season was canceled due to COVID-19, and Andraya, Terry, Soule, and Mitchell all graduated high school. In light of these events, Plaintiffs now concede that Soule and Mitchell do not have standing to seek prospective relief, *see* opp. 34, but Plaintiffs contend that Smith and Nicoletti still have standing to do so.

That argument is misguided. To establish standing for injunctive relief Plaintiffs must "plead a sufficient likelihood that" they "face[] a substantial risk of suffering a *future* injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 184 (1983). "Past exposure to [allegedly] illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* at 102. In their Second Amended Complaint, Smith and Nicoletti fail to plausibly allege any actual or imminent risk that they will compete against a girl who is transgender at any time in the future. Indeed, they do not even allege knowledge that any girl who is transgender is competing in track in their events this school year, or will be while they are in high school. Without any threat of imminent *future* injury, Smith and Nicoletti lack Article III standing to seek an injunction against CIAC's policy. *See* Second Amended Complaint ("SAC") ¶ 178(C) (requesting such an injunction).[1]

---

[1] Plaintiffs liberally pick and choose language from *McCormick* to support their standing (and other) arguments. *See* Opp. 10, 15–17, 19–22, 33–35 (discussing standing) (citing *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d. Cir. 2004)). But *McCormick* is not helpful to Plaintiffs. There, the equal treatment issue was cut-and-dry: "scheduling . . . girls' soccer"—but not boys'—"out of the championship game season." 370 F.3d at 295. Importantly, the *McCormick* parties stipulated that the plaintiff girls would play soccer in the fall if they could. Thus, the "injury was not conjectural or hypothetical—[plaintiffs] wanted to play soccer in the fall and have a chance to compete in the championship games but the schools would not offer soccer in the fall." *Id.* at 281. The defendants' scheduling thus literally denied the plaintiffs the "chance to be champions" because they were competing at the wrong time. *Id.* at 291. These certainties are a far cry from the chain of speculation Plaintiffs attempt to construct here to establish standing.

In an attempt to save their claims, Plaintiffs assert that Smith and Nicoletti's claims should be analyzed under the rubric of mootness. *See* Opp. 37. But this too fails.[2] To avoid dismissal for mootness, "there must be a reasonable expectation that the *same* complaining party would encounter the challenged action in the future," and "mere speculation that the parties will be involved in a dispute over the same issue does not rise to the level of a reasonable expectation." *Van Wie v. Pataki*, 267 F.3d 109, 114 (2d Cir. 2001) (emphasis in original). Plaintiffs have identified only two high school female athletes who are transgender—Andraya and Terry—who have *ever* competed in their track and field events in Connecticut. They do not identify any other girls who are transgender who may race against them in the future. Rather, Plaintiffs rely on pure speculation that a different, hypothetical, girl who is transgender *may* compete in in track and field at an *unknown time in the future*, *and* compete in the same events as Smith and Nicoletti, *and* place higher than Smith and Nicoletti in those events. The Second Amended Complaint fails to allege any facts that would plausibly permit the Court to infer that this extraordinary set of coincidences is likely to coming to pass. Accordingly, none of the four Plaintiffs has standing to seek prospective relief.

      **B.**    **Plaintiffs Have Failed to Plausibly Allege That Altering the Official Records of Past Races Is Likely to Redress Plaintiffs' Injuries.**

Plaintiffs also seek an injunction requiring Defendants to alter the official records of past races to expunge the times of girls who are transgender and retroactively declare Plaintiffs the winners, regardless of the fact that they did not actually win. *See* SAC ¶¶ 178(D), (E). To establish standing for such a request, Plaintiffs must plausibly allege that it is "'likely,' as opposed to merely

---

[2] Plaintiffs assert that Defendants bear a "heavy burden" to establish mootness, Opp. 37, but that more stringent standard applies only to the "voluntary cessation" exception to mootness, which is not at issue here. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (articulating standard for voluntary cessation); *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (same); Wright & Miller, 33 Fed. Prac. & Proc. Judicial Review § 8347 (2d ed.) ("[T]he Supreme Court applies an extremely strict standard for determining whether a defendant's voluntary cessation of conduct moots a case.").

'speculative,'" that the alterations would redress their alleged injuries. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' belief that such an injunction "will make [them] happier" or provide "psychic satisfaction" is not enough. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Rather, Plaintiffs must show they "personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

Plaintiffs cannot make that showing. First, deleting Andraya and Terry's racing times would not affect Plaintiffs' times. Their times remain the same. And Plaintiffs' conclusory assertions do not allow the Court to draw a plausible inference that it is likely that changing past athletic records by deleting the times of girls who are transgender will benefit Plaintiffs "in a tangible way." Plaintiffs assert that altering records "will plausibly be relevant to the college recruitment opportunities," even though their times would remain the same, *see* Opp. 35, but Soule and Mitchell have already graduated and matriculated at colleges. Thus, altering high school athletic records as sought by Plaintiffs cannot have any impact on Soule and Mitchell's college recruitment opportunities.

Second, as for Nicoletti and Smith, the only "official records" at issue are from races that took place during their freshman year, in the Spring 2019 track-and-field season. Nicoletti and Smith each identifies only a single instance in which she allegedly would have placed higher in the standings but for the participation of Andraya or Terry. *See* Motion to Dismiss ("Mem.") 9-10. Again, they assume that college recruiters look to placement rather than times. Regardless, the Second Amended Complaint does not allege any facts to support the assertion that deletion of the times run by Andraya and Terry during Nicoletti and Smith's freshman season would plausibly have any effect on Nicolleti and Smith's college recruitment opportunities years later.

Finally, Plaintiffs also assert—in an even more conclusory fashion—that altering records could somehow be relevant to future employment opportunities. *See* Opp. 35. But the Second Amended Complaint does not include a single allegation related to employment opportunities, and

the only cases Plaintiffs cite are those related to expungement of derogatory information from school records related to unconstitutional disciplinary sanctions, which is not at issue here. *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007); *Hatter v. L.A. City High Sch. Dist.*, 452 F.2d 673, 674 (9th Cir. 1971). The Opposition fails to demonstrate standing for such injunctive relief, and, therefore, the Motion to Dismiss should be granted.[3]

### C. Plaintiffs Lack Standing to Obtain Injunctive Relief for Athletic Events in Which Plaintiffs Have Not Competed, or Will Not Compete.

At a minimum, Plaintiffs' requests for injunctive relief must be dismissed to the extent they seek to alter records of races in which Plaintiffs did not participate, delete times of girls who are transgender generally, or seek to bar transgender students from participating in future races that do not involve Plaintiffs. Despite Plaintiffs' assertions to the contrary, Plaintiffs' standing to seek such relief is a question of Article III jurisdiction, which cannot be "left for a later day." Opp. 39.

"[S]tanding is not dispensed in gross." *Lewis v. Casey,* 518 U.S. 343, 358 n.6 (1996). "At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017); *see also Laidlaw,* 528 U.S. at 185 (holding that "a plaintiff must demonstrate standing separately for each form of relief sought"). "[T]he actual-injury requirement would hardly serve the purpose of preventing courts from undertaking tasks assigned to the political branches, if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)

---

[3] Plaintiffs have twice amended the complaint, giving them ample opportunity to add factual allegations related to allegedly lost employment opportunities. By not doing so, Plaintiffs demonstrate that this claim is baseless. Indeed, despite the complaint, Plaintiffs have conceded in discovery responses that the only compensatory damages they seek are emotional damages. *See* Defendants' damages analysis, attached as Ex. 1.

5

(internal citation omitted). Rather, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* (internal quotation omitted).

This is not a question of the specific relief requested, *contra* Opp. 39–40, but of whether Plaintiffs have standing to request relief in the first place. They do not. No plaintiff has standing to seek relief related to races in which she did not or will not compete. Plaintiffs do not have Article III standing to redress perceived injuries to others.

## II. Plaintiffs Have Failed to Allege a Cognizable Claim Under Title IX.

While the Motion to Dismiss demonstrates that excluding girls who are transgender from competing on athletic teams consistent with their gender identity would violate Title IX and the Equal Protection Clause, *see* Mem. 18–27, the question here is even simpler. The question in this case is not whether Title IX *requires* schools to allow girls who are transgender to participate on girls' athletic teams, but whether Title IX *prohibits* schools from doing so. As a matter of law, whatever complaints Plaintiffs may have about competing with girls who are transgender, those grievances do not give rise to a Title IX claim.

### A. Title IX and Its Implementing Regulations Do Not Bar Girls Who Are Transgender from Participating with Other Girls.

1. *Plaintiffs have failed to cite any court cases supporting their interpretation.*

Plaintiffs' claims are premised upon the faulty assumption that Title IX and its regulations establish a definition of "sex" that precludes girls who are transgender—and who are recognized as girls "in current school records and daily life activities in the school and community," *see* CIAC By-laws Article IX, Section B—from being recognized as girls for purposes of sex-separated athletic activities. As explained in the Motion to Dismiss, Plaintiffs fail to identify any text from Title IX, the implementing regulations, the 1979 Policy Statement, or any other OCR Policy Statements pre-2020

that purports to restrict schools from allowing girls who are transgender to play on the same teams as other girls. Mem. 28–29.

Plaintiffs also fail to identify any judicial precedent interpreting Title IX in such a manner. To the contrary, every court of appeals to consider the question in the context of sex-separated restrooms, *see* 34 C.F.R. § 106.33, has rejected Plaintiffs' argument, concluding instead that the regulation "does not dictate how schools should approach transgender students' restroom use or define a transgender student's 'sex.'" *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1309 (11th Cir. 2020); *accord Grimm v. Gloucester Cty. Sch. Bd.,* No. 19-1952, 2020 WL 5034430, at *23 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (denying stay pending appeal). In the context of athletics, the only district court to consider the question has similarly rejected the argument that separating teams based on sex requires the exclusion of girls who are transgender from participating in women's competition. *See Hecox v. Little*, No. 1:20-CV-00184-DCN, 2020 WL 4760138, at *30 (D. Idaho Aug. 17, 2020). The Opposition fails to identify any cases to the contrary.

        2.      *OCR's August 31, 2020 notice is not entitled to any deference by this Court*.

Absent any judicial support for their position, Plaintiffs rely exclusively on the Office of Civil Rights ("OCR") notice of impending enforcement action *in this very case*. *See* Opp. 5–8, 14–15 (citing revised notice of pending enforcement issued on August 31, 2020 ("the August Letter")).[4] Plaintiffs assert that the August Letter is entitled to deference under *Auer v. Robbins*, 519 U.S. 452,

---

[4] That Plaintiffs rely so heavily on the August Letter highlights the importance of the Department of Education being joined in this action.

457 (1997),[5] because it constitutes an agency's interpretation of its own regulations. Opp. 14. But Plaintiffs' argument is misplaced.

As an initial matter, Plaintiffs ignore the Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), which scaled back lower courts' interpretation of *Auer* and underscored the doctrine's limited scope. In particular, *Kisor* emphasized that "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." *Id.* at 2418–19 (internal quotation omitted). "That disruption of expectations may occur when an agency substitutes one view of a rule for another" or provides a "construction conflicting with a prior one." *Id.* (internal quotation omitted). Thus, *Kisor* controls, not *Auer*.

Second, Defendants are not aware of and could not locate *any* other OCR notice of impending enforcement action stating, as the August Letter does, that it constitutes "a formal statement of OCR's interpretation of Title IX and its implementing regulations and should be relied upon, cited, and construed as such." Instead, such notices—including OCR's initial notice of enforcement in this case on May 15, 2020 (the "May Letter")—have always said the opposite: that the notice "is *not* a formal statement of OCR policy and should *not* be relied upon, cited, or construed as such." (emphases added). *Compare* August Letter (Ex. B to Opp.) *with* May Letter (Ex. A to Opp.). *Kisor* speaks precisely to this type of "unfair surprise" and prohibits this Court from giving any deference to OCR's position.

Third, the August Letter's conclusory assertion that Title IX's regulations require transgender students to be separated by so-called "biological sex" fails to acknowledge that five courts of

---

[5] Plaintiffs also cite to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). *Chevron* requires deference to an agency when the agency interprets an ambiguous *statute* that falls within its purview. *Auer*, in contrast, requires deference when interpreting a *regulation* previously promulgated by that agency. *Chevron* deference is irrelevant here because it is a regulation, not a statute, that results in the current dispute.

appeals, as discussed above, have rejected that very position. *See* August Letter 35. The August Letter's failure to address, much less distinguish, precedent-setting opinions is precisely what *Kisor* seeks to avoid.

That *Kisor* governs is further demonstrated by OCR's conflicting Title IX guidance in 2016 and 2017. As already briefed in Defendants' Motion for Joinder, *see* ECF No. 90-1, in 2016, the Department of Education ("ED") instructed that "[w]hen a school provides sex-segregated activities"—including athletics—"transgender students must be allowed to participate in such activities . . . consistent with their gender identity."[6] Shortly after Donald Trump's inauguration and Education Secretary Devos' confirmation in 2017, ED and DOJ withdrew the 2016 guidance, purportedly because it: (a) did not "contain extensive legal analysis or explain how the position is consistent with the express language of Title IX;" (b) did not "undergo any formal public process," such as notice and comment; (c) conflicted with a recent decision from a district court in Texas; and (d) did not give "due regard for the primary role of the States and local school districts in establishing educational policy."[7]

Now, in a complete reversal, the 2020 letters assert that the same athletic policies that OCR encouraged schools to adopt in 2016 to *comply* with Title IX actually *violate* the statute. Ironically, the August Letter also contradicts all statements made in 2017 about the proper procedure for enacting such policies. The August Letter was issued without extensive legal analysis, without the

---

[6] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., and Vanita Gupta, Principal Deputy Assistant Att'y for Civil Rights, U.S. Dep't of Just. (May 13, 2016), attached as Ex. 2. In an accompanying document with model policies, the Department of Education approvingly cited a Rhode Island policy mandating athletic participation in accordance with gender identity. *See* Office of Elementary and Secondary Education, Examples of Policies and Emerging Practices for Supporting Transgender Students (May 2016), attached as Ex. 3.

[7] Letter from Sandra Battle, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., and T.E. Wheeler, II, Acting Assistant Att'y General for Civil Rights, U.S. Dep't of Just. (Feb. 22, 2017), attached as Ex. 4.

benefit of a formal public process such as notice and comment rulemaking, and in spite of contrary court precedent, while making a mockery of the Departments' statements in 2017 that due regard should be given to the primary role of the states and local schools in establishing educational policy in this area. The August Letter does this without acknowledging the extensive reliance interests that have been upended by this surprise change in policy. This unusual and unreasoned enforcement letter is not entitled to deference by this, or any other, Court. [8] And nothing in the plain text of Title IX or the athletic regulation prohibits schools from allowing girls who are transgender to compete on the same teams as other girls.

### B. Plaintiffs Have Not Plausibly Alleged the Elements of an "Equal Treatment" or "Effective Accommodation" Claim Under Title IX.

Plaintiffs attempt to raise both "equal treatment" and "effective accommodation" claims under Title IX.  But even if Title IX or its regulations required schools to define girls who are transgender as "males" (or define boys who are transgender as "females") for purposes of participation on sex-separated teams, Plaintiffs claims would still fail. The Court should grant Defendants' Motion to Dismiss.

        1.    *Plaintiffs' equal treatment claim fails as a matter of law*.

Plaintiffs complain that they are denied equal athletic opportunity as a result of competing against girls who are transgender. Conflating and distorting "effective accommodation" and "equal treatment" claims, Plaintiffs assert that Title IX requires not merely an equal opportunity for girls and boys to compete, but also requires that an equal number of trophies be awarded to (in Plaintiffs' words) people with "male bodies" and people with "female bodies." Plaintiffs cannot identify any

---

[8] Defendants have moved to join ED and DOJ in this lawsuit, which DOJ has resisted. Now that ED has issued notices of impending action and referred the case to DOJ for enforcement, DOJ has no valid basis to avoid joinder in this matter. In fact, the August Letter compels ED and DOJ to be joined, and compels the Court to review the highly unusual and inappropriate manner in which the August Letter was issued.

10

court, or any prior enforcement action by OCR, that has interpreted Title IX in such a manner. And with good reason! Title IX claims for "equal treatment" all relate to equal treatment of boys' and girls' *teams* with respect to "schedules, equipment, coaching, and other factors affecting participants in athletics." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012). Plaintiffs do not allege that Defendants treat boys' teams differently from girls' teams in any way.

2. *Plaintiffs' effective accommodation claim fails as a matter of law.*

By contrast, claims related to the creation or composition of particular sex-separated teams are analyzed exclusively under the rubric of "effective accommodation." To prevail on a claim that cisgender girls have been denied effective accommodation as a result of competing with girls who are transgender, Plaintiffs would have to show that cisgender girls "do not possess sufficient skill . . . *to compete actively*" on a team with girls who are transgender. 1979 Policy Interpretation § VII.C.4.(b)(3) (emphasis added). Plaintiffs do not even attempt to make this showing. Nor could they. Two of the plaintiffs have outperformed both Andraya and Terry in championship races. And all are accomplished athletes who have won awards in multiple track-and-field events. As discussed in Defendants' Motion to Dismiss—even assuming that Title IX somehow dictated the interpretation of "sex" that Plaintiffs advocate—Title IX allows schools to provide equal athletic opportunities to girls and boys on mixed teams without mandating that an equal number of males and females win every competition. Mem. 31–32.[9]

3. *Hypothetical situations fail to state a Title IX claim in this case.*

Instead of engaging with these undisputed facts, Plaintiffs focus on a hypothetical situation in which "the great bulk of the females would quickly be eliminated from participation and denied any

---

[9] Taking words out of context, Plaintiffs argue that Title IX requires that athletic opportunities not be "illusory." But the "illusory opportunities" in *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) referred to girls trying out for boys' teams without actually being able to play. The "illusory opportunities" in *Biediger*, 691 F.3d at 101, referred to Quinnipiac's attempt "to pump up

11

meaningful opportunity for athletic involvement." Opp. 2 n.1. But Plaintiffs' factual allegations —as opposed to rhetoric—show nothing of the kind. The allegations show that for the past seven years, only two girls who are transgender, Andaya and Terry, have competed competitively in girls' track-and-field, each in only three events out of dozens per meet. Opp. 23 n.7. Irrespective of Andraya and Terry's talents, their participation in three events per meet has not resulted in cisgender girls being "categorically squeezed off of girls' varsity teams, out of playing and competitive opportunities, and out of all victories and championships." Opp. 18. *See also Hecox,* 2020 WL 4760138, at *29 ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

### C.  Plaintiffs' Claims for Retrospective Relief are Barred by *Pennhurst*.

Despite Plaintiffs' assertions to the contrary, *Pennhurst State Sch. & Hosp. v. Halderman* is routinely relied on to limit the scope of available relief. In arguing that *Pennhurst* "addresses the question of *whether* a private right of action will be implied from a federal mandate that is based on the spending power," Opp. 75, Plaintiffs have confused *Pennhurst* with *Alexander v. Sandoval*, 532 U.S. 275 (2001). Indeed, the *primary* function of *Pennhurst* is to restrict the scope of available remedies when a private cause of action has already been created, whether explicitly or implicitly. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (invoking *Pennhurst* to conclude that expert witness fees cannot be recovered as "costs" under the IDEA);

---

its women's track team rosters by requiring every injured field hockey, soccer, and volleyball player to join these teams even though they would never actually compete in the indoor and outdoor track seasons and, for that matter, would never want to enter a race." Neither of these cases—nor any other case—stands for the proposition that an athletic opportunity is "illusory" unless a student is guaranteed to win every competition, as Plaintiffs maintain.

*Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 287 (1998) ("Title IX's contractual nature has implications for our construction of the scope of available remedies.").

Nor is *Pennhurst*'s requirement for a clear statement to impose liability for money damages limited to cases in which the funding recipient has sovereign immunity. Opp. 46. It applies to *all* monetary conditions imposed through Spending Clause legislation. The Supreme Court thus routinely invokes *Pennhurst*'s clear-statement rule to protect school districts like Defendants here. *See Murphy*, 548 U.S. at 296; *Gebser*, 524 U.S. at 287); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74 (1992).

*Pennhurst* is also fatal to Plaintiffs' requests for retrospective declaratory relief because a declaratory judgment may be considered "retrospective" relief only "to the extent that it is intertwined with a claim for monetary damages." *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006).

### III.  Plaintiffs Fail to Allege that Title IX Provides a Cause of Action Against the School District Defendants.

Plaintiffs attend or attended four separate high schools, three of which are named as defendants.[10] But the Second Amended Complaint fails to set forth any facts that show that those schools violated Plaintiffs' rights. Plaintiffs also assert claims against the two schools previously attended by Terry and Andraya. Yet Plaintiffs fail to demonstrate any basis on which they can seek

---

[10] Presumably, the fourth, Immaculate High School, is not named because it is a private parochial school that does not receive federal funding and, therefore, is not bound by Title IX.

relief against schools that they do not attend. For the reasons set forth in the Motion to Dismiss and below, therefore, those schools should all be dismissed from this lawsuit.

### A.    Plaintiffs' Claims Fail Against their Home Schools.

In regard to the Plaintiffs' home schools, Plaintiffs argue that "Glastonbury, Canton, and Danbury have a duty to ensure that the athletic opportunities they provide to their students both effectively accommodate and ensure equal athletic opportunities for their female athletes." Opp. 27. Plaintiffs cite to Paragraphs 87–102 and 175–77 of the SAC as alleging facts that support the claim that the home schools did not meet those obligations. These paragraphs demonstrate the exact opposite, however: They show that the home schools provided teams for Plaintiffs; they allowed Plaintiffs to participate on those teams; and Plaintiffs participated with great success. Title IX simply does not provide a right for any student to finish first in an event, or finish in any particular position. Moreover, Plaintiffs cannot identify any allegations in the Complaint that demonstrate how the home schools would have any way of knowing whether runners on other schools' teams are transgender. Plaintiffs are attempting to impose obligations on their home schools that do not exist under Title IX. Therefore, the home schools must be dismissed.

### B.    Plaintiffs' claims fail against Cromwell and Bloomfield.

In the Motion to Dismiss, Bloomfield and Cromwell argued that courts have "dismissed Title IX claims brought by non-students, holding they lacked standing because the plaintiff in a Title IX suit must be a student of the educational institution being sued in order for his or her claims to proceed." Mem. 51. In other words, a student attending school in Danbury, Glastonbury, Canton and at Immaculate High School is not the "intended beneficiary" of federal funds received by Bloomfield or Cromwell. Rather, the "intended beneficiaries" of those funds are students attending those schools.

14

Bloomfield and Cromwell, unlike Plaintiffs, cite several cases, including *Doe v. Brown Univ.*, 896 F.3d 127, 133 (1st Cir. 2018), supporting that position.

First, that Bloomfield and Cromwell coordinate with other schools through the CIAC to establish competition schedules, even if true, does not make Plaintiffs the intended beneficiaries of federal funds received by Bloomfield or Cromwell. Although the cases on which Bloomfield and Cromwell rely are sexual assault cases, they address directly the situation presented here—a plaintiff who does not attend the school against which they filed a lawsuit—and are indistinguishable.

Second, Plaintiffs' reliance on *Doe* to support their own argument is curious at best. Plaintiffs have cherry-picked a single, non-binding statement in footnote 6 that is nothing more than *dictum*. A footnote can never "clearly h[o]ld" anything, as wrongly asserted by Plaintiffs. *See* Opp. 29.[11] Moreover, *Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112 (D. Kan. 2017) is inapposite since it involves an employee, not a student, of the institution against which the employee brought suit. *Fox* says nothing about a student (or employee) having standing to bring a claim against a public school with which he or she has no affiliation.

Therefore, Plaintiffs' claims as brought against Cromwell and Bloomfield fail as a matter of law and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Second Amended Complaint should be dismissed.

---

[11] Even as *dictum*, the cited footnote does not advance Plaintiffs' argument. It suggests that members of the public engaging in educational programs or activities offered (1) by covered institutions (2) to the public may have a Title IX right of action should they encounter sex discrimination. 896 F.3d at 127 n.6. But Bloomfield and Cromwell's track teams are unlike the cited examples of a campus tour or public lecture. *See id.* To the contrary—as with a biology laboratory or student support group—a person must be enrolled at the institution for access. Plaintiffs here are no more fit to bring a Title IX claim against Bloomfield or Cromwell for the composition of their track rosters than any adult on the street, because those schools do not open track participation to the public.

Respectfully submitted,

/s/ Joshua Block
Joshua Block*
Chase Strangio*
Galen Sherwin*
Lindsey Kaley*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jblock@aclu.org

Elana Bildner (ct30379)
Dan Barrett (ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue, 1st Floor
Hartford, CT 06105
(860) 471-8471
e-filings@acluct.org

*Counsel for Andraya Yearwood and Thania Edwards on behalf of T.M.*

Michael E. Roberts (ct30824)
CHRO
450 Columbus Boulevard, Suite 2
Hartford, CT 06103
(860) 541-4715
michael.e.roberts@ct.gov
*Counsel for CHRO*

Johanna G. Zelman (ct26966)
Mohammed B. Shihabi*
FordHarrison, LLP
CityPlace II
185 Asylum Street, Suite 610
Hartford, CT 06103
(860) 740-1355
jzelman@fordharrison.com
*Counsel for Bloomfield and Cromwell Boards of Education*

Peter J. Murphy (ct26825)
Linda L. Yoder (ct01599)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
(860) 251-5950
pjmurphy@goodwin.com
*Counsel for CIAC and Danbury Board of Education*

David S. Monastersky (ct13319)
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114
(860) 249-1361
dmonastersky@hl-law.com
*Counsel for Glastonbury and Canton Boards of Education*

*Admitted *Pro Hac Vice*