## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SELINA SOULE, *et al.*, | |
| *Plaintiffs,* | |
| v. | No. 3:20-cv-00201-RNC |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC. *et al*, | |
| *Defendants,* | April 3, 2024 |
| and | |
| ANDRAYA YEARWOOD and TERRY MILLER; COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES, | |
| *Intervenor-Defendants.* | |

### INTERVENOR-DEFENDANTS ANDRAYA YEARWOOD AND TERRY MILLER'S 12(b)(6) MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Intervenor-Defendants Andraya Yearwood and Terry Miller ("Andraya" and "Terry") submit this Motion to Dismiss Plaintiffs' Third Amended Complaint (the "Complaint"), ECF No. 201, for failure to state a claim upon which relief can be granted.

**ORAL ARGUMENT REQUESTED**

## INTRODUCTION

Andraya and Terry are transgender women who each participated in their respective schools' track-and-field teams several years ago, when they were teenagers in high school. They did so in accordance with a Connecticut policy that allows transgender students to play on sex-separated sports teams consistent with their gender identity if they meet certain criteria. Andraya and Terry followed all the rules of competition, on and off the field. They achieved significant success at the state-wide and regional level in particular events, but they were repeatedly outperformed by cisgender girls—including some of the Plaintiffs in this case. Unlike the Plaintiffs in this case, Andraya and Terry did not receive any college scholarships, and they are not even participating in college athletics.

Plaintiffs are four cisgender women who allege that Andraya and Terry's participation on the girls' team violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. Courts across the country have held that Title IX and the Equal Protection Clause protect the rights of girls who are transgender to participate on school sports teams consistent with their gender identity.[1] But the question in this case is narrower. The question is not whether Title IX *requires* schools to allow girls who are transgender to participate on girls' athletic teams, but whether Title IX *prohibits* schools from doing so. No court has ever interpreted Title IX to prohibit the inclusion of girls who are transgender on girls' athletic teams, and neither the plain text of Title IX nor its implementing regulations supports such a claim.

---

[1] *See Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023); *B.P.J. v. W. Va. State Bd. of Educ.*, No. 23-1078, 2023 WL 2803113 (4th Cir. Feb. 22, 2023) (granting injunction pending appeal); *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831 (D. Ariz. July 20, 2023), *appeal filed*, No. 23-16026 (9th Cir. July 24, 2023); *A.M. by E.M. v. Indianapolis Pub. Schs.*, No. 1:22-CV-01075-JMS-DLP, 2022 WL 2951430 (S.D. Ind. July 26, 2022), *appeal dismissed*, No. 22-2332, 2023 WL 371646 (7th Cir. Jan. 19, 2023).

Plaintiffs' Complaint[2] is based on the false legal premise that Title IX creates a federal definition of sex that invalidates the antidiscrimination laws of every state in this Circuit, and requires schools to treat transgender girls as though they were cisgender boys for purposes of school athletics. Plaintiffs cannot identify any statute, regulation, or pre-existing agency guidance supporting these assertions. And to the extent that courts have considered similar arguments in the context of restrooms, they have unanimously rejected the argument that Title IX requires schools to exclude transgender students from facilities consistent with their gender identity. *See, e.g.*, *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018).

The Complaint also suffers from a deeper flaw. Title IX's regulations and controlling policy interpretations have specific tests and standards for determining what does—and does not—constitute a denial of "equal athletic opportunity" under Title IX. Even if this Court accepted Plaintiffs' false legal premise that Title IX defines girls who are transgender as cisgender boys, Plaintiffs would still fail to plausibly allege that they have actually been denied equal athletic opportunity under those controlling tests and standards. Title IX does not require sex-separated teams or an equal number of trophies for male and female athletes. And while Plaintiffs rely on baseless factual assertions that they "can't win" against girls who are transgender, those assertions are contradicted by Plaintiffs' own track and field records, which reveal that Plaintiffs repeatedly outperformed Andraya and Terry in direct competition, winning multiple championships in the process. *See* Exhibits A-F (attached) (providing complete set of records for Plaintiffs, Andraya, and Terry).

---

[2] For ease of reference, Intervenor-Defendants cite here to the Third Amended Complaint when referring to "the Complaint."

Plaintiffs seek to engage in a broad policy debate about the inclusion of girls and women who are transgender in athletics. *See* Compl. ¶¶ 52-83 (discussing hypothetical scenarios and athletes outside of Connecticut); *id.* at ¶¶ 158-64 (discussing risk of injury in contact sports even though track and field is not a contact sport). This Court's jurisdiction, however, is limited to resolving particular cases and controversies, which "assure[s] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). It is not enough for Plaintiffs to speculate about a hypothetical future in which "a larger wave of" girls and women who are transgender "hits high school and college" and cisgender girls "simply vanish from the victory podium." Compl. ¶ 80. Plaintiffs must allege facts about what actually happened to these specific plaintiffs, in Connecticut, between 2017 and 2020. As a matter of law, even accepting Plaintiffs' false premise that girls who are transgender are defined by Title IX as "males," the presence of two transgender girls on girls' track and field teams in Connecticut during the relevant time does not state a claim of denial of equal athletic opportunity for these four plaintiffs.

Because Plaintiffs have failed to state a valid Title IX claim, this Court should grant Intervenor-Defendants' motion dismiss for failure to state a claim upon which relief can be granted.

## FACTS

### Andraya, Terry, and the CIAC Policy

When the underlying events in this case took place, Andraya and Terry were high school students who participated in interscholastic track-and-field events in accordance with Connecticut law and Connecticut Interscholastic Athletic Conference ("CIAC") policy.

Compl. ¶¶ 15-16. At the time this case was filed, Andraya was an 18-year-old girl who is transgender in her senior year at Cromwell High School. *Id.* at ¶ 16. Terry was a 17-year-old girl who is transgender in her senior year at Bloomfield High School. *Id.* at ¶ 15.

Gender identity is a medical term for a person's "deeply felt, inherent sense" of one's sex. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020); Brief of *Amici Curiae* Am. Acad. of Pediatrics, *et al.* ("AAP Amicus") at 8, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365).[3] Everyone has a gender identity, and most people have a gender identity that aligns with the sex designated for them at birth. *See id.* Transgender people, however, have a gender identity that does not align with their birth-designated sex. *See id.* Girls who are transgender are girls who were designated male at birth. Boys who are transgender are boys who were designated female at birth. There is a medical consensus that gender identity has a biological component and cannot be changed by medical intervention. *See Grimm*, 972 F.3d at 594-95; AAP Amicus 9-12.

The lack of alignment between their gender identity and their sex designated at birth can cause transgender people to develop clinically significant distress, known as "gender dysphoria." *See Grimm*, 972 F.3d at 594-95; AAP Amicus 12-13. Before puberty, gender dysphoria is treated by allowing transgender children to live and express themselves in accordance with their gender identity. *See Grimm*, 972 F.3d at 596; AAP Amicus 18. As transgender children reach puberty, they may receive puberty-delaying medication to avoid going through endogenous puberty, thereby avoiding the physical changes and heightened gender dysphoria that puberty causes for

---

[3] In describing transgender individuals, the Fourth Circuit in *Grimm* relied upon an amicus brief submitted by the American Academy of Pediatrics, the American Psychological Association, the American Psychiatric Association, and the Endocrine Society. A similar amicus brief was filed in this case at the Second Circuit. *See Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.) ("Some amicus briefs collect background or factual references that merit judicial notice.").

many young people who are transgender. *See Grimm*, 972 F.3d at 596; AAP Amicus 20. Later in adolescence, transgender youth may receive gender-affirming hormone therapy. *See Grimm*, 972 F.3d at 596; AAP Amicus 19.

Andraya and Terry both participated in indoor and outdoor track and field on their schools' respective girls' teams, in accordance with a Connecticut Interscholastic Athletic Conference ("CIAC") policy that allows students who are transgender to play on sex-separated sports teams consistent with their gender identity if they meet certain criteria. *See* Compl. ¶¶ 93, 95, 98. Under the CIAC policy, which has been in place since 2013, each school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." CIAC By-Laws art. IX, § B.[4] By submitting a team roster to the CIAC, each school district verifies that the students listed "are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*[5]

The CIAC policy is not an outlier. High school athletic associations across the country—including the athletic associations in every state within this Circuit—allow transgender students to participate in athletics consistent with their gender identity. *See* Brief of *Amici Curiae* States

_____

[4] The CIAC By-Laws are available online at http://www.casciac.org/ciachandbook. *See* Compl. ¶¶ 91-95 (citing to the CIAC By-Laws and CIAC Handbook).

[5] The CIAC policy does not, as Plaintiffs allege, allow students to play on girls' teams based on whether they "claim[]" to have a female gender identity. Compl. ¶ 80. Rather, as quoted above, it dictates student participation based on "the gender identification of that student in current school records and daily life activities in the school and community."

("State Amicus") at 19-21, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365). All parties in this case agree that participating in high school athletics yields concrete—and lifelong—physical and emotional benefits for students. While Plaintiffs focus on the importance of athletics for cisgender girls, athletic participation is no less important for Andraya, Terry, and other girls who are transgender. *See* Brief of *Amici Curiae* Trevor Project, at 8-15, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365); AAP Amicus at 22-25; State Amicus at 10-14. According to the National Women's Law Center and the Women's Sports Foundation, inclusive policies for transgender girls and women benefit *all* girls and women, and *all* girls and women are harmed when transgender girls and women are excluded. *See* Brief of *Amici Curiae* National Women's Law Center, *et al*. ("NWLC Amicus:) at 14-27, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365); *See* Brief of *Amici Curiae* 155 Athletes in Women's Sports, National Basketball Players Association, Women's Sports Foundation, *et al*. ("Women's Sports Foundation Amicus") at 18-30, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365).

Plaintiffs' Allegations

Plaintiffs are four cisgender women—Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti—who allege that Andraya and Terry's participation in girls' track-and-field events deprived Plaintiffs of equal athletic opportunities. All four Plaintiffs assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' high school athletic events, they and other cisgender girls and women "are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." Compl. ¶ 83.

But Plaintiffs fail to back up their rhetoric with an accurate recounting of the facts. Although this Court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context,'" including documents incorporated into the complaint by reference. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)). Nearly all of Plaintiffs' assertions are based on publicly available records from the Athletic.net website. *See* Compl. ¶ 101 & Attach. A. The complete set of records from Athletic.net paints a different picture from the selected excerpts highlighted in the Complaint. *See* Exhibits A-F (attached) (providing complete set of records for Plaintiffs, Andraya, and Terry).

*First*, and most significantly, the Complaint is filled with conclusory assertions that the Plaintiffs and other non-transgender girls "can't win" when competing against Andraya and Terry. Compl. ¶¶ 83, 137. But the complete set of track-and-field records for CIAC events reflects that Alanna Smith and Chelsea Mitchell outperformed both Terry and Andraya on multiple occasions:

(a) In the 2019 outdoor season, Mitchell outperformed Andraya in the 100m State Open championship. *Compare* Ex. D (showing first-place performance for Mitchell) *with* Ex. A (showing fourth-place finish for Andraya).

(b) Mitchell also outperformed Andraya in the 2019 indoor Class S championship in the 55m dash. *Compare* Ex. D (showing Mitchell in second) *with* Ex. A (showing Andraya in third).

(c) In the 2019 outdoor season, Smith outperformed both Andraya and Terry in the 100m State Open championship. *Compare* Ex. E (showing third-place finish for Smith) *with* Ex. A (showing fourth-place finish for Andraya) *and* Ex. B (showing false start for Terry).

(d) In the 2020 indoor season, Mitchell won first place in the 55m dash Class S championship, first place in the 55m dash State Open championship, and first place in

the 300m Class S championship, outperforming Terry each time. *Compare* Ex. D (showing Mitchell's results) *with* Ex. B (showing Terry's results).[6]

(e)   By the time Smith was a high school junior in 2021, she recorded faster times than Terry in all but one outdoor event. She also recorded faster times than Andraya ran, in any outdoor event, at any point during Andraya's high school career. *Compare* Ex. E (showing Smith achieving times of 11.83 in the outdoor 100m, 24.00 in the outdoor 200m, and 56.46 in the outdoor 400m) with Ex. A (showing Andraya's fastest times as 12.17 in the outdoor 100m, 25.33 in the outdoor 200m, and 1:04:97 in the outdoor 400m) and Ex. B (reflecting Terry's fastest times as 24.17 in the outdoor 200m and 57.81 in the outdoor 400m).

Plaintiffs' assertion that they and other girls "can't win" is "simply not true." *Dixon v. von Blanckensee*, 994 F.3d 95, 107 (2d Cir. 2021).

*Second*, and in similar fashion, the Complaint asserts in conclusory terms that Plaintiffs have been denied the "chance to be champions," Compl. ¶¶ 5, 136, and "the satisfaction, public recognition, and scholarship opportunities that can come from victory," *Id.* ¶ 83. But Plaintiffs have an extensive record of victories, both when competing against Andraya and Terry and otherwise.

- Soule won <u>five</u> Central Conference of Connecticut championships (2020 indoor long jump; 2019 indoor long jump; 2018 outdoor 100m, 200m, and long jump), <u>three</u> Class LL state championships (2020 indoor 55m and 4x200 relay; 2019 indoor 4x200 relay), and <u>two</u> State Open championships (2020 indoor 4x200 relay; 2019 indoor 4x200 relay). *See* Ex. C.[7]

- Smith won <u>three</u> Fairfield County Interscholastic Conference championships (2019 outdoor 100m, 200m, and 400m), <u>three</u> Class LL state championships (2019 outdoor 100m, 200m, and 400m), <u>one</u> State Open championship (2019 outdoor 400m), and <u>one</u> New England Regionals championship (2019 New

---

[6] See also Shawn McFarland, *For the second week in a row, Canton's Chelsea Mitchell beats Terry Miller in 55-meter dash, this time to win State Open title*, Hartford Courant (Feb. 23, 2020), https://perma.cc/2PJR-36ES.

[7] *See also* Soule Decl. in Support of Intervention ¶ 15, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, ECF 46-1 (S.D. Fla. Sept. 21, 2021) (describing herself as "a five-time state title holder").

England outdoor 400m), all during the single year in which Smith overlapped with Andraya and Terry. *See* Ex. E.[8]

- Mitchell won <u>twenty</u> North Central Connecticut Conference championships (2020 indoor 55m, 300m, and long jump; 2019 outdoor 100m, 200m, and long jump; 2019 indoor 55m, 300m, and long jump; 2018 outdoor 100m, 200m, and long jump; 2018 indoor 55m, 300m, and long jump; 2017 outdoor 100m and 200m; and 2017 indoor 55m, 300m, and 4x200 relay); <u>eight</u> Class S championships (2020 indoor 55m, 300m, and long jump; 2019 outdoor 400m and long jump; 2019 indoor long jump; and 2018 outdoor 100m and 4x100 relay); <u>three</u> State Open championships (2020 indoor 55m; 2018 outdoor 100m, and 2019 indoor long jump); and <u>one</u> New England Regionals championship (2019 outdoor 100m). *See* Ex. D.[9]

Plaintiffs have not only had *the chance* to be champions; they have already *been* recognized as champions multiple times over.

*Third*, despite their sweeping assertions about the widespread loss of athletic opportunities, the Plaintiffs allege only a few discrete instances in which Andraya and Terry's participation actually affected their ability to receive an award or advance to the next level of competition. Mitchell alleges that without Andraya and Terry's participation, she would have won an additional four championships. *See* Compl. Attach. A at 4 (2019 indoor Class S for 55m, 2019 indoor State Open for 55m, and 2019 outdoor Class S for 100m and 200m). Mitchell also alleges that without Andraya and Terry's participation, she would have received second place instead of fourth in the 2018 outdoor State Open for 100m, and third place instead of fourth place in the 2019 outdoor State Open for 200m. *See id*. Attach. A at 2, 3, 4.

---

[8] Smith went on to win many more. *See* Will Aldam, *Danbury's Smith smashing records in first indoor season*, CT Insider (Jan. 4, 2022), at https://perma.cc/QTX3-68QW; Univ. of Tenn. 2022-23 team roster profile for Alanna Smith, https://utsports.com/sports/track-and-field/roster/alanna-smith/18624 (listing many of Smith's championship titles).

[9] As of the 2020 indoor season, Mitchell was ranked first among all girls in Connecticut for the 200m and second among all girls nationally in the long jump. *See* Gerry deSimas, Jr., *Canton's Chelsea Mitchell signs letter of intent to run at William and Mary*, Collinsville Press (Nov. 16, 2019), https://perma.cc/Q5NT-HWUF (summarizing Mitchell's achievements).

The remaining three Plaintiffs allege a collective total of four instances in which they allegedly lost an opportunity because of Andraya and Terry's participation. Nicoletti alleges she would have finished in seventh place instead of ninth place in the 100m preliminary race for the 2019 outdoor Class S championship and advanced to the finals. *See* Compl. ¶ 122 & Attach. A at 4. Smith alleges she would have finished second instead of third in the 200m at the 2019 outdoor State Open championship. *See* Compl. ¶ 124 & Attach. A at 5. And Soule alleges she would have (i) finished in sixth place instead of eighth place in the preliminary 55m race for the 2019 indoor State Open championship and advanced to the finals, and (ii) received third instead of fourth place at the Central Conference of Connecticut championships for 2019 and 2020 indoor 55m races. *See id.* Attach. A at 4-5.

All of the other alleged "lost opportunities" for the Plaintiffs in the Complaint's "Attachment A" relate to (a) regular season races for which no championship is awarded (18 entries); (b) preliminary races in which Plaintiffs still placed high enough to advance to the actual competition (20 entries); or (c) races in which plaintiffs placed so low in the rankings that they would have failed either to advance or to receive a spot on the victory podium regardless of whether Andraya or Terry participated (at least seven entries, including entries with 36th-, 12th-, 25th-, and 14th-place finishes for Soule, 16th- and 10th-place finishes for Mitchell, and 14th-place finish for Nicoletti).[10]

*Fourth*, although Plaintiffs make generalized assertions about lost scholarship or recruitment opportunities (Compl. ¶¶ 1-3, 82-83, 118, 131, 137, 153, 179, 194, 208, 218), they fail to support those generalizations with any specific factual allegations. To the contrary, Soule

---

[10] Plaintiffs also include six entries for the New England Regional championship races, which are administered and controlled by an independent organization with its own policy regarding participation of transgender athletes.

received an offer to run for Florida Atlantic University;[11] Nicoletti signed to compete in Division II Track and Field for Belmont Abbey College in North Carolina;[12] Smith ran at University of Tennessee[13] and currently runs at Georgia Southern University;[14] and Mitchell received an athletic scholarship to attend William & Mary[15] and is now on the track team at Belmont University in Tennessee.[16] Plaintiffs also fail to allege that any scholarships or recruitment opportunities actually went to Andraya or Terry. (In fact, Andraya and Terry received no scholarship opportunities to compete in college and are not participating in college athletics.)

Procedural history

On February 12, 2020, Plaintiffs filed a Complaint against the CIAC and the five school boards representing the jurisdictions where Plaintiffs, Andraya, and Terry each attended school. ECF 1.[17] The Complaint alleged that the CIAC policy violates Title IX by failing to effectively accommodate non-transgender girls and by failing to provide equal treatment, benefits, and athletic opportunities for non-transgender girls. This Court subsequently granted Andraya, Terry,

---

[11] *See* Soule Decl. in Support of Intervention ¶ 29, *D.N. v. DeSantis*, No. 21-cv-61344-RKA, (S.D. Fla. Sept. 21, 2021), ECF 46-1.

[12] *See IHS Student Athletes Sign National Letters of Intent*, Immaculate High School Mustang Monthly, https://perma.cc/97AK-G9ZB.

[13] *See* Univ. of Tenn. 2022-23 team roster profile for Alanna Smith, https://utsports.com/sports/track-and-field/roster/alanna-smith/18624.

[14] *See* Georgia Southern Univ. 2023-2024 team roster profile for Alanna Smith, https://perma.cc/WXC7-BHFB.

[15] See Ashley Schwartz-Lavares et al., *Trans women targeted in sports bans, but are they really at an advantage?* ABC News (Apr. 7, 2021), https://perma.cc/9ZC7-TEJB.

[16] *See* Belmont Univ. 2023-24 team roster profile for Chelsea Mitchell, https://perma.cc/CLE2-C57Y.

[17] Plaintiffs filed an Amended Complaint on April 17, 2020, and a Second Amended Complaint on August 11, 2020. *See* ECF 89, 141. The original complaint was filed on behalf of only Soule, Mitchell, and Smith. The Amended Compliant added Nicoletti as a fourth plaintiff.

and the Connecticut Commission on Human Rights and Opportunities permission to intervene as defendants. ECF 92.

On April 25, 2021, this Court granted Defendants' and Intervenor-Defendants' motion to dismiss. ECF 178. Without reaching the merits of whether Plaintiffs had stated a valid claim under Title IX, this Court held that Plaintiffs lacked standing to pursue claims for injunctive relief and that Plaintiffs' damages claims were barred under *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). A panel of the Second Circuit initially affirmed, *see Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43 (2d Cir. 2022), but the en banc court vacated and remanded to this Court "for consideration in the first instance of whether Plaintiffs have plausibly stated a claim under Title IX," *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 41 (2d Cir. 2023) (en banc). The Second Circuit emphasized that "[t]he Court reaches no conclusion as to whether Plaintiffs have plausibly stated a Title IX violation. Nor does the Court opine on the question of whether—even if Plaintiffs have stated such a claim—they are entitled to any of the injunctive relief they seek." *Id.* at 54.

Plaintiffs filed their Third Amended Complaint on March 4, 2024. As with the previous versions of their complaint, the Third Amended Complaint is based on the premise that, by allowing Andraya and Terry to participate on the same teams as other girls, the CIAC policy allows "males" to participate in women's sports, and that such participation violates the rights of cisgender girls under Title IX.

## LEGAL STANDARD

On a motion to dismiss, the court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (internal quotation marks

and citations omitted). Although this Court must accept all well-pleaded facts as true, "it is well established that [courts] need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009)). "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Id.* at 147.

## ARGUMENT

### I.    Plaintiffs Have Failed to Allege Cognizable Title IX Claims.

Plaintiffs' claims are based on two fundamentally flawed assertions about Title IX and its requirements. First, Plaintiffs' claims are based on the flawed premise that Title IX creates a federal definition of "sex" that preempts the law of every state within this Circuit and requires schools to treat girls who are transgender as though they were cisgender boys. Second, even assuming for purposes of a motion to dismiss that Title IX's references to sex-separated teams refer exclusively to separation based on sex designated at birth, Plaintiffs' claims are based on the flawed premise that Title IX is automatically violated whenever girls are required to compete against boys on a mixed team.

Title IX's text, regulations, and controlling policing statements provide longstanding— and well-defined—tests for determining what constitutes a denial of equal athletic opportunity. Instead of pleading the elements of those tests, Plaintiffs offer generalized rhetoric about the alleged unfairness of not personally winning more championships. But this Court's limited role is to apply Title IX's text, regulations, and controlling policy interpretations—not to "pick and choose among competing policy arguments" to "select[] whatever outcome seems . . . most congenial, efficient, or fair." *Pereida v. Wilkinson*, 592 U.S. 224, 240 (2021). Because Plaintiffs'

allegations do not satisfy the elements of a claim for denial of equal athletic opportunity under the text of the statute, regulations, and controlling policy interpretations, Plaintiffs have failed to state a claim upon which relief can be granted.

### A.     Title IX and Its Implementing Regulations Do Not Define Girls Who Are Transgender as "Males" for Purposes of School Athletics.

Plaintiffs' Title IX claims are premised upon the faulty assumption that Title IX and its regulations establish a definition of "sex" that precludes girls who are transgender—and who are recognized as girls "in current school records and daily life activities in the school and community," CIAC By-Laws art. IX, § B—from being recognized as girls for purposes of sex-separated athletic activities. But Plaintiffs fail to identify any text from Title IX or the implementing regulations that defines sex, or to otherwise support those assertions.

Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C § 1681(a). Although the statutory text does not explicitly address athletics, regulations codified at 34 C.F.R. § 106.41 "set forth the standards for assessing an athletics program's compliance with" the statute. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 288 (2d Cir. 2004). Under the regulations, schools are generally prohibited from "provid[ing] . . . athletics separately" "on the basis of sex," but "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(a)-(b). Schools are also required to provide "equal athletic opportunity for members of both sexes." *Id.* § 106.41(c).

Plaintiffs assert that in authorizing schools to sponsor "teams for members of both sexes," Title IX and its implementing regulations implicitly defined sex as "biological sex[]" and thus preempts state laws and policies recognizing girls who are transgender as girls. *See* Compl. ¶ 36. In doing so, Plaintiffs repeat the same arguments that have been considered and rejected in the

context of regulations authorizing school to provide separate restrooms "on the basis of sex." *See* 34 C.F.R. § 106.33. Every court of appeals to consider the question has held that the restroom regulation does not require schools to exclude transgender students from restrooms consistent with their identity. "[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on [']biological sex['] and cannot accommodate gender identity." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020); *accord Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 533 (3d Cir. 2018). Plaintiffs' arguments should be rejected for the same reasons. [18]

Plaintiffs offer a variety of policy arguments for excluding girls who are transgender, but those policy arguments (which Intervenor-Defendants vigorously dispute) cannot be shoehorned into the allegedly plain meaning of the word "sex." As the Seventh Circuit recently explained, "Title IX does not define sex," and "[t]here is insufficient evidence to support the assumption that sex can mean only biological sex." *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024). "Sex is such a complex subject that any invocation of plain meaning is apt to misfire." *Id.* at 775 (Easterbrook, J., concurring). [19]

Moreover, even assuming for the sake of argument that the word "sex" in Title IX's regulations refers exclusively to physiological and biological characteristics, the so-called

---

[18] *See also Grimm*, 972 F.3d at 618 (holding that excluding of transgender boy from boys' restroom violated Title IX); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024) (same).

[19] The Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644 (2020), declined to limit the meaning of sex under Title VII to the physiological distinctions advocated by the Plaintiffs here. Instead, the Court merely "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female," without deciding whether "the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation." *Id.* at 655; *see, e.g.*, *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 526 (D. Conn. 2016) (collecting definitions). As in *Bostock*, it is not necessary in this case to decide whether the word

"biological sex" of a transgender student is not necessarily the sex they were assigned at birth. *See generally* Brief of *Amicus Curiae* interACT, *Soule ex rel. Stanescu v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (No. 21-1365). There are many different biological components of sex, and "transgender individuals often undergo a variety of procedures and treatments that result in anatomical and physiological changes, such as puberty blockers and hormone therapy." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F.Supp.3d 444, 461 (E.D. Va. 2019), *aff'd*, 972 F.3d 586. The regulations authorizing sex-separated sports teams assume that the student population consists of "what has traditionally been understood as the usual 'dichotomous occurrence' of male and female where the various indicators of sex all point in the same direction." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded on other grounds,* 137 S. Ct. 1239 (2017). But they "shed[] little light on how exactly to determine the 'character of being either male or female' where those indicators diverge." *Id.* "Narrow definitions of sex do not account for the complexity of the necessary inquiry." *A.C.*, 75 F.4th at 770.

For example, Plaintiffs argue that the word "sex" in the athletic regulations must refer to biology because "male bodies" have an inherent physiological advantage over "female bodies." But Plaintiffs' own Complaint admits that those physiological differences result from hormones, not from genetics or anatomy at birth. Plaintiffs admit that "boys and girls are closer in athletic capabilities before" puberty, and that men's alleged "powerful physiological athletic advantage over" women is driven by a "natural flood of testosterone" beginning during puberty. *Complaint* at ¶ 55. Thus, even under Plaintiffs' own allegations, a girl who is transgender and who—as a

---

"sex" in Title IX refers only to biological distinctions because, as noted below, many transgender students have biological characteristics that align with their gender identity and not the sex assigned to them at birth.

result of receiving puberty-delaying medication and gender-affirming hormone therapy—never goes through endogenous puberty will not have the alleged "powerful physiological athletic advantage" that Plaintiffs complain about. *See Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *18 (D. Ariz. July 20, 2023) (granting preliminary injunction to transgender girl who did not go through endogenous puberty).

Plaintiffs' overconfident reliance on legislative history similarly fails to withstand scrutiny. Despite Plaintiffs' assumption to the contrary, Title IX's allowance for sex separation did not solely "depend on the assertion of innate biological difference between the sexes, but rather on the historic and societal reality that girls and women have not had the benefit of anywhere near the same opportunities as boys and men to develop their athleticism." Deborah Brake, *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. 41, 70 (2023) (footnotes omitted). Thus, Title IX's legislative history repeatedly attributes the lack of equal athletic opportunities, in part, to the socialization of girls and women to conform to sex stereotypes, not just biology. *See, e.g.*, *Sex Discrimination Regs. Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. & Labor, House of Representatives*, 94th Cong. 189 (1975) (Statement of Sen. Birch Bayh); *id.* at 197 (Statement of Rep. Stewart McKinney). For these reasons, some prominent scholars of Title IX have argued that, far from advancing the goals of Title IX, attempts to exclude girls who are transgender "rest on a biological determinism that has historically and continues to hurt women's equality in general and women's prospects

for equal athletic opportunity in particular." *Title IX's Trans Panic*, 29 William & Mary J. of Race, Gender, & Soc. Just. at 85.[20]

Because neither the plain text of Title IX, the plain meaning of the word "sex," nor anything in the statute's legislative history requires schools to discriminate against girls who are transgender by treating them like cisgender boys, Plaintiffs have failed to state a claim upon which relief can be granted.

### B.     Title IX and Its Regulations Do Not Mandate Sex-Separated Teams as the Exclusive Means of Promoting Equal Athletic Opportunity.

Even assuming for purposes of a motion to dismiss that inclusion of transgender girls could be taken to mean that their track teams were no longer "sex separated," Plaintiffs' claims would still be based on a second faulty assumption: that the lack of sex separation automatically violates Title IX and its athletic regulations.

Far from mandating sex-separated teams, section (a) of the regulations establishes a "[g]eneral" rule *prohibiting* schools from "provid[ing] . . . athletics separately" on the basis of sex. 34 C.F.R. § 106.41(a) (emphasis added). Section (b) of the regulations then carves out an exception to that general prohibition, stating that "a recipient *may* operate or sponsor separate

---

[20] Plaintiffs assume that when Title IX passed in 1972 and the athletic regulations were issued in 1975, it was universally understood that sports would be separated based on what Defendants refer to as "biological sex." But the Supreme Court rejected a similar argument in *Bostock*. The defendants in *Bostock* argued that "'no one' in 1964 or for some time after would have anticipated" that Title VII would be interpreted to prohibit discrimination based on sexual orientation or transgender status. *Bostock*, 590 U.S. at 675. "[L]urking just behind such objections," the Supreme Court observed, "resides a cynicism that Congress could not possibly have meant to protect a disfavored group." *Id.* at 1751. Just as there is reason to doubt whether that assumption is "really true" as to Title VII, there is reason to doubt Plaintiffs' assumption here. *Id.* 1750. As only one example, a few years after Title IX's regulations were finalized, Renée Richards won the legal right to compete in the women's division of the U.S. Open Tennis Championship as a transgender woman under New York State's Human Rights Law. *See Richards v. U.S. Tennis Ass'n*, Misc. 2d 713, 400 (Sup. Ct. 1977). So "at least some people" in the 1970s did not share Plaintiffs' assumption that sex-separated teams for girls and women could not include girls and women who are transgender. *See Bostock*, 590 U.S. at 675.

teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b) (emphasis added).

The regulation thus allows schools to provide sex-separated teams, but does not require schools to do so. It is "purposely permissive and flexible on this point, rather than mandatory." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 656 (6th Cir. 1981) (striking down high school athletic association rule mandating sex-separation for all teams as inconsistent with Title IX). The only thing mandated by subsection (b) is that "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited," members of the "excluded sex" must be allowed to try out for the team unless it is a contact sport. 34 C.F.R. § 106.41(b).

Subsection (c) of the regulation further requires schools to provide "equal athletic opportunity," but does not impose a general requirement for schools to use sex-separated teams as the exclusive means of doing so. *Id.* § 106.41(c). Indeed, at the time that Title IX was adopted, and continuing to this day, courts have recognized that allowing girls to play on boys' teams (and vice versa) can sometimes be the only effective way to provide equal athletic opportunity under Title IX or the Fourteenth Amendment.[21]

Plaintiffs' assumption that Title IX universally requires sex-separated athletics is particularly unwarranted in Connecticut, which—like many other states—allows girls and boys

---

[21] *See, e.g.*, *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019) (injunction allowing boys to compete on girls' competitive dance team); *Bednar v. Neb. Sch. Activities Ass'n*, 531 F.2d 922, 923 (8th Cir. 1976) (injunction allowing girl to compete on boys' cross-country team); *Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384 (M.D. Pa. 2014) (injunction allowing girl to compete on boys' wrestling team); *Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) (same); *Lantz v. Ambach*, 620 F. Supp. 663 (S.D.N.Y. 1985) (injunction allowing girl to compete on boys' football team).

to compete together on the same contact-sports teams. According to statistics from the National Federation of State High School Associations, during the 2018-19 academic year, 17 girls in Connecticut played on boys' baseball teams, 42 girls played on boys' football teams, and 21 girls played on boys' ice hockey teams. *See* Nat'l Fed. of State High Sch. Ass'ns: Participation Data, https://perma.cc/D3GC-UTBB.

Thus, even accepting Plaintiffs' flawed argument that all girls who are transgender are actually boys, and thus that any Connecticut sports team they compete on is effectively a "mixed" team, that alone would not give rise to a Title IX violation.

**C.      Plaintiffs Have Not Alleged Cognizable Claims of Unequal Athletic Opportunity Under the Department of Education 1979 Policy Interpretation.**

Finally, Plaintiffs fail to establish a Title IX violation under longstanding guidance from the Department of Education defining how to measure "equal athletic opportunity." The 1979 Policy Interpretation, which was adopted through notice and comment, divides claims for denial of "equal athletic opportunity" into two categories: claims about "effective accommodation," and claims about "equal treatment." *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012). Each category is linked to certain non-exhaustive factors set out in Title IX's regulations, which are codified at 34 C.F.R. § 106.41(c). An "effective accommodation" claim derives from the first factor of the Title IX regulations: "Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). "[E]qual treatment claims focus on sections 106.41(c)(2)–(10)." *Lazor v.*

*Univ. of Conn.*, 560 F. Supp. 3d 674, 679 (D. Conn. 2021). Plaintiffs fail to allege the elements

of a cognizable claim under these controlling legal frameworks.

> **1.      Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" Under the 1979 Policy Interpretation's "Selection of Sports" Provision.**

The Selection of Sports provision of the 1979 Policy Interpretation addresses when a

school is required to provide the opportunity to play in a particular sport. *See* 1979 Policy

Interpretation § VII.C.4(a) (contact sports); (b) (non-contact sports). It is also the only provision

in the 1979 Policy Interpretation to specifically address when a school is required to provide

separate teams for boys and girls. *See Berndsen v. N.D. Univ. Sys.*, 7 F.4th 782, 789 (8th Cir.

2021). The 1979 Policy Interpretation states that "where an institution sponsors a team in a

particular sport for members of one sex, it may be required ***either*** to permit the excluded sex to

try out for the team ***or*** to sponsor a separate team for the previously excluded sex." 1979 Policy

Interpretation § VII.C.4 (emphases added). Sex-separated teams in non-contact sports such as

track and field are required only if, among other things, "[m]embers of the excluded sex do not

possess sufficient skill to be selected for a single integrated team or to compete actively on such

a team if selected." *Id.* § VII.C.4.b(3). Thus, even assuming for purposes of this case that

inclusion of transgender girls could be taken to mean that their track teams were no longer "sex

separated," Plaintiffs could not state a claim for denial of effective accommodation under the

Selection of Sports provision unless they could show that they do not possess sufficient skill "to

compete actively" alongside girls who are transgender. *Id.* § VII.C.4.b(3).

Plaintiffs fail to plausibly allege the denial of effective accommodation under this

standard. Any argument that Plaintiffs and other cisgender girls were unable to "compete

actively" with girls who are transgender is both implausible on its face and belied by facts

incorporated in the Complaint itself. As discussed above, Plaintiffs' complete sets of track-and-field records unequivocally demonstrate that Mitchell and Smith actively competed against Andraya and Terry and repeatedly *won* those competitions. Plaintiffs assert that they have been denied the "chance to be champions," but, as discussed above, Plaintiffs' records further demonstrate that Soule, Mitchell, and Smith have been "champions" on multiple occasions. During the time they overlapped with Andraya and Terry, Smith won eight championships, Soule won nine, and Mitchell won 32. By the time she graduated, Smith was one of the most decorated runners in Connecticut, having repeatedly recorded faster times than Andraya and Terry and winning Connecticut Open championships multiple times over. *See, e.g.*, Will Aldam, *Danbury's Smith smashing records in first indoor season*, CT Insider (Jan. 4, 2022), https://perma.cc/QTX3-68QW; Bob Greeney, *Alanna Smith's record-setting day led Danbury to FCIAC girls track and field crown*, FCIAC.net (May 30, 2022), https://perma.cc/9G7S-PY54; Univ. of Tenn. 2022-23 team roster profile for Alanna Smith, https://utsports.com/sports/track-and-field/roster/alanna-smith/18624 (listing many of Smith's championship titles).[22]

Plaintiffs have also received wide acclaim and recognition for their accomplishments. For example, Plaintiffs misleadingly allege that during the 2019 indoor season, Andraya and Terry denied Mitchell the ability to "ma[k]e her school's history as the first female athlete . . . ever to be named State Open Champion." Compl. ¶ 117. But Mitchell's complete set of records shows that, although she was not named the 2019 indoor State Open champion in the 55m dash, she still "made her school's history" by winning the State Open championship for the long jump on the

---

[22] Nicoletti, for her part, alleges only two races in which she ever competed against either Andraya or Terry. *See* Compl. ¶ 122 & Attach. A. She placed ninth in one race and thirteenth in another—behind Terry and/or Andraya, but also behind Mitchell (who won one of the races) and numerous cisgender girls. This hardly suffices to show that cisgender girls in Connecticut are unable to "compete actively" in school sports against girls who are transgender.

same day. *See* Gerry deSimas, Jr., *Canton's Chelsea Mitchell wins State Open title in long jump, takes 3rd in 55 meters*, Collinsville Press (Feb. 18, 2019), https://perma.cc/8S2Q-BS5E. Mitchell further complains that Terry took recognition away from her when the Hartford Courant named her "All-Courant girls indoor track and field athlete of the year" for the 2018-19 season. Compl. ¶ 120. But only months later, Mitchell herself was named "All-Courant girls outdoor track and field athlete of the year" for the 2019 season. *See* Shawn McFarland, *2019 All-Courant girls outdoor track and field athlete of the year: Chelsea Mitchell, Canton*, Hartford Courant (July 10, 2019), https://perma.cc/XN7H-7G3Q.

While Plaintiffs complain that they want more championships and accolades to go along with those they already received, there is enough room in Connecticut—and in track-and-field competition more generally—for girls who are transgender to have "the chance to be champions," too. Providing effective accommodation for the interests and abilities of these four Plaintiffs does not require Defendants to deny effective accommodation to other girls, including girls who are transgender. *See* NWLC Amicus at 5, 8-9.

> ### 2. Plaintiffs Have Not Alleged Cognizable Claims for "Effective Accommodation" under the 1979 Policy Interpretation's "Levels of Competition" Provision.

Plaintiffs also fail to allege a denial of "effective accommodation" claim under the "levels of competition" provision of the 1979 Policy Interpretation. Under that provision, there are two tests: a "three-part test relates to participation opportunities, and a second, two-part test relates to the competitive schedules and opportunities for men's and women's teams." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 301 (2d Cir. 2004). Whether analyzed as

a claim based on "participation opportunities" or a claim based on "competitive schedules,"

Plaintiffs fail to state a Title IX violation under either standard.

In a typical claim for effective accommodation claim based on "participation

opportunities," a plaintiff seeks to create a new women's team or challenge the elimination of an

existing women's team. *See McCormick,* 370 F.3d at 301 (summarizing cases). The school can

then defend itself by satisfying one of three "safe harbors" set for in the 1979 Policy

Interpretation. That three-part test opportunities analyzes:

> (1) Whether [] participation opportunities for male and female students are
> provided in numbers substantially proportionate to their respective enrollments; or
> (2) Where the members of one sex have been and are underrepresented among []
> athletes, whether the institution can show a history and continuing practice of
> program expansion which is demonstrably responsive to the developing interest
> and abilities of the members of that sex; or (3) Where the members of one sex are
> underrepresented and the institution cannot show a continuing practice of program
> expansion . . ., whether it can be demonstrated that the interests and abilities of
> the members of that sex have been fully and effectively accommodated by the
> present program.

*Biediger*, 691 F.3d at 92-93 (citing 1979 Policy Interpretation). The 1979 Policy Interpretation

further defines "participants" as those athletes . . .

> a. Who are receiving the institutionally sponsored support normally provided to
> athletes competing at the institution involved, e.g., coaching, equipment, medical
> and training room services, on a regular basis during a sport's season; and
>
> b. Who are participating in organized practice sessions and other team meetings
> and activities on a regular basis during a sport's season; and
>
> c. Who are listed on the eligibility or squad lists maintained for each sport; or
>
> d. Who, because of injury, cannot meet a, b, or c above but continue to receive
> financial aid on the basis of athletic ability.

*Id.* at 93 (quoting 44 Fed. Reg. at 71,415) (alterations incorporated). The three-part "test is

applied to assess whether an institution is providing nondiscriminatory *participation*

*opportunities* to individuals of both sexes, and an institution is in compliance if it meets any one of the three prongs of the test." *McCormick*, 370 F.3d at 300 (emphasis in original).

Although portions of Plaintiffs' latest Complaint gesture to some components of the three-part test, Plaintiffs fail to actually allege they have been deprived of any participation opportunities under the 1979 Policy Interpretation. Instead of seeking to add a new team or challenge the elimination of an existing team, Plaintiffs assert that each time an individual cisgender girl places behind a girl who is transgender or fails to advance to the next level of post-season competition, she has been denied a "participation opportunity." Compl. ¶ 202. But, as noted above, the term "participation opportunities" has a specific definition. Participation opportunities are calculated based on the number of people participating on a team, not based on the number of times an athlete qualifies to participate in a particular championship or places behind another runner. A particular athlete's failure to win a championship or advance past the preliminary race does not constitute the denial of a participation opportunity.[23]

Plaintiffs also fail to state a claim under the two-part test for competitive schedules. Under that test, courts examine.

> (1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

---

[23] Unlike previous versions of the Complaint, the most recent version includes some allegations concerning the three-part test for participation-opportunity claims. For example, the Complaint newly alleges that Defendants fail the first prong of the three-part test regarding "substantially proportionate" participation opportunities because, during the relevant period, women accounted for "less than 48% of the Connecticut high school enrollment but only 44.5% of the state high school athletes." Compl. ¶ 202. Plaintiffs also include language about "Determination of Student Interests & Abilities" under prong three of the test. *See* Compl. ¶¶ 185-189. But Plaintiffs do not allege that they have personally been denied a participation opportunity as defined by the 1979 Policy Interpretation. Whether or not the alleged participation gap would provide basis for *someone else* to argue that Title IX requires Defendants to add an additional sporting event for girls (or reduce the number of sporting events for boys) the viability of that hypothetical claim regarding true "participation opportunities" has no bearing on Plaintiffs' desire to win more championships, which are simply not "participation opportunities" under the Policy Interpretation. *See Soule*, 90 F.4th at 50 ("[T]he remedy sought must redress the particularized harm that Plaintiffs allege.").

> (2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

*McCormick*, 370 F.3d at 301. Here, it is undisputed that CIAC has fourteen teams designated for girls and fourteen teams designated for boys, *see* Compl. ¶¶ 86-87, and Plaintiffs have not alleged any disparity between the boys' and girls' teams with respect to the availability of post-season competition or the number of available awards. Indeed, girls as a group have *more* potential competitive opportunities in the CIAC because they can choose to participate on boys' teams, including boys' post-season competition. *See* Compl. ¶ 91; See Nat'l Fed. of State High Sch. Ass'ns: Participation Data, https://perma.cc/D3GC-UTBB (reflecting that in 2018-19 academic year, seventeen girls in Connecticut played on boys' baseball teams, 42 girls played on boys' football teams, and 21 girls played on boys' ice hockey teams). Thus, even assuming for argument's sake that the presence of two girls who are transgender on the girls' running teams somehow reduced the number of competitive opportunities of cisgender girls on those teams, any reduction would be overwhelmingly offset by the number of girls who participate on boys' teams in other sports. *See McCormick*, 370 F.3d at 293 (explaining that under the 1979 Policy Interpretation, "compliance should not be measured by a 'sport-specific comparison' but rather by examining 'program-wide benefits and opportunities'").

Plaintiffs allege that in some hypothetical future, "a larger wave of" girls and women who are transgender will "hit[] high school and college," causing cisgender girls to "simply vanish from the victory podium." Compl. ¶ 80. But Plaintiffs' factual allegations—as opposed to their rhetoric—show nothing of the kind. The allegations are that since the CIAC's inclusive policy has been in place, only two girls who are transgender, Andraya and Terry, have run

competitively in girls' track and field, each in only three events out of dozens per track-and-field meet. Plaintiffs' records also show that non-transgender girls have repeatedly won championships by outperforming Andraya and Terry in direct competition. Irrespective of Andraya and Terry's talents in high school, their participation in three events per meet has not caused cisgender girls to "vanish from the victory podium." Compl. ¶ 80; *see also Hecox v. Little*, 479 F. Supp. 3d 930, 977 (D. Idaho Aug. 17, 2020), *aff'd*, 79 F.4th 1009 ("It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women.").

Once again, the undisputed facts show that Plaintiffs were able to qualify for their Class championships, for the State Open, and for the New England Championship—often with great success, and often outperforming Andraya and Terry in direct competition. The fact that these particular Plaintiffs did not win *every* competition does not mean that they were denied competitive opportunities under Title IX.

### 3. Plaintiffs Have Not Alleged Cognizable Equal Treatment Claims.

Plaintiffs also fail to allege a cognizable claim for denial of "equal treatment" under the 1979 Policy Interpretation (Count Two). When determining whether equal treatment has been denied, courts review the second through tenth factors set forth in the Title IX regulations:

(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

28

34 C.F.R. § 106.41(c)(2)-(10); *McCormick*, 370 F.3d at 291.

Under the 1979 Policy Interpretation, a school may be liable for denial of equal treatment "[i]f comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability," for "members of both sexes." *See* 1979 Policy Interpretation § VII(B)(2). Thus, for example, an athletic program may be found to deny equal treatment when it schedules women's sports in a less advantageous manner than men's sports. *See McCormick*, 370 F.3d at 299 (sustaining unequal treatment claim by members of women's soccer team given high school's "off-season scheduling that disadvantaged members of only one sex"); *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 855-57 (W.D. Mich. 2001) (high school athletic association violated Title IX by scheduling athletic seasons and competitions for girls' sports during nontraditional and less advantageous times compared to boys' sports).

Plaintiffs' factual allegations fail to state a valid equal treatment claim under this legal framework. Plaintiffs do not even attempt to argue that the CIAC or other Defendants treat a boys' track-and-field team differently from a girls' track-and-field team. Indeed, they make no mention of anything resembling factors two through ten in the 1979 Policy Interpretation. *Compare* 34 C.F.R. § 106.41(c)(2)-(10) (delineating, among other things, equal "provision of equipment and supplies," and "opportunity to receive coaching and academic tutoring) *with* Compl. ¶¶ 214, 218 (making vague reference to "post-season competition," "loss of accurate placement," and "loss of medals").

The only allegations even remotely related to the regulatory factors are Plaintiffs' vague claims that they were denied publicity and recognition of their efforts due to victories by other girls. But, as with "effective accommodation" claims, the assessment of unequal publicity

focuses on the publicity institutions provide to their teams on a program-wide basis—not the coverage ultimately enjoyed individually by each athlete from third-party news outlets. *See* 1979 Policy Interpretation § VI(B)(3)(i) (explaining that compliance is assessed based on "access to publicity resources for men's and women's programs" as well as "quantity and quality of publications and other promotional devices featuring men's and women's programs"). For example, if a school were only publicizing its male athletes, and not its female athletes, on the school's website, that would support a claim for unequal publicity. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1112 (S.D. Cal. 2012) (sustaining unequal treatment claim on the basis of, among other things, a showing that "girls' athletic activities were provided with less coverage and promotion in yearbooks, fewer announcements in the school's Daily Bulletin, less signage on the school's electronic marquee, and inferior signage"), *aff'd*, 768 F.3d 843. Plaintiffs have alleged nothing of the kind.

***

The question is not whether Title IX *requires* schools to allow girls who are transgender to participate on girls' athletic teams, but whether Title IX *prohibits* schools from doing so. No court has ever interpreted Title IX to prohibit the inclusion of girls who are transgender on girls' athletic teams, and neither the plain text of Title IX nor its implementing regulations supports such a claim. "[N]one of [Plaintiffs'] contentions about what [they] think the law was meant to do, or should do, allow us to ignore the law as it is." *Bostock*, 590 U.S. at 675.

## CONCLUSION

For the foregoing reasons, Intervenor-Defendants' motion to dismiss for failure to state a claim should be granted.

Respectfully submitted,

/s/ Joshua Block

Joshua Block*
Ria Tobacco Mar*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jblock@aclu.org

/s/ Elana Bildner

Elana Bildner (ct30379)
Dan Barrett (ct29816)
ACLU Foundation of Connecticut
765 Asylum Avenue
Hartford, CT 06105
(860) 471-8475
ebildner@acluct.org

*Counsel for Andraya Yearwood and Terry Miller*

*Admitted Pro Hac Vice