IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SELINA SOULE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 3:20-cv-00201-RNC |
| | ) | |
| v. | ) | |
| | ) | |
| CONNECTICUT ASSOCIATION OF | ) | |
| SCHOOLS, INC. *et al*, | ) | April 3, 2024 |
| | ) | |
| *Defendants,* | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO DISMISS BY THE CIAC AND THE BOARD DEFENDANTS**

In 2013, the Connecticut Association of Schools, Inc., d/b/a/ Connecticut

Interscholastic Athletic Conference ("CIAC") implemented a policy to ensure that transgender

student-athletes could participate in interscholastic athletics consistent with their gender

identity, as expressed in current school records and in their daily life activities in the school

and community ("the CIAC Policy"). Despite already graduating from high school, these four

cisgendered Plaintiffs continue in their attempt to strike down the CIAC Policy and preclude

transgender students from participating in sports in accordance with their gender identity.

Plaintiffs' requested remedy would result in transgender girls being treated as girls for all

purposes during the school day, including student records, how teachers refer to them, what

bathroom they use, and how they are reported to the state and federal governments, but then

treated differently solely for purposes of athletics. Plaintiffs also continue in their

unprecedented attempt to remove all past records of Andraya Yearwood and Terry Miller's

("the Intervening Defendants") participation and successes, and retroactively alter the results

of races run in 2017, 2018, and 2019. Plaintiffs' claims are factually and legally deficient, and, therefore, their Third Amended Complaint ("the Complaint") must be dismissed in its entirety for several reasons.

First, as provided in the Intervening Defendants' Motion to Dismiss (Ecf. 207), Plaintiffs' claims for injunctive relief are based on a legal theory that distorts Title IX, and contradicts the U.S. Department of Education's own guidance and relevant case law from the Supreme Court, numerous Courts of Appeal, and District Courts across the country. Second, Plaintiffs have not plausibly alleged a denial of equal athletic opportunity claim under either the effective accommodation or equal treatment framework. Finally, as already found by the Court in this case, Plaintiffs' claims for monetary damages are barred by *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). For all these reasons set forth in Intervening Defendants' motion, which Defendants join and incorporate herein, the Complaint should be dismissed in its entirety.

But even if some of Plaintiffs' claims could survive these substantive deficiencies, their claims must still be dismissed against the Glastonbury, Canton, and Danbury Boards of Education because those school systems did not take any actions against the individual Plaintiffs that would give them a viable Title IX claim against their home schools.[1] Indeed, it is undisputed that Plaintiffs all had a full opportunity to participate in athletics, often to great success. Accordingly, Plaintiffs' claims against Glastonbury, Canton, and Danbury fail as a matter of law and must be dismissed.

---

[1] Plaintiff Ashley Nicoletti attended Immaculate High School in Danbury. (TAC ¶ 13.) She did not attend the Danbury Public Schools, like Plaintiff Alanna Smith. Plaintiffs did not name Immaculate High School as a defendant in this matter.

For all of these reasons, as set forth more specifically below, the CIAC and the Board of Education defendants move to dismiss the Complaint in its entirety.

## FACTUAL BACKGROUND

As more fully set forth below, for purposes of this motion, the Court must "accept as true all factual allegations and draw from them all reasonable inferences," but is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (internal citation omitted). "When ruling on a motion to dismiss, the court may consider the complaint and the documents incorporated by reference into the complaint. . . ." *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 78 (D. Conn. 2019)(Chatigny, J.). The court also may properly consider matters of which judicial notice may be taken. *See Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 63 n. 4 (2d Cir.2012). The Third Amended Complaint quotes from and relies upon (a) the text of the CIAC policy at issue in this case, CIAC By-Laws Article IX, Section B, and (b) publicly available records of students' track-and-field performance posted on the online repository Athletic.net. The complete text of the CIAC policy and the relevant individuals' athletic records may, therefore, be considered on a motion to dismiss because even when "a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal citation omitted).

**Yearwood and Miller**

Intervenor Defendants Yearwood and Miller attended the Cromwell Public Schools ("Cromwell") and Bloomfield Public Schools ("Bloomfield"), respectively. Third. Am. Compl. ("TAC") ¶¶ 15–16. They are transgender, meaning that they are women with a female gender identity, who at birth were designated the sex of male. Gender identity is the medical term for a person's deeply felt, inherent sense of belonging to a particular gender. Most people have a gender identity that matches the sex they were designated at birth, but people who are transgender have a gender identity that differs from their sex designated at birth. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-97, reh. en banc denies, 576 F.3d 399 (4th Cir. 2020). Miller and Yearwood graduated from high school in 2020. (TAC ¶ 98.)

**The CIAC Policy**

The CIAC is the "sole governing body for inter-scholastic athletic activities in Connecticut" for its member schools, and "'directs and controls' all high school athletics for boys and girls in Connecticut." TAC ¶22. Since 2013, the CIAC has permitted transgender students like Yearwood and Miller to play on sex-separated sports teams that are consistent with their gender identity if they meet certain criteria. TAC ¶ 92, 95 (*citing* CIAC By-Laws Article IX, Section B).[2] The CIAC Policy specifies that:

> The CIAC is committed to providing transgender student-athletes with equal opportunities to participate in CIAC athletic programs consistent with their gender identity. Hence, this policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates [at the time of birth].[3]

---

[2] The CIAC By-Laws are available online at http://www.casciac.org/pdfs/ciachandbook_2122.pdf

[3] Of course, some transgender students may have had their gender markers changed on their birth certificates as part of the process of transitioning. The CIAC policy would cover those students as well.

CIAC By-Laws, pg. 52-53, Article IX, Section B. The policy acknowledges that any other policy would be "fundamentally unjust and contrary to applicable state and federal law." *Id.*

For purposes of the CIAC policy, a student's school district "shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season." *Id.* By submitting a team roster to the CIAC, each school district "is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics." *Id.*

Pursuant to the CIAC policy, Yearwood competed on the girls' track-and-field team at Cromwell High School for the 2017, 2018, and 2019 indoor and outdoor seasons. *See generally* TAC ¶¶ 1-2-124, 132.[4] Miller competed on the girls' track-and-field team at Bloomfield High School for the 2018 outdoor season and the 2019 indoor and outdoor seasons. *See* TAC ¶¶ 88–91. The Spring 2020 outdoor track season was then cancelled due to the COVID pandemic. TAC ¶ 99.

**Plaintiffs**

Plaintiffs are four cisgender girls: Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti. Like Yearwood and Miller, it is undisputed that Soule and Mitchell graduated high school in 2020, and Smith and Nicoletti graduated in 2022. *See* TAC ¶¶ 10-13; Ecf. 178,

---

[4] The published results of all of Plaintiffs', Miller's, and Yearwood's track-and-field events are attached to the Intervening Defendants' Motion to Dismiss.

¶ 8-9. Plaintiffs, Yearwood, and Miller all participated in outdoor and indoor track. For track, schools are grouped by size, or "Class": Class S, M, L, or LL. Schools generally compete against schools their size. At the end of the season, there is a Class championship meet in both indoor and outdoor track. *See* TAC ¶ 100. As an example, a student in a school designated Class M could win the girls' outdoor track 100m final at the Class M championship. *Id*. That student, along with the other top-five finishers at the Class M championship, would then advance to the subsequently held State Open Championship. *See, e.g.*, TAC ¶¶ 100, 102, 104, 107. At the State Open, students from the various Classes compete against each other in each race. *Id*. at ¶ 100. After some preliminary heats, the top finishers race in the final. The student who wins, along with the other students placing in the top six for that race, moves on to the New England Championship. *Id*. at ¶ 102, 107.

Under that format, Plaintiffs allege that girls who are transgender have unfair "athletic advantages," and that Yearwood and Miller's participation in girls' track-and-field events deprived them of equal athletic opportunity on the basis of sex. *See, e.g.*, TAC ¶¶ 120-125. All four plaintiffs assert in conclusory terms that, as a result of the participation of girls who are transgender in girls' athletic events, Plaintiffs "are losing competitive opportunities, the experience of fair competition, and the opportunities for victory and the satisfaction, public recognition, and scholarship opportunities that can come from victory." *Id*. ¶ 83. The Complaint and the records incorporated into the Complaint demonstrate otherwise, however. As briefed already in the Intervening Defendants' Motion to Dismiss, Plaintiffs have identified very few instances where Miller and/or Yearwood's participation affected their ability to

advance to the next round or to receive an award. Indeed, Soule, Smith, and Nicoletti allege only one instance each, and Miller identifies four:

i.    *Selina Soule.*

Soule alleges that she competed against Miller and Yearwood in a preliminary heat of the 55m dash at the 2019 indoor State Open Championship, at which Miller had the fastest time and Yearwood had the second-fastest. (TAC ¶ 112-14). Soule had the eighth-fastest time—behind Miller, Yearwood, and five other, non-transgender girls, including Mitchell—and therefore failed to qualify for the final 55m championship race. *Id.*

ii.    *Ashley Nicoletti*

Nicoletti alleges that she competed against Miller and Yearwood in the 100m at the S Class Women's Outdoor Track Finals in 2019. (TAC ¶ 122.) In the preliminary race, to determine eligibility for the final heat, Mitchell had the fastest time, Miller had the second-fastest time, and Yearwood had the third-fastest time. *Id.* Nicoletti had the ninth-fastest time and failed to qualify for the final. *Id.*

iii.    *Alanna Smith.*

Smith alleges that she competed against Miller in the 200m race at the 2019 outdoor State Open Championship, Miller placed first and Smith placed third. (TAC ¶103.) The second place finisher was a cisgender girl. *Id.*

iv.    *Chelsea Mitchell*

Plaintiff Chelsea Mitchell competed against Miller and Yearwood on several occasions, beating them in some races and finishing behind them in others. (TAC ¶¶ 107, 110, 112, 122-25.) For example, in the 2019 outdoor season, Mitchell outperformed both Miller and

Yearwood in the preliminary heat in the 100m S Class championship, but then finished behind Yearwood and in front of Miller in the final of that even. *Id*. Mitchell identifies four races in total where if Miller and/or Yearwood did not participate she allegedly would have finished first and "won." *Id*.

**Plaintiffs' Claims and Requested Relief**

Plaintiffs ask this Court to declare that the CIAC policy violates Title IX, issue an injunction requiring Defendants to "correct" all records where Plaintiffs finished behind or lost to Miller or Yearwood, and award them nominal damages and attorney's fees. *See* TAC, Prayer for Relief, pg. 58.

## LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The law and rules governing motions to dismiss brought pursuant to Rule 12(b)(6) are well-established. In adjudicating a motion brought pursuant to Rule 12(b)(6), the Court is generally required to accept all factual allegations made in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Perkins v. S. New Eng. Tel. Co.*, No. 3:07-CV-967, 2009 WL 350604, at *1 (D. Conn. Feb. 12, 2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions. Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has clarified:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.
>
> ***
>
> While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679 (internal citations omitted); *see also Twombly*, 550 U.S. at 565–66. Thus, the court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. After discounting those allegations, the court can next proceed to consider whether those "factual allegations [entitled to the assumption of truth] . . . plausibly suggest an entitlement to relief." *Id.* at 681.

## ARGUMENT

### I. PLAINTIFFS' TITLE IX CLAIMS FAIL TO STATE A CLAIM.

When remanding the case back to this Court, the Second Circuit made clear that it was reaching "no conclusion as to whether Plaintiffs have plausibly stated a Title IX violation. Nor does the Court opine on the question of whether—even if Plaintiffs have stated such a claim— they are entitled to any of the injunctive relief they seek." *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 54 (2d Cir. 2023). As several judges clarified, the substantive issue on remand is not whether Title IX requires schools to allow transgender girls to compete on girls' sports teams, but whether Title IX actively prohibits schools from doing so. *See, e.g., Soule,*

90 F.4th at 66 (Nathan, J. concurring). As set forth in the Intervening Defendants' Motion to

Dismiss, the answer to that question is no. More specifically, Plaintiffs have failed to allege a

cognizable Title IX claim because: (1) Title IX and its implementing regulations do not define

girls who are transgender as "males" for purposes of school activities, no less athletics, (2)

Title IX and its implementing regulations do not mandate sex-separated teams as the exclusive

means of promoting equal athletic opportunities; and (3) Plaintiffs have not alleged cognizable

claims of unequal athletic opportunities under either the effective accommodation framework

or the equal treatment framework. (*See* Ecf. 207, pg. 15, 19, and 21). These comprehensive

arguments largely mirror the substantive arguments made in the Defendants' previously-filed

Motion to Dismiss (Ecf. 145), which the Court did not address due to the Court's findings on

the underlying standing and *Pennhurst* issues. Rather than repeat those same arguments here,

the Defendants instead join in and adopt the Intervening Defendants' arguments as if fully

incorporated herein. [5]

---

[5] As noted in the Complaint, the CIAC policy does not require high schools to inquire about a
girl's puberty status or the status of any gender affirming medical care. TAC ¶ 92. To reiterate
a point made by the Intervenor Defendants' Motion to Dismiss, Title IX imposes no obligation
on the CIAC or its members to inquire about a girl's puberty status or the status of any gender
affirming medical care, and the CIAC policy complies with Title IX in its current form. The
examples Plaintiffs cite from college sports, the Olympics, and professional sports have no
bearing on the CIAC's policy for high school athletes. As Plaintiffs note, the "CIAC rightly
deems athletics an 'integral' part of the state's 'total educational program.'" (TAC ¶ 90). The
CIAC's Policy, therefore, treats transgender students in the same manner as they are treated by
their home school for all school-related purposes, including student records, how teachers refer
to them, what bathroom they use, and how they are reported to the state and federal
governments.

**II.** **PLAINTIFF'S CLAIMS FOR RETROSPECTIVE RELIEF ARE BARRED BY THE _PENNHURST_ DOCTRINE.**

Sitting _en banc_, the Second Circuit vacated the _Pennhurst_ portion of this Court's prior opinion on the "narrow grounds" that addressing the question of adequate notice before reaching the merits of the Title IX claim was not required, and remanded the case with instructions for this Court to address the merits issue before or in tandem with Defendants' _Pennhurst_ argument. _Soule_, 90 F. 4th at 54. When reaching that conclusion, the Second Circuit specifically noted that it was remanding the _Pennhurst_ argument "without resolution of these issues at this stage." _Id_. When addressing the _Pennhurst_ issue previously, this Court found that "[t]here can be no doubt that the clear notice required by _Pennhurst_ is lacking here." (Ecf. 178, pg. 22). Nothing in the Second Circuit's remand opinion compels a different conclusion. Therefore, for the reasons set forth below, this Court should once again find that Plaintiffs' claims for monetary damages are barred by _Pennhurst_.

According to _Pennhurst_, the Spending Clause to the U.S. Constitution precludes the federal government from imposing any obligation on states, as a condition of receipt of federal funds, that Congress did not make clear in the statutory language. _Pennhurst_, 451 U.S. at 17, 24–25. Congress is required to "speak with a clear voice," and "unambiguously" put state funding recipients on notice of the conditions of federal funds. _Id_. at 17. "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" _Davis Next Friend LaShonda D. v. Monroe County Bd. Of Educ._, 526 U.S. 629, 640 (1999) (_citing Pennhurst_, 451 U.S. at 17). "In interpreting language in spending legislation, we thus 'insis[t] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no

knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.'" *Id.* (*citing Pennhurst*, 451 U.S. at 24–25).

Congress may employ the spending power to "further broad policy objectives by conditioning receipt of federal mon[ies]" on the recipient's compliance with federal directives. *See South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987). The Supreme Court in *Dole* identified four limitations on the exercise of the spending power to condition federal grants: (1) Congress must use its spending power to further "the general welfare;" (2) Congress must state all conditions on the receipt of federal funds "unambiguously" so as to "enabl[e] the States to exercise their choice knowingly, cognizant of the consequences of their participation;" (3) conditions attached to federal grants must be related "to the federal interest in particular national projects or programs;" and (4) conditions on federal funding must not violate any other constitutional provision. *Id.*

This requirement of congressional clarity is heightened where, as under Title IX, Congress asks the states to relinquish their historic immunity from suit as one condition of receiving federal funds. In the Eleventh Amendment context, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). While Congress may choose either to abrogate sovereign immunity directly or (as in Title IX) make waiver of sovereign immunity a condition to receipt of federal funds, the test in either case is the same: Congress's intent must be "expressly and

unequivocally stated in the text of the relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 290–91 (2011).[6]

Because Title IX was passed pursuant to the Spending Clause, "private damage actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005).

> When Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.' As we have recognized, '[t]here can ... be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds].')

*Id.* at 182–83 (*quoting Pennhurst*, 451 U.S. at 17).

Title IX is an exercise of Congress' spending power. However, as discussed *supra*, Title IX does not expressly and unequivocally provide a definition of sex that would preclude transgender girls from participating in sex-separated girls' teams. As one court noted, "[l]ooking at both the specific and broader context of the use of the term 'sex,' neither Title IX nor the implementing regulations define the term 'sex' or mandate how to determine who is male and who is female. . . ." *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 867 (S.D. Ohio 2016). Further, "Title IX includes language identical to that in Title VII," and when interpreting Title VII the Supreme Court

---

[6] Local boards of education act as agents of the state when fulfilling the statutory duties imposed upon them by the legislature in light of the state constitutional mandate to furnish public education. *Cheshire v. McKenney,* 182 Conn. 253, 257–58 (1980). "A local board of education acts as an agent of the state when it performs those duties delegated to it by the state. . . . In other words, if a school board is engaged in the provision of primary and secondary education, it is acting under the authority of the state and as the state's agent." *Bd. of Educ. of City of New Haven v. City of New Haven*, 237 Conn. 169, 181 (1996).

held, as a textual matter, discrimination based on "transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cty.*, 590 U.S. 669 (2020); see id. at 660 ("[I]t is impossible to discriminate against a person for being…transgender without discriminating against that individual based on sex.").

As discussed above, and in the Intervenor Defendants' memorandum as incorporated herein, Plaintiffs' interpretation of Title IX is unprecedented. Although Plaintiffs claim Defendants' conduct violates the plain language of Title IX, they do not actually identify the text explicitly providing notice, or any implementing regulations or Department of Education policy statements that would alert schools receiving federal funds that Title IX bars girls who are transgender from participating in athletics with other girls. Under *Pennhurst*, schools cannot be held liable for damages under such an unprecedented and unsupported legal theory.

Agency regulations and guidance reinforce that Defendants did not have adequate notice. *See Davis*, 526 U.S. at 647 (holding that Department of Education's Title IX guidance may "contribute to [an entity's] notice of proscribed misconduct"). As relevant here, Congress has delegated authority to the Department of Education to "promulgate specific rules" regarding Title IX's interpretation. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96 (2d Cir. 2012) ("Congress explicitly delegated to the administering agency the task of prescribing standards for athletic programs under Title IX." (quotation marks omitted)). Thus, guidance from the Department of Education would be what puts Defendants on notice as to what violates Title IX. *See Davis*, 526 U.S. at 647 (guidance issued by the Department of Education providing that certain discrimination violates Title IX would have "contribute[d] to [the School] Board's notice of proscribed misconduct" had it been issued earlier).

But Department of Education has not issued regulations or guidance stating that a policy allowing girls who are transgender to participate in girls' high school athletics violates Title IX. Quite the contrary. As this Court already found, in 2014 the Department of Education's Office of Civil Rights ("OCR") announced that "[a]ll students, including transgender students and students who do not conform to sex stereotypes are protected from sex based discrimination under Title IX." (Ecf. 178 p. 23.) In an opinion letter dated January 7, 2015, (the "2015 Letter"), OCR further explained that "[t]he Department's Title IX regulations permit schools to provide sex-segregated . . . athletic teams . . . [and] [w]hen a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity." Letter from James A. Ferg-Cadima, Acting Deputy Assistant for Policy, U.S. Dep't of Educ. Office for Civil Rights, to Emily Prince (Jan. 7, 2015), *available at* http://www.bricker.com/documents/misc/transgender_student_restroom_access_1-2015.pdf.

On May 13, 2016, the Department of Justice and the Department of Education issued a joint "Dear Colleague" letter (the "2016 Letter") summarizing public schools' obligations regarding transgender students under Title IX, and explaining how those departments evaluate a school's compliance with those obligations. Letter from Catherine E. Lhamon, Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and Vanita Gupta, Principal Dep. Ass't Attorney for Civil Rights, U.S. Dep't of Justice (May 13, 2016), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf. The 2016 Letter included notice that Title IX protects students from discrimination in school on the basis of gender identity, including in regard to names and pronouns, restrooms, and

athletics. The guidance made clear that Title IX allows students to participate in sex-segregated activities and access sex-segregated facilities consistent with their gender identity.

On February 22, 2017, however, the DOE and DOJ issued another "Dear Colleague" letter (the "2017 Letter"). Letter from Sandra Battle, Acting Ass't Sec. for Civil Rights, U.S. Dep't of Educ. and T.E. Wheeler, II, Acting Ass't Attorney General for Civil Rights, U.S. Dep't of Justice (Feb. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf. The 2017 Letter withdrew the 2015 Letter and the 2016 Letter, but did not replace their guidance with any contrary guidance. As one court aptly stated: "[T]he 2017 [Letter] did not propound any 'new' or different interpretation of Title IX or the Regulation, nor did the 2017 [Letter] affirmatively contradict the 2015 and 2016 Guidance documents. It instead appears to have generated an interpretive vacuum pending further consideration by those federal agencies of the legal issues involved in such matters." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 298 (W.D. Pa. 2017); *see also Adams*, 2020 WL 4561817 at *57 (noting that the 2017 Letter simply constituted a withdrawal of previous guidance based on disavowal of guidance letters generally, and "contained no substantive interpretation of the meaning of 'sex discrimination' in Title IX"). Although it created an "interpretive vacuum" in regard to federal law, the 2017 Letter was unequivocal in stating that "the Departments believe that, in this context, there must be due regard for the primary role of the States and local school districts in establishing educational policy."

Until recently, then, the federal agencies responsible for enforcing Title IX were instructing schools that Title IX required them to treat students who are transgender in accordance with their gender identity, including when it comes to athletics. Moreover, every

federal Court of Appeals to consider the issue before this lawsuit was filed held that Title IX requires schools to treat transgender students consistent with their gender identity. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018); *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034 (7th Cir. 2017); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016); *Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016), *vacated*, 137 S. Ct. 1239 (2017). This wealth of judicial authority further underscores the lack of clear notice that the CIAC Policy's application to Plaintiffs violated Title IX, and compels this Court to find once again that "[t]here can be no doubt that the clear notice required by Pennhurst is lacking here"; (Ecf. 178, pg. 22). Following such a finding, this Court should once again dismiss Plaintiffs' claims for monetary damages.

III. **PLAINTIFFS HAVE FAILED TO ALLEGE THAT TITLE IX PROVIDES A CAUSE OF ACTION AGAINST THEIR HOME SCHOOLS.**

In the Third Amended Complaint, Plaintiffs Soule, Smith, and Miller brought claims against their "home" schools--Glastonbury, Danbury, and Canton (for purposes of this argument, "Home Schools"), respectively. *See* TAC ¶¶ 10–13.[7] But Plaintiffs cannot identify any actions taken by the Home Schools regarding transgender athletes or to allegedly limit Plaintiffs' athletic participation. Instead, Plaintiffs allege that actions of other parties harmed them. The factual allegations in the Third Amended Complaint fall well short of pleading "enough facts to state a claim to relief that is plausible on its face" under either theory against Glastonbury, Danbury, and Canton. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

---

[7] Nicoletti appears to join in these arguments, but she did not attend a school named as a defendant in this lawsuit. To the extent she does join in these arguments, her claim must be dismissed for the reasons set forth in the text above.

Therefore, even if some of Plaintiffs' substantive claims survive this Motion to Dismiss, Glastonbury, Danbury, and Canton must be dismissed as Defendants.

### 1. Plaintiffs Have Not Alleged that their Home Schools Failed to Provide Effective Accommodation.

As provided in Intervenor Defendants' motion as incorporated herein, effective accommodation claims "derive from the Title IX regulation at 34 C.F.R. § 106.41(c)(1), which bases Title IX compliance in part on whether 'the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.'" *Mansourian v Regents of Univ. of California*, 602 F.3d 957, 964 (9th Cir. 2010). When conducting the assessment of whether a school effectively accommodates students from the underrepresented group, the proper focus is on the programs offered at the school the plaintiff attends. *Biediger*, 928 F. Supp. 2d at 436 (analyzing claims raised by students who attended Quinnipiac); *Robb v. Lock Haven Univ. of Pennsylvania*, 2019 WL 2005636, at *7 (M.D. Pa. May 7, 2019) (analyzing participation numbers at Lock Haven University to address students' challenge to elimination of its women's varsity swim team and demotion of its women's varsity field hockey team from Division I to Division II).

In this case, Soule, Smith, and Miller have not and cannot allege that their respective Home Schools eliminated girls' track, failed to field a girls' track team, or that they were denied any opportunity to participate on it. To the contrary, they specifically allege that the Home Schools had girls' track teams, and that they were able to participate (and succeed) on such teams. Rather than focus on the opportunities presented at the Home Schools, Plaintiffs base their effective accommodation claim against the Home Schools solely on the fact that Miller and Yearwood participated on the girls' track teams at Cromwell and Bloomfield High

Schools—schools that they did not attend and that are not operated by the Home Schools. There is no legal authority for Plaintiffs to base effective accommodation claims against the Home Schools when the Home Schools deprived them of nothing. Plaintiffs accordingly fail to state an effective accommodation claim against their home schools: Glastonbury, Danbury, and Canton. *Cf. Thomas v. Regents of Univ. of Calif.*, 2020 WL 1139595 *10 (N.D. Cal. Mar. 9, 2020)(dismissing plaintiff's effective accommodation claim "because plaintiff has not tied her release from the team to any alleged system-wide participation gaps at UC Berkeley").

### 2. Plaintiffs Have Not Alleged that their Home Schools Failed to Provide Equal Treatment.

Like an effective accommodation claim, an equal treatment claim reviews the plaintiff's treatment with the treatment received by members of the opposite sex *at the same school*. *Thomas*, 2020 WL 1139595 at *4 (comparing women's soccer program at Berkeley with men's soccer program at Berkeley); *Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 863–67 (D. Minn. 2019) (comparing university's athletics program for men with its athletics program for women and finding that, among other things, "men's teams are overall favored in receiving superior quality practice and competitive facilities"); *Lock Haven*, 2019 WL 2005636, at *6 (explaining that "to succeed on their equal treatment claim, Plaintiffs must show that there is a substantial disparity between the treatment of male and female athletes in an individual segment of Lock Haven's athletics program or in the athletics program as a whole").

In this case, Plaintiffs again fail to allege that the boys' track teams at the Home School received preferential treatment in regard to things such as "schedules, equipment, coaching, and other factors affecting participants in athletics." *Biediger*, 928 F. Supp. 2d at 436. Instead, their allegations focus exclusively on the treatment of female athletes at Cromwell and

Bloomfield High Schools—schools that they do not attend. Title IX simply has no mechanism for students to base equal treatment claims on such a theory. *Cf. Burgess v. Harris Beach PLLC*, 346 F. App'x 658, 661 (2d Cir. 2009) (rejecting Title IX claim brought by an attorney against several schools: "Without a direct relationship between herself and any of the defendants, there was no materially adverse action that any of the defendants could have taken against Burgess and therefore no way for them to have retaliated against her.").

### 3. The Home Schools Are Not Liable for 'Applying' or 'Facilitating' the CIAC policy.

Plaintiffs attempt to avoid the clear deficiencies in their effective accommodation and equal treatment claims against Canton, Glastonbury, and Danbury by alleging that the Home Schools harmed them by "applying and facilitating" the CIAC policy. This argument must fail, however, as there are no factual allegations to support it. As noted previously, Canton, Glastonbury, and Danbury are not alleged to have any transgender athletes participating in girls' track, and are not alleged to have "applied" the CIAC's policy to any athletes that attend their high schools.

In regard to "facilitating" the CIAC's policy, the Third Amended Complaint alleges that Canton, Glastonbury, and Danbury are dues-paying members of the CIAC, along with "[v]irtually all public and parochial high schools in Connecticut." TAC ¶¶ 23–24. The Third Amended Complaint further alleges:

> Each Defendant School actively works with and assists CIAC to schedule and organize interscholastic athletic competitions, including track and field meets, that are conducted subject to CIAC rules including the CIAC policy at issue in this litigation. Each defendant board of education causes the schools and athletic programs under its authority to abide by the rules, regulations, and qualifications of CIAC concerning eligibility, competition rules, and tournament policies and procedures.

*Id.* ¶ 34. Facilitating is generally defined as "to make easier; help bring about."[8] Scheduling meetings and abiding by the CIAC's rules for athletic competitions falls well short of "facilitating" the CIAC's policy as to transgender students' eligibility.[9] Indeed, as conceded by the Plaintiffs in their Third Amended Complaint, schools such as Canton, Danbury, and Glastonbury have no way of knowing whether runners on other schools' teams are transgender, as the CIAC's policy allows athletes to participate based on the gender they identify with in their home school. This information is not available to other member schools. Scheduling meets and allowing their students to participate in such meets falls well short of any definition of "facilitating" actions that allegedly violate Title IX. Moreover, Plaintiffs have not and cannot set forth a legal basis for holding the home schools liable for such "facilitation" under Title IX. For all of these reasons, Canton, Glastonbury, and Danbury simply are not necessary or appropriate parties in this matter, and they should be dismissed as defendants as a matter of law.

---

[8] *See* https://www.merriam-webster.com/dictionary/facilitate

[9] If Plaintiffs' "facilitating" theory were correct, then they would have a cause of action against every school district in the state that is a CIAC member. That is simply nonsensical.

## CONCLUSION

For the foregoing reasons, the Third Amended Complaint should be dismissed in its entirety, with prejudice.

By: /s/ Peter J. Murphy

Peter J. Murphy (ct26825)
Linda L. Yoder (ct01599)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
(860) 251-5950
pjmurphy@goodwin.com
*Counsel for CIAC and Danbury Board of Education*


By:  /s/ Johanna G. Zelman

Johanna G. Zelman (ct26966)
Mohammed B. Shihabi*
FordHarrison, LLP
CityPlace II
185 Asylum Street, Suite 610
Hartford, CT 06103
(860) 740-1355
jzelman@fordharrison.com
*Counsel for Glastonbury, Canton, Bloomfield, and Cromwell Boards of Education*