**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SELINA SOULE, et al., | Case No.:  3:20-CV-00201-RNC |
| *Plaintiffs,* | |
| v. | |
| CONNECTICUT ASSOCIATION OF SCHOOLS, INC., et al., | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTION TO DISMISS** |
| *Defendants,* | |
| ANDRAYA YEARWOOD, et al., | Dated: May 3, 2024 |
| *Intervenor-Defendants.* | |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................... ii

Introduction ..................................................................................................... 1

Background ....................................................................................................... 2

I.    Statutory Background ........................................................................... 2

II.   Factual Background ............................................................................. 4

III.  Procedural Background ...................................................................... 7

IV.  Plaintiffs' Allegations ......................................................................... 8

Legal Standard ............................................................................................... 11

Argument ........................................................................................................ 12

I.    Plaintiffs have adequately pled that CIAC's Policy violates Title IX's plain text. ........................................................................................ 12

     A.   Title IX uses "sex" to denote a biological binary. ................................ 12

     B.   Title IX prohibits "excluding" or "denying" based on sex in education programs or activities. ........................................................ 17

     C.   Plaintiffs' concrete allegations show that CIAC's Policy discriminated against them on the basis of sex. ................................... 23

II.   Plaintiffs have adequately pled facts that show CIAC's Policy violates regulatory guidance. ........................................................................... 28

     A.   CIAC's Policy does not effectively accommodate the interests and abilities of female athletes. ........................................................... 29

     B.   CIAC's Policy does not provide female athletes with equal treatment .......................................................................................... 33

III.  Plaintiffs adequately pled Title IX claims against Defendant schools. .......... 34

IV.  Defendants had adequate notice that their discriminatory Policy violated Title IX. ............................................................................................... 36

     A.   Official policies—like athletic eligibility rules—always represent intentional conduct not subject to any notice requirement. ................. 36

     B.   Title IX's clear terms provide notice. .................................................... 39

Conclusion ...................................................................................................... 45

# TABLE OF AUTHORITIES

## **Cases**

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ................................................................. 16

*Adams ex rel. Kasper v. School Board of St. Johns County,*
  57 F.4th 791 (11th Cir. 2022) ............................. 1, 3, 4, 13, 16, 18, 27, 42

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................................. 25

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ............................................................................. 14

*B.P.J. ex rel. Jackson v. West Virginia State Board of Education,*
  98 F.4th 542 (4th Cir. 2024) ..................................................... 22, 27, 28

*Baker v. California Land Title Co.,*
  507 F.3d 895 (9th Cir. 1974) ............................................................... 15

*Balow v. Michigan State University,*
  24 F.4th 1051 (6th Cir. 2022) .............................................................. 31

*Barnes v. Gorman,*
  536 U.S. 181 (2002) ............................................................................. 44

*Biediger v. Quinnipiac University,*
  691 F.3d 85 (2d Cir. 2012) .............................................................. 30, 31

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ................................................. 12, 20, 41, 42, 43

*Bridge ex rel. Bridge v. Oklahoma State Department of Education,*
  2024 WL 150598 (W.D. Okla. 2024) ..................................................... 13

*Brown v. Gardner,*
  513 U.S. 115 (1994) ......................................................................... 15, 16

*Cannon v. University of Chicago,*
  441 U.S. 677 (1979) ............................................................................. 14

*Cape v. Tennessee Secondary School Athletic Association,*
  563 F.2d 793 (6th Cir. 1977) ........................................................... 11, 43

*Chase Group Alliance LLC v. City of New York Department of Finance,*
  620 F.3d 146 (2d Cir. 2010) ................................................................. 11

*City of Cleburne v. Cleburne Living Center,*
  473 U.S. 432 (1985) ............................................................................. 44

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
  886 F.2d 1191 (9th Cir. 1989) ............................................................. 27

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
  695 F.2d 1126 (9th Cir. 1982) ............................................................ 19, 22

*Clark v. Hanley,*
  89 F.4th 78 (2d Cir. 2023) ........................................................................ 31

*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt,*
  139 S. Ct. 1507 (2019) .............................................................................. 41

*Cohen v. Brown University,*
  101 F.3d 155 (1st Cir. 1996) ............................................................. 19, 43

*Cohen v. Brown University,*
  991 F.2d 888 (1st Cir. 1993) .................................................................... 21

*Craig v. Boren,*
  429 U.S. 190 (1976) ................................................................................... 22

*D.M. ex rel. Bao Xiong v. Minnesota State High School League,*
  917 F.3d 994 (8th Cir. 2019) .................................................................... 27

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
  526 U.S. 629 (1999) ..................................................................... 39, 42, 44

*Doe v. Samford University,*
  29 F.4th 675 (11th Cir. 2022) .................................................................. 34

*Franciscan Alliance, Inc. v. Becerra,*
  553 F. Supp. 3d 361 (N.D. Tex. 2021) ..................................................... 41

*Franklin v. Gwinnett County Public Schools,*
  503 U.S. 60 (1992) ..................................................................................... 37

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) ................................................................................... 15

*Gebser v. Lago Vista Independent School District,*
  524 U.S. 274 (1998) ............................................................................ 37, 38

*Grimm v Gloucester County School Board,*
  972 F.3d 586 (4th Cir. 2020) .............................................................. 34, 45

*Gundy v. United States,*
  139 S. Ct. 211 (2019) ................................................................................ 14

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ..................................................................... 44

*Horn v. Medical Marijuana, Inc.,*
  80 F.4th 130 (2d Cir. 2023) ..................................................................... 12

*Horn v. Medical Marijuana, Inc.,*
  2024 WL 1839091 (Apr. 29, 2024) .......................................................... 12

*Jackson v. Birmingham Board of Education,*
  544 U.S. 167 (2005) ................................................................ 37, 39, 40, 41

*Kelley v. Board of Trustees,*
   35 F.3d 265 (7th Cir. 1994) ................................................................... 43

*Kleczek v. Rhode Island Interscholastic League, Inc.,*
   612 A.2d 734 (R.I. 1992) ........................................................................ 18

*Kouambo v. Barr,*
   943 F.3d 205 (4th Cir. 2019) ................................................................. 42

*L.W. ex rel. Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) .................................................................. 41

*Lynch v. City of New York,*
   952 F.3d 67 (2d Cir. 2020) ..................................................................... 11

*Mansourian v. Regents of University of California,*
   602 F.3d 957 (9th Cir. 2010) ................................................... 20, 37, 38, 40

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
   370 F.3d 275 (2d Cir. 2004) ..................................... 1, 14, 24, 25, 26, 29, 31, 32, 33

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ........................................................ 41, 42, 43

*Moses v. New York Times Co.,*
   79 F.4th 235 (2d Cir. 2023) ................................................................... 12

*Neal v. Board of Trustees of California State University,*
   198 F.3d 763 (9th Cir. 1999) ......................................................... 4, 24, 43

*Neese v. Becerra,*
   640 F. Supp. 3d 668 (N.D. Tex. 2022) ......................................... 13, 14, 42

*New Prime Inc. v. Oliveira,*
   586 U.S. 105 (2019) ................................................................................ 16

*North Haven Board of Education v. Bell,*
   456 U.S. 512 (1982) ................................................................................ 14

*Northeasten Florida Chapter of Associated General Contractors of America v. City of Jacksonville,*
   508 U.S. 656 (1993) ................................................................................ 25

*Pederson v. Louisiana State University,*
   213 F.3d 858 (5th Cir. 2000) ........................................................... 37, 40

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir, 2021) ................................................................. 41

*Peltier v. Charter Day School, Inc.,*
   37 F.4th 104 (4th Cir. 2022) ................................................................. 34

*Petrie v. Illinois High School Association,*
   394 N.E.2d 855 (Ill. App. Ct. 1979) ..................................................... 19

iv

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) .................................................. 17

*Roberts v. Colorado State Board of Agriculture*,
  998 F.2d 824 (10th Cir. 1993) ................................... 33

*Roe v. St. John's University*,
  91 F.4th 643 (2d Cir. 2024) ....................................... 33

*Sail'er Inn, Inc. v. Kirby*,
  485 P.2d 529 (Cal. 1971) ........................................... 15

*Soule v. Connecticut Association of Schools, Inc.*,
  90 F.4th 34 (2d Cir. 2023) ...................... 8, 25, 38, 43, 44, 45

*Texas Department of Housing & Community Affairs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ................................................. 21

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985) ................................................. 21

*United States v. Scott*,
  990 F.3d 94 (2d Cir. 2021) ....................................... 15

*Vega v. Hempstead Union Free School District*,
  801 F.3d 72 (2d Cir. 2015) ....................................... 12

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ............................................. 12

*Whitman v. American Trucking Associations*,
  531 U.S. 457 (2001) ................................................. 13

*Williams v. School District of Bethlehem*,
  998 F.2d 168 (3d Cir. 1993) ........................................ 1

*Yates v. United States*,
  574 U.S. 528 (2015) ................................................. 42

## Statutes

18 U.S.C. § 249(a)(2) ................................................... 41

20 U.S.C. § 1681 ......................................................... 17

20 U.S.C. § 1681(a) ................................... 3, 8, 12, 39, 42

20 U.S.C. § 1681(a)(2) ................................................. 13

20 U.S.C. § 1681(a)(8) ................................................. 13

20 U.S.C. § 1686 ......................................................... 43

20 U.S.C. § 1687(2)(A) ................................................. 21

34 U.S.C. § 12291(b)(13)(A) .......................................... 41

42 U.S.C. § 2000e-2(a) ........................................................................... 42

42 U.S.C. § 2000e-5(g)(2)(B) ................................................................. 17

Education Amendments of 1974, Public Law No. 93-380, § 844,

88 Stat. 484 (1974) ............................................................................ 20, 28

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance, 89 Fed. Reg. 33474 (Apr. 29, 2024) (to be
    codified at 34 C.F.R. § 106.1 *et seq.*) ........................................................ 3

**Regulations**

34 C.F.R. § 106.33 ................................................................................ 14

34 C.F.R. § 106.41 ................................................................................ 39

34 C.F.R. § 106.41(a) ......................................................................... 3, 29

34 C.F.R. § 106.41(b) ....................................................................... 14, 20

34 C.F.R. § 106.41(c) ................................................................... 14, 29, 34

1979 Policy Interpretation, 44 Federal Register 71,413–18 (December 1979) ... 31, 32

**Other Authorities**

130 Congressional Record 18,536 (1984) ..................................................... 2

Chris W. Surprenant, *Accommodating Transgender Athletes*,
    18 GEORGETOWN JOURNAL OF LAW & PUBLIC POLICY 905 (2021)............................ 3

Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, *Re-Affirming the
    Value of the Sports Exception to Title IX's General Non-Discrimination Rule*,
    27 DUKE JOURNAL OF GENDER LAW & POLICY 69 (2020) ................................. 4, 18

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female
    Category of Sport: Perspectives on Testosterone Suppression and Performance
    Advantage*,
    51 SPORTS MEDICINE (2021) .............................................................. 18, 19

H.R. 1652, 113th Congress (2013) ............................................................ 41

Jennifer C. Braceras, et al., *Competition: Title IX, Male-Bodied Athletes, and the
    Threat to Women's Sports*,
    INDEPENDENT WOMEN'S F. & INDEP. WOMEN'S LAW CENTER (2021) ..................... 19

Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies
    Are Required to Ensure Equality of Opportunity*,
    14 MARQUETTE SPORTS LAW REVIEW 11 (2003) ....................................... 21

Jodi Hudson, *Complying with Title IX of the Education Amendments of 1972:
    The Never-Ending Race to the Finish Line*,
    5 SETON HALL JOURNAL OF SPORT LAW 575 (1995) ................................... 3

Joe Reedy, *Women's NCAA Title Game Outdraws The Men's Championship with an Average of 18.9 Million Viewers*, AP (April 9, 2024)............................................ 2

Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, OCR, U.S. Department of Education, to Colleagues (January 16, 1996) ("1996 Clarification").................................................................................... 30, 32

*Letter to the Chief State School Officers*, *Title IX Obligations in Athletics*, U.S. Department of Education (September 1975) .................................. 20

*More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. COMM'N ON CIV. RIGHTS (July 1980) .................................................. 2

Office Of Civil Rights, U.S. Department of Education, *Revised Letter of Impending Enforcement Action* (August 31, 2020) ................................ 36

S. 439, 114th Congress (2015) .............................................................. 41

The American Heritage Dictionary (1976) .............................................. 13

*The Role of Testosterone in Athletic Performance*, DUKE CENTER FOR SPORTS LAW & POLICY (Jan. 2019) ........................... 18

*Title IX at 45*, NATIONAL COALITION FOR WOMEN & GIRLS IN EDUCATION (2017)........ 2

Webster's Third New International Dictionary (1966) ............................. 17

**INTRODUCTION**

Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Smith are four girls who competed in Connecticut track and field throughout their high school careers. They "trained much of [their lives]—striving to shave mere factions of seconds off [their] race times—in order to experience the personal satisfaction of victory." Third Amended Complaint ("TAC") ¶ 1. Like all athletes, these girls competed to win. "The greater the potential victory, the greater the motivation." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 294 (2d Cir. 2004).

Yet the Connecticut Athletic Interscholastic Conference ("CIAC") enacted a discriminatory policy that permits biologically male athletes who identify as female to compete in female athletic events. As a result, two athletes born male displaced Plaintiffs from "honors, opportunities to compete at higher levels, proper placements, … statewide rankings, and public recognition critical to college recruiting and scholarship opportunities." TAC ¶ 3.

That's exactly what Congress sought to prevent when it enacted Title IX. Before Title IX, most schools emphasized boys' athletic programs "to the exclusion of girls' athletic programs," and vastly fewer girls participated in competitive interscholastic athletics. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). But Title IX "precipitated a virtual revolution for girls and women in sports." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 818 (11th Cir. 2022) (Lagoa, J., concurring) (cleaned up). It "paved the way for significant increases in athletic participation for girls and women at all levels of education." *Id.*

Just this year, the "women's NCAA [basketball] championship game drew a bigger television audience than the men's title game for the first time." Joe Reedy, *Women's NCAA Title Game Outdraws The Men's Championship with an Average of 18.9 Million Viewers*, AP (Apr. 9, 2024), https://perma.cc/9FZ8-X4P3.

Discriminatory policies like CIAC's threaten to undo this work. Title IX's plain text prevents funding recipients from enacting policies that exclude girls from athletics or deny them equal participation opportunities. Plaintiffs' experiences in being forced unfairly to compete against two biologically male athletes concretely show how CIAC's Policy contravenes Title IX's promise. Plaintiffs have alleged valid claims under Title IX. This Court should deny the motions to dismiss.

## BACKGROUND

### I.    Statutory Background

Female athletes have suffered historic discrimination. Although "[p]articipation in athletics has long been viewed as an integral part of the educational process in American high schools and colleges," women have faced significant hurdles just to participate. *More Hurdles to Clear: Women and Girls in Competitive Athletics*, U.S. COMM'N ON CIV. RIGHTS, at iii (July 1980). Many public high schools did not have girls' sports teams, which drastically reduced the number of women who could compete in college. Moreover, the average university devoted a mere 2% of its athletic budget to women's sports teams. *Title IX at 45*, NAT'L COAL. FOR WOMEN & GIRLS IN EDUC. 40 (2017). As a result, for most of history, "women [have been] denied opportunities for athletic competition and scholarships." 130 Cong. Rec. 18,536 (1984) (statement of Rep. Snowe).

Fifty years ago, that started to change. Recognizing this unique set of problems, Congress enacted Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

From the start, the implementing regulations defined "program or activity" to include interscholastic athletics.[1] 34 C.F.R. § 106.41(a). That "triggered an athletic revolution that changed the face of intercollegiate athletics." Jodi Hudson, *Complying with Title IX of the Education Amendments of 1972: The Never-Ending Race to the Finish Line*, 5 SETON HALL J. OF SPORT L. 575, 575 (1995). Before Title IX, less than 5% of women participated in high school sports; by 2019, that number skyrocketed to 43%. Chris W. Surprenant, *Accommodating Transgender Athletes*, 18 GEO. J. OF L. & PUB. POL'Y 905, 908 (2021); *accord* TAC ¶ 51. Stated differently, "since Title IX was enacted, the number of girls playing high school sports has gone from one in twenty-seven, to one in three." *Adams*, 57 F.4th at 818–19 (Lagoa, J., concurring).

As a result, "[w]omen and girls today have the opportunity only boys and men had in the previous period to reap the widely recognized and highly valued benefits

---

[1] The Department of Education recently promulgated new guidance. That guidance has no bearing on this case. "The final regulations apply only to sex discrimination that allegedly occurred on or after August 1, 2024. With respect to sex discrimination that allegedly occurred prior to August 1, 2024, regardless of when the alleged sex discrimination was reported, the Department will evaluate the recipient's compliance against the Title IX statute and the Title IX regulations in place at the time that the alleged sex discrimination occurred." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33841 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106.1 *et seq.*).

of being physically strong, of being on teams and developing the myriad skills associated with competitive sport, of attending college on athletic scholarships, and of high-end competitive experiences." Doriane Lambelet Coleman, Michael J. Joyner & Donna Lopiano, *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. OF GENDER L. & POL'Y 69, 72 (2020). "[I]t is now commonplace to see young women training in state-of-the-art athletic facilities, from swimming pools to basketball arenas, with the records of their accolades hung from the rafters." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring).

In short, Title IX has "enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory [and] the agony of defeat." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

## II.   Factual Background

In Connecticut, female track athletes have experienced the "agony of defeat" disproportionately to the "thrill of victory"—and disproportionately to the experience of male athletes. That's because CIAC adopted a policy that bases participation in women's athletics solely on a student athlete's "gender identification." TAC ¶ 93. Under this Policy, if a biological male identifies as female in "current school records and daily life activities," *id.*, then that athlete can compete in women's events—even though "scientists agree that males and females are materially different with respect to the main physical attributes that contribute to athletic performance," *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 92 (cleaned up). That difference means that "even the very best females are not competitive for the win against males." *Id.* at 115; *accord*

4

TAC ¶ 61 ("[B]iologically male athletes consistently achieve records 10–20% superior to comparably aged, fit, and trained women."). Biological males, if allowed to compete, will dominate women's sports.

That is exactly what happened in Connecticut's high school track and field. In 2017, Andraya Yearwood, a biologically male athlete who identified as female, started running in women's track and field. TAC ¶ 98. Unsurprisingly, Yearwood, even as a freshman, claimed two State Class championships that year.[2] *Id.* ¶ 102. Yearwood also went on to rank third in the State Open championship. *Id.* ¶ 107. Plaintiff Chelsea Mitchell, a freshman at the time, finished in seventh place. *Id.* But for CIAC's Policy allowing Yearwood to compete, Chelsea "would have had the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships." *Id.*

Male dominance became starker in 2018. That year, Terry Miller, another biologically male athlete who identified as female, switched from competing in boys' track to girls' track events. TAC ¶¶ 108–09. As a male runner, Miller had never advanced to a State Class or State Open championship. Miller took first prize at the women's 2018 State Open outdoor 100m championship, with Yearwood as the runner-up. *Id.* ¶ 110. Otherwise, "Chelsea would have won second place," and Plaintiff Selina Soule would have taken fourth. *Id.* Miller also won the outdoor

_____

[2] Connecticut track and field involves multiple tiers of competition. First, athletes may qualify to compete in statewide "Class" races based on school size. TAC ¶ 100. "[T]he top-performing students within each State Class championship qualify to participate in the State Open championships," wherein the top State athletes compete against each other regardless of school size. *Id.* Finally, "the top performers in the State Open championships qualify to participate in the New England Championship." *Id.*

200m event, pushing Chelsea "down in the rankings and setting another women's division meet record at the expense of the top-performing biological girl." *Id.* ¶ 111.

The 2019 events saw similar results. In one preliminary State Open championship race, the two male-bodied athletes, Miller and Yearwood, took the top slots—bumping Chelsea down to fourth place and completely preventing Selina from advancing to the final State Open championship race. *Id.* ¶ 112. In that final State Open race, Miller and Yearwood again took the top prizes, leaving Chelsea to finish in third place. Miller managed to break the "girls' State Open meet record" and went on to be named "All-Courant girls indoor track and field athlete of the year" by a Connecticut newspaper. *Id.* ¶¶ 113, 120. Chelsea, meanwhile, would have "made her school's history as the first female athlete … ever to be named State Open Champion" but was instead "repeatedly referred to … as the 'third-place competitor.'" *Id.* ¶¶ 117, 119.

In spring 2019, the two male-bodied athletes subsequently ranked second and third in a preliminary State Class race, preventing Plaintiff Ashley Nicoletti from advancing "to the next level of competition" and competing "for a spot at the State Open Championship." *Id.* ¶ 122. Miller then defeated Chelsea in the final State Class race, depriving her of the honor of "Class S outdoor state champion." *Id.* ¶ 123. Similarly, in the spring State Open championship races, Miller took top prize, leaving Plaintiff Alanna Smith to rank third and Chelsea to rank fourth. *Id.* ¶ 124.

Overall, from 2017 through 2019, Yearwood and Miller, two biologically male athletes, won 13 girls' state-championship titles and occupied more than 68

opportunities to advance to and participate in exclusive higher-level competitions—opportunities that would otherwise have gone to females. *Id.* ¶¶ 125, 127. In fact, in seven important state-level events, Yearwood and Miller won 13 out of 14 "girls'" championships, leaving a female runner to win just one. *Id.* ¶ 125. (Needless to say, in the boys' division, males won all 14 parallel "boys'" championships.)

## III.    Procedural Background

Plaintiffs originally sued CIAC and five Connecticut high schools in 2020, alleging that CIAC's Policy violates Title IX, both by failing to provide female athletes with equal treatment, benefits, and opportunities, and by failing to effectively accommodate female athletes' interests and abilities. Originally, Plaintiffs asked for a declaration that the Policy violates Title IX and an injunction against its continued enforcement. They also requested an injunction requiring CIAC and its member schools to correct all athletic records by properly crediting the achievements and championships of female athletes, including Plaintiffs. Finally, Plaintiffs sought monetary damages. Soon after Plaintiffs sued, Yearwood and Miller (as well as the Connecticut Commission on Human Rights and Opportunities) were allowed to intervene as defendants.

Though this Court initially dismissed Plaintiffs' complaint for lack of standing, the en banc Second Circuit reversed. "[A]ll members of the *en banc* Court agree[d] unanimously that … Plaintiffs have pled facts sufficient to establish Article III standing"—specifically, a "concrete, particularized, and actual injury in fact" in the "alleged denial of equal athletic opportunit[ies] and concomitant loss of publicly recognized titles and placements during track and field competitions in which they

participated against and finished behind" biological males. *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 41 (2d Cir. 2023) (en banc). Further, a majority of the en banc Court concluded that, as to monetary damages, the question of whether Defendants had adequate notice their policies violated Title IX should be considered in tandem with the merits of Plaintiffs' claim. *Id.* at 42. The Second Circuit remanded to this Court to "assess in the first instance whether Plaintiffs' complaint states a claim for a violation of Title IX." *Id.*

## IV.   Plaintiffs' Allegations

In March 2024, Plaintiffs filed a third amended complaint. They reasserted their claims that CIAC's Policy violates Title IX by failing to effectively accommodate female athletes or give them equal treatment. And they sought both nominal damages for these harms and an injunction requiring CIAC and its member schools to correct all athletic records by properly crediting the achievements and championships of female athletes.[3]

Plaintiffs' legal theory follows decades of precedent. Title IX prohibits federal funding recipients from "exclud[ing]," "den[ying]," or "discriminati[ng]" against student athletes "on the basis of sex." 20 U.S.C. § 1681(a). Consistent with this text, Title IX has long been implemented to require equal athletic opportunities for girls. By enacting a Policy that allows male-bodied athletes to compete in events reserved exclusively for females, CIAC did exactly what Title IX prohibits.

---

[3] Given that Plaintiffs have all graduated high school at this point, they no longer request an injunction against the Policy's continued enforcement.

Plaintiffs back this legal theory up with allegations demonstrating the physiological advantage male-bodied athletes have over females. From the start, those born male have physical advantages over those born female. That gap widens as "male puberty quickly increases the levels of circulating testosterone in healthy teen and adult males to levels ten to twenty times higher than the levels that occur in healthy adult females." TAC ¶ 55. Not only that, but after puberty, males can generally "demonstrate greater strength; run faster; jump higher and farther; throw, hit, and kick faster and farther; and exhibit faster reaction times than comparably fit, trained, and aged females. *Id.* ¶ 58. Meanwhile, after puberty, the female body takes on "increased body fat levels," which "creates increased weight without providing strength," and develops "wider hips and different hip joint orientation that result in decreased hip rotation and running efficiency." *Id.* ¶ 59.

These physiological differences matter in sports generally, but they are particularly important in athletic events like track and field, where a fraction of a second can separate a record-breaker from a last-place finisher. "[B]iologically male athletes consistently achieve records 10–20% superior to comparably aged, fit, and trained women across all athletic events, with disparities of up to 50% in events that require both strength and speed." *Id.* ¶ 61. In track and field specifically, "boys and men consistently run faster and jump higher and farther than girls and women." *Id.* ¶ 63. In 2017, "thousands of men and boys achieved times in the 400m faster than the best *lifetime* performances of three Olympic champions in that event." *Id.* ¶ 64 (emphasis added). The physiological advantages are "unequivocal," and "[c]laims to the contrary are simply a denial of science." *Id.* ¶ 65.

Plaintiffs know first-hand how real the disparities are. As alleged, Plaintiffs lost race after race to biologically male athletes. Across seven state-level championship events in Connecticut, male athletes captured first and second place 22 times out of 28, with biologically male athletes winning first place in 13 out of 14 championships. To say nothing of advancement opportunities to those championships: out of 108 total opportunities, biologically male athletes captured 68. In virtually every race, Plaintiffs were pushed down in the rankings.

This discriminatory treatment not only robbed Plaintiffs of championships and participation opportunities—it also caused them emotional harm. Each loss left them "demoralized, knowing that their efforts to shave mere fractions of a second off of their race times in the hopes of earning placements, experiencing the thrill of victory, and advancing to next level meets could all be for naught." *Id.* ¶ 138. Every time Chelsea showed up on race day, unsure whether she would compete in a fair race, she "felt stress, anxiety, intimidation, and emotional and psychological distress"—to the point she was "physically sick." *Id.* ¶ 140. Similarly, Ashley "felt discouraged, anxious, and angry about being forced to compete against male-bodied athletes because she knew she would lose." *Id.* ¶ 142. Selina "suffered depression" and "felt hopeless." *Id.* ¶ 141. And Alanna felt "betrayed and frustrated," knowing "before she got to the track she had little hope of winning the top spot against a biological male." *Id.* ¶ 139.

To compound these emotional harms, Plaintiffs were "told to shut up" about the discrimination they suffered. *Id.* ¶ 143. Meanwhile, the male-bodied athletes were lauded as "courageous" and hailed "female athlete of the year." *Id.* ¶ 81.

These harms are not surprising. They are the predictable result of a policy that bases participation in women's sports not on sex but on a student's "gender identification." *Id.* ¶ 93. For decades, courts have warned that "were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam). As Plaintiffs alleged, male-bodied athletes displaced female athletes over and over again in Connecticut high school track and field, all because of CIAC's discriminatory Policy. That violated Title IX.

## LEGAL STANDARD

This Court must construe Plaintiffs' "complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in [Plaintiffs'] favor." *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (cleaned up). Whether Plaintiffs' "factual allegations plausibly give rise to an entitlement to relief does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up). Put simply, "the question is not whether [Plaintiffs are] *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether [Plaintiffs] allege enough to nudge their claims across the line from conceivable to plausible." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (cleaned up).

## ARGUMENT

**I.  Plaintiffs have adequately pled that CIAC's Policy violates Title IX's plain text.**

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

When interpreting Title IX, courts "start with the text of the statute, seeking to discern and apply the ordinary meaning of its terms at the time of their adoption." *Horn v. Medical Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023) (cleaned up), *cert. granted*, 2024 WL 1839091 (Apr. 29, 2024). Each word "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022). Courts must not "add to, remodel, update, or detract from old statutory terms" to fit their "own imaginations." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654–55 (2020).

The operative words in the statute—namely, "sex" and "discrimination"—have easily discernible plain meanings that support Plaintiffs' allegations.

### A.  Title IX uses "sex" to denote a biological binary.

Title IX does not define "sex," so to ascertain its "ordinary, common-sense meaning" in 1972 when the statute was enacted, this Court should reference "contemporary dictionaries." *Moses v. N.Y. Times Co.*, 79 F.4th 235, 247 & n.5 (2d Cir. 2023). Virtually every dictionary from this era defines sex as the biological status of male or female. *Sex*, The American Heritage Dictionary 1187 (1976) (defining sex as "[t]he property or quality by which organisms are classified

12

according to their reproductive functions"); *Sex*, Webster's Third New Int'l Dictionary 2081 (1971) ("[T]he sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underline most evolutionary change[.]"). Given that "the overwhelming majority of dictionaries" define sex "on the basis of biology and reproductive function," there's nothing "implicit," as Defendants suggest, about Title IX's meaning. *Adams*, 57 F.4th at 812–13; *contra* Intervenors Br. 15.

What dictionaries tell us, the "statutory and historical context" confirms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). Throughout Title IX, Congress used "sex" to denote a biological binary. *Neese v. Becerra*, 640 F. Supp. 3d 668, 684 (N.D. Tex. 2022); *accord Bridge ex rel. Bridge v. Okla. State Dep't of Educ.*, 2024 WL 150598, at *7 (W.D. Okla. 2024). For example, Title IX permits schools to go from admitting "only students of *one sex*" to admitting "students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphases added). It also exempts "father-son or mother-daughter activities … but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." *Id.* § 1681(a)(8) (emphases added).

The implementing regulations promulgated shortly after Title IX's enactment also reflect this understanding.[4] They permit separate locker rooms and showers so

---

[4] Unless otherwise indicated, when Plaintiffs refer to the Department's regulations and guidance, they mean the regulations and guidance in place when the alleged discrimination occurred. Plaintiffs do not refer to the recently issued guidance, which, as noted, has no bearing on this case. *Supra* n.1.

long as facilities "for students of *one sex*" are comparable to facilities "for students of the *other sex*." 34 C.F.R. § 106.33 (emphases added). The sports regulations allow schools to "sponsor separate teams for members of *each sex*." *Id.* § 106.41(b) (emphasis added). And they require schools to "provide equal athletic opportunity for members of *both sexes*" to "effectively accommodate the interests and abilities of members of *both sexes*." *Id.* § 106.41(c) (emphases added).

Further, the history surrounding Title IX's enactment illuminates that the American public would have understood "sex" to denote a biological binary. *Gundy v. United States*, 139 S. Ct. 2116, 2124–26 (2019) (noting that statutory interpretation is a "holistic endeavor" that looks at "purpose and history"). "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick*, 370 F.3d at 286; *accord Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979). And this purpose "to prohibit the discriminatory practice of treating women worse than men" "is evident in the text itself." *Neese*, 640 F. Supp. 3d at 681 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)).

Courts have "long interpreted Title IX to prohibit federally funded education programs from treating men better than women (or vice versa)." *Id.* at 680 (citing *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon,* 441 U.S. at 680). In addition, at the time of Title IX's enactment, courts defined "sex" as an immutable binary. The California Supreme Court said that sex, "like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth." *Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529, 540 (Cal. 1971). A plurality of the

United States Supreme Court agreed: "sex" is "an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality). Contrary to CIAC's Policy, *no one* understood sex to implicate school records or daily life activities—it referred to the body. In fact, as the Ninth Circuit concluded, sex *did not* mean "personal modes of dress or cosmetic effects." *Baker v. Cal. Land Title Co.*, 507 F.3d 895, 897 (9th Cir. 1974).

That "some people" might have understood sex differently in 1972 does not change the equation. *Contra* Intervenors Br. 19 n.20. The "ordinary meaning of a [word] is just that: the meaning associated with the *ordinary* or *prototypical* use of the [word] rather than any meaning that is *linguistically possible*." *United States v. Scott*, 990 F.3d 94, 129 (2d Cir. 2021) (Menashi, J., concurring in part and in the judgment). Everything here—from contemporaneous dictionary definitions to statutory and regulatory context—points in one direction: "sex," as used in Title IX, denotes "biological sex." Defendants cannot create an ambiguity where none exists by conjuring up "definitional possibilities." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Nor does the Seventh Circuit's decision in *A.C. ex rel. M.C. v. Metropolitan School District of Martinsville* counsel differently. There, the Seventh Circuit erroneously suggested that there is "insufficient evidence to support the assumption that sex can mean only biological sex." 75 F.4th 760, 770 (7th Cir. 2023). Yet the court cited only two dictionaries—and even then resorted to secondary definitions—to find ambiguity. As the en banc Eleventh Circuit concluded, "a statutory term is not deemed to be ambiguous simply because … of definitional *possibilities*." *Adams*,

57 F.4th at 813 (emphasis added) (quoting *Brown*, 513 U.S. at 118 (1994)). Title IX's statutory context makes clear that Congress used sex per "the overwhelming majority of dictionaries." *Id.* at 812. The Seventh Circuit ignored "the statutory context of Title IX," *id.* at 813, and instead buttressed its conclusions with policy considerations, *e.g.*, *A.C.*, 75 F.4th at 770 ("Narrow definitions of sex do not account for the complexity of the necessary inquiry.").[5] Courts cannot resort to policy considerations to override Congress's clear terms. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 120 (2019).

Finally, Defendants point out that Title IX's "legislative history repeatedly attributes the lack of equal athletic opportunities, in part, to the socialization of girls and women to conform to sex stereotypes." Intervenors Br. at 18. Yet CIAC's Policy perpetuates these very sex stereotypes. Rather than depend on the objective measurement of biological sex, CIAC turns to the subjective assessment of a student athlete's "gender identification" in "daily life activities." TAC ¶ 93. CIAC effectively classifies its sports teams based on whoever "walk[s] more femininely, talk[s] more femininely, dress[es] more femininely, wear[s] make-up, ha[s] her hair styled, and wear[s] jewelry." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality), *superseded by statute on other grounds* 42 U.S.C. § 2000e-5(g)(2)(B). Such an approach embodies and exacerbates the very stereotypes Title IX confronted by selecting "sex" as the only relevant criterion.

---

[5] Defendants also rely on Judge Easterbrook's concurrence in *A.C.* Though Judge Easterbrook questioned sex's plain meaning, he nonetheless concluded "that *Adams* is closer to the mark in concluding that 'sex' in Title IX has a genetic sense, given that word's normal usage when the statute was enacted." *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023) (Easterbrook, J., concurring).

Perhaps recognizing that the ordinary meaning, statutory context, legislative history, and social background all point in one direction, Defendants contend that this Court need not decide what "sex" means as used in Title IX. Intervenors Br. at 16–17 n.19. Title IX's meaning is fundamental to Plaintiffs' claim and cannot be avoided.

**B.      Title IX prohibits "excluding" or "denying" based on sex in education programs or activities.**

Title IX prohibits "exclud[ing]" or "deny[ing]" "on the basis of sex" in "education program[s] or activit[ies]." 20 U.S.C. § 1681. Like "sex," these operative verbs—"exclude" and "deny"—have discernible ordinary meanings. To exclude means to "shut out," "hinder" an "entrance" into, or "bar … from participation, enjoyment, consideration, or inclusion." *Exclude*, Webster's Third New Int'l Dictionary 793 (1966). Similarly, to "deny" means to "turn down or give a negative answer to." *Id.* at 603. Thus, Title IX forbids schools from shutting out or hindering females from enjoying, participating in, or reaping educational benefits—including athletics.

Allowing male-bodied athletes to compete in events reserved exclusively for females both "excludes" girls and "denies" them the very benefits Title IX protects. In athletics, biological distinctions matter. "[I]t is neither myth nor outdated stereotype that there are inherent differences between those born male and those born female and that those born male … have physiological advantages in many sports." *Adams*, 57 F.4th at 819 (Lagoa, J., concurring) (citing *Re-Affirming the Value of the Sports Exception*, 27 DUKE J. OF GENDER L. & POL'Y at 87–88); *accord Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 739 (R.I. 1992) ("Because

17

of innate physiological differences, boys and girls are not similarly situated as they
enter athletic competition.").

In particular, "measurable physical differences between males and females
develop during puberty that significantly impact athletic performance." *Adams*, 57
F.4th at 819 (Lagoa, J., concurring) (citing Emma N. Hilton & Tommy R.
Lundberg, *Transgender Women in The Female Category of Sport: Perspectives
on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 200–
01 (2021)). "For example, in comparison to biological females, biological males have:
'greater lean body mass,' i.e., 'more skeletal muscle and less fat'; 'larger hearts,'
'both in absolute terms and scaled to lean body mass'; 'higher cardiac outputs';
'larger hemoglobin mass'; larger maximal oxygen consumption (VO2 max), 'both in
absolute terms and scaled to lean body mass'; 'greater glycogen utilization'; 'higher
anaerobic capacity'; and 'different economy of motion.'" *Id.* (citing *The Role of
Testosterone in Athletic Performance*, DUKE CTR. FOR SPORTS L. & POL'Y 1 (Jan.
2019)). "These physical differences cut directly to the main physical attributes that
contribute to elite athletic performance, as recognized by sports science and sports
medicine experts." *Id.* at 819–20 (cleaned up). Indeed, "studies have shown that
these physical differences allow post-pubescent males to 'jump (25%) higher than
females, throw (25%) further than females, *run (11%) faster than females*, and
*accelerate (20%) faster than females* on average." *Id.* at 820 (emphasis added) (citing
Jennifer C. Braceras, et al., *Competition: Title IX, Male-Bodied Athletes, and the
Threat to Women's Sports*, INDEP. WOMEN'S F. & INDEP. WOMEN'S L. CTR. 20 (2021)).

18

"As particularly relevant to this [case], such physiological differences exist in high school sports." *Id.* The "average high school athlete[ ] … would be eliminated from competition in the earliest rounds" if Title IX did not require some sports teams based on sex. *Id.* "For that matter, many biological girls may not even make the team, missing out on the key skills learned from participation in sports and missing out on key opportunities to further their education through higher education scholarships." *Id.*

From the beginning, Congress recognized that these average physiological differences mattered. Unlike Title VII, Title IX does not prohibit sex discrimination in general but in a specific context: education programs and activities—including sports. And in sports, males' physiological differences will allow them to "displace females to a substantial extent." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n,* 695 F.2d 1126, 1131 (9th Cir. 1982) (*Clark I*). That's why women's-only teams are part of "a long-standing tradition in sports of setting up classifications whereby persons having objectively measured characteristics likely to make them more proficient are eliminated from certain classes of competition." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979). Across the country, "athletics programs *necessarily* allocate[d] opportunities separately for [biological] male and female students." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) (*Cohen II*). As a result, under Title IX, an athlete's sex is not just "relevant"—it is determinative. *Contra Bostock*, 590 U.S. at 660.

The regulations enacted shortly after Title IX drove home this point. After enacting Title IX, Congress passed the Javits Amendment, which directed the

Department of Health, Education, and Welfare (the current Department of Education's predecessor) to make "reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). The Department issued the "sports exception" regulation the following year, permitting sex-segregated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). Under this exception, to prevent females from being excluded from sports altogether, Title IX *requires* sex-separation where male participation in events results in any exclusion or denial to female athletes. If female athletes are squeezed off teams or relegated to the back of the pack by "requiring [them] to prevail against men," then that barrier "foreseeably preclude[s] their future participation" in sports. *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 970 n.18 (9th Cir. 2010). That's what Title IX has always been understood to prohibit. *Letter to the Chief State School Officers*, *Title IX Obligations in Athletics*, U.S. Dep't of Educ. (Sept. 1975), https://bit.ly/3zNrFvq (stating a school would not comply with Title IX if it disbanded "its women's teams and opened up its men's teams to women, but only a few women were able to qualify for the men's teams").

Congress ratified this understanding in 1987, defining Title IX's educational programs to cover all educational programs, including sports. 20 U.S.C. § 1687(2)(A); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993) (*Cohen I*). This decision to "retain the relevant statutory text" is "convincing support" that Congress "accepted and ratified" the "unanimous precedent" endorsing sex-specific sports. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys.*

20

*Project, Inc.*, 576 U.S. 519, 536 (2015). "Indeed, the record of the floor debate leaves little doubt that the enactment was aimed, in part, at creating a more level playing field for female athletes. Congress thus confirmed the strong message it had sent when the regulations were first promulgated": the regulations "correctly reflected Congress' intent with regard to Title IX's application to athletics." Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ. SPORTS L. REV. 11, 23–24 (2003) (quoting *Cohen I*, 991 F.2d at 894) (cleaned up).  When given the opportunity to act otherwise, Congress left the Department's initial guidance intact—acknowledging that, to comply with Title IX's overarching command, educational institutions sometimes need to recognize biological distinctions to ensure equal access. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) ("[A] refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction.").

Defendants resist this straightforward reading with numerous arguments, but none overcome Title IX's plain text. Start with Defendants' contention that "physiological differences result from hormones, not from genetics or anatomy at birth." Intervenors Br. at 17. It is inappropriate to resolve such a factual dispute on a motion to dismiss. Moreover, Defendants' contention has no limiting principle. If the physiological differences result solely from hormones, then there's no reason men who identify as male with low testosterone levels should be excluded from women's sports. And, at the end of the day, it's just a red herring. It does not matter whether male advantages trace to hormones or genetics. What matters is that, as

alleged in the complaint, the male body *has* physiological advantages, such that allowing male-bodied athletes to compete in events reserved exclusively for females will unfairly exclude females.[6] That's what CIAC's Policy does, in violation of Title IX's plain prohibition.

At bottom, sex serves as "an accurate proxy" for athletic ability and performance, accounting for the "average real differences between the sexes." *Clark I*, 695 F.2d at 1131; *see Craig v. Boren*, 429 U.S. 190, 204 (1976). Defendants themselves recognize the benefit of sex-separated athletics. Otherwise, CIAC would not separate sports based on sex, nor would Intervenors defend so vigorously their ability to participate in women's sports particularly.

Defendants cannot avoid Plaintiffs' allegations by conjuring up hypothetical males who "receiv[e] puberty-delaying medication and … hormone therapy." Intervenors Br. 18. The Policy makes no such distinction. It allows males to participate in female athletics so long as they identify as female in "current school records and daily life activities." TAC ¶ 93. The Policy says nothing about testosterone levels or hormone therapy. So under CIAC's Policy, a male can part-icipate in female athletics based on "daily life activities." *Id.* That violates Title IX.

Most importantly, in contrast to these hypothetical males, there's no complaint allegation that the male athletes here received puberty-blocking medication or hormone therapy. *See id.* ¶ 69.

---

[6] Moreover, Defendants ignore evidence that "biological boys have a competitive advantage over biological girls *even before puberty*." *B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 568 (4th Cir. 2024) (Agee, J., concurring and dissenting in part). In any event, at the motion to dismiss stage, this Court must accept Plaintiffs' allegations and construe all inferences in their favor.

Finally, Defendants construct a straw man, claiming that Plaintiffs assume "that the lack of sex separation automatically violates Title IX and its athletic regulations." Intervenors Br. at 19. Not true. Though there is strong evidence that a lack of sex separation in athletics will generally deprive women of equal participation opportunities and therefore violate Title IX in most cases, Plaintiffs do not argue that it is always required. What they alleged is that sex separation was required here. When schools choose to separate sports based on sex—as CIAC undisputedly has—then the school must provide equal athletic opportunities to both sexes. Here, allowing male-bodied athletes to compete in female events to the exclusion of female athletes did not satisfy the statutory obligation to provide equal opportunities. Plaintiffs have alleged concrete harms they suffered because of unequal treatment. That is sufficient to state a claim under Title IX.

### C. Plaintiffs' concrete allegations show that CIAC's Policy discriminated against them on the basis of sex.

Plaintiffs' allegations concretely show how allowing two male-bodied high school athletes to participate in female athletics "shut[s] out" females from effective competition. Start with Chelsea. In 2017, Chelsea "would have had the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships"—but the Policy allowed Yearwood to compete against her and take this opportunity instead. TAC ¶ 107. Then, in 2018, Chelsea "would have won second place statewide," but lost to Yearwood and Miller to rank fourth instead. *Id.* ¶ 110. Moreover, in 2019, Chelsea claimed a silver medal at the State Class championship—but would have claimed a gold medal if the Policy did not permit Miller to compete against her. Finally, and most egregiously, but for the Policy,

Chelsea "would have made her school's history as the first female athlete … ever to be named State Open Champion." *Id.* ¶ 117. Instead, she finished behind Yearwood and Miller and "was repeatedly referred to in the press as the 'third-place competitor.'" *Id.* ¶ 119. Twice that year alone, Chelsea lost out on her "chance to be [a] champion[ ]." *McCormick*, 370 F.3d at 295. And overall, Chelsea lost four state championship titles, two All New England awards, medals, points, and publicity, all because the Policy allowed biological males to compete against her.

The other Plaintiffs have similar stories. In 2019, Alanna—even as a freshman—would have finished runner-up at a State Open Championship event; instead, the Policy caused her to finish third. TAC ¶ 124. And, but for the Policy, Ashley "would have advanced to the next level of competition in … [a] state championship … and competed for a spot at the State Open Championship." *Id.* ¶ 122. Likewise, in 2019, the Policy kept Selina from advancing beyond a preliminary race to the championship finals. *Id.* ¶ 114. In all three instances, the Policy allowed biological males to compete against Selina, Alanna, and Ashley and deprive them of the "thrill of victory." *Neal*, 198 F.3d at 773.

That Plaintiffs have sometimes defeated biologically male athletes does not mitigate the harm they suffered. Defendants make much of the fact that Plaintiffs occasionally won competitions against male-bodied athletes. To be sure, Plaintiffs are proud of that accomplishment—they were able to make up for the physiological disadvantage through skill, training, and hard work. But most of the time, they could not do it. And the point is that they never should have had to bridge that gap.

24

In any event, that's misleading for two reasons. To start, Title IX is concerned with whether females are afforded an opportunity to "compet[e] on an equal footing." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). Plaintiffs' "injur[ies] in fact ... [are] the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (cleaned up); *accord McCormick*, 370 F.3d at 284 (identifying the injury as "the opportunity to play for a team that can qualify for the Regional and State Championships" rather than obtaining such qualification). In discussing Plaintiffs' injuries here, the en banc Court explicitly acknowledged that "[i]n cases involving claims of discriminatory treatment, the alleged harm is frequently twofold: plaintiffs are discriminated against and that discriminatory treatment results in the denial of certain benefits that they would otherwise have enjoyed." *Soule*, 90 F.4th at 46. So even if Plaintiffs beat the odds on occasion, that does not remedy the discriminatory treatment they suffered along the way. (To say nothing of the emotional harms that stem from such treatment.) Title IX prohibits unfair treatment, not simply unfair outcomes.

Second, there *were* unfair outcomes here, too. That Plaintiffs *sometimes* won competitions against biological males says nothing about the numerous times they did not. These losses were not "a few discrete instances" but instead a predictable pattern. *Contra* Intervenors Br. at 10. Just consider the losses at the highest levels: Chelsea missed out on 14 first-place finishes due to unfair competition, and Selina lost one first-place finish and three second-place finishes. Unfair competition

prevented Alanna from earning two second-place finishes, while it kept Ashley from advancing to the next level of competition in at least two races. Even one of those losses would suffice to state a claim under Title IX. The statute does not contain the "no overall harm, no foul" view that Defendants advocate.

Defendants also attempt to reframe these concrete injuries as Plaintiffs wanting "more" or "guaranteed" victories. But that is not the gravamen of Plaintiffs' complaint. Title IX promised Plaintiffs equal opportunities to compete, and CIAC's Policy took that away from them by forcing them to compete against biological males. Plaintiffs fully understand that no female athlete is entitled to win. But every female athlete is entitled to fair competition. By subjecting Plaintiffs to unfair competition, CIAC's Policy effectively capped Plaintiffs' opportunities. Yet "[t]he boys are subject to no such ceiling. Treating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes." *McCormick*, 370 F.3d at 295. Plaintiffs seek to vindicate the rights Congress gave them over 50 years ago—nothing more, nothing less.

Finally, that Connecticut allows some "girls to play on boys' teams" does not change its obligations to Plaintiffs here. *Contra* Intervenors Br. 21. Girls who knowingly accept the risks that come with competing on boys' teams are not similarly situated to girls who compete in the spaces Title IX reserves solely for females. If males can on average "eliminate" females from equal competition, then allowing females to compete in male athletics does not threaten males' equal participation in athletics. There's no sex-based discrimination that would trigger

Title IX. Yet for the very same reason, if males can "displace females to a substantial extent," then permitting even one male to compete in a sport reserved for females will take "the goal of equal participation by females in interscholastic athletics" and "set [it] back, not advance[ ]" it. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) (*Clark II*).

Defendants cite only one case where a court required a school to allow boys to participate in a girls-only sports team. *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019). In that case, however, the Eighth Circuit stressed that in "*many sports*, single-sex teams can be justified if boys enjoy a competitive advantage over girls." *Id.* at 1003 n.3 (emphasis added). The problem in that case was the Minnesota sports league did not "present[ ] any evidence (and [did] not seem to seriously argue) that boys enjoy any competitive advantage over girls in dance." *Id. D.M.* says nothing about this case, where the average post-pubescent male can "run (11%) faster than females[ ] and accelerate (20%) faster than females." *Adams*, 57 F.4th at 820 (Lagoa, J., concurring).

Nor does the Fourth Circuit's recent decision in *B.P.J. ex rel. Jackson v. West Virginia State Board of Education,* 98 F.4th 542 (4th Cir. 2024). The male-bodied student there took "puberty blocking medication" and never experienced "male adolescent development." *Id.* at 564. In any event, *B.P.J.* was wrongly decided, and this Court should not repeat its errors.

"Given how biological differences affect typical outcomes in sports, ensuring equal opportunities for biological girls in sports requires that they not have to compete against biological boys." *Id.* at 571 (Agee, J., concurring and dissenting in

part). CIAC's Policy failed to do that—at Plaintiffs' expense. They have pled
concrete facts about their experiences that are "a quintessential example of why"
male-bodied athletes "participating in biological girls' sports" violates Title IX. *Id.*
Yearwood and Miller's "participation did exactly what" Title IX "was [enacted] to
prevent": Yearwood and Miller, two biological boys, "repeatedly took opportunities
away from biological girls." *Id.* Plaintiffs stated a claim under Title IX's plain text,
so this Court should deny Defendants' motions to dismiss.

## II.  **Plaintiffs have adequately pled facts that show CIAC's Policy violates regulatory guidance.**

Beyond Title IX's plain text, Plaintiffs have also pled claims that satisfy
decades of regulatory guidance. In 1974, Congress tasked the Secretary of Health,
Education, and Welfare with "prepar[ing] and publish[ing] … proposed regulations
implementing the provisions of Title IX … with respect to intercollegiate athletic
activities reasonable provisions considering the nature of particular sports." Pub. L.
No. 93-380, § 844, 88 Stat. 484 at 612. These regulations, now under the purview of
the Department of Education, set forth nonexclusive standards for an athletic
program's compliance with Title IX. They provide that "[n]o person shall, on the
basis of sex, be excluded from participation in, be denied the benefits of, be treated
differently from another person or otherwise discriminated against in any
interscholastic, intercollegiate, club or intramural athletics." 34 C.F.R. § 106.41(a).
The regulations allow recipients to separate athletics based on sex, but if they do so,
they must "provide equal athletic opportunity for members of both sexes." *Id.*
§ 106.41(c).

The Department's regulations include various ways to determine "whether equal opportunities exist." *McCormick*, 370 F.3d at 289. First, courts measure whether "the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). Alternatively, courts can look at a variety of factors—including the "[s]cheduling of games and practice time." *Id.* Plaintiffs have alleged concrete facts showing that, under the Department's guidelines, CIAC's Policy violates Title IX. Under either the "effective accommodation" or the "equal treatment" tracts, Plaintiffs have adequately pled Title IX violations.

### A.  CIAC's Policy does not effectively accommodate the interests and abilities of female athletes.

Under the Department's guidance, courts measure schools' compliance with Title IX based on whether the school "effectively accommodate[s] the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). Typically, effective accommodation claims focus on either "participation opportunities" or "competitive schedules and opportunities for men's and women's teams." *McCormick*, 370 F.3d at 301. Plaintiffs have alleged adequate facts to satisfy both.

*Participation opportunities*. Plaintiffs have alleged countless discrete instances where, due to CIAC's Policy, they were prevented from participating in athletic competitions that they otherwise would have been entitled to compete in. For instance, in 2017, absent unfair competition, Chelsea "would have had the nearly unprecedented opportunity to qualify as a freshman for the New England Regional Championships." TAC ¶ 107. Similarly, in 2019, Ashley "would have advanced to the next level of competition in … [a] state championship … and

competed for a spot at the State Open Championship." *Id.* ¶ 122. Likewise, Selina did not advance beyond a preliminary race to the championship finals due to unfair competition. *Id.* ¶ 114. In total, male-bodied athletes claimed 68 out of 108 advancement opportunities. *Id.* ¶ 127. CIAC's Policy failed to afford Plaintiffs adequate participation opportunities.

Defendants first argue that "participation opportunities" are limited to "the number of people participating on a team." Intervenors Br. at 26. But Defendants' cramped definition appears nowhere in the regulatory guidance. In fact, Department guidance makes clear that participation opportunities encompass more than raw numbers; "for an athlete to be counted" toward those raw numbers, the participation opportunities themselves must be "real, not illusory." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012) (quoting Letter from Norma V. Cantú, Assistant Sec'y for Civ. Rts., OCR, U.S. Dep't of Educ., to Colleagues, at 4 (Jan. 16, 1996) ("1996 Clarification")). Since regulatory guidance instructs courts to consider participation opportunities based on substance, Plaintiffs' allegations that discriminatory competition prevented them from "win[ning] a championship or advanc[ing] past the preliminary race" adequately satisfy their pleading burden. *Contra* Intervenors Br. at 26.

Defendants' argument tries to shift their own burden onto Plaintiffs. By attempting to limit the definition of "participation opportunities" to raw numbers, Defendants invoke the regulatory "safe harbors." *Biediger*, 691 F.3d at 93 (citing 1979 Policy Interpretation, 44 Fed. Reg. 71,413–18 (Dec. 11, 1979)). Yet it is Defendants' burden to show that they satisfy those safe harbors, *id.* at 99; *see also*

*Balow v. Mich. State Univ.*, 24 F.4th 1051, 1059 (6th Cir. 2022) ("In the types of cases at issue, schools, not plaintiffs, are the only parties who have access to the underlying Title IX data."), not Plaintiffs' pleading burden, *see Clark v. Hanley*, 89 F.4th 78, 93–94, (2d Cir. 2023) ("The pleading requirements of the Federal Rules of Civil Procedure do not compel a litigant to anticipate potential affirmative defenses … and to affirmatively plead facts in avoidance of such defenses."). And whether Defendants satisfy those safe harbors is a "fact-specific issue[ ] premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop the factual record." *Id.* at 94. Defendants cannot short-circuit the process by redefining what Plaintiffs have to plead.

      *Competitive opportunities.* Plaintiffs' allegations also show how CIAC's Policy did not afford them proper competitive opportunities. Under Department guidance, schools must "afford proportionally similar numbers of male and female athletes *equivalently advanced competitive opportunities.*" *McCormick*, 370 F.3d at 301 (emphasis added). CIAC's Policy does no such thing. As Plaintiffs' complaint documents, male-bodied athletes have inherent advantages over female athletes that prevent head-to-head competition from being "equivalent[ ]." So allowing biological males to compete in female athletics will largely displace female athletes from advancing to higher levels of competition and winning championships. As the Second Circuit held in *McCormick*, "the inability to compete in championship games … relates to competitive schedules/opportunities." *Id.* Plaintiffs concretely detailed numerous championship games that they would have competed in—and others they would have won—but for CIAC's Policy. That satisfies their pleading burden.

Defendants argue that girls have "*more* potential competitive opportunities … because they can choose to participate on boys' teams." Intervenors Br. at 27. That ignores the operative word in the Department's guidance: *competitive.* As Plaintiffs pled, boys on average will beat girls in anywhere from 10–50% of events. TAC ¶ 61. Male athletes will therefore win out in male events—and, under CIAC's Policy, in female events, too. That's precisely what happened to Plaintiffs. And it's exactly what Title IX forbids.

Similarly, Defendants attempt to shrink a recipient's obligations to provide equal accommodations to the provision of mere "opportunities." Intervenors Br. at 25. That ignores both the Department's guidance and courts' interpretation of it. In 1979, the Department explicitly stated that athletic programs' compliance with Title IX turns on "[w]hether the policies … are discriminatory in … effect." *McCormick*, 370 F.3d at 292. Schools must therefore provide "equal opportunity" not only in participation but in "levels of competition … which equally reflect [females'] abilities." 44 Fed. Reg. at 71,417–18. Again in 1996, the Department clarified that "the *quality* of competition offered to members of both sexes" factors into "whether an institution effectively accommodates the interests and abilities of its students." 1996 Clarification (emphasis added). Following this guidance, courts have looked at not only the opportunities that athletic programs provide but also the "*quality* of competition provided" and whether athletic opportunities "equally reflect[ ]" women's "abilities." *Roberts v. Colo. State Bd. of Ag.*, 998 F.2d 824, 829 (10th Cir. 1993) (emphasis added). Schools can "provid[e] sufficient opportunities for *participation*" and still fail to accommodate female athletics equally. *McCormick*,

370 F.3d at 301. Defendants cannot skirt their obligations by claiming that they provided opportunities. Those opportunities needed to be equal, and Plaintiffs have pled facts showing that they were not.

**B.   CIAC's Policy does not provide female athletes with equal treatment.**

Plaintiffs have adequately pled facts demonstrating that not only does CIAC's Policy fail to effectively accommodate female athletes, but it also fails to treat them equally. Title IX prohibits recipients from "[t]reating girls differently regarding a matter so fundamental to the experience of sports—the chance to be champions." *McCormick*, 370 F.3d at 295. Over the course of several seasons, CIAC's Policy allowed male-bodied athletes to win 13 out of 14 track-and-field championships. That disparity "sends a message to" females that "they are not expected to succeed and that" Defendants do "not value their athletic abilities as much as [they] value[ ] the abilities of boys." *Id.* That is unequal treatment under Title IX.

Defendants do not grapple with Plaintiffs' facts but instead attempt to shoulder Plaintiffs with proving legal theories at the motion-to-dismiss stage. That's wrong for at least two reasons. First, Plaintiffs' burden at this stage is to plead facts, not prove specific legal theories. *Roe v. St. John's Univ.*, 91 F.4th 643, 667 & n.5 (2d Cir. 2024) (Menashi, J., dissenting) (collecting cases). Those facts need only make out a plausible claim under the statute. Plaintiffs' complaint does that. *Supra* Argument § I.

Second, while the Department's regulations might show *some* ways that a recipient can violate Title IX, they "do not capture the full range of conduct that could lead to liability under Title IX." *Doe v. Samford Univ.*, 29 F.4th 675, 687 (11th

Cir. 2022). Defendants even admit that the Department's guidance is "non-exhaustive." Intervenors Br. at 21. A claim does not have to mirror a specific scenario provided in the guidance to allege a violation of Title IX, especially when the alleged conduct violates Title IX's text itself. After all, "the [Department of Education's] regulation[s] cannot override the statutory prohibition against discrimination on the basis of sex." *Grimm v Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618 (4th Cir. 2020), as amended (Aug. 28, 2020). To state a Title IX claim, Plaintiffs needed to show that they were "excluded from participation in an education program or activity, denied the benefits of this education, or otherwise were subjected to discrimination because of [their] sex." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 129 & n.21 (4th Cir. 2022) (en banc). They have done so, and that is all the Federal Rules require at this stage.

## III.   Plaintiffs adequately pled Title IX claims against Defendant schools.

Not only did CIAC violate Title IX through its Policy, but so too did Defendant schools. Defendant school districts attempt to avoid liability by hiding behind CIAC. But Defendant schools do not dispute that they are subject to Title IX, nor do they disown their Title IX obligation to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). They instead argue that they "have no way of knowing whether runners on other schools' teams are transgender," Def. Br. at 21, so they cannot be liable for something that CIAC's Policy allows other schools to do. Yet Defendant schools do not—cannot—claim that they were ignorant of CIAC's Policy, which is discriminatory on its face. If CIAC enacts a policy that does not provide equal athletic opportunity, then it is Defendant schools'

responsibility to provide some avenue that does. Otherwise, schools that receive federal funds could avoid Title IX simply by outsourcing athletic competitions to another entity and then washing their hands of anything that comes afterward. Such an ostrich-head-in-the-sand approach cannot immunize federal funding recipients from Title IX's obligations.

Moreover, Defendant schools neglect the control they exercise over CIAC itself. As Plaintiffs alleged, Defendant schools fund CIAC. TAC ¶¶ 23–24. They "actively work[ ] with and assist[ ] CIAC to schedule and organize interscholastic athletic competitions." *Id.* ¶ 34. Most importantly, "[e]ach Defendant board of education causes the schools and athletics programs under its authority to abide by the rules, regulations, and qualifications of CIAC concerning eligibility, competition rules, and tournament policies and procedures." *Id.* Defendant schools are thus far from the innocent bystanders they claim to be.

The Department found as much in its 2020 Enforcement Letter. With respect to each school, the Department's Office for Civil Rights concluded:

> [T]he participation of [Defendant schools] in athletic events sponsored by the CIAC … which resulted in [Plaintiffs] … competing against [male-bodied athletes], denied athletic benefits and opportunities to [Plaintiffs] and other female student athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(b). … [Defendant schools] placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. … [Defendant schools'] obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC.

Off. Of Civ. Rts., U.S. Dep't of Educ., *Revised Letter of Impending Enforcement*

*Action* (Aug. 31, 2020).[7]

Defendant schools chose to provide athletic opportunities through events subject to CIAC's discriminatory Policy. That choice caused Plaintiffs to compete unfairly against and lose to male-bodied athletes in races they otherwise would have won. As recipients of federal funding, Defendant schools had an obligation to ensure Plaintiffs' athletic events were qualitatively equal to male athletics. They persisted in doing the opposite. Plaintiffs have therefore stated a claim under Title IX against Defendant schools.

## IV. Defendants had adequate notice that their discriminatory Policy violated Title IX.

Plaintiffs' complaint requests nominal damages to compensate them for the injuries they suffered due to CIAC's illegal Policy. CIAC and its member schools argued that they lacked notice that their conduct violated Title IX, so any damage remedy is inappropriate. But Defendants' argument misses the mark.

### A. Official policies—like athletic eligibility rules—always represent intentional conduct not subject to any notice requirement.

Congress enacted Title IX pursuant to its spending authority. "In *Pennhurst State School and Hospital v. Halderman*, the [Supreme] Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was unintentional." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74 (1992) (cleaned up); *accord Mansourian*, 602 F.3d at 966 (*Pennhurst* "precludes the

---

[7] Although the Department has since withdrawn this letter, it did so based on procedural, not substantive, reasons. The letter shows that Plaintiffs' claims are plausible—all that is required at this stage.

award of damages for unintentional violations of statutes, like Title IX, enacted pursuant to Congress's spending authority"). Thus, in some private rights of action under Title IX, the Court has held that "a damages remedy will not lie … unless an official who … has authority to address the alleged discrimination and to institute corrective measures … has actual knowledge of discrimination … and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

But "pre-litigation notice of an alleged violation" is not "a prerequisite to recovery in every Title IX case." *Mansourian*, 602 F.3d at 967. Prelitigation notice is needed only "in cases … *that do not involve official policy of the recipient entity*." *Gebser*, 524 U.S. at 290 (emphasis added); *accord, e.g.*, *Mansourian*, 602 F.3d at 967 ("Proof of actual notice is required only when the alleged Title IX violation consists of an institution's deliberate indifference to acts that do not involve official policy of the [institution]." (cleaned up)). When an educational institution "intentionally violates" Title IX, the notice "limitation on private damages actions is not a bar to liability." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005).

And "[schools'] decisions with respect to athletics are … easily attributable to the [institution] and [are] always—by definition—intentional." *Mansourian*, 602 F.3d at 968 (quoting *Jackson*, 544 U.S. at 183); *accord Pederson v. La. State Univ.*, 213 F.3d 858, 882 (5th Cir. 2000) (holding that the notice requirement "is not applicable for purposes of determining whether an academic institution intentionally discriminated on the basis of sex by denying females equal athletic opportunity"). "Institutions, not individual actors, decide how to allocate resources

37

between male and female athletic teams. Decisions to create or eliminate teams or to add or decrease roster slots for male or female athletes are official decisions, not practices by individual students and staff." *Mansourian*, 602 F.3d at 968.

So, too, are decisions to allow biological males to compete in girls' events. That decision reflects CIAC's official position. Like all other official athletic policies, it bears an institutional imprimatur. It did not arise by accident, nor was it enacted by "individual students [and] staff." *Id.* Unlike sexual harassment cases—where an educational institution might not know about the actions of its individual agents— here it was CIAC itself that adopted the discriminatory Policy. This athletic decision that "fail[s] effectively to accommodate students of both sexes thus represent[s] 'official policy of the recipient entity' and so [is] not covered by *Gebser*'s notice requirement." *Mansourian*, 602 F.3d at 968 (quoting *Gebser*, 524 U.S. at 290).

So "the Supreme Court has already answered the question: Official policies of recipients of federal funds qualify as intentional conduct under Title IX." *Soule*, 90 F.4th at 59 (Menashi, J., concurring). Three circuits—the Fifth, Ninth, and Tenth— have "held, in the Title IX context, that the official acts—including policies—of a recipient of federal funds qualify as intentional conduct and are not subject to a further *Pennhurst* notice requirement." *Id.* at 60 (collecting cases). By intentionally enacting a discriminatory Policy, Defendants have failed "effectively to accommodate students of both sexes." *Mansourian*, 602 F.3d at 968. A "notice problem does not arise in a case such as this, in which intentional discrimination is alleged." *Jackson*, 544 U.S. at 182–83. "Title IX itself" supplies "sufficient notice." *Id.* at 183.

CIAC's Policy represents official conduct that "violates the clear terms of the statute." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). *Pennhurst* does not bar Plaintiffs from recovering nominal damages.

## B.     Title IX's clear terms provide notice.

Even if athletic policies like CIAC's require clear notice, Defendants had it. Congress explicitly tied Title IX funding to recipients agreeing not to discriminate against students based on sex. 20 U.S.C. § 1681(a). And recipients have been on notice for over four decades that nondiscrimination under Title IX means ensuring equal athletic opportunities and benefits for girls, as well as effectively accommodating girls' athletic abilities. 34 C.F.R. § 106.41. These obligations flow from Title IX's "clear terms." *Davis*, 526 U.S. at 642; *supra* Argument § I.

Notice isn't defeated if intentional conduct produces "unprecedented" results. The Supreme Court's "cases since *Cannon*, such as *Gebser* and *Davis*, have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183. In *Jackson*, for instance, a teacher sued his school system under Title IX, alleging that the school had retaliated against him after he reported sex discrimination. The school tried to argue that it lacked notice that such retaliation would violate Title IX, but the Supreme Court admonished that "the [school] should have been put on notice" that its intentional conduct violated Title IX because the Court had "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Id.* at 183.

To get around this clear statement of law, CIAC and its member schools dress up a merits argument as a notice problem. They cannot argue that the Policy represents unintentional action. After all, "[schools'] decisions with respect to athletics are … easily attributable to the [institution] and [are] always—by definition—intentional." *Mansourian*, 602 F.3d at 968 (quoting *Jackson*, 544 U.S. at 183); *accord Pederson*, 213 F.3d at 882. So Defendants instead argue that, even though their *conduct* was intentional, its discriminatory *effects* were not—and because the *effects* were unintentional, CIAC and the member schools lacked sufficient notice that their *conduct* violated Title IX.

But the Supreme Court has consistently rebuffed that argument. *Jackson* is again illustrative. There, the school system tried to argue that, even though its conduct—retaliation—was intentional, any ensuing discrimination was not. Although the school presented this argument as a notice issue, the Supreme Court rejected that characterization. For notice purposes, the Court reaffirmed that, so long as the school's conduct was intentional, it had sufficient notice that it could face liability under Title IX—regardless of whether that conduct's *effects* were intentional. "Funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when we decided *Cannon*." *Jackson*, 544 U.S. at 182.

Supposed guidance from the Department of Education cannot undo the notice that the statute itself provides. A statute's ordinary public meaning remains intact until Congress amends the statute. *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019). Numerous congressional attempts to change Title IX's

text to include "sexual orientation" and "gender identity" have fallen flat. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).[8] Indeed, Congress ratified the very opposite when it approved earlier Department guidance in 1987. No newfound guidance from the Department can achieve through "administrative fiat" what Congress has failed to do through legislation. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 372 (N.D. Tex. 2021).

Nor does *Bostock* say anything to the contrary. *Bostock*'s "text-driven reasoning applies only to Title VII." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). The Court made clear that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. *Bostock*, 590 U.S. at 681; *accord Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir, 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.").

For good reason. *Bostock*'s analysis does not work under Title IX. *Bostock* focuses on Title VII, which "is a vastly different statute" than Title IX. *Jackson*, 544 U.S. at 168; *accord Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects."). The differences start with the statutes' respective texts. Title VII prohibits discrimination in "employment practice[s]" "because of … sex," 42 U.S.C. § 2000e-2(a), while Title IX prohibits discrimination "under any education program" "on the basis of sex," 20 U.S.C.

---

[8] By contrast, Congress *has* enacted hate-crimes legislation with enhanced penalties for crimes motivated by "sexual orientation" or "gender identity." 18 U.S.C. § 249(a)(2); 34 U.S.C. § 12291(b)(13)(A) (prohibiting discrimination in certain funding programs based on "sexual orientation" and "gender identity," separately from "sex").

§ 1681(a). *Bostock* concluded that "because of … sex" means but-for causation, but "on the basis of sex" doesn't mean the same thing—or impose the same laxer causation standard. *Neese*, 640 F. Supp. 3d at 679. Instead, "on the basis of sex" means that biological sex must be the sole reason for the discrimination. *Kouambo v. Barr*, 943 F.3d 205, 211 (4th Cir. 2019) (noting that use of "the" article implies a singular object).

Moreover, the statutes have two very different contexts, and in "law as in life," context matters. *Yates v. United States*, 574 U.S. 528, 537 (2015); *accord id.* at 555 (Kagan, J., dissenting). "[T]he same words, placed in different contexts, sometimes mean different things." *Id.* at 537. Whereas Title VII focuses on hiring and firing in the workplace, Title IX targets "education program[s] or activit[ies]." 20 U.S.C. § 1681(a). In short, Title IX deals with "schools and children," *Adams*, 57 F.4th at 808, and the Supreme Court has long recognized that "schools are unlike the adult workplace," *Davis*, 526 U.S. at 651.

Title VII and Title IX also handle sex distinctions differently. Under Title VII, sex "is not relevant to the selection, evaluation, or compensation of employees"—ever. *Bostock*, 590 U.S. at 660 (cleaned up). So when an employer takes an adverse action, "if changing the employee's sex would have yielded a different choice by the employer[,] a statutory violation has occurred." *Id.* 559–60. Conversely, to comply with Title IX, schools often "*must* consider sex." *Meriwether*, 992 F.3d at 510 n.4. "Unlike most employment settings, athletic teams are gender segregated[.] … As a result, determining whether discrimination exists in athletic programs *requires* gender-conscious, group-wide comparisons." *Neal*, 198 F.3d at

773 n.8. Congress even "specifically directed the agency in charge of administering Title IX to issue, with respect to 'intercollegiate athletic activities,' regulations containing 'reasonable provisions considering the nature of particular sports.'" *Kelley v. Bd. of Trustees*, 35 F.3d 265, 270 (7th Cir. 1994). And Title IX's text allows schools to consider sex in a way that Title VII's does not. Title IX contains a rule of construction, 20 U.S.C. § 1686, which makes clear that the statute is not blind to differences between the sexes. Because the statute cannot "be construed to prohibit … separate living facilities for the different sexes," *id.*, the statute cannot require the principle from *Bostock*.

In other words, though sex has no "relevan[ce] to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660 (cleaned up), it "is *not* an irrelevant characteristic" in sports, *Cohen II,* 101 F.3d at 178 (emphasis added). Without sex separation in sports, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape*, 563 F.2d at 795 (per curiam). Unlike in employment, in athletics, a male is not "materially identical in all respects" to a female, no matter the gender each may identify. *Contra Bostock*, 590 U.S. at 660. So courts should not take "principles announced in the Title VII context [and] automatically apply [them] in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4.

Court cases dealing with restroom access do not alter Title IX's clear terms. "[B]athrooms are not athletic competitions." *Soule*, 90 F.4th at 63 (Menashi, J., concurring). And the distinction between the two "is important." *Id.* at 64 (Menashi, J., concurring) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 468–69

(1985) (Marshall, J., concurring and dissenting in part) ("A sign that says 'men only' looks very different on a bathroom door than a courthouse door.")).

Defendants argue that the Supreme Court's language in *Davis* about "clear terms" bestows a lesser form of qualified immunity on funding recipients. That's mistaken. In *Davis*, the Supreme Court said that "a recipient may be held liable to third-party beneficiaries for intentional conduct that violates the clear terms of the relevant statute, … but not for its failure to comply with vague language describing the objectives of the statute." *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) (citing *Davis*, 526 U.S. at 642). Defendants cannot twist those words into a qualified-immunity-like shield. *Soule*, 90 F.4th at 54 (en banc); *id.* at 61 (Menashi, J., concurring) ("The 'clear terms' language is satisfied if the statutory language creates enforceable legal rights; a plaintiff need not demonstrate that the rights are 'clearly established' and that reasonable officials 'would have known' about those rights."). Here, Plaintiffs don't rely on vague objectives within Title IX but instead on its very words, which "make[ ] clear that … students must not be denied access to educational benefits and opportunities on the basis of" sex. *Davis*, 526 U.S. at 650. Any notice that Defendants needed, Title IX gave them long ago.

Moreover, "[w]here Congress has explicitly directed the courts to create and administer a private right of action, judicial determination of the rules governing the scope of liability is itself, in effect, a clear statement by Congress." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003). CIAC accepted federal funds "with the knowledge that the rules for [Title IX] liability will be subject to judicial determination." *Id.* The Fourth Circuit rejected a school board's similar argument in

concluding that *Pennhurst* did not bar damages in a transgender student's lawsuit about restroom facilities. *Grimm*, 972 F.3d at 619 n.18 ("Title VII has repeatedly produced unexpected applications[.] … So too Title IX. And the Board knew or should have known that the separate facilities regulation did not override the broader statutory protection against discrimination.").

In fact, if conflicting regulatory guidance makes anything clear, it's that courts will ultimately resolve the scope of CIAC's liability. *Soule*, 90 F.4th at 62 (Menashi, J., concurring) ("That the CIAC was subject to conflicting guidance from the Department of Education … made clear that the issue implicated Title IX and would ultimately be decided by a court.").

## CONCLUSION

For the reasons set forth above, this Court should deny Defendants' respective motions to dismiss.

Respectfully submitted this May 3, 2024.

*s/ Cody S. Barnett*

| | |
|---|---|
| Susan Patton Fox | Roger Greenwood Brooks* |
| CT Bar number 306599, | CT Fed. Bar No. PHV10498 |
| CT Fed. Bar No. 20937 | ALLIANCE DEFENDING FREEDOM |
| SUSAN PATTON FOX LAW OFFICES | 15100 N. 90th Street |
| PO Box 3483 | Scottsdale, AZ 85260 |
| Tequesta, FL 33469 | Telephone: (480) 444-0020 |
| Telephone: (860) 304-9979 | Fax: (480) 444-0028 |
| Email: susanfoxlaw@aol.com | Email: rbrooks@adflegal.org |

*Counsel for Plaintiffs Selina Soule, Chelsea Mitchell, Alanna Smith, and Ashley Nicoletti*

Cody S. Barnett*
CT Fed. Bar No. PHV207825
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Fax: (571) 707-4656
Email: cbarnett@adflegal.org

Christiana M. Kiefer*
CT Fed. Bar No. PHV10493
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Fax: (202) 393-8690
Email: ckiefer@adflegal.org

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2024, a copy of the foregoing Response in

Opposition to Motion to Dismiss was filed electronically with the Clerk of Court.

Service on all parties will be accomplished by operation of the court's electronic

filing system.


                                                 /s/ *Cody S. Barnett*
                                                Attorney for Plaintiffs