UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SELINA SOULE,                    :
CHELSEA MITCHELL,                :
ALANNA SMITH,                    :
ASHLEY NICOLETTI,                :
                                 :
     Plaintiffs,                 :
                                 :
v.                               :   Case No. 3:20-CV-00201(RNC)
                                 :
CONNECTICUT ASSOCIATION OF       :
SCHOOLS d/b/a CONNECTICUT        :
INTERSCHOLASTIC ATHLETIC         :
CONFERENCE,                      :
BLOOMFIELD PUBLIC SCHOOLS BOARD  :
OF EDUCATION,                    :
CROMWELL PUBLIC SCHOOLS BOARD    :
OF EDUCATION,                    :
GLASTONBURY PUBLIC SCHOOLS       :
BOARD OF EDUCATION,              :
CANTON PUBLIC SCHOOLS BOARD OF   :
EDUCATION,                       :
DANBURY PUBLIC SCHOOLS BOARD OF  :
EDUCATION,                       :
                                 :
Defendants.                      :

RULING AND ORDER

I.

This is an action under Title IX of the Education
Amendments of 1972, 20 U.S.C. §§ 1681-1688, which provides, "No
person in the United States shall, on the basis of sex, be
excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any education program or
activity receiving Federal financial assistance." 20 U.S.C. §
1681(a). The case involves the transgender participation policy

of the Connecticut Interscholastic Athletic Conference ("CIAC"), the governing body for high school athletics in Connecticut. Under the CIAC policy, transgender students are eligible to participate on sex-separated sports teams consistent with "the gender identification of [the] student in current school records and daily life activities in the school." This case arises from the defendants' adherence to the policy in the context of girls' high school track competitions despite complaints by the plaintiffs, their parents, and others that two transgender girls were winning races and qualifying for higher levels of competition at the expense of biological girls. Following en banc proceedings in the Court of Appeals, the case has been remanded for a determination of whether the plaintiffs can state a plausible claim for relief under Title IX. See Soule v. Connecticut Assoc. of Schools, Inc., 90 F. 4th 34, 54 (2d Cir. 2023).

Since the remand, a second amended complaint has been filed by agreement of the parties (the "Amended Complaint"), and the defendants have again moved to dismiss the action in its entirety. The defendants contend that the plaintiffs' allegations as amended still fail to show a violation of Title IX, the plaintiffs' home schools have no legal liability under Title IX, and the plaintiffs' claims for monetary relief are barred by the clear-notice requirement of Pennhurst State School

& Hospital v. Halderman, 451 U.S. 1 (1981).  At oral argument on
the motions to dismiss, plaintiffs' counsel clarified that the
plaintiffs are not seeking compensatory damages.

For reasons discussed below, I conclude that the
allegations of the Amended Complaint, accepted as true and
construed favorably to the plaintiffs, provide the basis for a
disparate-treatment claim within the scope of Title IX's implied
private right of action; the plaintiffs' home schools are
potentially liable for subjecting the plaintiffs to
discrimination under their athletic programs in violation of
Title IX; and the impact of Pennhurst on the plaintiffs' ability
to obtain nominal damages, attorneys' fees and costs cannot be
determined at this time as a matter of law.  Accordingly, the
motions to dismiss are denied.

II.

Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to
state a claim for relief, a complaint must contain "a short and
plain statement of the claim showing that the pleader is
entitled to relief."  A "claim" is comprised of elements that
must be proven for the plaintiff to establish entitlement to
relief.  The elements are derived from the substantive law that
establishes the parties' legal rights and duties.

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief may be granted, as the defendants do here.  The purpose of a Rule 12(b)(6) motion is to test whether the complaint adequately alleges the elements of a claim on which some form of relief may be granted by the court.  A motion under Rule 12(b)(6) does not provide a vehicle for resolving disputes between the parties with regard to the facts or legal merits of the plaintiff's case.  Rather, the motion only tests whether the allegations provide the plaintiff with a sufficient basis to litigate the case beyond the pleading stage.

In determining whether a Rule 12(b)(6) motion should be granted,

> [T]he only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor . . . . [T]he facts a plaintiff alleges in the complaint may turn out to be self-serving and untrue.  But a court at this stage of [a] proceeding is not engaged in an effort to determine the true facts . . . . If the complaint is found to be sufficient to state a legal claim, the opposing party will then have ample opportunity to contest the truth of the plaintiff's allegations and to offer its own version.

Doe v. Columbia Univ., 831 F. 3d 46, 48 (2d Cir. 2016) (hereinafter "Doe").

"[T]o survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

4

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  A claim is plausible if the allegations allow the court to reasonably conclude that the defendant may have engaged in the alleged wrongdoing.  Accordingly, although a complaint may not be dismissed merely because the court thinks the case is factually doubtful, the plausibility standard does require the court to consider how likely it is that the alleged wrongdoing actually occurred.  A remote possibility that the conduct could have occurred is insufficient, but the court need not find it probable that the wrongdoing did occur.  In practical terms, if the allegations are believable, the plausibility standard is met.

III.

<u>Factual Background</u>

The Amended Complaint alleges the following.  CIAC adopted its transgender participation policy "sometime before 2017." ECF 201 ¶ 92.  Andraya Yearwood, a transgender girl, began competing in girls' track in 2017 consistent with CIAC's transgender participation policy.  Yearwood won the Class M State Championship in the 100m and 200m events in May.  <u>Id.</u> ¶ 102, Tables 7-8.  Yearwood advanced to the 2017 State Open Women's Track Competition, displacing Chelsea Mitchell from

qualifying, and ultimately won third in the 100m event.  Id. ¶ 107, Table 9.[1]

In February 2018, Chelsea Mitchell's mother sent a complaint letter to the CIAC's executive director, the first documented complaint regarding the transgender participation policy.  Id. ¶ 170.  She and Selina Soule's mother subsequently met, or requested to meet, with representatives of the CIAC and their daughters' home schools to voice their concerns about unfair competition.  Id. ¶ 171.

During the Spring 2018 track season, another transgender girl, Terry Miller, also began competing in girls' track.  Miller and Yearwood placed first and second, respectively, in the women's 100m event at the 2018 Outdoor State Open; if not for their participation, Mitchell would have won second place statewide.  Id. ¶ 110.  Miller also won the women's 200m event.  Id. ¶ 111.[2]

---

[1] Plaintiffs seek revision of records of 2017 races as follows: the record of one race at the Middletown Invite, in which Yearwood finished ahead of Selina Soule; the records of three races at the Connecticut State Open (Outdoor), in which Yearwood finished ahead of Mitchell; the record of one race at the New England Regionals (Outdoor), in which Yearwood also finished ahead of Mitchell; and two records from the Old Saybrook Qualifier, in which Yearwood finished ahead of Mitchell.  See ECF 201-1 at 2.

[2] Plaintiffs seek to have twenty records from 2018 races revised: three from the Connecticut Championship (Indoor), in which Yearwood finished ahead of Mitchell; one from the Connecticut State Open (Indoor), in which Yearwood finished ahead of Mitchell; three from the Bristol Invite, in which Yearwood and Miller finished ahead of Mitchell or Soule or both; three from the Middletown Invite, in which Yearwood and Miller finished ahead of Soule; two from the Greater Hartford Invite, in which Miller finished ahead of Soule; three from the Connecticut State Open (Outdoor), in one of which Miller and Yearwood finished ahead of Mitchell, in one of which Miller and Yearwood finished ahead of Mitchell and Soule, and in one of which Miller finished

In 2019, more parents sent emails to CIAC complaining about the policy.  Id. ¶ 172.  The Amended Complaint does not allege how many parents complained or when they did so.  Construing the allegations in plaintiffs' favor, I infer that emails were sent to CIAC by more than a few parents at various times throughout the year.

In February 2019, at the 2019 State Indoor Open, Miller and Yearwood finished first and second, respectively, in both the preliminary and final women's 55m event.  Id. ¶ 112.  Had they not competed, Mitchell would have won the final, becoming the first female athlete and the first track athlete from her high school to be named a State Open Champion.  Id. ¶ 117.  In addition, Soule would have advanced to the next stage of competition.  Id. ¶ 114.  Shortly thereafter, in March 2019, Mitchell's mother sent the CIAC a third complaint letter.  Id. ¶ 175.

In May 2019, in the Class S preliminary 100m event, Mitchell, Miller, and Yearwood finished first, second, and third, respectively.  Id. Table 13.  In the final, Miller and Yearwood won first and third, respectively, and Mitchell won second.  Id. Table 14.  Had Yearwood and Miller not competed,

---

ahead of Mitchell and Soule and Yearwood finished ahead of Soule; two from the New England Regionals (Outdoor), in which Miller finished ahead of Mitchell and Soule in one and just Mitchell in the other; and three from the Hillhouse Invitational, in which Miller finished ahead of Soule.  See ECF 201-1 at 2-3.

Mitchell would have placed first and been named State Champion. Id. ¶ 123.  In June 2019, Miller won the State Open Championship 200m final; Alanna Smith won third and Chelsea Mitchell fourth. Id. Table 15.[3]

In late June 2019, plaintiffs filed a complaint with the U.S. Department of Education ("DOE") Office of Civil Rights ("OCR"), which is responsible for enforcing DOE's regulations for athletic programs.  They wanted OCR to take action to prevent Yearwood and Miller from competing in girls' track in the 2020 spring season.  In October, OCR notified the defendants that it had initiated a formal investigation.  Id. ¶ 176.  But OCR took no further action in advance of the 2020 spring season, so the plaintiffs brought this case.

---

[3] Plaintiffs seek to have eighteen records from 2019 races revised:  two from the CCC Conference Championship (Indoor), in which Miller finished ahead of Soule; two from the CT Championship (Indoor), in one of which Miller finished ahead of Soule and in one of which Miller and Yearwood finished ahead of Mitchell; two from the Connecticut State Open (Indoor), in one of which Miller and Yearwood finished ahead of Mitchell and Soule and in the other they finished ahead of Mitchell; two from New England Regionals (Indoor), in which Miller and Yearwood finished ahead of Mitchell; two from the New York Relays, in which Miller finished ahead of Alanna Smith; two from the Greater Hartford Invite, in which Miller finished ahead of Mitchell and Soule; three from the Connecticut Championship (Outdoor), in one of which Miller and Yearwood finished ahead of Nicoletti, in one of which Miller finished ahead of Mitchell, and in one of which Miller finished ahead of Mitchell and Nicoletti; two from the Connecticut State Open (Outdoor), in one of which Miller finished ahead of Nicoletti and Mitchell and in one of which Miller finished ahead of Mitchell, Smith, and Soule and Yearwood finished ahead of Soule; and one from the New England Regionals (Outdoor), in which Miller finished ahead of Smith and Mitchell.  See ECF 201-1 at 4-5. They seek to have six records from 2020 revised: two from the Elm City Coaches Invite, in which Miller finished ahead of Soule; two from the Shoreline Coaches Invitational, in which Yearwood finished ahead of Mitchell; and two from the CCC Conf. Championship (Indoor), in which Miller finished ahead of Soule. See ECF 201-1 at 5.

In addition to alleging the foregoing chronology of events, the Amended Complaint alleges that the defendants' conduct negatively impacted the plaintiffs by conveying the dispiriting message that their interests and aspirations as student athletes were less worthy of protection than those of their male counterparts on the boys' team.

The Amended Complaint further alleges, either explicitly or by fair implication, that when the plaintiffs or their parents complained to the defendants, the response they received was dismissive at best. For example, a representative of CIAC told Chelsea Mitchell's mother that further complaints on her part would receive no response and school officials admonished Chelsea herself to stop complaining.

Finally, the Amended Complaint alleges that there has been a long history of systematic discrimination against women and girls in high school athletics in Connecticut. Construed most favorably to the plaintiffs, this allegation implies that the defendants would have responded differently if similar complaints about unfair competition had been made by and on behalf of boys.

IV.

Procedural History

In February 2020, Soule, Mitchell and Smith brought this action under Title IX against CIAC, the Boards of Education of

9

their home schools (Glastonbury, Canton, and Danbury) and the
Boards of Education of the schools attended by Yearwood and
Miller (Bloomfield and Cromwell).  All five schools are members
of CIAC and abide by the transgender participation policy.

In their original complaint, the plaintiffs claimed that by
permitting Yearwood and Miller to compete in girls' track, the
defendants were denying biological girls opportunities to
participate in fair and equal athletic competition in violation
of Title IX and 34 C.F.R. § 106.41(c).[4]  They requested a
preliminary injunction to prevent Yearwood and Miller from
competing in events scheduled to take place during the 2020
spring season.

Soon after the complaint was filed, the 2020 spring season
was suspended indefinitely due to the COVID-19 pandemic.  An
amended complaint was subsequently filed, adding then-sophomore
Ashley Nicoletti as a plaintiff.  Yearwood, Miller, and the
Connecticut Commission on Human Rights and Opportunities were
granted leave to intervene as defendants.  As expected, the
pandemic led to cancellation of the spring season, after which
further proceedings in this case were stayed by agreement.

Once the stay was lifted, the defendants moved to dismiss
the complaint in its entirety for lack of subject matter

---

[4] The regulations are set forth in full later in this ruling.

jurisdiction and failure to state a claim.  In April 2021, the motion was granted for the following reasons: (1) the plaintiffs' request for an injunction was moot, as Soule, Mitchell, Yearwood and  Miller had all graduated and the remaining plaintiffs could not identify other transgender students against whom they were likely to compete; (2) the plaintiffs' claims for compensatory damages were barred by the clear-notice requirement of Pennhurst; and (3) the plaintiffs lacked standing to seek an injunction requiring the defendants to revise records of events in which the plaintiffs competed against Yearwood and Miller.  See Soule v. Connecticut Assoc. of Schools, Inc., No. 3:20-cv-201(RNC), 2021 WL 1617206 (April 23, 2021).

On appeal, the plaintiffs argued that their challenge to the CIAC policy should be adjudicated on the merits because injuries they sustained as a result of the policy could be redressed through revision of records of races in which Yearwood and Miller were permitted to run.  The panel that heard the appeal affirmed the judgment dismissing the complaint.  See Soule v. Connecticut Assoc. of Schools, Inc., 57 F. 4th 43 (2022).  But the appeal was reheard en banc and the judgment was reversed.  See Soule v. Connecticut Assoc. of Schools, 90 F. 4th 34 (2023).  The en banc Court concluded that the plaintiffs' alleged injuries are sufficient to provide them with standing to

sue in federal district court.  The case was remanded for a determination of whether the defendants' adherence to the policy during the years Yearwood and Miller participated in girls' track provides the plaintiffs with a viable claim under Title IX and, if it does, whether they can obtain monetary relief from the defendants.

V.

Overview of Applicable Law

    A.  Title IX

Title IX is derived from the substantive provisions of Title VI of the Civil Rights Act of 1964, which bans racial discrimination in programs that are supported by federal funds. See Doe, 831 F. 3d at 48 (Congress enacted Title IX "to supplement the Civil Rights Act of 1964's ban on racial discrimination in the workplace and in universities.")(citing Yusuf v. Vassar Coll., 35 F. 3d 709, 714 (2d Cir. 1994)). Accordingly, "courts have interpreted Title IX by looking to the body of case law developed under Title VI, as well as the case law interpreting Title VII," which prohibits discrimination in employment.  Yusuf, 35 F. 3d at 714.  The Supreme Court has held that, like the Equal Protection Clause of the Fourteenth Amendment, Title VI "prohibits only intentional discrimination." Alexander v. Sandoval, 532 U.S. 275, 280 (2001).  Therefore, the same limitation applies to Title IX.

B. Implementing Regulations for Athletics

In enacting Title IX, Congress directed federal agencies that distribute education funding to "issue[] rules, regulations or orders of general applicability" to ensure that aid recipients adhere to the statute's nondiscrimination mandate. See Gebser v. Lago Vista Indep. Sch. Dist., 534 U.S. 274, 280 (1998). Title IX's passage provoked a reaction regarding its potential impact on athletics, with some opponents arguing that the law's nondiscrimination mandate did not encompass athletics.[5] As a result, Congress adopted the Javits Amendment of 1974, which specifically directed the Secretary of Health, Education, and Welfare (HEW) to "prepare and publish . . . proposed regulations implementing the provisions of Title IX . . . with respect to intercollegiate athletic opportunities [making] reasonable provisions concerning the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).[6] In 1975, following an extensive public notice-and-comment process, HEW published its final

---

[5] See Wyatt Honse & Jayma Meyer, Title IX's "Substantial Proportionality" Test: Old Challenges and New Debates In Assessing Whether a School Provides Equal Opportunity to Participate in Athletics, 33 MARQ. SPORTS L. REV. 83, 95-96 (2022)(recounting passage of Title IX and early debates over its scope); see also Paul M. Anderson, Title IX at Forty: An Introduction and Historical Review of Forty Legal Developments that Shaped Gender Equity Law, 22 MARQ. SPORTS L. REV. 325, 329-30 (2012); Diane Heckman, Women & Athletics: A Twenty Year Retrospective On Title IX, 9 U. MIAMI ENT. & SPORTS L. REV. 1, 11-12 (1992).
[6] Authority to promulgate regulations pertaining to athletics was transferred to DOE in 1979 when HEW was split into the DOE and the Department of Health and Human Services. See Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 669 (1979).

regulations for Title IX, which included regulations for athletics programs.  See North Haven Bd. Of Ed. V. Bell, 456 U.S. 512, 530, 531 n.22 (1982).  Congress allowed the regulations to go into effect after an opportunity for review and objection.  See id. at 530.

Echoing Title IX's ban on sex discrimination, the regulations for athletics provide:

(a)  General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

The sex-blind approach mandated by subsection (a) is subject to the following exception, which enables schools to offer sex-separated teams in the interest of fair competition and safety:

(b)  Separate teams.  Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.  However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport is a contact sport.  For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the

purpose or major activity of which involves bodily contact.

The regulations further provide:

(c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes.  In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2) The provision of equipment and supplies;
(3) Scheduling of games and practice times;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 C.F.R. § 106.41.

A policy interpretation issued by HEW's Office for Civil Rights in 1979 and subsequently used by DOE provides guidance to funding recipients regarding how to comply with the requirement in § 106.41(c) that they provide "equal athletic opportunity for members of both sexes." See generally Title IX of the Education Amendments of 1972, A Policy Interpretation, Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11,

1979)(hereinafter "Policy Interpretation").[7]  Like the

regulations, the policy interpretation is accorded substantial

deference by courts.  See Cohen v. Brown University, 101 F. 3d

155, 173 (1st Cir. 1996).

　　C. Regulatory Violations

　　Reported cases involving a funding recipient's alleged

failure to provide "equal athletic opportunity to members of

both sexes," as required by 34 C.F.R. § 106.41(c), address two

distinct types of violations: failure to provide a "selection of

sports and levels of competition" that "effectively

accommodates[s] the interests and abilities of members of both

sexes," as required by subsection (1); and failure to provide

equal treatment to members of both sexes, as required by

subsections (2) through (10).

　　To effectively accommodate athletes of both sexes, a school

must provide comparable participation opportunities and

competitive opportunities to male and female students.  See

McCormick Ex. Rel. v. Sch. Dist. Of Mamaroneck, 370 F. 3d 275,

301 (2d. Cir. 2004)(hereinafter "McCormick").  See also Policy

Interpretation at 71,417 ("The regulation requires institutions

---

[7] "The Policy Interpretation is divided into three sections: (1) compliance in financial assistance (scholarships) based on athletic ability; (2) equivalence in other athletic benefits and opportunities (equal treatment claims) and (3) effective accommodation of student interest and abilities (accommodation claims)."  Parker v. Franklin Cty. Cty. Sch. Corp., 667 F. 3d 910, 9218 (7th Cir 2012)(citing 44 Fed. Reg. at 71,414).

to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes."). Pursuant to the policy interpretation, "participation opportunities" must be provided to male and female students in numbers substantially proportionate to their respective enrollments, and "competitive schedules and opportunities" must be equivalent for boys' and girls' teams. See Biedinger v. Quinnipiac, 691 F. 3d 85, 93 (2d Cir. 2012). The "governing principle" for evaluating accommodation claims is that "the athletic interests and abilities of male and female students must be equally effectively accommodated." 44 Fed. Reg. at 71,414.

The regulation's requirement of equal treatment is implicated when a significant disparity exists in a school's treatment of members of both sexes. See Valerie McMurtrie Bonnette, Title IX and Interscholastic Athletics: How It All Works – In Plain English 10 (2012). "A disparity is a difference, on the basis of sex, in benefits or services, that has a *negative impact* on athletes of one sex when compared with benefits or services available to athletes of the other sex. A disparity does not mean that benefits and services are merely different." Office of Civil Rights, Department of Education, Title IX Athletics Investigator's Manual 10 (1990). "A

17

'*significant'* disparity refers to a single disparity that is so substantial as to deny equal opportunity in athletics to students of one sex." Id.

Compliance with the requirement of equal treatment depends on an overall comparison of male and female athletic programs. However, the Second Circuit has recognized that, under the policy interpretation, a significant disparity in a single program component "can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school." McCormick, 370 F. 3d at 293.

The "governing principle" for equal treatment claims is that "male and female athletes should receive equivalent treatment, benefits, and opportunities." Policy Interpretation, 44 Fed. Reg. at 71, 414. A disparity in one program component negatively impacting members of one sex "can be offset by a comparable advantage to that sex in a different area as long as the overall effect of any differences is negligible." McCormick, 370 F. 3d at 294; Policy Interpretation, 44 Fed. Reg. at 71,415. If equal treatment is not provided, "a finding of compliance may still be justified if the differences are the

result of nondiscriminatory factors."  See McCormick, 370 F. 3d at 298.[8]

   D. Private Right of Action

   In Cannon v. University of Chicago, the Supreme Court decided that Congress did not intend to limit the enforcement scheme established by Title IX to the one expressly provided by the statute's text – remedial action by the federal agency overseeing compliance with the regulations, which can result in a decision by the agency to cut off aid.  After examining the legislative history of Title IX, the Court concluded that Congress intended to supplement the administrative means of enforcement with a right of action enabling individuals to sue funding recipients in federal district court.  Like agency action to enforce the regulations, this implied private right of action serves Congress's main purposes in enacting Title IX: to ensure federal funds are not used to support programs in which individuals are subjected to discrimination on the basis of sex and to provide individuals with effective protection against sex discrimination.  See 441 U.S. 677 (1979).

   Since Cannon, the Supreme Court and other courts have been called on to define the scope of the implied private right of action and the scope of available remedies.  The resulting body

_____

[8] The policy interpretation provides a list of nondiscriminatory factors that can justify unequal treatment.  See Policy Interpretation, 44 Fed. Reg. at 71,415-16.

of case law, viewed in light of ongoing developments in antidiscrimination law generally, provides the following guidance:

First, the implied private right of action under Title IX mirrors the implied right of action under Title VI. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI ... and passed Title IX with the explicit understanding that it would be interpreted as Title VI was."); Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (explaining that Congress intended to create comparable remedies under Titles VI and IX). In Alexander, the Supreme Court established that, because Title VI's text prohibits only intentional discrimination, its private right of action encompasses claims based on disparate treatment, which require intentional discrimination, but not claims based on disparate impact, which have no such requirement. See id.[9] In light of

---

[9] The Supreme Court has explained the distinction between disparate-treatment and disparate-impact claims: "[D]isparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic]." Teamsters v. U.S., 431 U.S. 324, 335 n.15 (1977). See also Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993)(discussing disparate-treatment claims in the context of the Age Discrimination in Employment Act of 1967). Liability in a disparate-treatment case "depends on whether the protected trait . . . actually motivated the employer's decision." Id. at 610. By contrast, disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Teamsters, 431 U.S. at 335-336, 335 n.15. Under a disparate-impact theory of discrimination, "a facially neutral employment policy may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a "disp[arate-treatment" case.

_Alexander_, the private right of action under Title IX does not
encompass disparate-impact claims. _Weser v. Glen_, 190 F. Supp.
2d 384, 395 (E.D.N.Y. 2002), aff'd, 41 Fed. Appx. 521 (2d Cir.
2002) ("Because Title IX is derived from Title VI, _Alexander v._
_Sandoval_ implies that no such private right of action exists
under Title IX as well.").[10]  The private right of action to
enforce Title IX therefore differs from the express private
right of action provided by Title VII, which enables an
individual suing for employment discrimination to present claims
alleging disparate treatment, disparate impact, or both. See _Yu_
_v. Vassar Coll._, 97 F. Supp.3d 448, 461, 461 n.6 (S.D.N.Y.
2015)(citing _Weser_).

   _Second_, the scope of Title IX's private right of action is
narrower than Title VII's in another important respect.  Under
Title VII, an individual has a right to sue for a single
instance of discrimination in violation of the statute's

---

_Wards Cove Packing Co. v. Atonio_, 490 U.S. 642, 645-46 (1989), superseded by
statute on other grounds, Civil Rights Act of 1991, § 105, 105 Stat. 1074-
1075, 42 U.S.C. § 2000e-2(k)(1994 ed.); _Raytheon Co. v. Hernandez_, 540 U.S.
44, 52-53 (2003).

[10] See also _Xiaolu Peter Yu v. Vassar College_, 97 F. Supp. 3d 448, 461
(S.D.N.Y. 2015)("it does not appear that a private right of action for
disparate impact is cognizable under Title IX"); _Barrett v. W. Chester Univ._
_of Penn. of State Sys. of Higher Educ._, No. CIV.A. 03-CV-4978, 2003 WL
22803477, at *11 (E.D. Pa. Nov. 12, 2003) (rejecting plaintiffs' attempt to
enforce disparate impact regulations under § 902 of Title IX); _Nat'l_
_Wrestling Coaches Ass'n v. Dep't of Educ._, 366 F. 3d 930, 946 (D.C. Cir.
2004) (distinguishing Title IX disparate-treatment claims from disparate-
impact claims), abrogated on other grounds by _Perry Capital LLC v. Mnuchin_,
848 F. 3d 1072, 1101 (D.C. Cir. 2017); _E.L. ex rel. Bachman v. Penn Harris_
_Madison Sch. Sys._, No. 3:05-CV-717-RM, 2006 WL 2512077, at *1 (N.D. Ind. Aug.
28, 2006) (rejecting Title IX disparate-impact claim).

outright prohibition of employment discrimination limited only
by the requirement that the discrimination result in some harm.
See Muldrow v. City of St. Louis, 601 U.S. 346 (2024).  Under
Title IX, in contrast, an individual is not entitled to sue for
every discriminatory act by a funding recipient.  Instead, the
implied right of action enables an individual to challenge a
practice by a funding recipient that violates the statute's
implementing regulations and therefore could provide the basis
for administrative enforcement action.  See Davis Next Friend
LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 652
(1999).  To rise to the level of discrimination that can be
addressed through a private action, moreover, the effect of the
practice must be "serious enough to have the systemic effect of
denying the victim equal access to an educational program or
activity."  Id.  To adequately allege a "systemic effect," a
plaintiff must identify a "concrete, negative effect on either
the ability to receive an education or the enjoyment of equal
access to educational programs or opportunities."  Hawkins v.
Sarasota County Sch. Bd., 322 F. 3d 1279, 1289 (11th Cir. 2003).
A single instance of interference with a student's access is
unlikely to rise to the level of a "systemic effect."  Davis,
526 U.S. at 652-53.

Courts typically conceive of a "systemic effect" in terms
of an individual plaintiff's educational experience.  See

<u>Pahssen v. Merrill Comm. Sch. Dist.</u>, 668 F. 3d 356, 363 (6th Cir. 2012) (When assessing whether the conduct had a systemic effect, "[i]ncidents involving third-party victims lack relevance unless the plaintiff can show that the incidents deprived her of such access."). However, as the defendants correctly argue, "a recipient's provision of equal athletic opportunity on the basis of sex [is evaluated] at a program-wide level, rather than an individual level." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474, 33,817 (Apr. 29, 2024). Accordingly, in the context of athletics, the systemic effect required to support a Title IX claim must be assessed on a program- wide basis. <u>See</u> Policy Interpretation, 44 Fed. Reg. at 71,418 (opportunities available to "men's and women's <u>teams</u>" must be proportionally similar "on a <u>program-wide</u> basis." (emphases added)).

VI.

<u>Analysis</u>

   A.  <u>Plaintiffs' Disparate-Treatment Claim</u>

   Consistent with the foregoing summary of the applicable law, the main issue presented here is whether the allegations of the Amended Complaint, properly construed, are sufficient to support a claim for disparate treatment on the basis of sex in violation of Title IX. To meet their pleading burden, the

plaintiffs must allege facts showing that (1) they were excluded from, denied the benefits of, or otherwise subjected to discrimination under the defendants' educational programs; and (2) the defendants' actions were motivated at least in part by the plaintiffs' status as females.  See Tolbert v. Queens Coll., 242 F. 3d 58, 69 (2d Cir. 2001); see also Doe, 831 F. 3d at 53-54 (standard for judging sufficiency of complaint alleging discrimination under Title IX).

The plaintiffs claim that, in adhering to the CIAC policy when Yearwood and Miller competed in girls' track, the defendants failed to provide female students with "levels of competition [that] effectively accommodate[d] [their] interests and abilities," 34 C.F.R. § 106.41(c)(1), and also failed to provide them with equal treatment and benefits.  34 C.F.R. § 106.41(c)(2)-(10).[11]

In support of this claim, the plaintiffs allege that, during the period 2017-2019, the defendants offered sex-separated teams for track-and-field, as permitted by the regulations, to provide female athletes with opportunities for

---

[11] Plaintiffs do not identify a particular subsection within 34 C.F.R. § 106.41(c)(2)-(10) that the defendants allegedly violated.  Rather, they argue broadly that "Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate **equal terms**.  The 'equal treatment' to which girls and women are entitled includes equal 'opportunities to engage in . . . post-season competition,' equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are 'discriminatory in . . . effect' or that have the effect of denying 'equality of athletic opportunity.'" ECF 201 ¶ 46 (quoting Policy Interpretation at 71,416-17).

24

fair competition.  Yet, due to the defendants' adherence to the CIAC policy, the plaintiffs were required to compete against biological males who had an unfair competitive advantage, resulting in the plaintiffs' displacement from podium positions and advanced levels of competition.

The crux of the plaintiffs' position is that Title IX's implementing regulations not only permit funding recipients to provide sex-separated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), but "require[] sex-separation where male participation in events results in any exclusion or denial to female athletes."  ECF 154 at 20.  Stated differently, they contend that when, as a result of biological males' inherent physiological advantages, male participation threatens to displace female athletes from postseason races or championship podiums, a funding recipient must provide female athletes with sex-separated sports to fulfill its obligation to provide them with equal athletic opportunity.

The defendants argue that the plaintiffs' allegations are insufficient to state a claim for relief because they fail to show a denial of equal athletic opportunities on a program-wide level and any unequal treatment arising from their adherence to the CIAC policy was justified by nondiscriminatory reasons.

The Supreme Court has formulated a three-step burden-shifting framework for testing the legal sufficiency of discrimination claims.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  At step one of the McDonnell Douglas framework, the plaintiff has the initial burden of alleging facts needed for a prima facie case, which is met by alleging facts showing that the defendant subjected the plaintiff to adverse action sufficient to support a claim in circumstances permitting an inference that the defendant's action was motivated at least in part by unlawful discrimination.  At step two, the defendant has the burden of articulating a legitimate nondiscriminatory reason for the challenged action.  At step three, the plaintiff has an opportunity to show that the defendant's proffered justification is a pretext for unlawful discrimination, meaning the explanation given by the defendant is false or, at a minimum, incomplete.  Such a showing can lend support for an inference that the defendant unlawfully discriminated, but the defendant's explanation need not be pretextual for a discrimination claim to survive.  Instead, a plaintiff can prevail if such an inference is adequately supported by the record as a whole.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

The McDonnell Douglas framework was designed to assist courts in evaluating evidence in discrimination cases when

ruling on motions for judgment as a matter of law at trial or following pretrial discovery, and it does not establish pleading requirements to govern motions to dismiss.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (under McDonnell Douglas, prima facie case is an evidentiary standard, not a pleading requirement).  Presumably for this reason, none of the briefs filed by the parties mentions it.  But I find the McDonnell Douglas framework helpful in analyzing the parties' arguments concerning the legal sufficiency of the plaintiffs' allegations.  Accordingly, the analysis below follows the familiar three-step burden shifting approach.

1. Step One: Prima Facie Case

At step one of the McDonnell Douglas analysis, two questions are presented: (1) whether the plaintiffs plausibly allege that the defendants' adherence to the CIAC policy denied them effective accommodation or equal treatment in violation of 34 C.F.R. § 106.41(c) in a manner that had the effect of denying equal athletic opportunity on a program-wide level; and, if so, (2) whether the defendants nonetheless complied with the regulations because their adherence to the policy was supported by sufficient nondiscriminatory reasons.

a. Effective Accommodation

As discussed above, effective accommodation claims are assessed in light of participation opportunities and competitive

27

opportunities available to members of both sexes.  Plaintiffs
have not plausibly alleged that the defendants' adherence to the
CIAC policy affected female students' participation
opportunities.  Participation opportunities include being listed
on a team roster, participating regularly in team activities,
and receiving the same institutionally sponsored support (like
coaching and equipment) as other athletes.  See Policy
Interpretation, 44 Fed. Reg. at 71,415.  Plaintiffs do not claim
that the policy operated to deprive them of opportunities to be
team members, practice, or receive material institutional
support.  Therefore, they have not plausibly alleged a violation
of 34 C.F.R. § 106.41(c)(1) based on participation
opportunities.[12]

However, the plaintiffs plausibly allege that the
defendants' failure to provide them with sex-separated
competition deprived them of high-quality competitive
opportunities that "equally reflect[ed their] abilities."
Policy Interpretation, 44 Fed. Reg. at 71,417-18; see also
Letter from Norma V. Cantú, Assistant Sec'y for Civ. Rts., OCR,
U.S. Dep't of Educ., to Colleagues, at 4 (Jan. 16, 1996) (the
"quality of competition provided" informs the evaluation of

---

[12] Plaintiffs correctly note that participation opportunities do not count
unless they are "real, not illusory."  ECF 218 at 30 (quoting Biediger v.
Quinnipiac Univ., 691 F. 3d 85, 93 (2d Cir. 2012).  However, they advance no
argument that their participation opportunities, as construed under the
policy interpretation, were illusory.

competitive opportunities).  The Amended Complaint alleges that,
had Yearwood and Miller been barred from girls' competition,
female athletes would have secured each championship and
qualifying result Yearwood and Miller achieved over their three
years of competition in girls' track.  Therefore, the policy's
enforcement, in effect, decreased the number of competitive
opportunities available to female athletes.  And, as the Second
Circuit noted in McCormick, "the inability to compete in
[postseason] championship games falls under the 'levels of
competition' portion of factor one of the regulations."  370 F.
3d at 301.

     b. Equal Treatment

     The regulations and case law do not provide clear guidance
regarding when a disparity in a single program component is
sufficiently substantial to support an equal treatment claim.
But one long-used common-sense metric is the percentage of
athletes and number of teams affected by a disparity.  See
Bonnette at 10 ("The higher a percentage of athletes affected by
any disparity, the more serious the problem.  A problem
affecting one team is not as serious as a problem affecting two
teams, which is not as serious as a problem affecting all teams
for one sex.").

     In McCormick, the plaintiff brought a claim based on a
disparity in the "[s]cheduling of games and practice time,"  34

C.F.R. § 106.41(c)(3), stemming from her school's decision to schedule girls' soccer in the spring, rather than in the fall like the boys' team.  The plaintiff alleged that the school's out-of-season scheduling of girls' soccer deprived her team of the opportunity to qualify for a place in playoffs conducted in the fall.  The opinion in McCormick does not disclose how many schools scheduled girls' soccer in the spring but it is reasonable to infer from the opinion that most schools did not. The Court concluded that the scheduling disparity was sufficiently substantial to support an equal treatment claim.

The treatment disparity at issue here might well have negatively impacted more girls and teams than did the disparity in McCormick.  Accepting the plaintiffs' allegations as true, the CIAC policy affected the fairness of every race in which Yearwood and Miller participated and thus impacted every biological girl and every team participating in those events. As in McCormick, moreover, the disparity's alleged effects include lost opportunities to participate in postseason competition.  Accordingly, under McCormick, the allegations of the Amended Complaint are sufficient to support an equal treatment claim.[13]

---

[13] Unlike in McCormick, the plaintiffs do not identify a particular subsection within 34 C.F.R. § 106.41(c)(2)-(10) that the defendants' conduct allegedly violated.  However, the regulations state that subsections (2)-(10) comprise a non-exhaustive list of factors relevant to the equal opportunity inquiry. 34 C.F.R. § 106.41(c).

c. Systemic Effect

Plaintiffs do not explicitly allege or argue that the defendants' adherence to the CIAC policy had the systemic effect of denying them equal athletic opportunity on a program-wide level.  However, on a Rule 12(b)(6) motion to dismiss, the court has a responsibility to consider whether the allegations are sufficient to support a claim under applicable law.  Crediting the plaintiffs' allegations, it is reasonable to expect that they may be able to prove the requisite systemic effect, especially in light of McCormick, which controls here.

d. Defendants' Justification

As mentioned above, even when a disparity in treatment is significant for purposes of Title IX, "a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors."  McCormick, 370 F. 3d at 298.  The defendants submit that the alleged unequal treatment of the plaintiffs was justified by the need to avoid excluding Yearwood and Miller based on transgender status.  In support of their position, they argue that the term "sex" in Title IX, properly interpreted, encompasses gender identity and thus protects transgender girls as well as biological girls.  Plaintiffs contend that the term has a plain meaning, one that refers solely to immutable biological characteristics relating to reproduction.

Under recent Supreme Court precedent, when a court is presented with a dispute about the meaning of a statutory term, the judicial task is to determine the ordinary public meaning of the term when the statute was enacted.  See Wis. Cent. Ltd. v. U.S., 585 U.S. 274, 277 (2018) (quoting Perrin v. U.S., 444 U.S. 37, 42 (1979)) ("our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute'"); Moses v. N.Y. Times Co., 79 F. 4th 235, 247, 247 n.5 (2d Cir. 2023).  Ordinary public meaning is what a member of the public, familiar with the relevant context, would reasonably understand the statutory term to mean.  For this reason, ordinary public meaning is like an empirical fact.  However, the ordinary public meaning of a term in a statute typically is determined as a matter of law.

A strong case can be made that, in 1972, the ordinary meaning of the term "sex," when used to refer to a characteristic of an individual,[14] meant the property of being male or female, derived from the biological division of organisms into either male or female.  Contemporary dictionaries defined  "sex" as: "The property or quality by which organisms are classified according to their reproductive functions"; "Either of the two divisions, male or female, into which

---

[14] This is the manner in which the term "sex" is used in Title IX.

persons, animals, or plants are divided, with reference to their reproductive functions"; and "Either the male or female division of a species, [especially] as differentiated with reference to the reproductive functions."  See Adams by and through Kasper v. Sch. Bd. Of St. Johns County, 57 F. 4th 791, 812-13 (11th Cir. 2022)(en banc)(consulting nine contemporary dictionaries for definitions of the term "sex").[15]

Title IX's text uses the term "sex" in a manner consistent with these definitions.  The statute permits "separate living facilities for the different sexes," 20 U.S.C. § 1686, which reflects a binary classification based on biological differences.  In addition, it provided a grace period for educational institutions that had "begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes." 20 U.S.C. § 1681(a)(2).

Title IX's implementing regulations, promulgated within three years of the statute's enactment, interpret the term "sex" in the statute as denoting a biological binary.  For instance, they allow schools to provide separate locker rooms and showers as long as facilities "for students of one sex" are equivalent to facilities "for students of the other sex," they require

---

[15] Eight of the nine dictionaries collected in Adams define "sex" with regard to reproductive functions.  The other refers vaguely to "male" and "female."

schools to "provide equal athletic opportunity for members of
both sexes," and they allow schools to "sponsor separate teams
for members of each sex."  Id. §§ 106.33, 106.41(b) (emphases
added).  Indeed, the regulations recognize that sex-separated
teams are justified by overriding interests in safety and fair
competition, which are grounded in a biological binary.

And, until recently, DOE construed the term "sex" in the
statute and regulations to mean biological sex.  See
Nondiscrimination on the Basis of Sex in Education Programs or
Activities Receiving Federal Financial Assistance, 85 Fed. Reg.
30,026, 30,178 (May 19, 2020)("Title IX and its implementing
regulations include provisions that presuppose sex as a binary
classification, and provisions in the Department's current
regulations . . . reflect this presupposition.").  See State of
Tenn. v. Dept. of Educ., 104 F. 4th 577, 584-86 (6th Cir.
2024)(recounting history of agency regulations and
interpretations).

In support of a broader conception of the term "sex" in
Title IX, the defendants rely on the Supreme Court's
determination that an employer who fires an individual merely
for being gay or transgender violates Title VII.  See Bostock v.
Clayton County, 590 U.S. 644, 649-52 (2020).  In one of the
three cases that were before the Court in Bostock, an employer
fired a longtime employee soon after the employee publicly

34

transitioned from male to female.  See EEOC v. R.G. & G.R.
Harris Funeral Homes, Inc., 884 F. 3d 560 (8th Cir. 2018).  The
employer admitted that it fired the employee to avoid disruption
of its business.  The Court assumed the term "sex" in Title VII
refers "only to biological distinctions between male and
female."  Bostock, 590 U.S. at 655.  Even so, it went on to hold
that the firing was "because of sex" in violation of Title VII.
The Court reasoned that an employer who discriminates against
transgender employees "necessarily and intentionally applies
sex-based rules," which constitutes discrimination "because of
sex."

In Zarda v. Altitude Express, Inc., 883 F. 3d 100 (2d Cir.
2018), which was also before the Court in Bostock, a Second
Circuit en banc panel held that sexual orientation
discrimination is motivated at least in part by sex and is,
therefore, a subset of sex discrimination prohibited by Title
VII.  Id. at 112.  The Court relied on the "sex-dependent
nature" of sexual orientation discrimination and also applied a
but-for test of causation to conclude that sexual orientation
discrimination is discrimination "because of sex."  Id. at 115-
19.  Judges Lynch and Livingston dissented, principally on the
ground that, in 1964, when Title VII was enacted, the ordinary
meaning of sex discrimination did not include discrimination
based on sexual orientation.  Id. at 137-67 (Lynch, J.,

dissenting) and 167-69 (Livingston, J. dissenting).  The Supreme
Court affirmed.[16]

    In view of the majority opinions in Bostock and Zarda, and
pending further clarification by the Supreme Court or the Second
Circuit, I assume that discrimination on the basis of
transgender status does constitute a subset of sex
discrimination under Title IX.  See B.P.J. by Jackson v. West
Virginia State Bd. Of Education, 98 F. 4th 542 (4th Cir.
2024)(excluding eighth-grade transgender girl from playing on
girls' cross country and track-and-field teams violated Title
IX); A.C. by M.C. v. Met. Sch. Dist. Of Martinsville, 75 F. 4th
760 (7th Cir. 2023)(school bathroom policy violated Title IX);
Doe v. Hanover County School Bd., No. 3:24cv493, 2024 WL 3850810
(E.D. Va. Aug. 16, 2024)(granting preliminary injunction
requiring middle school to permit 11 year-old transgender girl
to try out for and play on girls' tennis team); see also Burgess
v. New School University, No. 23-cv-4944, 2024 WL 4149240, at *5
n.3 (S.D.N.Y. Sept. 11, 2024)(Koeltl, J.)(assuming in light of
Bostock that Title IX protects individuals against
discrimination on the basis of gender identity); but see Adams,

---

[16] DOE relied on Bostock when it recently published documents defining
discrimination "on the basis of sex" in Title IX to "include discrimination
on the basis of sex stereotypes, sex characteristics, pregnancy or related
conditions, sexual orientation, and gender identity."  89 Fed. Reg. 33,886
(2024).  At the request of twenty states, DOE has been enjoined from
"effectuat[ing] its new reading of Title IX" without notice-and-comment
rulemaking."  See State of Tenn., 191 F. 4th at 611, 614.

57 F. 4th at 800 (Title IX allows schools to separate bathrooms by biological sex).[17]

Accordingly, this case presents a direct conflict between two interests protected by Title IX: the interest in providing fair competition for biological females, which has long been recognized as a significant governmental interest under Title IX, and the interest in providing transgender girls with opportunities to participate in girls' sports, which is now protected by a Connecticut state statute.  See CONN. GEN. STAT. § 10-15c (2023)(each child in public school shall have "an equal opportunity to participate in the activities, programs and course of study . . . without discrimination on account of . . . gender identity or expression").[18]

---

[17] In A.C. by M.C., Judge Easterbrook expressed the view that, even after Bostock, the term "sex" in Title IX is properly interpreted to mean only "biological sex (encoded in a person's genes) . . . given that word's ordinary usage when the statute was enacted."  75 F. 4th at 775 (2023) (Easterbrook, J., concurring).  I agree that this interpretation of the term is the one that best reflects the term's ordinary public meaning in 1972. But see Mitchell N. Berman and Guha Krishnamurthi, Bostock was Bogus: Textualism, Pluralism, And Title VII, 97 NOTRE DAME L. REV. 67, 117, 117 n.225 (2021) (arguing that, at the time of Title IX's enactment, like today, the word "sex" was widely used to mean sex or gender, or both sex and gender). As the opinion in Bostock demonstrates, however, the ordinary public meaning of the term "sex" in 1972 is not dispositive.

[18] Defendants argue in passing that interpreting "sex" in Title IX to denote a biological binary would improperly preempt Connecticut laws and policies that recognize transgender girls as girls.  See ECF 207 at 14-15.  Whether a federal statute preempts state law, including a state statute, "is basically [a question] of congressional intent.  Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law."  Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 30 (1996) (citing U.S. Const., Art. VI, cl. 2).  To discern Congress's intent, a court examines the statutory language, as well as the federal statute's structure and purpose.  See id. at 31.  Even when a

There is little guidance to be found in Title IX's existing regulations regarding how a court should balance these interests.  But several courts have addressed student-athletes' conflicting interests in fair competition and athletic inclusion in cases under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").  The decisions in these cases are instructive and show that the issue raised here cannot be resolved at the pleading stage.[19]

In the ADA context, courts have concluded that "[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties."  A.H. by Holzmueller v. Ill. High Sch. Ass'n, 881 F.

---

federal law does not expressly preempt state law, it may do so implicitly if "there exists an irreconcilable conflict between the federal and state regulatory schemes," Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982), or federal regulations occupy the field in a manner "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).  The implicit argument here is that interpreting "sex" under Title IX to refer to a biological binary would create an "impossibility of dual compliance" with Title IX and state laws recognizing transgender girls as girls.  See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143 (1963).  Title IX's regulatory scheme expressly provides that funding recipients' "obligation to comply with Title IX [] is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX[]."  34 C.F.R. § 106.6.  Therefore, if the defendants were to confront a situation in which they could not comply with both Title IX and state law, Title IX would preempt state law.

[19] DOE has disclosed an intention to apply a presumption favoring transgender inclusion in athletic programs while allowing for exceptions based on the interests in safety and fair competition.  Under this approach, a transgender girl could be excluded from competing in girls' track only when necessary to safeguard fair competition, and a school would have the burden of justifying the exclusion.  DOE has been enjoined from implementing this new approach unless it first engages in notice-and-comment rulemaking.  See State of Tenn., 104 F. 4th at 613.

3d 587, 594 (7th Cir. 2018) (quoting Oconomowoc Residential
Programs v. City of Milwaukee, 300 F. 3d 775, 784 (7th Cir.
2002)).  The relevant needs may be competitive, administrative,
financial, or safety-related.  See id. (proper to consider
whether requested accommodation "imposes significant financial
or administrative costs, or if it fundamentally alters the
nature of the program or service");[20] Badgett ex rel. Badgett v.
Ala. High Sch. Athletic Ass'n, No. 2:07-CV-00572-KOB, 2007 WL
2461928, at *4 (N.D. Ala. May 3, 2007) ("In deciding what is
reasonable in the context of a high school athletic program,
considering both competitive and safety concerns is
appropriate.").

Courts have also weighed the emotional impact on individual
athletes of exclusion or differential treatment and the public's
interest in inclusive athletic participation.  See, e.g., id. at
*2 (wheelchair athlete felt that "competing alone ma[de] her an
'exhibition' rather than a part of her team"); McFadden v.
Grasmick, 485 F. Supp. 2d 642, 646-48 (D. Md. 2007) (in
evaluating motion for preliminary injunction allowing wheelchair
athlete to score team points, court considered racer's "real and
substantial" interest in being a member of the team not only "in

[20] The Supreme Court has explained that "a fundamental alteration occurs
either through a significant change that affects all athletes alike, but
alters an essential aspect of the game; or, through a peripheral change that
gives a disabled athlete an advantage over others."  See A.H., 300 F. 3d at
595 (citing PGA Tour, Inc. v. Martin, 532 U.S. 661, 663 (2001)).

spirit" and the public interest in disabled students' "full and meaningful participation" in athletics). In addition, some courts have consulted norms in national and international competitions. See, e.g., Badgett, 2007 WL 2461928, at *5 (citing norms for accommodating wheelchair athletes in national and international track-and field-competitions).

The ADA athletics accommodation cases are particularly instructive because they also arose in the context of track competition. The cases recognize that the "essential nature" of a race is "to run a designated distance in the shortest time possible." See A.H., 300 F. 3d at 595 (denying request to create para-ambulatory track division because "lowering particular eligibility or qualifying requirements established by an entity can be substantial modifications that are unreasonable"). They also recognize that track competition presents a zero-sum situation, in which only the three fastest runners win podium positions and only a limited number qualify for advanced levels of competition. See, e.g., Badgett, at *5 (in setting rules of competition, athletic associations "can and must be allowed to take [into account] such considerations [as "bumping an able-bodied athlete who qualified for the state championship or needing to create a third heat at the state championship"). The cases also recognize the need to consider fairness to track teams, not just individual competitors. See

McFadden, 485 F. Supp. 2d at 647 (noting that allowing wheelchair racers to score team points may grant teams with wheelchair racers "unwarranted advantage in the quest for team championships" against teams of all-able-bodied athletes).

In determining how much weight should be given to the interests of fair competition and inclusion implicated in a given case, courts have considered supporting evidence provided by the parties or the lack of such evidence.  See, e.g., K.L. v. Mo. State High Sch. Activities Ass'n, 178 F. Supp. 3d 792, 804, 806 (E.D. Miss. 2016)(denying preliminary injunction allowing disabled athlete using a racing chair to earn track team points where plaintiff's counsel and witnesses "failed to articulate and furnish evidentiary support for any such operating standards, qualifying standards and systems" that would facilitate the accommodation); Badgett, 2007 WL 2461928, at *5 ("[C]onclusions regarding [] legitimate safety issues should be respected if reasonable and supported by the available evidence.").

In sum, in the ADA athletics accommodations context, courts engage in a fact-specific analysis that balances the interests of the parties and the public.  This balancing requires an adequately developed record.  As no such record exists here, it would be premature to attempt to conduct such a balancing at this time.

Accordingly, I conclude that the plaintiffs' allegations
are sufficient to support a prima facie case of sex
discrimination under Title IX.

2. Step Two: CIAC Policy and OCR Guidance

In support of the motions to dismiss, the defendants submit
that they adhered to the CIAC policy because of OCR guidance
requiring funding recipients under Title IX to permit students
to participate in sex-separated programs consistent with their
gender identities.  Though not alleged in the Amended Complaint,
it is undisputed that in 2014, 2015 and 2016, OCR issued
guidance to funding recipients informing them that they must
allow transgender students to participate in activities
consistent with their gender identities.  The 2016 letter
specifically mentioned athletics.  Following the election in
2016, OCR withdrew this guidance but did not replace it with new
guidance.  That is where matters stood when Yearwood first
competed in 2017 and the plaintiffs first complained in 2018.

Defendants argue that even if the pre-2017 guidance was
incorrect and they were not legally required to permit Yearwood
and Miller to continue to compete, they surely had the legal
right to let them do so.  Plaintiffs do not contend, explicitly
or by fair implication, that the defendants' explanation fails
to satisfy their burden at step two of the McDonnell Douglas
framework.  But they do contend that Title IX did not permit the

42

defendants to allow Yearwood and Miller to continue competing.
It is therefore necessary to determine whether the defendants'
explanation qualifies as legitimate and nondiscriminatory.

A legitimate, nondiscriminatory reason is one that, "if
believed by the trier of fact, would support a finding that
unlawful discrimination was not the cause of the employment
action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507
(1993).  The proffered reason must be "clear and reasonably
specific" so as to afford the plaintiff "a full and fair
opportunity to demonstrate pretext." Texas Dep't of Cmty. Affs.
v. Burdine, 450 U.S. 248, 255, 258 (1981).  But a defendant need
not prove an "absence of discriminatory motive." Bd. of Trs. of
Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).  The
defendant's burden is not to eliminate any possibility of
discrimination, but merely to prove "that he based his
employment decision on a legitimate consideration." Furnco
Constr. Corp v. Waters, 438 U.S. 567, 570 (1978).

Implementing a facially neutral policy is, "by definition,
a legitimate, nondiscriminatory reason." Raytheon Co. v.
Hernandez, 540 U.S. 44, 51-52 (2003); see Terry v. Ashcroft, 336
F. 3d 128, 138 (2d Cir. 2003) (burden at step two met by
"showing a neutral reason for the complained of action").
Accordingly, the defendants may rely on CIAC's facially neutral
policy at step two.  See, e.g., Maresca v. City of N.Y., 514

Fed. Appx. 37, 39 (2d Cir. 2013) (enforcing fire department's
facially neutral zero-tolerance drug policy was legitimate
nondiscriminatory reason for terminating employee); U.S. v. City
of N.Y., 717 F. 3d 72, 89 (2d Cir. 2013) (results of written
entrance exam provided legitimate nondiscriminatory basis for
hiring firefighters because exam was facially neutral);
Kirkland v. Cablevision Sys., 760 F. 3d 223, 225 (2d Cir. 2014)
(facially neutral attendance policy was legitimate
nondiscriminatory reason for discharge).[21]

In addition, the defendants' reliance on the pre-2017 OCR
guidance can provide a legitimate nondiscriminatory reason for
their refusal to exclude Yearwood and Miller.  See, e.g.,
Johnson v. Transp. Agency, Santa Clara Cnty., Cal., 480 U.S.
616, 626 (1987) (employer's affirmative action plan provided
nondiscriminatory rationale for decision); Vivenzio v. City of

---

[21] The defendants can rely on the CIAC policy at step two notwithstanding its
disproportionate impact on female athletes.  In Raytheon, the Supreme Court
held that a neutral policy prohibiting rehiring any person fired due to
workplace misconduct was a "quintessential, legitimate, nondiscriminatory
reason under the ADA."  540 U.S. at 54-55.  It was error for the lower court
to conclude otherwise based on the policy's disproportionate impact on
recovering addicts and the company's lack of a business necessity defense.
See id. at 53-54.  See also U.S. v. City of N.Y., 717 F. 3d 72, 89 (2d Cir.
2013) (written entrance exam's disproportionate impact on Black applicants
was improper consideration at step two); Conkwright v. Westinghouse Elec.
Corp., 933 F. 2d 231, 233 (4th Cir. 1991) (facially neutral performance
rating system "must count as an articulation of a legitimate, non-
discriminatory reason" for selecting those subject to layoffs despite
disproportionate impact on older workers); Lopreato v. Select Specialty
Hosp. N. Ky., 640 Fed. Appx. 438, 443 (6th Cir. 2016) (that a challenged
"practice is not actually legitimate and nondiscriminatory because [it]
disproportionately impacts drug addicts, while perhaps plausible, would only
be relevant if [plaintiffs] had pursued a disparate impact theory").

Syracuse, 611 F. 3d 98, 104 (2d Cir. 2010)(affirmative action
plan in consent decree provided nondiscriminatory reason for
challenged action); Hayden v. Cnty. of Nassau, 180 F. 3d 42, 51
(2d Cir. 1999)(entrance exam developed to satisfy obligations
under consent decrees provided nondiscriminatory reason).

   3. Step Three: Pretext and Inference of Discrimination

      At step three of the McDonnell Douglas framework, the
initial issue is whether the facts alleged by the plaintiffs
could support a reasonable finding that the defendants'
explanation is a pretext for discrimination.  The plaintiffs do
not allege or argue that the defendants' explanation for
permitting Yearwood and Miller to continue to compete is false
or incomplete.  Accordingly, in assessing the legal sufficiency
of the allegations, I assume the defendants' explanation is not
pretextual.

      This leads to the ultimate issue: whether the facts alleged
in the Amended Complaint support a plausible claim that, in
adhering to the CIAC policy in 2017-19, the defendants
unlawfully discriminated against the plaintiffs on the basis of
sex.

      To support a claim of intentional discrimination, a
plaintiff must show that a defendant "selected or reaffirmed a
particular course of action at least in part 'because of,' not
merely 'in spite of,' its adverse effects upon an identifiable

45

group." <u>Personnel Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979).  To meet this burden, a plaintiff can present evidence showing that the defendant's conduct was motivated by animus. <u>See</u> <u>Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977).  There is no allegation or argument in this case that the defendants were motivated by animus toward biological girls.

However, the Second Circuit has noted that evidence of animus is not required in Title IX cases.  In <u>Doe v. Columbia</u>, a male student at Columbia University was accused of sexually assaulting a female student, which led to disciplinary proceedings conducted by the University.  After being found guilty, he sued under Title IX, claiming that University officials credited the accuser's account without considering his witnesses' accounts in order to appease female students and avoid negative press.  The district court dismissed the complaint on a Rule 12(b)(6) motion, concluding that the allegations were insufficient to support a claim under Title IX. The Second Circuit held that the allegations were sufficient to support a claim, stating in a footnote that the plaintiff was not required to prove that the University officials involved in the disciplinary process were motivated by animus or ingrained prejudice toward male students.  Rather, it would be sufficient to show that they were motivated by favoritism toward his female

accuser or a "desire to avoid practical disadvantages from unbiased action."  831 F. 3d at 58 n.11.

The Court's decision in <u>Bostock</u> provides further support for the conclusion that, to prevail on their claim, the plaintiffs do not have to prove the defendants were motivated by animus.  The employers in the three cases before the Court argued that intentional discrimination based on sexual orientation or transgender status does not constitute intentional discrimination based on sex, as a disparate-treatment claim requires.  The Court construed this argument to mean that the employers fired the plaintiffs for being gay or transgender but did not perceive themselves to be motivated by an intent to harm or discriminate on the basis of sex.  590 U.S. at 667.  The Court rejected the argument, stating that "nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination."  <u>Id.</u>

Accordingly, the issue here is whether the allegations support a plausible inference that the defendants responded to the plaintiffs' complaints the way they did "because of" the plaintiffs' sex.  In other words, but-for the plaintiffs' status as females, would the defendants have treated them more favorably?  Only minimal support for such an inference is

required at this stage.  See Doe, 831 F. 3d at 54; Littlejohn v. City of N.Y., 795 F. 3d 297, 311 (2d Cir. 2015).

   I conclude that the allegations provide at least minimal support for a plausible inference that the defendants would have responded more favorably if the complaining students had been male.  This conclusion is supported by the manner in which the defendants allegedly rebuffed the plaintiffs' complaints of unfair competition and attempted to stifle further complaints. As a result of the defendants' conduct, the plaintiffs reasonably perceived that the defendants regarded girls' sports as less worthy of consideration and support than boys' sports. In light of the history of discrimination against girls' high school sports in Connecticut, a reasonable official mindful of Title IX would take the plaintiffs' complaints seriously.  Yet the defendants apparently did not.  One possible explanation is that the plaintiffs' perception was accurate – the defendants did nothing to protect the plaintiffs' interest in fair competition because they regarded girls' sports as relatively unimportant compared to boys' sports, an attitude antithetical to the Title IX's nondiscrimination mandate.  Crediting the plaintiffs' allegations, it is plausible the defendants had such a mindset and acted accordingly.

B.  <u>Title IX's Requirement of Adequate Notice</u>

Under <u>Pennhurst</u>, "legislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions."  451 U.S. 1, 17 (1981).  Accordingly, to impose liability on funding recipients, Congress must "speak with a clear voice," providing them with notice of the legal obligations they undertake by accepting funding.  <u>See</u> <u>id.</u>

Title IX's express remedial scheme reflects this mandate. Indeed, under Title IX,

> [An] agency may not initiate enforcement proceedings
> until it "has advised the appropriate person or
> persons of the failure to comply with the requirement
> and has determined that compliance cannot be secured
> by voluntary means." [20 U.S.C. § 1682]  The
> administrative regulations implement that obligation,
> requiring resolution of compliance issues "by informal
> means whenever possible," 34 CFR § 100.7(d) (1997),
> and prohibiting commencement of enforcement
> proceedings until the agency has determined that
> voluntary compliance is unobtainable and "the
> recipient ... has been notified of its failure to
> comply and of the action to be taken to effect
> compliance," § 100.8(d); <u>see</u> § 100.8(c).

<u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 288 (1998).

The judicially implied private right of action under Title IX is no broader than the government's express authority to enforce the statute.  <u>See</u> <u>Nat. Collegiate Athletic Ass'n v.</u> <u>Smith</u>, 525 U.S. 459, 467 n.5 (1999) ("it would be anomalous to

assume that Congress intended the implied private right of
action to proscribe conduct that Government enforcement may not
check").  Because Title IX's express system of enforcement
requires notice to the recipient and an opportunity to come into
voluntary compliance, it would be "unsound" for a
judicially implied system of enforcement to require less.  See
Gebser, 524 U.S. at 289.  Accordingly, the "twin requirements"
of actual notice and opportunity-to-cure generally apply in
Title IX suits brought by private plaintiffs,  Liese v. Indian
River Cnty. Hosp. Dist., 701 F. 3d 334, 348 (11th Cir. 2012),
although not in cases alleging "intentional acts that clearly
violate Title IX," like retaliation for complaining about sex
discrimination.  Jackson v. Birmingham Bd. of Educ., 544 U.S.
167, 182 (2005).  See also Davis, 526 U.S. at 642 (the notice
"limitation on private damages actions is not a bar to liability
where a funding recipient intentionally violates the statute").

Courts have held that the notice requirement does not apply
in cases alleging a failure to effectively accommodate women's
interest in athletics, reasoning that decisions to create or
eliminate teams or add or decrease roster slots for male or
female athletes are official decisions; such decisions are
necessarily intentional; and funding recipients have affirmative
obligations to provide equal athletic opportunities and
continually assess and certify their compliance with Title IX.

See Mansourian v. Regents of Univ. of Cal., 602 F. 3d 957, 968
(2010)(citing Pederson v. La. State Univ., 213 F. 3d 858, 882
(2000)); but see Grandson v. Univ. of Minn., 272 F. 3d 568, 575
(8th Cir. 2001).

The reasoning in these cases does not precisely apply to
the defendants' refusal to exclude transgender girls from
competing in girls' track, the legality of which remains sharply
contested and which is a far different matter than adding or
dropping teams or roster sports.  At the pertinent time,
moreover, the defendants had the benefit of OCR's pre-2017
guidance prohibiting exclusion of transgender students.  The
defendants submit that, in light of this guidance, they did not
receive adequate notice that adhering to the CIAC policy would
"clearly violate Title IX."  Jackson, 544 U.S. at 182.

Assuming for present purposes that the requirements of
notice and opportunity-to-cure do apply, the allegations in the
Amended Complaint are sufficient to satisfy the plaintiffs'
pleading burden.  The plaintiffs allege that they and their
parents began informing CIAC of their concerns about the
transgender participation policy and its effect on their
athletic opportunities in February 2018.  See ECF 201 at ¶ 170.
They and others continued to prompt CIAC and the defendant
schools to take remedial action until March 2019.  Their efforts

51

having been for naught, they then filed a complaint with OCR in June 2019.  See id. at ¶¶ 171-72, 175.

The defendants could have consulted with OCR in response to the plaintiffs' complaints starting in 2018, but there is no indication any of them did so.  Perhaps they preferred not to because they had made a considered choice to adhere to CIAC's policy notwithstanding the plaintiffs' reasonable concerns about unfair competition and OCR's withdrawal of the pre-2017 guidance.  In other words, they may have deliberately refrained from consulting OCR about the plaintiffs' complaints because they assumed OCR would support the plaintiffs.  In that event, Title IX's notice and opportunity-to-cure requirements might not absolve them of liability.

Accordingly, I conclude that, if these requirements do apply, they do not compel dismissal of the action as a matter of law.

C.  The Claims Against the Home Schools

 Defendants move to dismiss the claims against the plaintiffs' home schools on the ground that, as there were no transgender girls participating on their girls' track teams, they did not deny the plaintiffs an opportunity to participate, treat them differently than male athletes, or facilitate enforcement of the transgender participation policy.

The home schools do not contest their obligation under Title IX to "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c).  They fulfill this duty, in part, by serving as dues-paying members of CIAC that abide by CIAC's policies, and by delegating to CIAC the administration of interscholastic athletic competitions.  Accordingly, as OCR noted in a 2020 enforcement letter, the home schools' "obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC."  Off. Of Civ. Rts., U.S. Dep't of Educ., Revised Letter of Impending Enforcement Action (Aug. 31, 2020).

Moreover, construing the plaintiffs' allegations favorably to them, their home schools' involvement in the policy's enforcement went beyond mere compliance.  Plaintiffs allege that the home schools decided not to act in response to numerous complaints regarding the policy's unfairness.  Canton High School officials allegedly instructed Chelsea Mitchell not to speak up about her objection to the policy and, if asked about the policy, to respond "no comment."  ECF 201 at § 144.

D.  Monetary Liability

 As mentioned at the outset, the plaintiffs have clarified that they seek only nominal damages.  Research reveals one reported case dealing with the question whether a claim for nominal damages is barred by Pennhurst.  See Tirrell v.

Edelblut, No. 24-cv-251-LM-TSM, 2024 WL 4132435, at *17 (D.N.H. Sept. 10, 2024). There, the district court concluded that such a claim is not barred because "the concerns animating the Supreme Court's Spending Cause jurisprudence are not implicated."

A claim for nominal damages does not implicate Congress's concern with regard to funding recipients' finances to the same degree as a claim for compensatory damages. In this case, however, that concern is still implicated to a significant degree, notwithstanding the plaintiffs' decision to forego a request for compensatory damages, because they still seek an award of attorneys' fees and costs, which could be substantial.

For reasons just discussed, I have concluded that Title IX's adequate notice requirement does not shield the defendants from liability as a matter of law. Consistent with that ruling, I conclude that the clear-notice requirement of Pennhurst does not necessarily preclude the plaintiffs from seeking to obtain monetary relief in the form of nominal damages, attorneys' fees and costs. The effect that should be given both requirements can be better assessed after the parties have had an opportunity to engage in discovery.

VII.

Accordingly, the motions to dismiss are hereby denied.

So ordered this 5th day of November 2024.

54

                                    /RNC/
                        _____
                            Robert N. Chatigny
                        United States District Judge